**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTOR SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO: 3:05 CV 1186** |
| | ) | |
| **EURO-PRO OPERATING, L.L.C.,** | ) | |
| **EURO-PRO MANAGEMENT COMPANY** | ) | |
| **CORP. and STANRO-EP CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT EURO-PRO MANAGEMENT SERVICES, INC.'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 Federal Rules of Civil Procedure, Defendant, Euro-Pro Management Services, Inc. ("Euro-Pro" or the "Company"), has filed a Motion for Summary Judgment on the claims raised in this suit by Victor Smith ("Smith" or "Plaintiff") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981.  Euro-Pro offers the following in support of that Motion:

### FACTS

Euro-Pro designs and sells a variety of small home appliances such as vacuum cleaners, steam cleaners, battery-charged sweepers and kitchen products.[1]  Euro-Pro opened its Auburn, Alabama facility in approximately 2002.[2]  At that Euro-Pro facility, there are two primary divisions, the Cleanability division and the Lifecycle division.[3] Terry Robertson was the Executive Vice-President of Engineering and Quality in charge of Euro-Pro's Auburn facility at

---

[1] Deposition of Ralph Hudnall, portions of which are attached hereto as Exhibit A, P. 11, L 20-P. 12, L 1.
[2] Hudnall Depo. P. 33, L 1-7.
[3] Victor Smith Depo. P. 31, L 6-11.

all times relevant to this lawsuit.[4]  Chad Reese was the Director of Operations at the facility

under Robertson, and Hudnall was the Lab Manager at all relevant times to this lawsuit.[5]

Plaintiff Victor Smith began working as a temporary employee for Euro-Pro on or around

December 1, 2003.[6]  Because Smith's employment was terminated on or around December 1,

2004, he was only employed with Euro-Pro for approximately one year.[7]  Smith initially worked

in the Cleanability division along with a couple of other temporary employees.[8]  Ralph Hudnall

was his supervisor at that time and throughout his employment.[9]  Shortly after Smith began

working at the Auburn facility, Euro-Pro made him a permanent employee and made him the

lead employee for the second shift, which Euro-Pro utilized for a brief period of time.[10]  Within a

few months, Euro-Pro no longer had a need for a second shift and the second shift was ended.[11]

At that point, Euro-Pro gave Smith the opportunity to become a Lab Technician in the

Lifecycle Testing division of the facility.[12]  Smith was excited about the opportunity and felt

that, based on his skill set and past experience, the job was a challenge that he wanted to take on

and understood as an opportunity to grow and advance in the Company.[13]  Robertson and

Hudnall discussed this new opportunity with Smith, and Robertson told him that his new

responsibility was to get the Lifecycle Testing System up and running.[14]  The Lifecycle Testing

System is Euro-Pro's way of evaluating how well a given product works over the course of its

lifetime, making sure that the consumer gets a fair value for the money when they buy the

---

[4] Declaration of Terry Robertson.
[5] Hudnall Depo. P. 15, L3-5, P. 47, L. 8-15; Plaintiff's Exhibit 2.
[6] Hudnall Depo. portions of which are attached hereto as Exhibit B, P. 27, L. 6-12.
[7] Smith Depo. P. 129, L. 5-P. 130, L. 2.
[8] Smith Depo. P. 31, L. 12-13.
[9] Smith Depo. P. 32, L. 16-19; P. 47, L. 8-15.
[10] Smith Depo. P. 36, L. 18-23-P. 38, L. 13; P. 67, L. 8-12.
[11] Smith Depo. P. 67, L. 8-12.
[12] Smith Depo. P. 67, L. 13-18.
[13] Smith Depo. P. 68, L. 3-14.
[14] Smith Depo. P. 71, L. 7-14.

product, making sure that the product fails in a safe manner, determining whether there are ways to improve the product and making sure that the product is reliable over the course of its life.[15] Smith was given a Position Description which established that his primary job responsibilities would be to monitor Lifecycle Testing, build new Lifecycle Testing fixtures and to troubleshoot problems with those fixtures.[16]  Robertson and/or Hudnall informed Smith in one of the initial meetings relating to the new position that they wanted him to take the Lifecycle Testing to the "next level" and Smith felt that he would be able to do so based on his skills and experience.[17] They also informed him that if he needed any help doing his job, he should rely primarily on Ralph, his supervisor.[18]  They, likewise, informed him that Chad Reese, Andras Simon and Brian McGhee, all of whom were engineers, would be available to assist him.[19]  Smith alleges that Simon was only available to him once or twice but that both of the other employees, plus Hudnall, were always available to him.[20]

It was clear to Smith that the Lifecycle Testing was important to Euro-Pro and that Robertson and Hudnall wanted him to succeed in his new role.[21]  As a part of his new job responsibilities, Smith's first major assignment was to design a Steam Cleaner Testing fixture. Smith began this project some time in May 2004.[22]  Smith had built five simple fixtures before he was asked to build the Steam Cleaner fixture, which was a more challenging fixture.[23]

---

[15] Hudnall Depo. P. 70, L. 18-P. 71, L. 15.
[16] Smith Depo. P. 69, L. 13-P. 70, L. 11;  Defendant's Exhibit 2 to Smith's Depo.
[17] Smith Depo. P. 73, L. 8-17.
[18] Smith Depo. P. 73, L. 18-22.
[19] Smith Depo. P. 73, L. 23-P. 76, L. 23; P. 183, L. 22-P. 186, L. 17.
[20] Smith Depo. P. 74, L. 15-P. 76, L. 23; P. 183, L. 22-P. 186, L. 17.
[21] Smith Depo. P. 75, L. 13-20.
[22] Smith Depo. P. 75, L. 3-5; P. 77, L. 7-12.
[23] Hudnall Depo. P. 81, L. 19-P. 82, L. 12.

When Smith first started that project, he had several meetings with Hudnall and Reese to get him started.[24]  Within the first week of the meetings, Reese, Hudnall and Smith came up with a schematic which set out the basics for the Steam Cleaner Lifecycle Testing fixture, including completion dates of various stages.[25]  The schematic lists the "Project Complete" date as July 28, 2006.[26]  Smith stated that he informed Hudnall that he could not complete the Steam Cleaner Lifecycle Testing fixture "alone" by that date and Hudnall responded that he should do the best he could and was told that engineering help was available.[27]  After the schematic was drawn, Smith had a series of meetings with Hudnall about moving forward with the project and about the basic setup of the Lifecycle Testing fixture.[28]

Smith encountered some significant problems in designing the fixture.[29]  Some of those problems were within his control and some of those were outside of his control.[30]  Smith acknowledged, for example, that the project required some parts that needed to be able to withstand a very hot temperature but he ordered parts that could not withstand those temperatures.[31]  In addition, the handles placed on the fixture were a problem because they were not as flexible as they needed to be.[32]

On or around August 27, 2004, Hudnall conducted an evaluation of Smith's performance.[33]  Smith agreed with Hudnall's assessment, including the areas in which he needed

---

[24] Smith Depo. P. 77, L. 13-16.
[25] Smith Depo. P. 77, L. 13; P. 79, L. 13; Defendant's Exhibit 3 to Smith's Depo.
[26] Defendant's Exhibit 3 to Smith's Depo.
[27] Smith Depo. P. 79, L. 13-P. 80, L. 20.
[28] Smith Depo. P. 83, L. 21-P. 84, L. 4.
[29] Smith Depo. P. 105, L. 16-19.
[30] Smith Depo. P. 105, L. 20-23.
[31] Smith Depo. P. 106. Smith alleges that he always consulted with Chad Reese before he ordered any such parts. Smith Depo. P. 106, L. 8-17.
[32] Smith Depo. P. 109, L. 3-9.  Smith blames the problem with the handles on Chad Reese's design although he acknowledges that he spent a significant amount of time dealing with the handle issue.  Smith Depo. P. 108, L. 15; P. 110, L. 20.
[33] Smith Depo. P. 104, 1-18.

improvement.[34]     Hudnall listed the following "Areas That Need Improvement" in that evaluation:

1.     Victor needs to accept the entire role for which he was hired.  He must accept that the role is constantly changing and growing.  These changes are expected to be accomplished without additional compensation.[35]

2.     There is a concern with accomplishing the routine tasks of the job.  An example is cleaning his work area before leaving for the day.  Personal areas should be cleaned before leaving for the day.[36]

3.     Victor needs to improve his initiative.  He needs to take it upon himself to correct problems seeing, either fixtures or products on tests.  Don't just report that a product has quit working, look to see if you can find the trouble.  In time, he will become the main analyst to determine life test failures.  This cannot happen if he does not start looking into the problems as they occur.[37]

In the "Comments" section of the evaluation, he stated that Smith is "in the midst of developing an automated fixture for Steam Cleaners."[38]  He also stated as follows:

Victor has to realize that the job is continually growing and changing.  This means new tasks and assignments will continue to be added to his workload.  Prioritizing these assignments, and meeting the established completion dates will be the main challenge.  …he will need to expand his review of failed and completed tests, to eventually become the first line of analysis of all products coming off tests.[39]

Smith did not complete the Steam Cleaner fixture by July 28, 2006.[40]  Hudnall counseled Smith on at least one occasion that the building of the Steam Cleaner Testing fixture was progressing too slowly and costing too much money.[41]  Smith understood that the fixture was of significant importance to the Company that it be completed as quickly as possible.[42]  Smith also

---

[34] Smith Depo. P. 104, L. 21-P. 105, L. 15.
[35] Defendant's Exhibit 6 to Smith Depo.
[36] Defendant's Exhibit 6 to Smith Depo.
[37] Defendant's Exhibit 6 to Smith Depo.
[38] Defendant's Exhibit 6 to Smith Depo.
[39] Defendant's Exhibit 6 to Smith's Depo. (Emphasis added).
[40] Smith Depo. P. 101, L. 4-8.
[41] Hudnall Depo. P. 102, L. 13-18.
[42] Smith Depo. P. 101, L. 22-P. 102, L. 3.

understood that the fixture needed to work and work well.[43]  Nevertheless, Hudnall testified that, even after the management team started to bring it to Smith's attention that it was taking too much time and costing too much money, "[i]t seemed like the project just drug on longer and longer."[44]

Euro-Pro also gave Smith numerous verbal reprimands/counseling relating to various other aspects of his performance:

1.  Euro-Pro management, after learning that he had been involved in a confrontation with a co-employee, counseled him to be more respectful to his co-workers.[45]

2.  Euro-Pro management, after learning that Smith had called a female employee from work during his working hours not relating to work, which was against Company policy, counseled Smith that he should not be making personal calls during working hours and should avoid any conduct toward a co-employee which might make them uncomfortable.[46]

3.  Euro-Pro management counseled Smith on multiple occasions that he was not keeping the work areas for which he was responsible as clean as was expected of all employees.[47]

4.  Euro-Pro management, after learning that Smith had discussed individual bonuses and raises with other employees, counseled him that he should not be discussing that subject matter with non-management employees.[48]

5.  Euro-Pro management, after learning that Smith was failing to maintain the supply inventory for the Cleanability group, on multiple occasions counseled Smith that he needed to keep it supplied so that the Company would not have to keep express ordering parts just to keep the testing going.[49]

6.  Euro-Pro management repeatedly counseled Smith that he needed to perform his duties at a higher level, including devising a maintenance system for all testing fixtures, completely reporting all maintenance activities, verifying the proper operation of all testing fixtures and buying the correct and appropriate number of parts (not being wasteful) for the Steam Cleaner Testing fixture.[50]

---

[43] Smith Depo. P. 102, L. 4-6.
[44] Hudnall Depo. P. 114, L. 8-10.
[45] Plaintiff's Exhibit 2 to Hudnall Depo.
[46] Plaintiff's Exhibit 2 to Hudnall Depo.
[47] Plaintiff's Exhibit 2 to Hudnall Depo.
[48] Plaintiff's Exhibit 2 to Hudnall Depo.
[49] Plaintiff's Exhibit 2 to Hudnall Depo.
[50] Plaintiff's Exhibit 2 to Hudnall Depo.

Smith took a two week vacation beginning Monday, November 22, 2004.[51]  Prior to leaving for vacation, the Steam Cleaner Testing fixture was still not fully operational.[52]  Hudnall informed Smith, that, before he left for vacation, Hudnall needed to know about any problems with the Steam Cleaner fixture and that he would need for Smith to be available to talk to him if any problems arose while Smith was out on vacation.[53]  Hudnall wanted to take the opportunity to go through and critique Smith's work on the fixture while Smith was on vacation, to see how well it was operating and to see if there were any ways in which he could help Smith improve the operation of the machine or learn how to improve on the next fixture that would be built.[54]

When Hudnall approached the machine to start it on Monday, November 22, 2004, Hudnall discovered that the wires were disconnected from the fixture itself.[55]  Hudnall was afraid to turn it on because he did not know why the wires were not connected and was concerned that if he tried to run the fixture it could possibly explode.[56]  Hudnall, therefore, called Smith at home and spoke with him.[57]  Smith informed Hudnall that he had had some issues with the Steam Cleaner fixture and that he had disconnected the wires.[58]  Smith acknowledged that he had not previously informed Euro-Pro that he had disconnected the wires.[59] When Hudnall asked Smith where the wires went, Smith responded that he would take care of it when he got back from vacation.[60]  Hudnall, however, indicated that that answer was not acceptable because Euro-Pro

---

[51] Smith Depo. P. 112, L. 14-16.
[52] Hudnall Depo. P. 116, L. 21.
[53] Smith Depo. P. 114, L. 23-P. 115, L. 3.
[54] Hudnall Depo. P. 115, L. 23-P. 116, L. 17.
[55] Hudnall Depo. P. 117, L. 21-P. 118, L. 4.
[56] Hudnall Depo. P. 118, L. 4-14.
[57] Hudnall Depo. P. 119, L. 11.
[58] Hudnall Depo. P. 119, L. 12-14.
[59] Smith Depo. P. 119, L. 16-18.
[60] Hudnall Depo. P. 120, L. 2-4.

needed to run the fixture during his vacation.[61]  Hudnall then informed Smith that he would try to figure it out but that, if he could not figure it out, he would have "to be able to talk to [Smith] so [Hudnall could] put this thing back into running order."[62]  Hudnall told Smith, "If I can't [get the fixture going], I'm going to call you back."[63]  Hudnall went back to the fixture but could not figure out where the wires went.[64]  Hudnall, therefore, called Smith's house again but Smith did not (or would not) answer the phone again.[65]  Hudnall called back twice on that Monday and another time the next day (Tuesday) and, after that, became frustrated and quit calling Smith's number.[66]

At that point, Hudnall went to Robertson explaining that the fixture was not working, that the wires were disconnected and that he could not get in touch with Smith.[67]  Hudnall subsequently asked Robertson how to proceed,  and Robertson instructed him to start over and try to rebuild it so that it would work.[68]  Hudnall was not ever able to make it work during Smith's vacation.[69]

Robertson made the decision to terminate Smith's employment based upon his poor performance, specifically including the cost of and problems with the Steam Cleaner Testing fixture.[70]  Robertson listed eight of the performance concerns upon which he based his decision in a typewritten memorandum form entitled "Victor Smith (General)."[71]  For Robertson, the "final straw" of Smith's poor performance was his insubordination and unacceptable handling of

---

[61] Hudnall Depo. P. 120, L. 4-7.
[62] Hudnall Depo. P. 120, L. 7-12.
[63] Hudnall Depo. P. 120, L 9-10; P. 178, L. 7-9.
[64] Hudnall Depo. P. 120, L. 14-16.
[65] Hudnall Depo. P. 120, L. 16-18.
[66] Hudnall Depo. P. 177, L. 22-P. 178, L. 21.
[67] Hudnall Depo. P. 120, L. 18-22.
[68] Hudnall Depo. P. 121, L. 6-7.
[69] Hudnall Depo. P. 121, L. 12-13.
[70] Robertson Decl. ¶4.
[71] Robertson Decl., Exhibit 1.

the situation when he left for vacation with the Steamer Cleaner Testing fixture not yet completed.[72]

Hudnall was not a part of the termination decision.[73]  Robertson did not inform Hudnall that he had even made the decision or that he would be terminating Smith's employment when he returned from vacation.[74]  In fact, Hudnall did not even become aware of the termination decision until after the December 1, 2004 termination meeting.[75]

Euro-Pro did not hire anyone to replace Smith.[76]  Euro-Pro has never hired a Lab Technician to take Smith's place.[77]  Euro-Pro hired Jeff Garrison, a white male, to be an Engineer for the Company after Smith's termination.[78]  Hudnall himself took on the responsibilities of Smith's job in addition to his own responsibilities, including rebuilding the Steam Cleaner Testing fixture from scratch, after Smith was terminated.[79]  Garrison spent approximately one-third of his time during a three month period assisting Hudnall in completing the Steam Cleaning testing fixture rebuild.[80]

Smith is not aware of Terry Robertson or Chad Reese ever making a racist statement to anyone.[81]  Smith is also not aware of Hudnall ever making a racist statement to anyone, other than in one incident in which he alleges that Hudnall recounted for him a skit from the Dave Chappelle Show.[82]  Smith alleges that Hudnall recounted that the actor in the skit was blind and African-American but he thought he was white and divorced his white wife when he learned he

---

[72] Robertson Decl. ¶ 7.
[73] Robertson Decl. ¶5.
[74] Robertson Decl. ¶5.
[75] Hudnall Depo. P. 124, L. 5-16.
[76] Hudnall Depo. P. 165, L. 23-P. 166, L. 2.
[77] Plaintiff's Exhibit 2 to Hudnall Depo.
[78] Hudnall Depo. P. 160, L. 14-P. 161, L. 11; P. 163, L. 6-10.
[79] Hudnall Depo. P. 164, L. 8-P. 168, L. 2.
[80] Hudnall Depo. P. 166, L. 19-P. 167, L. 10.
[81] Smith Depo. P. 59, L. 8-15.
[82] Smith Depo. P. 49, L. 20-P. 50, L. 6.

was African-American because she was a "nigger" lover.[83]   Smith acknowledged that Dave Chappelle used the word "nigger" in the skit itself and that Hudnall (allegedly) merely repeated the works used in the skit.[84]   Smith did not inform Hudnall that he was in any way offended by Hudnall's discussing the skit or allegedly using the offensive word and Smith did not tell Hudnall to stop saying it.[85]   Smith admitted that he and Hudnall had discussed the Dave Chappelle show "on occasion" at work and Smith acknowledged that he found some of Dave Chappelle's material to be funny.[86] Smith likewise did not complain to anyone at Euro-Pro Management about any use of racist language by Hudnall or anybody else at any time.[87]   Smith also acknowledged that Robertson was a good manager who used an open door policy and was available to discuss any complaints and that he could have discussed this alleged incident with Robertson if he had wanted to.[88]

Plaintiff acknowledged that he was not aware of any other instance throughout his entire employment that Ralph Hudnall did not treat him with respect.[89]   Smith, likewise, acknowledged that he and Hudnall were on friendly terms working together and that, on one occasion prior to the Company Christmas party, he had accepted Hudnall's invitation to come to his house to use Hudnall's shower and change clothes to save a trip from going all the way back to his house to change.[90]

---

[83] Smith Depo. P. 51, L. 14-P. 52, L. 2; Hudnall denies that he used the word "nigger" in discussing that skit. Hudnall Depo. P. 171, L. 10-12.
[84] Smith Depo. P. 52, L. 3-5.
[85] Smith Depo. P. 52, L. 14-17-P. 53, L. 3-5.
[86] Smith Depo. P. 50, L. 18-21-P. 53, L. 23-P. 54, L. 2.
[87] Smith Depo. P. 52, L. 14-17.
[88] Smith Depo. P. 58., L. 5-15.
[89] Smith Depo. P. 58, L. 16-20.
[90] Smith Depo. P. 177, L. 21-P. 178, L. 18.

Smith alleges that Ashley Sheffield, a white female Lab Technician employed by Euro-Pro, was treated more favorably than he was.[91]  Smith "believe(s)" that she came into work late everyday and that she used the Internet during working hours on numerous occasions and was not aware of her being written up for those alleged infractions.[92]  Sheffield, however, worked in the lab at Euro-Pro, not in the Cleanability division or in the Lifecycle Testing division.[93]  Smith is not aware of her alleged tardiness or use of the Internet to have ever negatively affected her job performance.[94]  Smith acknowledged that he did not keep up with her start and stop times each day, that he did not supervise her and that he did not even work in the same area as she did.[95]  Furthermore, Smith acknowledged that he had more responsibility in his position than Ashley Sheffield did in her position.[96]  Finally, Smith acknowledged that he never spoke with Ashley Sheffield's supervisors to know how they evaluated her performance, was not aware of Ashley Sheffield telling her supervisor that she would complete a project and then not completing it and was not aware of her ever failing to complete a large project that she was assigned by her supervisor in a timely and satisfactory manner.[97]

Smith likewise alleges that Dave Richards, a white male Lab Technician employed by Euro-Pro, was treated more favorably than he was.[98]  He bases this claim on his belief that Richards "called in sick and 'never' (sic) showed to work" "on more than five or six occasions."[99]  Smith acknowledged, however, that he was not Richards' supervisor and  that he

---

[91] Smith Depo. P. 138, L. 4-12.
[92] Smith Depo. P. 139, L. 13-P. 140, L. 3.
[93] Smith Depo. P. 139, L. 1-5.
[94] Smith Depo. P. 141, L. 8-10.
[95] Smith Depo. P. 140, L. 4-P. 141, L. 14.
[96] Smith Depo. P. 165, L. 3-7.
[97] Smith Depo. P. 169, L. 23-P. 170, L. 19.
[98] Smith Depo. P. 166, L. 3-11.
[99] Smith Depo. P. 166, L. 20-P. 167, L. 4.

never spoke with Richards' supervisors to know how they evaluated his performance.[100]  Smith

is also not aware of Richards ever telling his supervisor that he would complete a task and then

not completing it and is not aware of Richards ever failing to complete a large project assigned to

him by his supervisor in a timely and satisfactory manner.[101]

The EEOC issued Smith a No-Cause decision on September 26, 2005.[102]

## LEGAL ARGUMENT

Smith asserts a claim of racial termination under 42 U.S.C. §1981 and Title VII.[103]  To

establish his claim, Smith can show three different types of evidence: (1) direct evidence, (2)

circumstantial evidence, or (3) statistical evidence.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d

1318, 1330 (11th Cir. 1998).  In the current case, Smith presents only circumstantial evidence.[104]

Such circumstantial evidence is properly analyzed under the *McDonnell Douglas* framework.

*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).  To establish an

employer's discriminatory motive under *McDonnell Douglas,* the plaintiff must first prove a

*prima facie* case for discrimination.  *Id.*  Once the plaintiff has successfully proven a *prima facie*

case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the

---

[100] Smith Depo. P. 167, L. 22-P. 168, L. 17; P. 167, L. 23-P. 170, L. 4.

[101] Smith Depo. P. 170, L. 9-19.

[102] EEOC No-Cause decision dated September 26, 2005.

[103] The framework used to analyze a §1981 claim is exactly the same as that used to examine a Title VII claim, since both statutes have "the same requirements of proof and use the same analytical framework." *Keith v. MGA, Inc.* No. 06-12803, 2006 WL 3228073, at *2 (11th Cir. Nov. 8, 2006)(quoting *Standard v. A.B.E.L. Services, Inc.,* 161 F. 3d 1318, 1330 (11th Cir. 1998)); *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991). However, "[a] showing of discriminatory purpose is required to prove a *prima facie* case of discrimination under 42 U.S.C. [§] 1981."  *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000)(quoting  *Lee v. Washington County Bd. of Educ.*, 625 F.2d 1235, 1237 (5th Cir.1980)).

[104] The only evidence Smith could possibly proffer as "direct" is that Hudnall allegedly used the word "nigger" once, while quoting the comedian Dave Chappelle, in front of Smith. (Smith Depo. P. 51, L. 14-P. 52, L. 8). Hudnall, however, was not the *decisionmaker* in this case.  Terry Robertson alone decided to terminate Smith. (Hudnall Depo. P. 115, L. 3-5)(Robertson Decl. ¶4).  As a result, any alleged comment by Hudnall is not "direct evidence" of a discriminatory intent in Smith's termination.  *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) ("[R]emarks by non-*decisionmaker*s or remarks unrelated to the decision making process itself are not direct evidence of discrimination.").

employment action. *Id.* Finally, if the employer successfully proves a legitimate non-discriminatory reason, the burden shifts back to the plaintiff to show that the employer's reason is merely a "pretext" for discrimination. *Id.*

Given this framework, Smith fails to establish a *prima facie* case of discrimination. Assuming *arguendo,* that Smith does establish a *prima facie* case (which Euro-Pro adamantly denies), he fails to offer any issue of disputed fact that would discredit Euro-Pro's legitimate, non-discriminatory reason for termination as pretextual. Euro-Pro is therefore entitled to complete summary judgment on all of his claims.

A.    **Smith's Racial Termination Claims Fail a Matter of Law Because Smith Fails to Prove a *Prima Facie* Case.**

A plaintiff may show a *prima facie* case for discrimination by proving the following four elements:

(1)    He is a member of a protected class;

(2)    He was qualified for the position held;

(3)    He was subjected to an adverse employment action;

(4)    He was replaced by a person outside the protected class, or was treated less favorably than a similarly situated individual outside his protected class.

*Maynard v. Bd. of Regents of the Div. of Univ. of the Fla. Dept. of Educ.,* 342 F.3d 1281, 1289 (11th Cir. 2003)(citing *McDonnell Douglas*, 411 U.S. at 802). It is undisputed that Smith is an African-American male who was qualified for his position and then terminated. At issue, however, is the fourth prong of the *prima facie* case. Smith fails to satisfy this fourth element because he cannot show that any similarly situated employees, outside his protected class, were treated more favorably; nor can he show that he was replaced by a person outside his protected class.

13

### 1. No other similarly situated employees outside his protected class were treated more favorably than Smith.

Smith bears the burden of identifying a white employee who is "similarly situated in all relevant respects," but who received more favorable treatment. *Roland v. U.S. Postal Service*, No. 06-12261, 2006 WL 2881949, *4 (11th Cir. Oct. 11, 2006)(citing *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004)). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."[105] *Holifield v. Reno*, 115 F.3d 1555, 1567 (11th Cir. 1997)(emphasis added). "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* at 1562. "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)(citations omitted). "We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (emphasis added).

Smith identifies two employees whom he may claim are similarly situated: Ashley Sheffield and Dave Richards, both white employees who worked for Euro-Pro as Laboratory Technicians.[106] However, neither Sheffield nor Richards are similarly situated to Smith for at least three reasons.

---

[105] "In making this claim the burden is on [the plaintiff] 'to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to disprove their similarity.'" *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), quoting *Tate v. Weyerhaeuser*, 723 F.2d 598, 603 (8th Cir. 1983); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981)("it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally").
[106] Smith Depo. P. 138, L. 4-12; P. 166, L. 3-11.

     **i.**       **The comparators did not engage in the same prohibited conduct as Smith.**

Sheffield and Richards are not similar comparators because their conduct is not in any way "nearly identical" to the conduct engaged in by Smith. Smith contends that Ms. Sheffield would "come in late every day" and that "she also got caught numerous times on the Internet."[107] Smith asserts that Dave Richards also had attendance problems and often called in sick.[108] This conduct, however, is distinguishable from Smith's misconduct. Smith was terminated for several job performance problems, none of which related to attendance or Internet usage.[109]

In *Riley v. Emory University,* 136 Fed.Appx. 264, 267 (11th Cir. 2005) the Eleventh Circuit upheld summary judgment in favor of the employer because the comparator plaintiff identified was not "similarly situated" and thus the plaintiff failed to establish her *prima facie* case. The employer in *Riley* claimed the plaintiff failed to perform her job adequately at a conference in Chicago, was reluctant in performing other job functions, and was "disengaged." *Id.* at 266-67. In affirming the district court, the court in *Riley* found that a comparator who failed to attend the Chicago conference altogether, and was written up as "disengaged," but had a long record of service to the employer with good performance reports was not involved in the same "conduct" as the plaintiff, and was thus not similarly situated. *Id.*

Likewise, Smith has presented no evidence that Sheffield or Richards received criticism regarding the failure to perform a project or failure to perform a task required of them by their supervisor. Smith plainly states that he is entirely unaware of *any time* where either: (1) Richards or Sheffield told their supervisor they would do something and did not do it, or (2)

---

[107] Smith Depo. P. 139, L. 17-23-P. 140, L. 1-3.

[108] Smith Depo. P. 166, L. 23; P. 167, L. 1-4.

[109] Euro-Pro acknowledges that Smith did use the telephone for personal reasons while at work. Hudnall Depo. P. 91, L. 7-15. However, the only warning Smith received was a general warning against telephone and internet usage, given to all employees and was not specific to Smith. Hudnall Depo. P. 90, L. 17-23; P. 91, L. 1-5; Robertson Decl., Exhibit.

Richards or Sheffield were assigned a big project and then failed to complete the task in a timely and satisfactory manner.[110] In fact, it is undisputed that the very problem which Smith alleges against Sheffield and Richards—attendance—was never a problem for Smith.[111] When asked, Hudnall stated, "Attendance was never a problem [for Smith], never a problem."[112]

As a result, Sheffield and Richards are not similarly situated employees because the "quality" of their misconduct is certainly not "nearly identical," nor even similar to, Smith's misconduct.

### ii. Smith's conduct is clearly more egregious than the named comparators.

Not only is the type of misconduct alleged by Smith against Sheffield and Richards qualitatively different, the nature of Smith's misconduct is significantly more egregious. When a plaintiff engages in conduct that is "more egregious" than the comparator, such evidence may show the comparator was not similarly situated to the plaintiff. *See Roland* 2006 WL 2881949, at *5(affirming district court's finding that plaintiff's conduct was "more egregious" since she engaged in Mary Kay sales and marketing while at work in a position of authority, where comparator delivered Avon products in his postal vehicle but did not engage subordinates in his activity).

Clearly, any attendance problems alleged against Richards and Sheffield are not of the same nature or on the same scale as Smith's failure to complete a project or perform tasks assigned by his supervisor. Smith's failure to complete the fixture by late November, after a scheduled completion date of July and after being warned that the project was progressing too slowly, in addition to his insubordinate act and other performance issues is undoubtedly more

---

[110] Smith Depo. P. 71, L. 10-P. 73, L. 12.
[111] Hudnall Depo. P. 179, L. 22-23.
[112] Hudnall Depo. P. 179, L. 22-23.

egregious than minor attendance problems. Comparison of such conduct is not of the same "quality" and thus does not similarly situate the comparators to Smith.

### iii. The alleged comparators held different job responsibilities in different departments.

To be similarly situated, employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." *Malladi v. Brown*, 987 F.Supp. 893, 909 (M.D. Ala. 1997)(quoting *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir. 1992)). In *Malladi,* the plaintiff was a member of management and pointed to another employee as a comparator who "did not fall in the management structure." *Id.* at 910. The court noted that the plaintiff, as a member of management had a responsibility to investigate wrongdoing, where the comparator did not. *Id.* Essentially, the two were not similarly situated because "[c]onsidering the differences in their positions, one could not reasonably expect that [the comparator] would be treated the same as [plaintiff]." *Id.*

Sheffield and Richards were Lab Technicians for Euro-Pro.[113] However, there are various levels of Lab Techs within Euro-Pro, and not every Tech shares the same responsibilities.[114] Sheffield worked "in the lab" and never worked in the same division as Smith.[115] While Smith started working in the Cleanability division as a Lab Tech, he admits that Richards' attendance problems occurred while Smith was working in the Lifecycle Testing division.[116] In the different divisions, Smith and Richards had completely different job duties.[117]

---

[113] Smith Depo. P. 168, L. 18-23; P. 169, L. 5-17; P. 139, L. 3-5.
[114] Hudnall Depo. P. 28, L. 8-18.
[115] Smith Depo. P. 139, L. 3-12.
[116] Smith Depo. P. 168, L. 18-22.
[117] Smith Depo. P. 168, L. 4-22.

Moreover, Richards was a temporary employee, not even a permanent employee, when he allegedly was tardy on a few occasions.[118]  When Smith was transferred to the Lifecycle Testing division, he was given increased responsibility and authority and charged with designing and building a steam cleaning fixture.[119]  Smith admits that Richard's job "certainly didn't carry the responsibilities that [Smith's] did."[120]  Likewise, Ashley Sheffield was a Lab Tech, but in a different division and it is undisputed that Smith had more responsibilities than she did.[121]  Thus, Sheffield and Richards are not at all similarly situated to Smith, as Smith was in a different division and had more responsibility and expectations in his position than they did in their positions.

### 2.    Smith's *prima facie* case fails because he was not replaced by anyone outside his protected class.

The failure to show that any employee was similarly situated and received favorable treatment, or that the plaintiff was not replaced by an employee outside his protected class is fatal to a *prima facie* case.  *See Gamble v. Aramark Uniform Services*, 132 Fed.Appx. 263, 267 (11th Cir. 2005)(affirming summary judgment in favor of the employer since employee could not show he was replaced by anyone, "let alone a person from outside his protected class.").  Here, Smith cannot show Euro-Pro replaced him with someone outside Smith's protected class because Euro-Pro has not hired any employee to replace Smith.

Smith presents no evidence that Euro-Pro has hired anyone to replace him.  Instead, Hudnall's statement that Euro-Pro has not replaced Smith since his termination is undisputed.[122]  While Euro-Pro hired an additional engineer, Jeff Garrison, subsequent to Smith's termination,

---

[118] Smith Depo. P. 166, L. 23-P. 168, L. 23.
[119] Smith Depo. P. 71, L. 10-P. 73, L. 12.
[120] Smith Depo. P. 169, L. 5-8.
[121] Smith Depo. P. 164, L. 11-13.
[122] Hudnall Depo. P. 19, L. 16-21; P. 165, L. 23-P. 166, L. 2.

he was not hired to "replace" Smith.[123]  Even if Smith claims Euro-Pro terminated him in order to replace him with an Engineer, Smith offers no evidence that he has been so replaced. Moreover, it is undisputed that Hudnall, who is not an engineer, assumed Smith's primary responsibilities, including rebuilding the Steam Cleaner fixture to be fully operational.[124] Admittedly, Garrison did assist Hudnall, but Hudnall performed most of the work.[125]  As Hudnall stated, "I would characterize it as saying I took on the job and Jeff gave me a little help."[126]  Likewise Smith had similar access to engineers while he was working on the Steam Cleaner fixture.[127] Smith cannot therefore show that anyone has been hired to "replace" him. Coupled with Smith's inability to identify a similarly situated employee, Smith fails to meet the fourth prong of the *prima facie* case, or at least fails to present a genuine issue of material fact. As a result, Euro-Pro is entitled to summary judgment.

> **B.    Even if This Court Finds That Smith Has Shown a *Prima Facie* Case, Smith's Claims Fail Because Euro-Pro Articulated Legitimate, Non-Discriminatory Reasons for the Employment Decision.**

If a *prima facie* case of race discrimination is established, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action.  *Holifield,* 115 F.3d at 1564.  In *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991), the Eleventh Circuit held that courts: "[D]o not sit as a super-personnel department that reexamines an entity's business decisions. . .our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.*   The court went on to state, "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need

---

[123] Hudnall Depo. P. 160, L. 14-P. 163, L. 10.

[124] When asked, Hudnall stated that Smith's former responsibilities "eventually…became my full-time job." Hudnall Depo. P. 164, L. 8-11; P. 165, L. 12-20.

[125] Hudnall Depo. P. 165, L. 7-11.

[126] Hudnall Depo. P. 165, L. 10-11.

[127] Smith Depo. P. 186, L. 10-17.

only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory...." *Id.* (emphasis added). *See also Kelliher v. Veneman*, 313 F.3d 1270 (11th Cir. 2002)(holding that even assuming plaintiff established a *prima facie* case of race termination, employer's evidence of dereliction of duty and insubordination constituted "an adequate non-discriminatory reason for his discharge.").

Euro-Pro has presented substantial evidence that Smith was terminated for legitimate, non-discriminatory reasons.[128]  Over the course of 2004, it is undisputed that Smith was counseled relating to several incidents of job related conduct, as well as a variety of "areas of improvement" in a formal evaluation.[129]  It is also undisputed that Smith received a 3.5 out of 5 performance score on his August 2004 evaluation, which Hudnall notes was the lowest score he assigned to an employee.[130]  Smith also never took responsibility for keeping his area clean as required.[131]  Additionally, Smith was charged with designing and building a Steam Cleaner fixture for Lifecycle Testing, which he failed to complete in a timely or cost efficient manner.[132] After Smith was assigned the project in May with an initial completion date of July 28th, was told in his August evaluation that meeting completion dates was important, and was counseled that the building of the fixture was progressing too slowly and costing too much money, the fixture was still only "eighty percent operational" and unsafe to operate when Smith took vacation in late November.[133]  Hudnall described the main problems with Smith's work on the fixture as:

---

[128] Robertson Decl. ¶7.

[129] Smith had previously been counseled regarding discussing bonuses with other employees in violation of company policy, allegedly harassing two other female employees by calling them at night and failing to keep his area clean as required by management.  Robertson Decl., Exhibit; Hudnall Depo. P. 84, L. 16-P. 86, L. 18; P. 88, L. 7-16.

[130] Hudnall Depo. P. 87, L. 7-10.  While the evaluation reflects that Smith was meeting performance requirements, Hudnall explains that he informed Smith the score was low but did not want to score Smith too low so as to create a morale problem.  Hudnall Depo. P. 87, L. 11; P. 88, L. 3.

[131] Smith Depo. P. 125, L. 20; P. 127, L. 21.

[132] Hudnall Depo. P. 102, L. 13-21.

[133] Hudnall Depo. P. 117, L. 3-5.

The main thing to me was that it wasn't complete on time. We were almost wasting money because we were buying the wrong parts that obviously wouldn't go into this fixture.  And then after we started to bring it to [Smith's] attention that it was taking too much time and costing too much money, it seemed like the project just drug on longer and longer.[134]

The culmination of these problems occurred when Smith left for vacation and failed to: (1) comply with Hudnall's request to alert him to all the problems with the fixture before he left for vacation, and (2) make himself available by phone to assist Hudnall with the operation of the steam cleaning fixture.[135]  Prior to Smith's vacation, Hudnall asked Smith to tell him of any problems with the fixture.[136]  As Hudnall stated, "My final direction [to Smith] was, 'Make it operational or make sure I understand why it is not operational.'"[137]  After Smith left for vacation, Hudnall tried to operate the machine but noticed wires were disconnected and operation was unsafe.[138]  It is undisputed that Hudnall called Smith for assistance and specifically told him to remain available for further help if he could not make the fixture operate.[139]  Smith, who admitted he was not out of town on vacation, failed to remain available to take Hudnall's call in direct contravention of Hudnall's earlier directive and Hudnall was unable to reach Smith again.[140]  Hudnall then informed Robertson of these concerns and Smith's insubordination.[141]  Smith's failure to have the fixture in working order combined with his insubordination prevented Euro-Pro from operating the fixture during Smith's vacation.[142]

---

[134] Hudnall Depo. P. 114, L. 1-10.
[135] Hudnall Depo. P. 117. L. 17-P. 121, L. 13.
[136] Hudnall Depo. P. 123, L. 3-10.
[137] Hudnall Depo. P. 122, L. 11-13.
[138] Hudnall Depo. P. 117, L. 21-P. 118, L. 22.
[139] Hudnall Depo. P. 120, L. 8-12.
[140] Smith Depo. P. 118, L. 10-12; Hudnall Depo. P. 120, L. 16-18.
[141] Hudnall Depo. P. 115, L. 10-P. 116, L. 17.
[142] Hudnall Depo. P. 120, L. 3-12.

This final incident proved to be the "last straw" to Terry Robertson, and he subsequently terminated Smith based on his good faith belief that Smith's performance was unacceptable.[143] Robertson's belief that such behavior, in conjunction with repeated prior warnings and poor job performance, justified termination is certainly reasonable. Importantly, all of these incidents establish a legitimate non-discriminatory reason for termination. *See Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982)("for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory. . . .")(emphasis in original); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)("An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination."); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)(courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). Euro-Pro has thus articulated legitimate, non-discriminatory reasons for Smith's termination.

C.    **Smith's Claims Fail Since Smith Cannot Show Any Evidence that Euro-Pro's Employment Decision was Pretextual for Discrimination.**

"Once a legitimate, non-discriminatory reason for dismissal is put forward by the employer, the burden returns to the plaintiff to prove by significantly probative evidence that the proffered reason is a pretext for discrimination." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989). "A plaintiff may do so 'either directly by persuading the court that a discriminatory

---

[143] Smith Depo. P. 129, L. 14-P. 130, L. 2.

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id*. To avoid summary judgment, a plaintiff is "obligated to present evidence that [the employer's] legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1531 (11th Cir. 1997)(citations omitted). "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significant probative' evidence on the issue to avoid summary judgment." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)(citations omitted). "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Hollifield,* 115 F. 3d at 1565. Here, Smith entirely fails to meet this burden.

Smith has presented no evidence, much less substantial evidence, of pretext that demonstrates that Euro-Pro's termination decision was motivated in any way by race. Reading the facts in the light most favorable to Smith and assuming his allegations are true, the only shred of evidence upon which Smith could rely to establish pretext is that Hudnall, while quoting the African American comedian Dave Chappelle, repeated a racial comedy sketch and allegedly repeated Chappelle's use of use of the word "nigger" in Smith's presence (which Hudnall denies).[144] This evidence fails to establish pretext for any number of reasons.

Initially, the alleged incident fails to show pretext because Hudnall was not the *decisionmaker* in this case. Such a statement, again, assumed as true, is not evidence of pretext because it in no way indicates that <u>Robertson's decision</u> was based on or motivated by Smith's race. Robertson, alone, made the decision to terminate Smith.[145] It is undisputed that Hudnall

---

[144] Smith Depo. P. 51, L. 14-P. 52, L. 8.
[145] Hudnall Depo. P. 115, L. 3-5; Robertson Decl. ¶4.

did not even know Robertson was planning to terminate Smith before it took place.[146]  Smith has failed to present any evidence, direct, circumstantial, or otherwise, that Robertson acted out of racial animus in his decision.  In fact, Smith admits that there was never a time Robertson did not treat him with respect.[147]  In Smith's own words, "I never heard Terry Robertson… make a racial comment."[148]

Hudnall's statement is also not circumstantial evidence of racial animus.  A non-*decisionmaker*'s statements can be evidence of pretext, but the statements must be linked to the disputed employment action.  *See Kincaid v. Bd. of Trustees, Stillman College*, No. 05-15974, 2006 WL 1746885, at *4 (11th Cir. June 27, 2006)(finding statements of non-*decisionmaker*s regarding the College's hiring policy as preferring blacks were not circumstantial evidence of racial motivation in the termination of plaintiff, a white employee with poor job performance evaluations, because no evidence showed the statements applied to plaintiff or his termination); *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999)(noting that under the "Cat's Paw" theory, discriminatory animus can be shown if a decisionmaker relied on a biased recommendation for termination, without first performing his own independent investigation).

In *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1322 (11th Cir. 1998), the plaintiff alleged racial termination and presented evidence that her supervisor said "You black girls make me sick, sometimes I feel like just hitting you in the head;" and "you black girls get away with everything."  *Id.* at 1322. The same supervisor then consulted with another of plaintiff's supervisors regarding an incident of insubordination by plaintiff.  *Id.* at 1323.  Plaintiff was subsequently terminated for insubordination.  *See id.* While the court did not know the specific timing of the racial comments, the court did note that they were "remote" from the

---

[146] Hudnall Depo. P. 124, L. 5-11.
[147] Smith Depo. P. 48, L. 2-5.
[148] Smith Depo. P. 59, L. 13-15.

termination and that the plaintiff failed to establish they had any bearing on the supervisor's reporting plaintiff's insubordination or her termination *Id.* at 1323-24.

Smith has failed to link Hudnall's alleged racial comment in any way to the employment action taken against him by Robertson. Smith has presented absolutely no evidence that Hudnall's alleged statements were directed at Smith personally, or in any way influenced Robertson's decision. The alleged statement is wholly unrelated to Smith's poor job performance and insubordination. Furthermore, Hudnall's alleged statement was, at most, a recounting of an African-American comedian's comedy sketch in the context of an occasional conversation between the two employees relating to what was generally known to be a television show with vulgar humor. One incident, remote in time to Smith's termination, is not only not the required "significant[ly] probative" evidence of pretext, it is a completely contrived effort to show pretext where none exists. Smith has utterly failed to show any intentional discrimination on the part of Euro-Pro as required under § 1981 or to legitimately call into question Euro-Pro's good faith belief in the legitimate, non-discriminatory reasons for termination. Accordingly, Euro-Pro is entitled to complete summary judgment as to Smith's claims.

## CONCLUSION

For the foregoing reasons, Defendant Euro-Pro Management Services, Inc., respectfully requests that this Court grant summary judgment in its favor as to all of Victor Smith's claims in this lawsuit.


/s/ Warren B. Lightfoot, Jr.
_____
Warren B. Lightfoot, Jr.
Attorney for Defendant
Euro-Pro Management Services, Inc.

**OF COUNSEL:**
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama  35203-4604
(205) 254-1000


## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2006, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

John I. Cottle, III
Bowles & Cottle
P.O. Box 780397
2 So. Dubois Avenue
Tallassee, Alabama  36078


*/s/ Warren B. Lightfoot, Jr.*
_____
OF COUNSEL