## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: 3:05 CV 1186 |
| | ) | |
| EURO-PRO OPERATING, L.L.C., | ) | |
| EURO-PRO MANAGEMENT COMPANY | ) | |
| CORP. and STANRO-EP CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## EURO-PRO MANAGEMENT SERVICES, INC.'S EVIDENTIARY MATERIALS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

Exhibit A:   Portions of Plaintiff, Victor Smith's Deposition

Exhibit B:   Portions of Ralph Hudnall's Deposition

Exhibit C:   Declaration by Terry Robertson

Exhibit D:   EEOC No-Cause Finding

*/s/ Warren B. Lightfoot, Jr.*

_____

Warren B. Lightfoot, Jr.
Attorney for Defendant
Euro-Pro Management Services, Inc.

OF COUNSEL:
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-4604
(205) 254-1000

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2006, I electronically filed with the Clerk of Court the foregoing Defendant Euro-Pro Management Services, Inc.'s Evidentiary Materials in Support of Motion for Summary Judgment by using the CM/ECF system, which will send a notice of electronic filing to:

John I. Cottle, III
(334) 283-5366 Facsimile
Bowles & Cottle
P.O. Box 780397
2 So. Dubois Avenue
Tallassee, Alabama  36078


/s/ Warren B. Lightfoot, Jr.
_____
OF COUNSEL

# Exhibit A

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER: 3:05-CV-1186
6  VICTOR SMITH,
7       Plaintiff,
8       vs.
9  EURO-PRO OPERATING, L.L.C., et al.,
10      Defendants.
11
12      S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by and
14  between the parties through their respective
15  counsel, that the deposition of Victor Smith
16  may be taken before Angela Smith, RPR, CRR,
17  at the offices of Bowles & Cottle, at 2
18  South Dubois Avenue, Tallassee, Alabama
19  36078, on the 24th day of May, 2006.
20
21      DEPOSITION OF VICTOR SMITH
22
23

Page 2

1      IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8      IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17      IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21      * * * * * * * * * * * * *
22
23

Page 3

1      * * * * * * * * * * * * *
2      I N D E X
3      EXAMINATION
4           PAGE
5  By Mr. Lightfoot ................... 5
6  DEFENDANT'S EXHIBITS
7           PAGE
8  Ex. 1 - Mr. Smith's resume ......... 29
9  Ex. 2 - Job description for
10      position in life cycle
11      testing .................. 69
12  Ex. 3 - The sketch of the steam
13      cleaning testing
14      machine .................. 79
15  Ex. 4 - 6/28/04 e-mail from Chad
16      to Mr. Smith ............. 86
17  Ex. 5 - 5/5/04 evaluation from
18      Mr. Hudnall from
19      meeting .................. 90
20  Ex. 6 - 8/31/04 evaluation ........ 103
21      * * * * * * * * * * * * *
22
23

Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4  CASE NUMBER: 3:05-CV-1186
5  VICTOR SMITH,
6      Plaintiff,
7      vs.
8  EURO-PRO OPERATING, L.L.C., et al.,
9      Defendant.
10  BEFORE:
11      ANGELA SMITH, Commissioner.
12  APPEARANCES:
13      JOHN I. COTTLE, ESQUIRE, of BOWLES
14  & COTTLE, 2 South Dubois Avenue, Tallassee,
15  Alabama 36078, appearing on behalf of the
16  Plaintiff.
17      WARREN B. LIGHTFOOT, JR., ESQUIRE,
18  of MAYNARD, COOPER & GALE, 2400
19  AmSouth/Harbert Plaza, Birmingham, Alabama
20  35203, appearing on behalf of the Defendant.
21      ALSO PRESENT: Terry Robertson
22      Ralph Hudnall
23      Tiffany Threlkeld

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 29

1    Q.    Did they place other temps at
2  Euro-Pro as well?
3    A.    Yes.
4    Q.    All right.  And that was in
5  December of '03?
6    A.    Yes.
7         (Defendant's Exhibit 1 was
8         marked for identification
9         purposes.)
10   Q.    All right.  And what job did
11 you start out working at Euro-Pro?
12 Actually, hang on one second.  I'm sorry.
13 One second on that.
14        Down here on your resume, and
15 we'll just make this Defendant's Exhibit 1
16 to your deposition.  Did you -- Where it
17 talks about your skills at the bottom of
18 that page, do you see that?
19   A.    Uh-huh.  Yes.
20   Q.    All right.  Did you have all
21 of those skills by the time you -- Actually,
22 this is your resume as of the time you came
23 to Euro-Pro; right?

Page 30

1    A.    Right.
2    Q.    All right.  So, did you have
3  all these skills before you came to
4  Euro-Pro?
5    A.    Yes.
6    Q.    Okay.  And tell me what
7  knowledge you had in programmable logic
8  controls.
9    A.    College.
10   Q.    Okay.  That's something called
11 -- That's called PLC; is that right?
12   A.    Right.
13   Q.    All right.  So at college,
14 tell me what they -- Did you have a course
15 on it or what did you know about it?
16   A.    Yes.  I had a semester course
17 on programmable logic control.
18   Q.    And that would have been at
19 Gadsden State?
20   A.    Yes.
21   Q.    Okay.  All right.  So you were
22 telling me in December of 2003, you began
23 working at Euro-Pro.  And what was your

Page 31

1  position, starting out?
2    A.    My position at starting out, I
3  don't know the exact title when I started
4  out.  I was working with a temp agency.  I
5  don't think I had a title.
6    Q.    Okay.  All right.  There are
7  -- At the facility -- At Euro-Pro's facility
8  in Auburn, there's sort of two divisions,
9  right, there's the cleanability project and
10 the life cycle project; right?
11   A.    Yes.
12   Q.    Which project were you on?
13   A.    Cleanability.
14   Q.    Okay.  And is that where the
15 other -- what the other temps there working
16 with you were on the cleanability project?
17   A.    Yes.
18   Q.    Okay.  All right.  And what
19 were y'all doing on the cleanability
20 project?
21   A.    We would record data and get
22 data on carpet and vacuum pick up of dirt
23 out of carpet, off of carpet.

Page 32

1    Q.    Okay.
2    A.    Basically, that's what we did.
3    Q.    Yeah.  And the cleanability
4  just deals with the product of a vacuum
5  cleaner; right?
6    A.    Yes.
7    Q.    The other -- Life cycle dealt
8  with other types of products?
9    A.    Yes.
10   Q.    Okay.  Were there already two
11 temporary employees working there before you
12 got there?
13   A.    I'm not sure.
14   Q.    Were there other temps?
15   A.    Yes.
16   Q.    Okay.  All right.  When you
17 started out, were you reporting to Ralph
18 Hudnall?
19   A.    Yes.
20   Q.    Okay.  So, did you and the
21 other temps in cleanability report to Ralph?
22 Is that the way it was set up?
23   A.    Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1    Q.    And he was the director of lab
2  testing?
3    A.    I don't know if that was his
4  title. We reported to him.
5    Q.    Okay. And when you first
6  started, there was only the first shift,
7  right, there was that eight-to-five shift?
8    A.    Yes.
9    Q.    All right. And then at some
10 point within a -- shortly after you began,
11 the company started a second shift; right?
12   A.    Yes.
13   Q.    And that shift went from two
14 p.m. to ten p.m.; is that correct?
15   A.    I think so. I'm not sure, but
16 I think that's correct.
17   Q.    Okay. And at the point that
18 they started the second shift, did they tell
19 you -- did Ralph tell you that they were
20 making you a permanent employee, or did
21 Euro-Pro tell you they were making you a
22 permanent employee?
23   A.    I don't recall if it was right

Page 34

1  at that point. I don't know that it went
2  that fast.
3    Q.    Okay.
4    A.    But I think around that time I
5  was made a permanent employee.
6    Q.    Okay. And do you remember
7  what you were making, compensation-wise?
8    A.    I think my salary was
9  twenty-eight thousand, six hundred.
10   Q.    Twenty-eight thousand, six
11 hundred?
12   A.    Yes. I think. I'm not sure.
13   Q.    Okay. And did you know that
14 you were being compensated higher than the
15 other employees that were temporary
16 employees?
17   A.    That was temporary employees,
18 yes.
19   Q.    Did you also know that you
20 were being compensated more than every
21 employee there who wasn't a management
22 employee?
23   A.    No.

Page 35

1    Q.    You didn't know that? Do you
2  know that now, as we sit here?
3    A.    I know you told me that. I'm
4  not certain of that.
5    Q.    Okay. I understand. Yeah. I
6  was asking if you knew it. Not that you
7  have to rely on me to for that. I was
8  asking you if you knew that.
9          When you started with
10 Euro-Pro, did you -- did you have meetings
11 and such with Ralph Hudnall in terms of --
12 and Terry Robertson in terms of what was
13 expected as a Euro-Pro employee?
14   A.    Yes.
15   Q.    Okay. And were they clear
16 that they expected you to work during work
17 hours?
18   A.    Yes.
19   Q.    Okay. Did they tell you they
20 expected everybody at that facility to treat
21 each other with respect?
22   A.    Yes.
23   Q.    All right. Did they tell you

Page 36

1  that they expected you to be a team player?
2    A.    Yes.
3    Q.    Did you pull your share of the
4  workload?
5    A.    Yes.
6    Q.    Did they tell you it was
7  important to keep the work areas clean?
8    A.    Yes.
9    Q.    All right. Did they tell you
10 it was also important to show initiative, to
11 not just do what's asked, but to go above
12 and beyond the call of duty?
13   A.    Yes.
14   Q.    And did you believe in all
15 those things anyway, from your Navy training
16 and from all your prior work experience?
17   A.    Yes.
18   Q.    Okay. When they made you --
19 Did they actually sort of make you the lead
20 employee for the evening shift, where you
21 sort of were not a supervisor, but where you
22 were sort of in charge of the evening shift?
23   A.    Yes.

9 (Pages 33 to 36)

## FREEDOM COURT REPORTING

Page 37

1    Q.    Did they call you a lead
2  employee or was it just sort of -- did you
3  just play that role?
4    A.    I think I just played that
5  role.
6    Q.    Okay.  And based on your prior
7  work experience, it was appropriate for you
8  to be the lead employee; right?  I mean, did
9  you feel like it was appropriate for you to
10  be in that role?
11    A.    Yes.
12    Q.    And yet, you were made that
13  sort of lead -- You played that lead
14  employee role, and, yet, you were not the
15  most senior, in terms of experience, of the
16  employees that were on that evening shift;
17  correct?
18    A.    Correct.
19    Q.    You were the least senior;
20  right?  You were the newest guy there?
21    A.    Can we go back to the next
22  question -- the question before that?
23    Q.    Sure.

Page 38

1    A.    On the evening shift.
2    Q.    Yes.
3    A.    There was only two, if my
4  memory serves me correctly, only two
5  employees, and I was the only permanent
6  employee.
7    Q.    You mean three total, you and
8  two others, or just two, total.
9    A.    Me and another.  It was two
10  total.
11    Q.    Oh, okay.
12    A.    And I was the only permanent
13  employee on the evening shift.
14    Q.    Okay.  Did you go from -- Once
15  they put you on the evening shift in that
16  lead role, did you go from being an hourly
17  employee to a salaried employee?
18    A.    Yes.
19    Q.    And were you pleased with the
20  increase in pay and the added
21  responsibilities?
22    A.    Not exactly.
23    Q.    Oh, all right.  Did you not

Page 39

1  want to be the lead employee on the evening
2  shift?
3    A.    That's not what I -- I thought
4  I should have got paid more.  I wasn't -- I
5  wasn't satisfied with the amounts at the
6  time.
7    Q.    Okay.  Well, were you pleased
8  with the increase in pay, even if it wasn't
9  as much as you wanted?
10    A.    Was I pleased?
11    Q.    Yeah.
12    A.    Yes.
13    Q.    Okay.  All right.  And were
14  you pleased to take on a position of more
15  leadership and added responsibility?
16    A.    Yes.
17    Q.    Okay.  And are you the kind of
18  employee that likes to be challenged and to
19  get increases in responsibility?
20    A.    Yes.
21    Q.    All right.  How did you get
22  along with Sam Hickman?
23    A.    Not well.

Page 40

1    Q.    Okay.  Were you -- Did you
2  always treat him respectfully?
3    A.    Yes.
4    Q.    Was he a -- Was he an hourly
5  employee?
6    A.    No.  He was a contractor.
7    Q.    Oh, a contracted employee?
8    A.    Yes.
9    Q.    Who did he work for?
10    A.    I don't know the company.
11    Q.    Like a temp agency?
12    A.    Yes.
13    Q.    Okay.  He was a temporary
14  employee?
15    A.    Yes.
16    Q.    Like you had been before?
17    A.    Yes.
18    Q.    Okay.  Did you have an
19  incident where there was sort of a near
20  fight between you and him?
21    A.    I wouldn't call it a near
22  fight.  We had a disagreement.
23    Q.    An altercation?

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 45

1    Q.   Okay.  Did Euro-Pro have a --
2    have rules that you can -- employees are
3    only supposed to use the telephone for
4    personal reasons during emergencies or
5    during your break time, otherwise if you're
6    using the phone it needs to be for business
7    rules?
8    A.   I never heard of that rule.
9    Q.   Okay.  You recall a meeting
10   where Terry Robertson met with all employees
11   and spoke about those kinds of rules with
12   all of the employees?
13   A.   Yes.
14   Q.   Okay.  Did Terry say that he
15   had understood that there was too much
16   nonbusiness activity going on during
17   business hours?
18   A.   Yes.
19   Q.   Did he say that people were
20   abusing the phone, or words to that effect,
21   were using the phone too much?
22   A.   Yes.
23   Q.   Okay.  And then what did he

Page 46

1    say -- Did he say, you know: From now on,
2    that you can only use the phone for
3    emergency reasons or for -- or if you're on
4    your break time?
5    A.   I don't recall him saying
6    that.
7    Q.   Okay.  Well, then, what did he
8    set down as the ground rules going forward,
9    that you recall?
10   A.   If I recall that, it was also
11   the Internet and the phone.  And he was
12   telling everybody that people are using the
13   Internet too much and the phone too much.
14   Q.   During business time?
15   A.   Yes.  We were not allowed at
16   that time to use the Internet, unless it was
17   business purposes.
18   Q.   And the same thing with the
19   phone?
20   A.   The phone, I don't remember
21   the phone because it wasn't the main issue.
22   He could have said that, but I don't
23   remember.

Page 47

1    Q.   I understand.
2    A.   The Internet, at that time,
3    was the main issue.
4    Q.   I understand.
5    A.   And that's what I focused on.
6    Q.   Sure.  You had dealings with
7    -- Well, scratch that.
8        Ralph Hudnall, was -- was he
9    always your supervisor?  Let's see.  Let me
10   ask that.  Was he always your supervisor?
11   A.   As far as I can remember, yes.
12   Q.   Okay.  And then Terry was
13   above him, correct, Terry Robertson?
14   A.   I think it was Chad Reese and
15   Terry Robertson.
16   Q.   And then Terry.  Okay.  Did
17   all three of those men always treat you with
18   respect?
19   A.   Sometime.
20   Q.   Well, I mean --
21   A.   Not always.
22   Q.   I want to know if they always
23   treated you, in the workplace, with respect?

Page 48

1    A.   No.
2    Q.   Okay.  Terry Robertson, were
3    there times that he did not treat you with
4    respect?
5    A.   There was -- No.
6    Q.   Okay.  Was there ever a time
7    that Ralph Hudnall did not treat you with
8    respect?
9    A.   Rephrase that question,
10   please.
11   Q.   Sure.  Was there ever a time
12   that Ralph Hudnall did not treat you with
13   respect?
14   A.   Yes.
15   Q.   When did Ralph Hudnall not
16   treat you with respect?
17   A.   There was a time I thought he
18   was making inappropriate jokes or
19   inappropriate comments about something he
20   saw on TV.
21   Q.   All right.  When was that?
22   A.   I can't give you the exact
23   time or exact date.  I don't remember the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1 exact date.
2     Q.   Okay. You were only there a
3 year, so it would have been -- and you
4 started in December of '03, so would it have
5 been sometime in 2004?
6     A.   Yes.
7     Q.   Okay. Are you able to say
8 summertime? Did it happen on one occasion?
9     A.   It happened more than one
10 occasion.
11     Q.   Okay. How many occasions?
12     A.   Approximately four or five.
13     Q.   All right. When — And you
14 can't tell me when any of those four or five
15 were?
16     A.   Exactly no. Exact time, no.
17     Q.   And you can't even give me a
18 ballpark; is that right?
19     A.   No.
20     Q.   What were the inappropriate
21 jokes that you thought he said or he laughed
22 about or whatever?
23     A.   He would make inappropriate

Page 50

1 comments about a Dave Chappelle episode
2 that, really, I felt like it was
3 inappropriate for him to make that towards
4 me because there were racial jokes that
5 David Chappelle would make and he would
6 repeat those racial jokes to me.
7     Q.   Okay. So, on these four or
8 five occasions, were they all approximately
9 the same, I mean, it's the same type stuff?
10     A.   The same type thing. The same
11 type stuff.
12     Q.   Okay. And did you watch the
13 Dave Chappelle Show?
14     A.   Yes.
15     Q.   Did he watch the Dave
16 Chappelle Show?
17     A.   Yes.
18     Q.   Is that something that y'all
19 talked about on occasion?
20     A.   That's something that he had
21 brought up on occasion.
22     Q.   Did other employees talk about
23 the Dave Chappelle show as well?

Page 51

1     A.   Not as I recall.
2     Q.   You don't recall any other
3 employee ever talking about the Dave
4 Chappelle Show?
5     A.   I don't recall that anybody
6 has ever -- other employees come to me about
7 the Dave Chappelle show.
8     Q.   Did you hear Ashley Sheffield
9 ever talk about the Dave Chappelle Show?
10     A.   Not as I recall.
11     Q.   Okay. You don't recall
12 anybody else talking about it?
13     A.   No.
14     Q.   Okay. Tell me, if you can,
15 any of these four or five incidents, what
16 the substance of it was.
17     A.   There was one I can remember
18 he was doing — Dave Chappelle was blind and
19 he thought he was white and he was black.
20 And when he found out that he was white, he
21 divorced his white wife. And they asked him
22 why he divorced his white wife. He said:
23 Because she's a nigger lover. And he

Page 52

1 actually repeated that scene and I didn't
2 think that was funny.
3     Q.   Okay. He didn't use the "N"
4 word, did he?
5     A.   Yes.
6     Q.   Did Dave Chappelle use the "N"
7 word as well?
8     A.   Yes.
9     Q.   Okay. All right. You didn't
10 complain to anybody about that, did you?
11     A.   I think I talked to Ashley
12 about it once or twice, that I didn't think
13 that he should be making comments like that.
14     Q.   Okay. But you didn't talk to
15 anybody — You didn't complain to anybody in
16 management about that?
17     A.   No.
18     Q.   You just mentioned -- You say
19 you may have talked to Ashley about it?
20     A.   Yes.
21     Q.   Okay. Is that the only person
22 you would have mentioned it to?
23     A.   I think so. She was — We

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  talked. I think that's the only person I
2  mentioned it to.
3       Q.    And you didn't tell Ralph you
4  were offended by it, did you?
5       A.    No.
6       Q.    And you didn't tell Ralph to
7  stop saying it, did you?
8       A.    No.
9       Q.    Did you laugh? I mean, did
10 you kind of talk along with him?
11      A.    I think I mentioned I saw the
12 scene, yes.
13      Q.    Did you tell him you thought
14 it was funny, too?
15      A.    No.
16      Q.    Did he say he thought it was
17 funny?
18      A.    I mean, yes.
19      Q.    And did you say you thought it
20 was funny, too, you'd seen it?
21      A.    I told him I saw it. I didn't
22 think it was funny.
23      Q.    Okay. Did you think some of

Page 54

1  Dave Chappelle's stuff was funny?
2       A.    Some of it.
3       Q.    Did you think that some of
4  Dave Chappelle's stuff was funny and okay,
5  and some of it was not funny and over the
6  line, is that kind of --
7       A.    Some of it's over the line.
8       Q.    Is that your general
9  impression of Dave Chappelle?
10      A.    Yes.
11      Q.    Okay. A lot of other people
12 feel that way too, right, that some of it's
13 okay and some of it's over the line?
14      A.    I imagine so.
15      Q.    I mean, you've talked to
16 people that feel the same way you do; right?
17      A.    Yes.
18      Q.    All right. So you remember
19 that one time where he talked -- you say he
20 talked about that there was a -- Well, you
21 told me the story about a blind man. All
22 right. Can you remember any other stories
23 that you say y'all talked about?

Page 55

1       A.    Not at this time, no.
2       Q.    Okay. Take your time and
3  think about it. If there's any -- I mean,
4  we've got all day. If there's anything else
5  that you think he said that -- from the Dave
6  Chappelle show that you thought wasn't
7  funny, whether you complained or not.
8            To be clear, I'm not
9  interested in what the Dave Chappelle Show,
10 if Ralph -- if you're saying Ralph Hudnall
11 said something from that show.
12      A.    I can't recall anything else
13 at this time.
14      Q.    Okay. So, that's the only
15 specific you recall that Ralph ever said to
16 you about the Dave Chappelle Show?
17      A.    Yes.
18      Q.    Okay. Who was -- Who was
19 around when Ralph -- you say Ralph made this
20 one statement to you about a blind man?
21      A.    Nobody.
22      Q.    Where were y'all standing?
23      A.    In a life test area.

Page 56

1       Q.    How did the conversation
2  start?
3       A.    Exactly, I think he said:
4  Have you -- Do you -- Have you ever saw the
5  Dave Chappelle Show? And I said: Yeah. I
6  saw it before. He said: Do you remember
7  the scene about him being blind and black in
8  the Ku Klux Klan rally? I said: Yeah, I
9  saw it. And from there, the conversation
10 went on to that, the phrase I gave you
11 earlier.
12      Q.    Did you actually raise the
13 issue of the Dave Chappelle Show on the
14 first occasion to Ralph?
15      A.    No.
16      Q.    You've told me that you
17 thought it wasn't funny, but you weren't
18 offended, were you?
19      A.    I was offended by the word.
20      Q.    By the "N" word?
21      A.    Yes.
22      Q.    Not by the rest of it?
23      A.    I was offended by him saying

14  (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1  the "N" word, nigger. But not by the rest of
2  Q.  Right. But not by the rest of
3  the -- not by the recounting the rest of the
4  Dave Chappelle skit; right? Do you see what
5  I'm saying?
6  A.  I don't understand what you're
7  saying.
8  Q.  I hear you saying that you
9  were offended by him saying the "N" word,
10  but you weren't offended by him relating to
11  you the rest of the skit, were you?
12  A.  I was offended by the whole
13  situation of the racial comments, I meant
14  even the whole skit of the Dave Chappelle
15  Show.
16  Q.  But not offended enough to
17  complain to anybody; right?
18  A.  I talked to a friend about it.
19  Q.  Who is the friend?
20  A.  Ashley Sheffield.
21  Q.  Okay. And you told me about
22  that?
23  A.  Yes.

Page 58

1  Q.  What did you tell Ashley?
2  A.  That I didn't think Ralph
3  Hudnall should be making comments like that.
4  It was inappropriate in the workplace.
5  Q.  And you certainly knew that
6  you could talk to Terry Robertson if
7  something Ralph had done had offended you or
8  bothered you and you wanted it to stop;
9  right?
10  A.  I knew that he was available.
11  Q.  Did Terry -- Was Terry a good
12  boss, in terms of being open door,
13  available, if you had something that you
14  needed to talk about, when he was in town?
15  A.  Yes.
16  Q.  Okay. All right. Any other
17  time that Ralph Hudnall did not treat you
18  with respect throughout your whole
19  employment?
20  A.  I can't recall right now.
21  Q.  Okay. Did Chad Reese always
22  treat you with respect?
23  A.  Yes.

Page 59

1  Q.  Do you have any reason to
2  believe that Terry Robertson or Ralph
3  Hudnall or Chad Reese was racist in any way?
4  A.  Before I was fired, I believed
5  that, I believe that that's what that was
6  going to, that I was going to be
7  discriminated against.
8  Q.  Yeah. All right. That's not
9  my question. And we'll get to that. My
10  question is, do you have any reason to
11  believe that Terry Robertson, Ralph Hudnall
12  or Chad Reese were racist in any way?
13  A.  I've never heard -- I never
14  heard Terry Robertson or Chad Reese make a
15  racial comment.
16  Q.  Have you ever heard Ralph
17  Hudnall make a racist comment?
18  A.  I've heard Ralph Hudnall make
19  a racist comment as far as the Dave
20  Chappelle Show.
21  Q.  Oh, the one you've already
22  told me about?
23  A.  Yes.

Page 60

1  Q.  Okay. But other than that,
2  have you ever heard him making a racist
3  statement in any way?
4  A.  To anybody? No.
5  Q.  To anybody. Have you ever
6  heard of him making a racist statement to
7  anybody about anything?
8  A.  No.
9  Q.  One night when you were
10  working on the evening shift at 9:30 on a
11  Friday night, approximately, did you call
12  Ashley Sheffield at home?
13  A.  Yes.
14  Q.  And you just called her for
15  personal reasons; right? I mean, you didn't
16  have a business reason for calling her;
17  correct?
18  A.  Correct.
19  Q.  And did you just ask her what
20  she was up to that weekend, things like
21  that?
22  A.  Yes. I was on my break and I
23  made a phone call to her.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 65

1    Q.    Okay.  What did they say?
2    A.    They told me when I went to
3  the office that Ashley had talked to Ralph.
4  And they talked to me that Ashley had talked
5  to Ralph that I had called her.
6        And I asked them, I said:  Why
7  is that a problem?  And if I remember
8  correctly, they said that Ashley said she
9  didn't think it was appropriate for me to
10  call her by me being a supervisor in the
11  cleanability area.  It just -- We shouldn't
12  talk like that.
13    Q.    Did you tell them that you
14  hadn't intended to be offensive?
15    A.    Yes.
16    Q.    Okay.  And did they just say:
17  Just don't let it happen again, or words to
18  that effect?
19    A.    Yes.
20    Q.    Okay.  And was that the end of
21  it, in terms of did it ever even come up
22  again?
23    A.    Terry Robertson talked to me

Page 66

1  when he came back about it.
2    Q.    Around this same time period?
3    A.    I think it was like a couple
4  of weeks.  I don't know what the schedule
5  was.  I think it was like a week or two
6  after he came back.
7    Q.    Okay.  So, Chad and Ralph met
8  with you when Terry was out of town?
9    A.    Yes.
10    Q.    All right.  And they told you,
11  basically, just don't do it again, or words
12  to that effect.  And then Terry met with
13  you, whenever he got back in town, and then
14  tell me what was said in that conversation,
15  same type thing?
16    A.    Exactly what Terry say, I
17  can't recall.  He said he heard about what
18  had happened.  And I don't -- I think he
19  told me to be careful.
20    Q.    And did you assure him that
21  you would?
22    A.    I explained to him what the
23  situation was, and that it wasn't nothing to

Page 67

1  begin with.
2    Q.    Okay.  And after that meeting
3  with Terry, did it ever come up again?
4    A.    No.
5    Q.    At all, during your
6  employment?
7    A.    No.
8    Q.    Did the second shift at
9  Euro-Pro end after a few months?
10    A.    Actually, it ended probably
11  about a -- approximately a week after I
12  talked to Terry about that incident.
13    Q.    Okay.  At that point, did the
14  company offer for you to go into life cycle
15  testing?
16    A.    It was not an offer.  It was
17  that:  We're going to put you in the life
18  cycle test area.
19    Q.    All right.  And this was in
20  April of '04?
21    A.    I think, correct.
22    Q.    This was basically testing of
23  all the other products and how they would

Page 68

1  last on the market, their reliability?
2    A.    Yes.
3    Q.    And were you excited about the
4  opportunity?
5    A.    I was excited, yes.
6    Q.    And based on your skill set
7  and your past experience, was it something
8  -- was it a challenge that you wanted to
9  take on?
10    A.    In the beginning.
11    Q.    And did you understand it as
12  an opportunity to grow and advance in the
13  company?
14    A.    Yes.
15    Q.    And didn't you, in fact, learn
16  that Ralph Hudnall had sort of gotten his
17  start before he made supervisor doing a
18  similar type thing?
19    A.    I don't know.
20    Q.    You don't recall that?
21    A.    No.
22    Q.    Did you view it as a promotion
23  of sorts?

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1    A.    No.
2    Q.    You did not?
3    A.    No.
4    Q.    Why not?
5    A.    There was no more money, there
6    wasn't a raise, it wasn't a promotion.
7    Q.    That position was not offered
8    to anybody else, was it?
9    A.    I don't know.
10    Q.    As far as you know, it wasn't;
11    correct?
12    A.    Correct.
13    Q.    All right. And you were given
14    a position description or a job description;
15    correct?
16    A.    Correct.
17            (Defendant's Exhibit 2 was
18            marked for identification
19            purposes.)
20    Q.    All right. I'll show you what
21    I'm marking as Defendant's Exhibit 2. Why
22    don't you just -- You can put those up, if
23    you don't mind. Thanks. Because I'm just

Page 70

1    going to -- It's the same stuff, though.
2            MR. LIGHTFOOT: Do you need
3    this, John?
4            MR. COTTLE: It's the same
5    thing in here?
6            MR. LIGHTFOOT: It's the same
7    stuff you've got.
8            MR. COTTLE: Okay.
9    Q.    All right. Was this the
10    position description that was given to you?
11    A.    Yes.
12    Q.    All right. And who talked
13    with you on the front end about this new
14    opportunity for you? Was it --
15    A.    Can you rephrase that?
16    Q.    Sure. Well, did Terry and
17    Ralph and Chad talk with you about this new
18    opportunity? I know Ralph did, I just want
19    to know who all talked with you about this?
20    A.    Ralph and Terry.
21    Q.    Ralph and Terry. Okay. And
22    how many times did they talk with you before
23    you began it, before you started doing it?

Page 71

1    A.    If my memory serves me
2    correctly, it was only once.
3    Q.    Okay. All right. And would
4    that have been where you expressed
5    excitement in the new opportunity?
6    A.    When -- Yes.
7    Q.    Okay. And can you remember
8    the specifics of what they talked about in
9    that meeting?
10    A.    Specifically, Terry Robertson
11    said that he need to get the life test
12    system up and going. And they was going to
13    move me from cleanability area into the life
14    test system, to get it up and running.
15    Q.    Okay.
16    A.    And that's what I can recall
17    specifically.
18    Q.    Okay. Do you remember Ralph
19    adding anything to that discussion?
20    A.    I don't remember.
21    Q.    Okay. Did you have a -- Did
22    you sit down with Ralph and Terry and walk
23    through the job description? I'll ask that

Page 72

1    first.
2    A.    I remember seeing this. I
3    don't remember that we sat down and walked
4    through it.
5    Q.    Okay. Would that have been in
6    the first meeting with Ralph and Terry or in
7    a subsequent meeting with Ralph?
8    A.    I don't remember. I think
9    this was after that meeting. I don't
10    remember.
11    Q.    Okay. So, this would have
12    probably been with just Ralph?
13    A.    I think. I don't recall
14    actually when it happened or who I talked
15    to.
16    Q.    Okay. And when Ralph or
17    Terry, whoever was walking through this with
18    you, did they sort of walk through these
19    five main areas of responsibilities?
20            MR. COTTLE: Object to the
21    form. I think he said no one had walked
22    through it with him.
23    Q.    Did Ralph discuss these five

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  areas with you?
2      A.    Yes.
3      Q.    Okay.  Did you ask any
4  questions about it?
5      A.    I think we talked about it.  I
6  don't remember asking any questions, but we
7  did -- I think we did discuss it.
8      Q.    Okay.  Did Ralph or Terry say
9  words to you to the effect of -- in one of
10  these initial meetings that they wanted you
11  to take the life cycle testing to the next
12  level?
13     A.    Yes.
14     Q.    And you felt, based on your
15  skills and experience, that that was
16  something that you could do; correct?
17     A.    Yes.
18     Q.    They also told you that if you
19  need any help doing your job, you should
20  rely on Ralph primarily as your supervisor;
21  correct?
22     A.    Yes.
23     Q.    And Chad Reese and Andras were

Page 74

1  also available to help you; correct?
2      A.    Ralph and Chad Reese was
3  available.  Andras, he was available in the
4  beginning, but he became not available, for
5  one day.
6      Q.    Okay.  Let me try to break
7  that down a little bit.  You say Ralph and
8  Chad were always available?
9      A.    Ralph and Chad was available.
10     Q.    Okay.  You say --
11     A.    Andras was not always
12  available.
13     Q.    Okay.  Did Andras work there?
14     A.    Yes.
15     Q.    Okay.  How was he unavailable?
16     A.    In the beginning of the
17  project that I was working on, doing --
18  building life tests, Andras became available
19  for me for one day.  And I expressed the
20  fact that on this project, I needed an
21  engineer on this project with me.  For one
22  day, Andras became available.  The next day
23  he was not available.

Page 75

1      Q.    All right.  When was it that
2  he was available, what one day?
3      A.    The project began --
4      Q.    -- in May; right?
5      A.    Right.
6      Q.    Okay.  Was it somewhere in the
7  start?
8      A.    He was beginning -- He was
9  available from the start, in May.  And the
10  next day I came to work, he was not
11  available.  And he expressed that Ralph had
12  told him that I was to do it by myself.
13     Q.    Okay.  From those first
14  meetings that you had with Ralph and Terry,
15  was it clear to you that the life cycle
16  testing was important to Euro-Pro?
17     A.    Yes.
18     Q.    Was it also clear to you that
19  they wanted you to succeed in that role?
20     A.    Yes.
21     Q.    And wasn't that the reason why
22  they said:  We want to make these three
23  folks available to you?  Was that part of

Page 76

1  why you say that?
2      A.    There was two people available
3  for me.  Andras was not available for me.
4      Q.    Okay.  Now, you sought the
5  help of Brian McGee a lot during the life
6  cycle testing, didn't you?
7      A.    If you want to call it a lot.
8  Sometimes.
9      Q.    Well, on a weekly basis, you
10  did, didn't you?
11     A.    No.
12     Q.    Well, he was regularly
13  available to you; correct?
14     A.    No.
15     Q.    All right.  How was he not
16  available?
17     A.    He was working on another
18  project.  I didn't -- He wasn't available to
19  work on a project with me.  He wasn't
20  regularly available.
21     Q.    Okay.  But he helped you on
22  several occasions, didn't he?
23     A.    On some occasions, yes.

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1    Q.   And he's an engineer; right?
2    A.   Yes.
3    Q.   Okay.  Now, in terms of
4  getting set up to do your new job, it was
5  what was called a lab technician, wasn't it?
6    A.   Yes.
7    Q.   The first -- Let's see.
8  Sometime within a month of your starting,
9  the largest project that you were assigned
10  was the steam cleaner life cycle testing;
11  correct?
12    A.   Correct.
13    Q.   When you first started on
14  that, you had several meetings with Ralph
15  and Chad to get you started; correct?
16    A.   Correct.
17    Q.   All right.  And, let's see,
18  was it at one of the earlier meetings when
19  the group of you put together the diagram?
20    A.   I think it was, like, a week
21  after when Chad came up with that sketch.
22    Q.   Okay.  So, you knew that --
23  Well, you knew actually going in that

Page 78

1  building and installing the automated steam
2  cleaner fixture was going to be a big part
3  of your job; correct?  You'll see it listed
4  there about three-fourths of the way down.
5    A.   Yes.
6    Q.   Okay.  So you said it was,
7  what, maybe early on -- I can't remember
8  what you said, maybe a couple of meetings
9  into it this diagram was come up with?
10    A.   Yes.
11    Q.   Okay.  So, the early meetings
12  would have been with Ralph and Chad; is that
13  right?
14    A.   Correct.
15    Q.   Okay.  And then you said maybe
16  the third meeting is when y'all came up with
17  this diagram; correct?
18    A.   We came up with that sketch,
19  yes.
20    Q.   The sketch.  Okay.  And this
21  was a schedule that y'all wrote on the white
22  board; correct?
23    A.   Correct.

Page 79

1    Q.   And then y'all have a
2  technology that reduces it to a piece of
3  paper; right?
4    A.   Correct.
5    Q.   Okay.  And what y'all do is,
6  it looks like y'all sort of went through and
7  set up the various stages that would need to
8  be accomplished to complete the project; is
9  that what it was?
10    A.   Correct.
11    Q.   Okay.  And y'all agreed that
12  these were the appropriate stages; correct?
13    A.   Correct.
14        (Defendant's Exhibit 3 was
15         marked for identification
16         purposes.)
17    Q.   All right.  I'll go ahead and
18  just let you -- You can see it from a
19  distance.  I'll mark this as Defendant's
20  Exhibit 3.  That's the sketch we're talking
21  about; correct?
22    A.   Correct.
23    Q.   Okay.  And y'all all agreed on

Page 80

1  the project completion date of July 28th;
2  correct?
3    A.   No.
4    Q.   Well, who came up with that
5  date?
6    A.   Chad Reese.
7    Q.   Okay.  You didn't disagree
8  with that date, did you?
9    A.   Yes.
10    Q.   Well, you didn't say:  That's
11  not a good date, did you?
12    A.   I talked to Ralph Hudnall that
13  no way I could finish that alone by that
14  date.
15    Q.   Okay.  And what did Ralph say?
16    A.   He said:  Don't worry about
17  it.
18    Q.   Okay.
19    A.   He said:  It will be all
20  right.  Just do the best you can.
21    Q.   Okay.  And was that where
22  Ralph also told you that you could rely on
23  other people to get help?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 81

1    A.    And I asked him: Could I get
2  an engineer on the project? And that's when
3  Andras had came into the project.
4    Q.    Okay.
5    A.    And the next day he was gone.
6    Q.    All right. After y'all came
7  up with this sketch -- And you had input
8  into this sketch, didn't you?
9    A.    No.
10    Q.    Okay. Are you saying there's
11  some other part of this sketch or the
12  staging deadlines that you thought was wrong
13  or inappropriate?
14    A.    I asked for a schematic or a
15  diagram from an engineer of how to build --
16  or how to install the handles for the steam
17  cleaner and this is the sketch I came up
18  with. And I totally disagreed to Ralph
19  Hudnall that: This right here is
20  unprofessional. I don't know what to do
21  with this.
22    Q.    Who drew this sketch?
23    A.    Chad Reese.

### Page 82

1    Q.    And Chad is an engineer;
2  right?
3    A.    And that's what he told me.
4  He said: I'm an engineer. I'll draw you a
5  sketch. And he drew that in three minutes.
6    Q.    Well, did you say: Chad,
7  that's not good enough?
8    A.    I said: Chad, that's not good
9  enough and that's not going to work.
10    Q.    You said that in front of Chad
11  and Ralph?
12    A.    Yes.
13    Q.    What did they say when you
14  said: That's not good enough?
15    A.    Chad said: It will work. He
16  said: It will work. Go build it.
17    Q.    Why did you say that wouldn't
18  work?
19    A.    Because you have a ball coming
20  out of an air piston hitting a trigger.
21  There's no way that that ball is going to
22  ever be stable in hitting that trigger at
23  the exact same point every time, because it

### Page 83

1  is round.
2    Q.    You didn't point out that
3  specific problem to Chad, did you?
4    A.    Yes.
5    Q.    What did Chad say?
6    A.    Again, he said: I'm an
7  engineer. Go build it.
8    Q.    So did Chad -- So Chad clearly
9  thought it would work; right?
10    A.    Yes.
11    Q.    Okay. Was it clear that Ralph
12  thought it would work as well?
13    A.    It was not clear that Ralph
14  thought it was going to work.
15    Q.    Did Ralph say he disagreed
16  with it?
17    A.    Ralph had some -- I think
18  Ralph didn't say that he disagreed with it,
19  but he had some questions on whether it
20  would work or not.
21    Q.    All right. After this
22  schematic was drawn, did you have a series
23  of meetings with Ralph about sort of going

### Page 84

1  forward and what was the basic set-ups of
2  the life test fixture?
3    A.    I think so. After this
4  sketch, yes, I think so.
5    Q.    Okay. And that would have
6  been, what, within the week or two right
7  after this sketch?
8    A.    Yes.
9    Q.    All right. And were those --
10  Would some of them take all morning, or were
11  they one hour, or how long would those
12  meetings take?
13    A.    Oh, not even an hour. It
14  wasn't no hour-long meetings.
15    Q.    Okay. They were -- Would you
16  sit down with Ralph and talk through the
17  basics of sort of creating this fixture as
18  you were getting started?
19    A.    Yes.
20    Q.    Okay. All right. So, that is
21  somewhere in the -- Do you remember if that
22  was in early May?
23    A.    Yes.

21 (Pages 81 to 84)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1    Q.    Okay.  So that was in early
2  May.  So, basically, the setup was for you
3  to do this and have it done in about three
4  months' time, is that correct; by the end of
5  July, so May, June, July?  Sounds like it's
6  a little less, depending on when it was in
7  early May; right?
8    A.    Honestly, I don't know if this
9  came off in early May.  I think it was more
10  like early June when the project had came
11  about.  I'm not for sure.  But I think the
12  project started in, like, early June.  I'm
13  not sure.
14    Q.    Okay.  After the series of
15  meetings that you had at the beginning with
16  Ralph, did you ever seek Ralph's help on the
17  project?
18    A.    Yes.
19    Q.    All right.  On how many
20  occasions, after those early meetings, did
21  you seek Ralph's help on the project?
22    A.    Mostly -- I don't know how
23  many occasions that I talked to Ralph about

Page 86

1  the project, but I had to consult with Ralph
2  about anything that I wanted to do with the
3  project.
4    Q.    All right.  I'll show you an
5  e-mail --
6        MR. LIGHTFOOT:  John, I
7  produced this, didn't I?
8        MR. COTTLE:  Yeah.  If it's
9  the one I think --
10        MR. LIGHTFOOT:  I certainly
11  meant to, if I didn't.
12            (Defendant's Exhibit 4 was
13            marked for identification
14            purposes.)
15    Q.    All right.  I'll show you an
16  e-mail that I am showing you from late June.
17  Did you ask Chad for some help on an
18  occasion somewhere around June 28, 2004?
19    A.    I asked Chad for the
20  specifications of a steamer.
21    Q.    Okay.  And did he provide them
22  to you?
23    A.    Yes.

Page 87

1    Q.    Okay.  And is that what is
2  noted there on the e-mail that's dated
3  Monday, June 28, at 10:55 a.m.?
4    A.    Correct.
5    Q.    Okay.  Then, after that, you
6  sent him a response in which you asked him
7  for some more information; correct?
8    A.    Yes.
9    Q.    All right.  But his response
10  is, that that information is not something
11  he can give you because it changes and is
12  variable and you've got to go figure that
13  out yourself; correct?
14    A.    No.  I don't know if that was
15  his response.
16    Q.    Okay.  You tell me how you
17  interpret his response.  It's up on the top
18  of the page.  They go backwards.
19        MR. COTTLE:  It's just
20  backwards.
21    A.    Okay.  If that's what he
22  wrote, yes.
23    Q.    Okay.  On how many other

Page 88

1  occasions, after the initial meetings that
2  you had with Chad and then Ralph, did you
3  ever seek Chad's help with this project?
4    A.    I consulted with Chad whenever
5  I needed to buy equipment for the project,
6  and Ralph.
7    Q.    All right.  How about, though,
8  in terms of designing or the engineering of
9  the project?  Did you ever talk with Chad
10  about that, other than this one occasion on
11  June 28th?
12    A.    Yes.
13    Q.    How many times?
14    A.    More than five.  We
15  probably --
16    Q.    Less than ten?
17    A.    Less than ten.
18    Q.    All right.  And then the times
19  you talked with Ralph, would that be less
20  than ten as well, about the design or --
21    A.    I'm not sure.
22    Q.    I'm sorry.  Let me finish the
23  question, if you don't mind.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1    Q.    Let me show you what I'm
2  marking as Defendant's Exhibit 6. Well,
3  hold on.
4          As of July 31, or I guess the
5  end of July -- As of the end of July, you
6  did not have the steam cleaner life test
7  project completed; correct?
8    A.    Correct.
9    Q.    And you told that to Ralph;
10 right?
11   A.    Before I started the project,
12 it wasn't going to get finished at that
13 time, yes.
14   Q.    In late July or August, when
15 it wasn't completed, did Ralph tell you
16 words to the effect of: Get it done as
17 quickly as you can, even though we realize
18 you're not going to meet this July 28th
19 deadline?
20   A.    I can't recall that we ever
21 talked about that.
22   Q.    Okay. Well, you understood it
23 was of significant importance to the company

Page 102

1  that it be completed as quickly as possible;
2  correct?
3    A.    Of course.
4    Q.    And you understood that it
5  needed to work and work well; correct?
6    A.    Of course.
7    Q.    And you knew that Euro-Pro was
8  number one in the world in steam cleaners;
9  correct?
10   A.    I didn't know that exact -- I
11 did not know that, no.
12   Q.    You didn't know they're the
13 market leader in steam cleaners?
14   A.    No, actually, I didn't.
15   Q.    Did you know -- Did you know
16 the reason why it was important that the
17 steam cleaner life test be designed and
18 constructed and working well as soon as
19 possible?
20   A.    I mean, I understood that it
21 should have been working well and done --
22 that's anything that we should do, that we
23 should do it like that, quickly as possible

Page 103

1  and working well, yes, I understood that.
2    Q.    Okay. And sometime around
3  July 28th or early August, or whenever it
4  became apparent it wasn't going to be done
5  by then, did Ralph say words to you to the
6  effect of: You need to be reporting to me
7  on a weekly basis on the update as to how
8  it's coming and how close we're getting to
9  completion so that I can report to Terry
10 Robertson where we stand?
11   A.    No. I never had that
12 conversation.
13   Q.    All right. Did you understand
14 that Ralph was reporting to Terry about how
15 the design was going and how well it was
16 working?
17   A.    I did not -- I didn't know
18 that, no.
19   Q.    You didn't know that at all?
20   A.    No.
21         (Defendant's Exhibit 6 was
22         marked for identification
23         purposes.)

Page 104

1    Q.    All right. Let me show you
2  what I'm marking as Defendant's Exhibit 6,
3         MR. LIGHTFOOT: You've got it,
4  John.
5    Q.    Is this the evaluation you
6  were given on -- somewhere around August 20
7  -- August 31, 2004?
8         (Off-the-Record discussion
9         was held.)
10   A.    Ask the question again.
11   Q.    Sure. Is what I've just given
12 you, which I've marked as Defendant's
13 Exhibit 6, is that the evaluation that you
14 were given somewhere around August 31, 2004?
15   A.    Correct.
16   Q.    Okay. And Ralph gave it to
17 you; correct?
18   A.    Correct.
19   Q.    And you signed it?
20   A.    Correct.
21   Q.    Okay. And you agreed with it?
22   A.    Correct.
23   Q.    Okay. And do you have any

26  (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  idea how he rated you compared to the other
2  employees that he rated?
3      A.    No.
4      Q.    Okay.  And he talked about --
5  He talked about, once again, your strengths;
6  is that correct?
7      A.    Correct.
8      Q.    And also talked about the
9  areas in which you needed improvement;
10  correct?
11      A.    Correct.
12      Q.    And you didn't disagree with
13  any of the areas in which you needed
14  improvement; correct?
15      A.    Correct.
16      Q.    Now, you encountered some
17  significant problems in designing the steam
18  cleaner life cycle test; correct?
19      A.    Correct.
20      Q.    And some of those problems
21  were within your control and some of those
22  were outside of your control; correct?
23      A.    Correct.

Page 107

1      Q.    Yeah, but you -- Let's see.
2  You made the decision on which parts to
3  order; correct?
4      A.    No.  Chad Reese made the
5  decision to order those parts.
6      Q.    Well, was it your job, as the
7  designer of the life cycle test, or was it
8  Chad's job to order the parts?
9      A.    It was my job to build the
10  life test fixture.  Before the project, I
11  repeatedly asked for an engineer to do the
12  design and the schematics for the job,
13  correct.
14      Q.    My question is, in terms of
15  ordering the correct parts, whose job would
16  that be?
17          MR. COTTLE:  Which parts are
18  you talking about, now?
19          MR. LIGHTFOOT:  Any of the
20  parts.
21      A.    It would be left on me to
22  order the right parts.  But I consulted with
23  Chad to order the parts.

Page 106

1      Q.    One of the ones that was
2  within your control would have been when you
3  ordered the wrong valves; correct?
4      A.    I don't recall ordering wrong
5  valves.
6      Q.    All right.
7      A.    I don't recall.
8      Q.    Okay.  Do you recall ordering
9  parts that needed to be able to withstand a
10  very high temperature, but then it turns out
11  that the parts you ordered could not
12  withstand those temperatures?
13      A.    Correct.
14      Q.    Okay.  Was that the valves?
15      A.    Those are parts I consulted
16  with Chad Reese about, and they were -- I
17  was told to order those parts.
18      Q.    Okay.  Now, you didn't talk
19  with Chad about the number of -- the amount
20  of degree that it needed to withstand, did
21  you?  That was part of your job; right?
22      A.    Correct.  I talked to Chad
23  Reese about that.

Page 108

1      Q.    Are you saying that you
2  consulted with Chad before you ordered every
3  part?
4      A.    Any part that was over a
5  hundred dollars, I had to let Terry
6  Robertson know, Ralph Hudnall know and Chad
7  Reese know.  And just about every part on
8  that life test fixture was over a hundred
9  dollars.
10      Q.    Did you design handles that
11  did not work properly?
12      A.    No.
13      Q.    Did you design the handles?
14      A.    No.
15      Q.    What role did you play in the
16  handles?
17      A.    The handles was contracted out
18  to an independent contractor.  They was
19  designed by an independent contractor.
20      Q.    Did you try to do them first?
21      A.    I tried to do what's on this
22  sketch that I was shown and it wouldn't
23  work, because Chad Reese told me to try it

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  to see if it would work. I'm a technician,
2  not an engineer.
3        Q.    Were the problems with the
4  handles that you used was that they weren't
5  as flexible as they needed to be?
6        A.    The problem was, it was a
7  design flaw in the beginning, as I
8  previously expressed to Chad Reese at the
9  beginning of the project.
10       Q.    Okay. So, you're blaming that
11 on Chad Reese, the handles; is that correct?
12       A.    The handles -- This diagram,
13 this schematic, yes, this is Chad Reese.
14 This is a flaw in Chad Reese's design.
15       Q.    How much time did you spend on
16 the handles?
17       A.    I spent -- I don't know. I
18 don't have the exact time.
19       Q.    Approximately?
20       A.    I can't approximate. I mean,
21 I was on the project. So it was probably
22 all the time.
23       Q.    Okay. Tell me about the

Page 110

1  problems in the design that would have been
2  your fault, not Chad Reese's fault, or in
3  the construction.
4        A.    Like I said before, the
5  handles and everything was contracted out.
6  And it was all -- The engineers and me
7  looked at what the construction schematic
8  was. And I didn't see no problems with the
9  handles or the design of the handles, and
10 still don't.
11       Q.    But they didn't work, did
12 they?
13       A.    Yes, they did.
14       Q.    You mean the ones that were
15 contracted out?
16       A.    Yes.
17       Q.    Okay. But the ones you had
18 before that didn't work?
19       A.    No. But it was a design flaw
20 from Chad Reese.
21       Q.    Well, to be clear, you're not
22 blaming every construction problem on the
23 life test for the steam cleaners on Chad

Page 111

1  Reese, are you?
2        A.    I was not aware that there was
3  a lot of construction problems on the life
4  test.
5        Q.    Well, what were the problems
6  that y'all encountered in constructing the
7  life test for steam cleaners?
8        A.    The beginning problem was the
9  holdup on the design of the handles.
10       Q.    Okay.
11       A.    I expressed the fact that I
12 think they need to be contracted out because
13 we don't have the tools or the equipment
14 here to do it.
15       Q.    And did management report back
16 to you: We want you to construct them?
17       A.    Management in the beginning
18 reported to me they wanted me to design this
19 sketch and see would it work. And I -- They
20 wanted me to put this sketch together on the
21 handle to see would it work and I did so,
22 and it did not work.
23             At that point, we did not have

Page 112

1  the materials there to make it work. And I
2  expressed that in order to get it done, a
3  way that we needed it done, we need to
4  contract it out.
5        Q.    Okay. What other significant
6  problems arose with the construction of the
7  life test for steam cleaners?
8        A.    I'm not aware of any other
9  construction problems of it, I guess.
10       Q.    Sometime in November, did you
11 request a two-week vacation?
12       A.    I requested a two-week
13 vacation, I think, way before November.
14       Q.    Well, were you granted a
15 two-week vacation in November?
16       A.    Yes.
17       Q.    Around Thanksgiving?
18       A.    Yes.
19       Q.    Okay. You also asked Ralph
20 Hudnall if you could leave early the last
21 day of work; correct?
22       A.    Correct.
23       Q.    And Ralph said words to the

28 (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1 effect: No, not unless it's fully
2 operational; is that correct?
3  A.  No.
4  Q.  What did he say?
5  A.  I went to a meeting with Ralph
6 and I explained to Ralph that there was a
7 situation going on with the life test that I
8 think that we could buy a different part, it
9 would have improved the dependability of the
10 life test. And I explained to him what the
11 part was, and how we need to do it.
12      And after that, I asked him --
13 I told him I needed something to do before I
14 go on vacation, can I leave early? He said:
15 No -- He said:  Not a problem. I'm going to
16 leave early, too, just shut everything down.
17  Q.  Now, Ralph met with you the
18 morning -- that Friday morning before you
19 left for vacation; right, November the 19th?
20  A.  Yes. That's the conversation
21 we just had, yes.
22  Q.  Okay. And he told you that
23 before vacation, he needed to know about any

Page 114

1 problems with the life cycle for steam
2 cleaners; correct?
3  A.  Correct. And I told him the
4 problems I had with the steam cleaner.
5  Q.  All right. What problems did
6 you tell him in that meeting that morning?
7  A.  That there was -- We needed to
8 buy a current censor that would actually
9 turn the life test system on and off better
10 than what we had. And he agreed, that would
11 be a better equipment to buy.
12  Q.  Okay. Are there any other
13 problems that y'all discussed?
14  A.  Not as I can recall.
15  Q.  Okay. Did he also tell you
16 that it was -- Did he tell you it was
17 important that they be -- that the test be
18 fully operational before you went on
19 vacation?
20  A.  No.
21  Q.  Words to that effect?
22  A.  No.
23  Q.  All right. He did confirm

Page 115

1 with you that you would be available for him
2 to talk to on vacation, if he needed you?
3  A.  Correct.
4  Q.  All right. Did you leave at
5 -- What time did you leave, noon?
6  A.  I think lunchtime, yes.
7  Q.  Now, are you -- Are you
8 claiming that you had permission to go?
9  A.  Yes.
10  Q.  From whom?
11  A.  Ralph Hudnall.
12  Q.  And how is it that you say he
13 gave -- What is it that -- How is it that
14 you say you have permission?
15  A.  I asked him could I leave
16 early, I have some personal business to take
17 care of. He said: No problem, no problem,
18 I'm going to leave early, too. So just shut
19 everything down in the life test bay because
20 I'm leaving early, too. He had some
21 personal business to take care of.
22  Q.  And is it your testimony that
23 he did not say: It's okay to leave early,

Page 116

1 if the life test was running, or if you were
2 aware of any minor problems that needed to
3 be dealt with?
4  A.  No. He never told me that.
5 We had discussed a minor problem earlier,
6 but that was not an issue.
7  Q.  All right. On Monday morning,
8 November 22nd, Ralph called you at home;
9 correct?
10  A.  I never received a phone call
11 from Ralph while I was on vacation. Not as
12 I know of. I can't recall if I did ever
13 receive a phone call from Ralph.
14  Q.  Do you recall Ralph calling
15 you and telling you that the wires were
16 disconnected on Monday, November 22nd, and
17 reaching you and talking to you at your
18 home?
19  A.  I don't remember him ever
20 calling me while I was on vacation.
21  Q.  Okay. So, you just -- You
22 don't recall that?
23  A.  I don't recall that.

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1    Q.    You're not denying that, you
2  just don't recall it?
3    A.    I don't recall that.
4    Q.    Okay.  You had disconnected
5  the wires before vacation; correct?
6    A.    Correct.
7    Q.    Okay.  And did you report to
8  Ralph that the life test was not safe to
9  run?
10    A.    I reported that to him earlier
11  before I left, that we needed a current
12  censor to sense the current in the life
13  test.  And right at that moment, I don't
14  think it was safe to run.
15    Q.    Okay.  Did you also tell him
16  that on the Monday, do you recall?
17    A.    That -- I don't recall Ralph
18  ever calling me while I was on vacation.
19    Q.    Okay.  Do you recall saying
20  words to him on that Monday that you would
21  look into it after your vacation?
22    A.    I don't recall Ralph ever
23  calling me while I was on vacation.

Page 118

1    Q.    Okay.  Do you recall having a
2  discussion with Ralph about talking with
3  Chad Reese?
4    MR. COTTLE:  At what time?
5    Q.    On Monday, or at any time
6  after you went on vacation.
7    A.    As I said before, I don't
8  recall ever talking to Ralph while I was on
9  vacation.
10    Q.    Fair enough.  Where did you go
11  on vacation?
12    A.    Nowhere.
13    Q.    Okay.  And you only had one
14  home phone number; correct?
15    A.    Correct.
16    Q.    What is your home phone
17  number, or what was it then?
18    A.    Okay.  Area code (334)
19  863-4893.
20    Q.    Did you go visit Chad Reese at
21  the hospital?
22    A.    Yes.
23    Q.    What day?

Page 119

1    A.    It was that Friday I left
2  early on vacation.
3    Q.    And is that when they thought
4  he had had a heart attack?
5    A.    Yes.
6    Q.    Did you talk with Chad about
7  anything business related?
8    A.    I talked to him about the
9  situation about the current censor.  And he
10  said:  The current censor would work a whole
11  lot better.  He agreed.
12    Q.    Was he physically in a
13  hospital bed when you talked to him?
14    A.    Yes.
15    Q.    You didn't tell him you had
16  disconnected the wires, did you?
17    A.    We didn't get deep into it.
18  He asked me how is things going, I asked him
19  how he was.  We talked about a lot of
20  things.
21    Q.    Is the answer no, you didn't
22  tell him you disconnected the wires?
23    A.    No.

Page 120

1    Q.    I may be asking it wrong.  Am
2  I correct that you did not ask him -- I'm
3  sorry.  Let me start over.  Am I correct
4  that you did not tell him that you had
5  disconnected the wires; is that correct?
6    A.    I don't remember ever telling
7  him that.  I may have.  I don't remember.
8    Q.    But you say you all did talk
9  about the current censor?
10    A.    Correct.
11    Q.    And what was said about that?
12    A.    He thought that it would be
13  better.  He agreed.
14    Q.    Do you recall when the company
15  got the LabVIEW software from Auburn?
16    A.    Do I recall when they got the
17  LabVIEW software?
18    Q.    Yes.
19    A.    No, I don't recall.
20    Q.    Were you aware that the
21  company had gotten LabVIEW software at some
22  time?
23    A.    Yes.

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 129

1  meeting: Yes, we can't allow Victor to pick
2  up after ourselves. So we need to keep our
3  area clean when we go working in those
4  areas.
5      Q.    Did you return from vacation
6  on December 1, 2004?
7      A.    Correct.
8      Q.    Was that a Monday?
9      A.    Correct.
10     Q.    Did you come -- Did you start
11 somewhere around 7:30 in the morning?
12     A.    I came in around 7:30 in the
13 morning, yes.
14     Q.    All right. Were you called
15 into Terry's office?
16     A.    Yes.
17     Q.    And was Chad Reese in there?
18     A.    Yes.
19     Q.    All right. Did Terry -- What
20 did Terry tell you?
21     A.    I think Terry said that they
22 needed to eliminate the technician in that
23 area and hire an engineer. And I asked him:

Page 130

1  Do you mean eliminate me? And he responded:
2  Yes.
3      Q.    All right. Did he tell you
4  about -- that he felt that you had not
5  performed well doing -- completing the life
6  cycle for steam cleaner?
7      A.    Yes.
8      Q.    What did he say about that?
9      A.    He thought that it was -- cost
10 too much. And I responded to him: I didn't
11 -- I did not have a budget plan or a maximum
12 or a minimum of how much it should cost. He
13 thought, he said, that it took too long.
14     Q.    Did he talk about the
15 condition that you left the test in before
16 you went on vacation?
17     A.    Yes. And I explained to him I
18 talked to Ralph Hudnall about that.
19     Q.    Did he say that you had left
20 it not fully operational, or words to that
21 effect?
22     A.    Words to that effect.
23     Q.    Did he say that you had not

Page 131

1  informed Ralph of the issues like you were
2  supposed to before you went on vacation?
3      A.    And I explained to him I did.
4      Q.    Okay. Did he explain to you
5  about the wires being disconnected and how
6  it wouldn't run?
7      A.    Correct.
8      Q.    Did he explain to you about
9  how Ralph had to rip out the wires and
10 rebuild the wiring?
11     A.    I don't remember that.
12     Q.    Did you ever learn that, that
13 that had happened?
14     A.    No.
15     Q.    All right. So he told you
16 about those things. And did he tell you
17 that he thought that was inappropriate on
18 your part, that you had done those things?
19     A.    Yes.
20     Q.    All right. And what was your
21 response to that?
22     A.    I explained to him that I
23 talked to Ralph about that before I left. I

Page 132

1  explained to him that Ralph said it was okay
2  for me to leave early that day because he
3  was leaving early that day, too.
4          And he said: Well, you didn't
5  tell me. And my thoughts were that I
6  thought I was supposed to report to Ralph.
7      Q.    Did he talk to you about Ralph
8  talking to you while on vacation?
9      A.    I can't recall.
10     Q.    All right. Any other --
11 Anything else that was said by Terry or you
12 at the start of that conversation?
13     A.    I can't recall of anything
14 else.
15     Q.    At some point, did you jump up
16 and raise your voice?
17     A.    No, I jumped up and gave him
18 my keys and left.
19     Q.    What did you say? What words
20 did you say when you jumped up?
21     A.    I can't recall.
22     Q.    What comments did you make
23 about the life cycle for steam cleaners

33  (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1    Q.    And he was always available to
2  help; correct?
3    A.    Not always.
4    Q.    For the most part?
5    A.    Correct.
6    Q.    Okay.  And he told you Andras
7  would be available?
8    A.    He assigned Andras for one
9  day.
10    Q.    Okay.  And you knew Chad Reese
11  was available?
12    A.    Correct.
13    Q.    Tell me the information that
14  you have from any source that Euro-Pro's
15  decision to terminate your employment was
16  based on your race.
17    A.    Any information I have?
18    Q.    Yeah.  From any source that
19  makes you think that Euro-Pro's decision was
20  in any way based on your race?
21    A.    I don't have any information.
22    Q.    The only claim that you're
23  making in this lawsuit of discrimination is

Page 139

1    Q.    Oh, was she on life testing?
2    A.    No.
3    Q.    What was she in?
4    A.    She was a lab technician.  She
5  worked inside the lab.
6    Q.    Oh, so, she wasn't considered
7  in either of those other two categories?
8    A.    What other two categories?
9  I'm sorry.
10    Q.    I said cleanability or life
11  testing -- life cycle testing.
12    A.    No.
13    Q.    All right.  What performance
14  problems are you claiming that she had --
15  Well, tell me in which way you believe she
16  was treated more favorably than you.
17    A.    I believe that she would come
18  in late every day, almost every day, five,
19  ten, fifteen, twenty minutes late.  And
20  she's never got -- I don't believe, I don't
21  know that she got written up or anything for
22  that.
23        She also got caught numerous

Page 138

1  that this -- that your termination was
2  unfair and based on your race; correct?
3    A.    Correct.
4    Q.    Are you aware of any white
5  employees who did the same things you did,
6  and was similarly situated to you, who was
7  treated more favorably than you?
8    A.    Yes.
9    Q.    Who is that?
10    A.    I believe that Ashley
11  Sheffield was treated more favorably than
12  me.
13    Q.    Anybody else?
14    A.    No.
15    Q.    Okay.  Now, Ashley Sheffield,
16  was she an hourly employee or salaried
17  employee?
18    A.    Salary, I believe.
19    Q.    She was a technician?
20    A.    Yes.
21    Q.    All right.  And she was in
22  cleanability; right?
23    A.    No.

Page 140

1  times on the Internet.  I never knew that
2  she ever got written up or anything after
3  that.
4    Q.    Do you know one way or the
5  other whether she was ever spoken to by
6  management about what you say is coming in
7  late every day?
8    A.    I think she was spoken to by
9  management once.
10    Q.    Okay.  Are you aware of that
11  ever being a problem after that?
12    A.    Yes.  If she continued.
13    Q.    Did you keep up with her when
14  she started and when she stopped each day?
15    A.    No.
16    Q.    Did you supervise her?
17    A.    No.
18    Q.    Were you in the same area as
19  her?
20    A.    No.
21    Q.    Are you aware of her ever
22  being spoken to about being on the Internet?
23    A.    Yes.

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1    Q.    Are you aware of her ever
2  doing it after that?
3    A.    Yes.
4    Q.    All right. Did you -- But you
5  didn't work in the same department as she
6  did?
7    A.    No.
8    Q.    Are you aware of it ever
9  affecting the performance of her job?
10    A.    No.
11    Q.    Are you aware of what her
12  performance evaluations were like, in terms
13  of how she was performing her job?
14    A.    No.
15    Q.    All right. Any other white
16  employees that you're aware of who you would
17  say had performance issues or violated rules
18  and that weren't terminated?
19    A.    Not that I'm aware of, no.
20    Q.    Did anyone ever tell you that
21  race was a factor in the company's decision
22  to terminate your employment?
23    A.    I don't think I understand the

Page 142

1  question.
2    Q.    Well, do you have any
3  information from any other source, whether
4  you know it or whether someone else knows
5  it, that leads you to think that race had
6  anything to do with your termination?
7    A.    I think so, yes.
8    Q.    Yeah, but -- And I'm asking
9  you, do you have any basis for saying that,
10  other than just your subjective belief and
11  what you told me about Ashley Sheffield
12  being moved into the position after that?
13    A.    No. Not at this time, no.
14    Q.    Is there any other way in
15  which you believe Euro-Pro discriminated
16  against you on the basis of race at any
17  time?
18    A.    No.
19    Q.    Are you aware who took your
20  place at Euro-Pro?
21    A.    No.
22    Q.    Do you even know if you were
23  replaced?

Page 143

1    A.    I was told when I was fired I
2  was going to be replaced by an engineer.
3    Q.    That was in that meeting with
4  Terry Robertson and Chad Reese?
5    A.    Yes.
6    Q.    You never complained to
7  Euro-Pro about race discrimination at any
8  time during your employment, did you?
9    A.    No.
10    Q.    Did you ever tell jokes in the
11  workplace, jokes of a racial nature?
12    A.    No.
13    Q.    Did you ever tell them outside
14  the work place, but with folks that you
15  worked with?
16    A.    No.
17    Q.    Do you use the "N" word, ever?
18    A.    No.
19    Q.    Have you ever?
20    A.    I'm sure I have said it. I've
21  said it in this deposition before.
22    Q.    Other than this deposition?
23    A.    Yeah. Yes.

Page 144

1    Q.    You use it with your -- Have
2  you used it with your friends?
3    A.    No.
4    Q.    When is it that you have used
5  it?
6    A.    If it's in context when the
7  "N" word has been used or -- I don't call my
8  friends the "N" word. I don't do that. But
9  if it's a subject matter that's dealing with
10  the "N" word, I have used it.
11    Q.    Have you talked with your
12  friends about the Dave Chappelle Show?
13    A.    No.
14    Q.    Did you talk with Ashley
15  Sheffield and other coworkers about the Dave
16  Chappelle Show fairly regularly while it was
17  on TV?
18    A.    No.
19    Q.    Was that a common subject
20  amongst the employees at the office, whether
21  you were a part of it or not, about the Dave
22  Chappelle Show?
23    A.    It was a common subject with

36  (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 161

1    Q.    In fact, part of your job was
2  to help create it so that there would be a
3  design that would work for steam cleaners;
4  correct?
5    A.    No.
6    Q.    That wasn't your job?
7    A.    Well, it was my job to come up
8  with a solution. My job -- The independent
9  contractors did all the blueprints and
10 schematics for the steam cleaner fixtures.
11 I expressed to Ralph and Terry I never did
12 any kind of design. I'm not an engineer,
13 I'm a technician.
14    Q.    Well, you understood going in
15 that Euro-Pro was hiring you as a
16 technician, and not hiring an engineer, to
17 come up with this steam cleaner fixture?
18        MR. COTTER: Going into what,
19 now, his job or this project?
20        MR. LIGHTFOOT: This project.
21    Q.    Going into this project, you
22 understood that it was you, as a lab
23 technician, that they were expecting to come

Page 162

1  up with this steam cleaning fixture, not an
2  engineer; right?
3    A.    No. I did not understand
4  that. I did not understand that was the
5  reason -- That was not even the case. They
6  knew that a technician that has no
7  experience in this would not come up with a
8  design for this.
9    Q.    What did you think your job
10 was with regard to this steam clean fixture?
11 It was to build it, wasn't it?
12    A.    It was to build it correctly.
13    Q.    Okay. And there was no
14 schematic, in terms of how to take steps
15 one, two, three, four or an already- ready
16 drawing?
17    A.    An engineer does that.
18    Q.    All right. Was an engineer
19 assigned to build that fixture or were you
20 assigned to build that fixture?
21    A.    I was assigned that fixture, I
22 was assigned that project, yes.
23    Q.    Not an engineer?

Page 163

1    A.    Correct.
2    Q.    That was the whole point;
3  correct?
4    A.    I don't know what the whole
5  point was. But I was designed for the -- I
6  was put in -- tasked with that project, yes.
7    Q.    Ashley Sheffield was still a
8  temp after you were made permanent; correct?
9    A.    Ashley Sheffield was already
10 made permanent, I think, before I was made
11 permanent.
12    Q.    Okay. Do you know if it was
13 around the same time?
14    A.    I think it was actually the
15 same time or the same actual week.
16    Q.    Sometime in April -- around
17 April of '04?
18    A.    Correct.
19    Q.    Okay. And she was never the
20 lead person at any time, was she?
21    A.    No.
22    Q.    And did you understand whether
23 her pay was lower than yours or not?

Page 164

1    A.    We don't -- We didn't talk
2  about that.
3    Q.    You didn't talk about that
4  with her?
5    A.    No.
6    Q.    When you were lead person over
7  cleanability you had more responsibility
8  than she did; correct?
9    A.    It's safe to say correct. I
10 don't know what her responsibilities was.
11    Q.    Yeah. But even -- You knew
12 you had more responsibility than she did?
13    A.    No, I didn't know what her
14 responsibilities was. I knew what my
15 responsibilities was.
16    Q.    Right.
17    A.    Right.
18    Q.    But you were giving out -- For
19 instance, you were giving out assignments
20 to, what, seven people; right?
21    A.    Correct.
22    Q.    And she didn't have anything
23 like that? She didn't have responsibilities

41  (Pages 161 to 164)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 165

1 like that, did she?
2    A.    No.
3    Q.    Okay. When you became the lab
4 technician for the life cycle testing, you
5 had more responsibility than Ashley
6 Sheffield in her job, didn't you?
7    A.    I assume so, yes.
8    Q.    And you dealt with more
9 projects than she did, didn't you?
10    A.    Correct.
11    Q.    And you had more experience
12 than she did, didn't you?
13    A.    Correct.
14    Q.    And you had more education
15 than she did, didn't you, at that time?
16    A.    No, I think, if my memory
17 serves me correctly, we both had an
18 associate's degree in technical engineering
19 technology.
20    Q.    Do you remember going to the
21 EEOC, Mr. Smith?
22    A.    Correct. Yes.
23    Q.    Did you tell the EEOC the

Page 166

1 truth when you gave them your charge?
2    A.    As far as I know, yes.
3    Q.    You're not claiming in this
4 lawsuit, are you, that Dave Richards was
5 treated more favorably than you, are you?
6    A.    David Richards, I believe so,
7 yes.
8    Q.    Are you claiming he was a
9 white employee that was treated more
10 favorably than you?
11    A.    Yes.
12    Q.    Okay. Are there any other
13 employees that you're claiming were treated
14 more favorably than you?
15    A.    Not as I can remember, no.
16    Q.    Okay. So, are you claiming
17 that Dave Richards or Ashley Sheffield was
18 treated more favorable than you?
19    A.    Both.
20    Q.    All right. How is it that you
21 allege that David Richards was treated more
22 favorably than you?
23    A.    David Richards, numerous times

Page 167

1 called in sick and never showed to work.
2 More than five or six occasions I can think
3 of off the top of my head. I'm pretty sure
4 there was more.
5    And any other job that I ever
6 worked at, anybody that would show up late
7 like that, and call in to work almost once a
8 week or twice a week, would be terminated.
9    Q.    What time period -- Are you
10 talking about when y'all were in
11 cleanability together?
12    A.    When we was in cleanability
13 together and also when I was in life
14 testing.
15    Q.    Well, you said it happened
16 five or six times. Are you talking about --
17    A.    I said off the top of my head.
18 I'm pretty sure it's more than that.
19    Q.    Was that in cleanability?
20    A.    In cleanability and also when
21 I was in life testing.
22    Q.    Okay. When you were in life
23 testing, you were working a different area

Page 168

1 than he was; right?
2    A.    But I could see what's going
3 on, yes.
4    Q.    You weren't his supervisor,
5 were you?
6    A.    No.
7    Q.    Was he one of the employees
8 that -- Was he in -- Was he in cleanability
9 at the same time you were in cleanability,
10 or was he hired later?
11    A.    Let me think. I'm not sure.
12    Q.    As far as you know, you were
13 never over him?
14    A.    No.
15    Q.    You were not ever his
16 supervisor or lead person?
17    A.    I don't think so.
18    Q.    Okay. So, the time we're
19 talking about, when you say five or six
20 times, then you're talking about when you
21 were in life cycle and he was a temp in
22 cleanability; is that correct?
23    A.    That's correct.

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  Q.  Was he ever even made a
2  permanent employee while you were there?
3  A.  I'm not sure when he was made
4  permanent.
5  Q.  And his job certainly didn't
6  carry the responsibilities that yours did;
7  correct?
8  A.  Correct.
9  Q.  What was his job as a temp in
10  cleanability?
11  A.  He recorded data, picked up
12  dirt and sand and -- off the vacuum -- off
13  of carpets and recorded the vacuum cleaner
14  results.
15  Q.  The things you did, like, the
16  first month?
17  A.  Correct.
18  Q.  Any other reason that you
19  think -- that you claim that Mr. Richards
20  was treated more favorably than you?
21  A.  Other than him being white,
22  no.
23  Q.  Did you ever talk with any of

Page 170

1  his supervisors to know how they evaluated
2  his performance?
3  A.  No. That's something that I
4  didn't -- That's none of my business.
5  Q.  Did you ever talk to Ashley
6  Sheffield's supervisors to know how they
7  evaluated her performance?
8  A.  No.
9  Q.  Are you aware of either Ashley
10  Sheffield or Dave Richards telling their
11  supervisor they would do something and then
12  not doing it?
13  A.  I'm not aware of that, no.
14  Q.  Are you aware of Ashley
15  Sheffield or Dave Richards ever failing to
16  do a big project that they were assigned by
17  their supervisor in a timely and good
18  manner?
19  A.  No.
20  Q.  You told me about what you
21  claim was a -- you said a racially
22  inappropriate thing that you thought Ralph
23  Hudnall said to you. Do you remember that?

Page 171

1  A.  Correct.
2  Q.  I believe you also told me
3  that you're not aware of any other racist
4  statements or jokes or comments that were
5  ever made by anyone while you were at
6  Euro-Pro; is that correct?
7  A.  Not as I can recall, no.
8  Q.  On your initial disclosures
9  you list James Lee, I guess he's the EEOC
10  investigator, as someone who may have
11  information that supports your claim. What
12  would -- What does James Lee have to say
13  about your claims, if you know?
14  A.  I have no idea what you're
15  talking about.
16  MR. LIGHTFOOT: John, is he
17  just listed because he was the EEOC --
18  MR. COTTLE: Yeah. I mean,
19  you know -- And that's a document I
20  prepared. Victor didn't have anything to do
21  with that, other than it's based on what he
22  told me.
23  I listed him out of abundance

Page 172

1  of precaution. I don't have any idea that
2  he knows anything more than -- I mean, he
3  obviously knows something about it because
4  he conducted an investigation.
5  Q.  What were you making at
6  Euro-Pro at the time you were terminated?
7  A.  Twenty-eight thousand, six
8  hundred.
9  Q.  All right. I attached to your
10  deposition notice a request for production
11  of documents. Did you review those before
12  this deposition?
13  A.  Yes.
14  Q.  The requests?
15  A.  Yes.
16  Q.  Okay. As I understand from
17  John earlier, you don't have any responsive
18  documents except for tax returns, which
19  you'll be getting to me. So I just want to
20  make sure about that.
21  A.  Okay.
22  Q.  Sort of an overall question
23  that would cover a lot of these is: Do you

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1    A.    In February.
2    Q.    -- February?  And did some of
3  the Euro-Pro employees come to the funeral?
4    A.    Correct.
5    Q.    Who came?
6    A.    They came to the wake.
7    Q.    To the wake.  I'm sorry.  Who
8  came to the wake?
9    A.    Mason.
10   Q.    Mason.
11   A.    Brian.
12   Q.    Brian McGee?
13   A.    Yes.
14   Q.    Okay.
15   A.    I think Eric, but I'm not
16  sure.
17   Q.    Eric?
18   A.    I don't know Eric's last name.
19   Q.    Do you know Mason's last name?
20   A.    No.
21   Q.    Did you ever go over to Ralph
22  Hudnall's house?
23   A.    Yes.

Page 178

1    Q.    For what?
2    A.    We was having a -- I think it
3  was a Christmas party.  And I didn't want to
4  drive all the way back home.  He let me come
5  over and change clothes -- take a shower and
6  change clothes.
7    Q.    Did you appreciate him doing
8  that?
9    A.    Correct.
10   Q.    Did you consider him a friend
11  through work?
12   A.    I considered him an associate,
13  yes.
14   Q.    An associate?
15   A.    I mean --
16   Q.    I mean, were y'all on friendly
17  terms?
18   A.    We was on -- Yes, yes.
19   Q.    I mean, you didn't hesitate to
20  go to his house and shower, did you?
21   A.    After I asked him, no.
22   Q.    And when was that?  You said
23  it was a Christmas party?

Page 179

1    A.    I'm pretty sure it was.
2    Q.    Was that in '03?
3    A.    It was right after I got
4  hired, I think.
5    Q.    Yeah.  So it would have been
6  '03, if it was the Christmas party, I guess.
7          Have you ever been convicted
8  of a crime?
9    A.    Yes.
10   Q.    What was that?
11   A.    In 1991 or '92, for DUI.
12   Q.    Which county?
13   A.    San Diego County.
14   Q.    Is that in California?
15   A.    California.
16   Q.    Is that while you were in the
17  Navy?
18   A.    Yes.
19   Q.    Okay.  Did you ever serve any
20  time?
21   A.    Overnight.
22   Q.    Any other convictions?
23   A.    Gadsden, Alabama.  Public

Page 180

1  intoxication.
2    Q.    When was that, approximately?
3    A.    '97.  Around '97, '98.
4    Q.    Where were you when you were
5  arrested?
6    A.    At a nightclub.
7    Q.    Were you incarcerated?
8    A.    Overnight.
9    Q.    Any other convictions?
10   A.    No.
11   Q.    Did you keep a copy of the
12  documents that you sent the EEOC?
13   A.    I think so.
14        MR. LIGHTFOOT:  Will you get
15  me those, please, along with the tax
16  returns, John?
17        MR. COTTLE:  What documents
18  did you send to the EEOC?
19        THE WITNESS:  I did not send
20  anything to the EEOC.
21   A.    You asked me did I keep the
22  documents that the EEOC or that I sent the
23  EEOC?

45  (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1    Q.    Oh, I asked you that you sent
2    the EEOC.
3        A.    Oh, no. I don't have any
4    documents that I sent the EEOC.
5        Q.    Okay. You kept some documents
6    they sent you?
7        A.    Correct. I'm sorry. I
8    misunderstood the question.
9        MR. LIGHTFOOT: Same thing,
10   though, John, would you produce those as
11   well.
12       MR. COTTLE: I produced that.
13   I mean, all I have is --
14       MR. LIGHTFOOT: The Right To
15   Sue Notice.
16       MR. COTTLE: Yeah. That's all
17   I've got. Now, I've got some
18   correspondence. I might not have given you
19   this. I don't know.
20       MR. LIGHTFOOT: Okay.
21       MR. COTTLE: Let me just let
22   you look at it.
23       MR. LIGHTFOOT: Sure.

Page 182

1        MR. COTTLE: And I'll copy it
2    right now if you don't have it.
3        MR. LIGHTFOOT: Sure. These
4    are just from the Venable firm?
5        MR. COTTLE: Yes. I think she
6    copied Mrs. Rozenzweig with all that stuff.
7        MR. LIGHTFOOT: Oh, yeah. I
8    forgot about that.
9        MR. COTTLE: I don't if
10   there's anything in there that's -- I'll be
11   glad to copy that if you want it, if you
12   don't have it.
13       MR. LIGHTFOOT: Yeah, who --
14   John, this may be the same -- Yeah. I don't
15   need that. Thanks.
16       Q.    Which employee did your lawyer
17   contact? Which former coworker of yours did
18   your employer contact -- did your lawyer
19   contact?
20       A.    I think he contacted Ashley
21   Sheffield.
22       Q.    Are you aware of him
23   contacting any others?

Page 183

1        A.    No.
2        MR. COTTLE: I can tell you
3    that I did not, after I had a conversation
4    about that with Ms. Rozenzweig.
5        MR. LIGHTFOOT: All right.
6    Why don't you give me a few minutes. I
7    think I'm very close.
8        (Recess taken.)
9        MR. LIGHTFOOT: My question,
10   John, this is as much for you. I think
11   we've already -- I know we've already
12   covered it, I just want to make doubly sure.
13   I asked him if this was his only claim of
14   discrimination, of race discrimination and
15   he said yes. And I -- There's no claim of
16   racial harassment, hostile environment.
17   I've not seen that anywhere or seen that
18   claim nor heard that claim, but I just want
19   to make sure.
20       MR. COTTLE: Well, we're not
21   really making it, no.
22       Q.    Okay. All right. Mr. Smith,
23   you talked about one time when you asked

Page 184

1    Andras for help, and you said that was only
2    one day and then after that day he was
3    unavailable. Do you remember telling me
4    that?
5        A.    Correct.
6        Q.    Okay. Did you ever ask Andras
7    for help again after that time?
8        A.    I think I -- I think I did,
9    yes.
10       Q.    And did he help you?
11       A.    Actually, Andras told me that
12   Ralph told him that I was to do the job
13   myself.
14       Q.    Okay. But did you ever ask
15   him again?
16       A.    He have helped me after that,
17   yes.
18       Q.    He still helped you after that
19   time?
20       A.    Occasionally.
21       Q.    Occasionally? Three to five
22   times?
23       A.    Once or twice.

46  (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1    Q.    Was there ever a time after
2    that, after he told you that Ralph had said
3    you need to do it on your own or whatever,
4    and you said he helped you occasionally, was
5    there ever a time after that time that you
6    asked him for help that he didn't help you?
7    A.    Yes.
8    Q.    When?
9    A.    I can remember asking him for
10   his opinion on certain things and he told me
11   he was busy doing something else.
12   Q.    Oh, okay.
13   A.    I don't know actually the
14   dates.
15   Q.    Okay. But he never refused to
16   help you again unless he was -- I mean, in
17   other words, sort of for a reason other than
18   being busy; correct?
19   A.    Correct.
20   Q.    To be clear on that, so even
21   after he said to you: Ralph said you kind
22   of need to figure it out on your own, even
23   after he said that to you, he still helped

Page 186

1    you out occasionally.
2            There were times when you
3    asked him for help after that and he would
4    say: I can't right now, I'm too busy. But
5    he never turned you down and refused to help
6    you unless he was busy, as far as you know?
7    A.    There was times that I got the
8    feeling that he didn't want to help me, so I
9    stopped asking him for help.
10   Q.    And on the times where you
11   didn't ask Andras for help, you were always
12   able to ask Chad or Ralph if you needed
13   help; correct?
14   A.    Correct.
15   Q.    Or Brian, you were also able
16   to ask Brian for help?
17   A.    I've asked Brian, yes.
18   Q.    Have you told me today every
19   piece of information that you're aware of
20   that supports your claim in this lawsuit
21   that Euro-Pro discriminated against you on
22   the basis of race, in terminating your
23   employment?

Page 187

1    A.    Yes.
2            MR. LIGHTFOOT: No further
3    questions. Thank you.
4            MR. COTTLE: No questions.
5    (The deposition was concluded at 2:52 p.m.,
6    May 24, 2006.)

Page 188

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    ELMORE COUNTY,
4            I, Angela Smith, Registered
5    Professional Reporter and Commissioner for
6    the State of Alabama at Large, do hereby
7    certify that the above and foregoing
8    proceeding was taken down by me by
9    stenographic means, and that the content
10   herein was produced in transcript form by
11   computer aid under my supervision, and
12   that the foregoing represents, to the best
13   of my ability, a true and correct
14   transcript of the proceedings occurring on
15   said date and at said time.
16           I further certify that I am neither
17   of kin nor of counsel to the parties to the
18   action; nor in any manner interested in the
19   result of said case.
20
21
22           _____
             Angela Smith, RPR, CRR,
             for the State of
23           Alabama at Large.

47  (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# Exhibit B

# FREEDOM COURT REPORTING

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3               EASTERN DIVISION
 4
 5   VICTOR SMITH,
 6         Plaintiff,
 7      versus          3:05-CV-1186-MEF
 8   EURO-PRO MANAGEMENT
 9   SERVICES, INC.,
10         Defendant.
11
12
13
14        * * * * * * * * * * * * *
15
16        DEPOSITION OF RALPH HUDNALL,
17   taken pursuant to stipulation and agreement
18   before Jackie Parham, Certified Shorthand
19   Reporter and Commissioner for the State of
20   Alabama at Large, in the law offices of Bowles
21   & Cottle, 2 South Dubois Street, Tallassee,
22   Alabama, on Wednesday, the 4th day of October,
23   2006, commencing at approximately 10:15 a.m.
```

Page 2

```
 1            APPEARANCES
 2
 3   APPEARING ON BEHALF OF THE PLAINTIFF:
 4   JOHN I. COTTLE, III, ESQUIRE
 5   Bowles & Cottle
 6   2 South Dubois Street
 7   Tallassee, Alabama  36078
 8
 9   Also present:  Victor Smith
10
11
12   APPEARING ON BEHALF OF THE DEFENDANT:
13   WARREN B. LIGHTFOOT, ESQUIRE
14   Maynard, Cooper & Gale
15   1901 Sixth Avenue North
16   2400 AmSouth/Harbert Plaza
17   Birmingham, Alabama 35203
18
19
20        * * * * * * * * * * * * *
21
22
23
```

Page 3

```
 1              STIPULATION
 2        It is hereby stipulated and agreed by
 3   and between counsel representing the parties
 4   that the deposition of
 5            RALPH HUDNALL
 6   may be taken before Jackie Parham, Certified
 7   Shorthand Reporter and Commissioner for the
 8   State of Alabama at Large, without the
 9   formality of a commission, and all formality
10   with respect to other procedural requirements
11   is waived; that objections to questions, other
12   than objections as to the form of the question,
13   need not be made at this time, but may be
14   reserved for a ruling at such time as the said
15   deposition may be offered in evidence or used
16   for any other purpose, by either party, as
17   provided for by the Federal Rules of Civil
18   Procedure.
19        It is further stipulated and agreed by
20   and between the parties hereto and the witness
21   that the signature of the witness to this
22   deposition is hereby not waived.
23
```

Page 4

```
 1                INDEX
 2
 3   PX-1 (Notice of Depo) ................ 17
 4   PX-2 (Responses and Requests for  .... 20
 5      Production)
 6   PX-3 (Victor Smith's Resume') ........ 41
 7   PX-4 (Position Description) .......... 41
 8   PX-5 (Employee Evaluation) ........... 41
 9   PX-6 (Evaluation of Victor Smith) .... 44
10   PX-7 (W-2 Forms) ..................... 46
11   PX-8 (List of Topics for  ............ 46
12      Termination)
13   PX-9 (E-Mail Messages) ............... 47
14   PX-10 (Drawing) ..................... 107
15   PX-11 (Deductions Per Pay Period) ... 147
16   PX-12 (Memo Regarding Interim ...... 155
17      Personnel Policies)
18   PX-13 (Memo Regarding Performance .. 156
19      Review Policy)
20
21
22
23
```

# FREEDOM COURT REPORTING

Page 9

1    A.    El Paso, Texas.
2    Q.    What kind of courses did you take in trade
3          schools?
4    A.    It was for electronic engineering.
5    Q.    Did you get a degree?
6    A.    No, sir.
7    Q.    Do you have any other schools that you've
8          been to?
9    A.    No, sir.
10   Q.    How long have you lived at 812 McLure?
11   A.    I have to think. I think three years.
12   Q.    Where did you live before that?
13   A.    Immediately?
14   Q.    Yes.
15   A.    It was also in Opelika. I don't remember
16         the street number. It was Elizabeth
17         Street in Opelika.
18   Q.    How long did you live there?
19   A.    Not quite six months.
20   Q.    Where did you live before that?
21   A.    I rented an apartment downtown Auburn.
22         Actually, there were two apartments near
23         the downtown Auburn area. Gay Street, and

Page 10

1          I forget the name of the other street.
2    Q.    Okay. How long did you live in downtown
3          Auburn?
4    A.    Probably six -- No. More than that.
5          Probably more like nine months.
6    Q.    Okay. Where did you live before that?
7    A.    Petal, Mississippi, P-e-t-a-l.
8    Q.    Okay. And how long did you live in Petal,
9          Mississippi?
10   A.    About seven years.
11   Q.    And at each of those addresses we have
12         talked about, beginning in Petal,
13         Mississippi forward, was your wife with
14         you at each of those locations?
15   A.    Yes, except for the rental properties. We
16         were in the process of moving.
17   Q.    How long have you been married?
18              (Off-the-Record discussion)
19   A.    Twenty-five years.
20   Q.    Twenty-five years?
21   A.    Yes, sir.
22   Q.    Where is your wife from? Is she from
23         Alabama or Virginia?

Page 11

1    A.    No, sir. Originally born in New Mexico.
2          She -- I guess she would claim El Paso.
3          She moved there when she was young.
4    Q.    Okay. To the best of your knowledge, do
5          you have any relatives in Alabama, other
6          than your mother-in-law?
7    A.    No, sir.
8    Q.    To the best of your knowledge, does your
9          wife have any relatives in Alabama?
10   A.    No, sir.
11   Q.    You work for a company called Euro-Pro
12         Management Services; is that correct?
13   A.    Yes, sir, I believe so.
14   Q.    What do you do for them?
15   A.    I'm in charge of the testing, making sure
16         that the products are tested in a proper
17         manner.
18   Q.    Let's talk about what Euro-Pro does.
19   A.    Okay.
20   Q.    What kind of business are they in?
21   A.    We design and sell a variety of small home
22         appliances; vacuum cleaners, steam
23         cleaners, battery-charged sweepers,

Page 12

1          kitchen products, you know, toaster ovens,
2          those type things.
3    Q.    Do you actually manufacture those products
4          or just design them and have someone else
5          manufacture them?
6    A.    We design them. Someone else manufactures
7          them.
8    Q.    Okay. Now, the part of the company you
9          work in, what do you -- are you in design,
10         testing?
11   A.    Testing.
12   Q.    Can you tell me a little bit about what
13         your job description is at this time?
14   A.    To ensure all Euro-Pro product is tested
15         in accordance with whatever applicable
16         standards apply to that product.
17   Q.    Okay. And how long have you been in that
18         position?
19   A.    This position with Euro-Pro?
20   Q.    Yes.
21   A.    Three and a half years.
22   Q.    Now, how long have you worked for
23         Euro-Pro?

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1   A.   Three and a half years.
2   Q.   So you've been in the same position?
3   A.   Yes, sir.
4   Q.   Who is your supervisor?
5   A.   Right now?
6   Q.   Yes.
7   A.   Chad Reese.
8   Q.   Chad Reese?
9   A.   Yes, sir.
10  Q.   Has he always been your supervisor since
11       you've been employed with Euro-Pro?
12  A.   No, sir.
13  Q.   Who else has supervised you?
14  A.   Terry Robertson.
15  Q.   All right.  Are both Chad Reese and Terry
16       Robertson still with Euro-Pro?
17  A.   No, sir.
18  Q.   Who is no longer with Euro-Pro?
19  A.   Mr. Robertson.
20  Q.   How long has he been gone from Euro-Pro?
21  A.   About six months.
22  Q.   And is that when your supervisor became
23       Chad Reese?

Page 14

1   A.   I believe so.  There was some -- a little
2        bit of flux in there with the change.
3        Mr. Robertson left.  He got a replacement.
4        The replacement had to figure out who was
5        going to report to who.  I believe Chad's
6        been my boss ever since Terry left.
7   Q.   Has Terry Robertson been replaced by Chad
8        Reese or by someone else?
9   A.   Someone else.
10  Q.   Okay.  Who else?  What's the name of the
11       person who replaced Terry Robertson?
12  A.   Yigal Offir, Y-i-g-a-l O-f-f-i-r.
13  Q.   Okay.  And Mr. Offir has been there about
14       six months?
15  A.   About.
16  Q.   Is he the person in charge of the Auburn
17       -- Is it Auburn or Opelika where this
18       facility is?
19  A.   It's in Auburn.
20  Q.   Is Mr. Offir in charge of the Auburn
21       facility?
22  A.   Yes, sir.
23  Q.   How many people are in the second tier of

Page 15

1        management under Mr. Offir?
2   A.   I don't completely know.
3   Q.   Well, would -- Chad Reese, I assume, would
4        be in that second tier?
5   A.   Yes, sir.
6   Q.   And where would you fall, in like the
7        third tier?
8   A.   Yes, sir.
9   Q.   Where did you work before you came to work
10       for Euro-Pro?
11  A.   Sunbeam Household Products.
12  Q.   Was that in Petal, Mississippi?
13  A.   Hattiesburg.
14  Q.   And what kind of things did you do for
15       Sunbeam Products?
16  A.   At the end of my tenure with Sunbeam?
17  Q.   Yeah.
18  A.   Same thing.
19  Q.   How long did you work for Sunbeam?
20  A.   Seven years.
21  Q.   Have you ever given a deposition before?
22  A.   No, sir.
23  Q.   Have you ever sued anyone before?

Page 16

1   A.   No, sir.
2   Q.   Have you ever been sued?
3   A.   Yes, sir.
4   Q.   Tell me about that.
5   A.   I had just moved to the Hattiesburg area.
6        A rainy night.  I was driving down the
7        road.  A guy turned in front of me.  We
8        hit.  He sued me but -- Well, he sued me.
9   Q.   Okay.  That was about ten years ago?
10  A.   Something like that.  Yes, sir.
11  Q.   Car wreck case?
12  A.   Right.
13  Q.   That's the only time you've ever been
14       sued?
15  A.   To my knowledge, yes, sir.
16  Q.   Okay.  Have you ever been arrested or
17       charged with a criminal offense, other
18       than a traffic ticket?
19       MR. LIGHTFOOT:  You know what,
20            you don't need to answer
21            about arrested.  You can
22            answer as to convicted.
23  A.   Okay.  Yes.

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  Q.  Okay. Tell me what that was for.
2  A.  I was involved in a DUI.
3  Q.  Anything else you've been convicted of?
4  A.  No, sir.
5  Q.  When was the DUI?
6  A.  Five years ago.
7  Q.  Was that in Mississippi or Alabama?
8  A.  Mississippi.
9      (Plaintiff's Exhibit 1 marked
10      for purposes of identification)
11  Q.  Mr. Hudnall, let me show you what I've
12      marked as Plaintiff's Exhibit 1. This is
13      a deposition notice. Have you seen that
14      document, sir, before today?
15  A.  I believe so. Yes, sir.
16  Q.  It asks that you bring with you certain
17      things. And it's possible that all that
18      I've asked for here has already been
19      produced. But if you would look on the
20      third page of that document. "The
21      complete personnel file of the plaintiff."
22      Do you have that with you or have I
23      already been given that?

Page 18

1  A.  I believe you've been provided that.
2  Q.  Okay. "Documents reflecting any
3      complaints made by any supervisors or
4      co-employees of the plaintiff." Is there
5      anything you have in response to that that
6      you have not already given me?
7  A.  No, sir. Not that I've not already given
8      you.
9  Q.  Number 3. "Copies of documents reflecting
10      or referencing any exit interview
11      conducted at or near the time the
12      plaintiff was terminated." I have one
13      sheet of notes about that.
14  A.  Yes, sir.
15  Q.  Is there anything else you know of?
16  A.  Not that I know.
17  Q.  Number 4. "All employee evaluations of
18      the plaintiff." And I have one. It's a
19      document several pages long. But it
20      appears to be all the same evaluation.
21  A.  Okay.
22  Q.  Are there any others that you know of that
23      I don't have?

Page 19

1  A.  Not to my knowledge. No, sir.
2  Q.  Number 5. "All correspondence between the
3      plaintiff and defendant or any employee of
4      the defendant." Do you have anything like
5      that that you've not already produced?
6  A.  No, sir.
7  Q.  "The personnel file of Ashley Sheffield."
8      That was produced with some things
9      redacted and omitted. But you don't have
10      anything else on that today?
11  A.  No, sir.
12  Q.  The same with David Richards. Any other
13      documents from that file did you bring
14      with you?
15  A.  No, sir.
16  Q.  I asked for the personnel file of the
17      person hired to replace the plaintiff. Do
18      you have -- And I understand -- Actually,
19      you contend that no one was hired to
20      replace the plaintiff.
21  A.  That's correct.
22  Q.  But there was an individual hired around
23      the time the plaintiff was terminated by

Page 20

1      the name of Mr. Garrison, I think. Did I
2      say that right?
3  A.  Garrison. Yes, sir.
4  Q.  What is his --
5  A.  That's the correct pronunciation, I
6      believe.
7  Q.  What's his first name?
8  A.  Jeffrey.
9  Q.  Did you happen to bring his personnel file
10      with you?
11  A.  No, sir. He was not hired to replace
12      anybody. He was hired for a new position.
13      (Plaintiff's Exhibit 2 marked
14      for purposes of identification)
15  Q.  Let me show you what I've marked here as
16      Plaintiff's Exhibit 2. And this is
17      Defendant's Responses to Plaintiff's First
18      Set of Interrogatories. And I believe
19      you've signed those. Would you just look
20      those over and tell me if you have read
21      that over and if that's your signature on
22      the last page?
23  A.  That's my signature. Yes, sir.

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

### Page 25

1   country?
2   A.   Around the U.S.?
3   Q.   Yes.
4   A.   I know of two.
5   Q.   All right. Where are they?
6   A.   Boston and Alabama.
7   Q.   Okay. And the one in Alabama is the one
8        in Auburn?
9   A.   Correct.
10  Q.   That's the only one in Alabama?
11  A.   Yes, sir, to my knowledge.
12  Q.   And then there's one in Boston?
13  A.   Yes, sir.
14  Q.   Does it do essentially the same thing that
15       the Auburn plant does?
16  A.   The marketing and sales group, as well as
17       the president, those people stay in
18       Boston.
19  Q.   Okay. Do they do design and testing of
20       products?
21  A.   No, sir.
22  Q.   That's just the management; that's the
23       corporate headquarters, I guess?

### Page 26

1   A.   Correct.
2   Q.   So all of the design and testing of the
3        products is done at the Auburn facility;
4        is that correct?
5   A.   No.
6   Q.   Okay. Where else would there be design
7        and testing done?
8   A.   I believe -- Well, I know there's some
9        done in Montreal. And that's all --
10       that's all the company owns is down in
11       Montreal.
12  Q.   Okay. I think I got confused. You
13       limited your answer to the U.S., which I
14       think is what I asked you.
15  A.   Oh, yes, sir.
16  Q.   So you do have a facility in Montreal?
17  A.   Yes, sir.
18  Q.   Is there anywhere else in the world that
19       you know of that Euro-Pro has a facility
20       other than Boston, Montreal and Auburn?
21  A.   We have offices in China.
22  Q.   Okay.
23  A.   Hong Kong and China.

### Page 27

1   Q.   Okay. How many people are employed in the
2        Auburn facility?
3   A.   Today?
4   Q.   Yes.
5   A.   I'm guessing twenty.
6   Q.   At the time Victor Smith was hired, which
7        was in December of '03, about how many
8        people worked there at that time?
9   A.   When he first came to us?
10  Q.   Yes.
11  A.   When he first came to us. Okay. I think
12       seven, maybe eight.
13  Q.   At the time Victor Smith was terminated,
14       which was in December of '04,
15       approximately how many people worked at
16       the Auburn plant?
17  A.   I think maybe fifteen.
18  Q.   Could you tell me how many tiers or levels
19       of authority there are at the plant? I
20       mean, you've got one person who's the
21       manager of that facility.
22  A.   Right.
23  Q.   How many different tiers or levels of

### Page 28

1        authority are there below the plant
2        manager?
3   A.   Now?
4   Q.   Yes.
5   A.   At our facility itself?
6   Q.   Yes.
7   A.   I think two.
8   Q.   Is there a position called lab technician?
9   A.   Yes.
10  Q.   Where does that fall in the hierarchy?
11  A.   It would be the second level.
12  Q.   The lowest level?
13  A.   The technician level would be the lowest
14       level. But within that level are various
15       levels of technicians.
16  Q.   Okay. How many levels of lab tech are
17       there?
18  A.   We allow for three.
19  Q.   Okay. What are the various jobs -- I
20       mean, we're only talking fifteen to twenty
21       people. What are the various job
22       descriptions -- not job descriptions --
23       but job titles of the people who work in

7 (Pages 25 to 28)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  A.  I don't know specifically. It would have
2      been sometime in '02.
3  Q.  Were you there when it opened?
4  A.  No, sir. Let me --
5  Q.  Go ahead.
6  A.  No, sir. The organization was started in
7      Auburn when I came on board.
8  Q.  Okay. Were you on board with the
9      organization when Victor Smith was hired?
10 A.  Yes, sir.
11 Q.  Do you remember when he was hired?
12 A.  I don't remember specifically. He would
13     have come -- he came to us as a temp. It
14     would have been sometime --
15 Q.  Does December of '03 sound correct?
16 A.  That's when we hired him full-time.
17     That's when we hired him permanently.
18     Yes, sir.
19 Q.  He came there first as a temp?
20 A.  Yes, sir.
21 Q.  And that was through some employment
22     agency?
23 A.  That's correct.

Page 34

1  Q.  Is there one that Euro-Pro regularly uses?
2  A.  It would either have been A-1 or
3      Employment Resources. Those are the two
4      we typically use.
5  Q.  Is that typically how Euro-Pro hires
6      people?
7  A.  Well, for the Auburn facility, that's how
8      we found our local help.
9  Q.  What position was Victor Smith hired at?
10 A.  I forget the exact title. He would have
11     been hired as a lead tech -- some sort of
12     a lead tech for the Cleanability Group
13     when he was permanently hired.
14 Q.  Cleanability is dealing in vacuum
15     cleaners?
16 A.  Vacuum cleaner performance.
17 Q.  And that would have been when he came to
18     you as a temp?
19 A.  No, sir. As a temp he was -- I'm sorry.
20     As a temp he came in working the vacuum
21     cleaner performance as a tech -- lab tech
22     for vacuum cleaner performance.
23 Q.  When he was hired as a regular employee in

Page 35

1      December of '03, did his job duties change
2      any at that time?
3  A.  Yes, sir.
4  Q.  And how did they change?
5  A.  We asked him to go to second shift. We
6      had a lot of work to get done. We needed
7      to run two shifts. In order to continue
8      to run a second shift, we needed a
9      permanent person on board at the second
10     shift location. It was either going to be
11     me or somebody else. We thought of hiring
12     Victor, once we saw his resume', his skill
13     levels. We thought this would be a good
14     pick from the group we had to run our
15     second shift. So we offered him a second
16     shift job.
17         He was responsible for scheduling the
18     work that had to be done for second and
19     first shift. He was responsible to make
20     sure that we had plenty of -- plenty of
21     things to work with, sand, dirt -- you've
22     got to put something down to vacuum it up
23     -- plenty of that stuff to work with so we

Page 36

1      could continue to do the testing that
2      needed to be done.
3  Q.  Well, do I understand that when he was
4      hired in December of '03, that he was
5      placed in charge of the second shift?
6  A.  He was responsible to make sure the second
7      shift was getting the work done that
8      needed to be done, as well as scheduling
9      the work for the next shift the next day.
10 Q.  So did he have any supervisory authority
11     in that position?
12 A.  Some.
13 Q.  Can you explain that?
14 A.  He was not authorized to give people time
15     off or not authorized to make any kind of
16     changes as far as schedule goes, things
17     like that. But he was looked at as the
18     lead for the entire group. In that lead
19     role you're looked at -- well, you're the
20     leader of the group.
21 Q.  How many people worked on that second
22     shift?
23 A.  On the second shift?

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 45

1   certainly talk about what is needed and
2   how he can improve. These are types of
3   things you talk about in an evaluation
4   process.
5  Q.  Is that an evaluation you did?
6  A.  Yes, sir.
7  Q.  Is that a part of the evaluation reflected
8   by Plaintiff's Exhibit 5?
9  A.  No, sir, I wouldn't think so. No, sir.
10  Q.  Okay. Those were done at different times?
11  A.  Correct.
12  Q.  All right. Which one was done first?
13  A.  This shorter one.
14  Q.  Plaintiff's Exhibit 6?
15  A.  Yes, sir.
16  Q.  And what's the date of that?
17  A.  May 5th of '04.
18  Q.  And you did that?
19  A.  Yes, sir.
20  Q.  And then the next evaluation as shown by
21   Plaintiff's Exhibit 5, what's the date of
22   that?
23  A.  August 27th of '04.

Page 46

1  Q.  And you did that one as well?
2  A.  Yes, sir.
3  Q.  All right.
4   (Plaintiff's Exhibit 7 marked
5   for purposes of identification)
6  Q.  I've marked as Plaintiff's Exhibit 7 a
7   couple of W-2 forms showing Victor's wages
8   with Euro-Pro for 2003 and 2004. Is that
9   what those documents appear to be to you?
10  A.  Yes, sir. I believe so.
11  Q.  Would they be a part of his personnel
12   file?
13  A.  I don't know.
14   (Plaintiff's Exhibit 8 marked
15   for purposes of identification)
16  Q.  Okay. Let me show you Plaintiff's Exhibit
17   8. Do you know what that is?
18  A.  Yes, sir.
19  Q.  What is that?
20  A.  I believe it's the -- it's the list of
21   things Mr. Robertson was going to discuss
22   with Victor on the day that Victor was
23   terminated.

Page 47

1  Q.  Do you know who prepared that document?
2  A.  Not specifically, no, sir.
3  Q.  Do you know if it was prepared before or
4   after Mr. Robertson had his discussion
5   with Victor in which he terminated him?
6  A.  I don't know.
7  Q.  Have you ever seen that document before?
8  A.  Yes, sir.
9  Q.  Is that document a part of Victor's
10   personnel file?
11  A.  I'm not sure. It seems like it should be,
12   but I'm not sure.
13   (Plaintiff's Exhibit 9 marked
14   for purposes of identification)
15  Q.  Plaintiff's Exhibit 9, this is some e-mail
16   messages back and forth between Victor and
17   Chad, I guess Chad Reese; is that correct?
18  A.  Yes, sir.
19  Q.  Is that something you have seen before?
20  A.  Yes, sir.
21  Q.  Is that a part of Victor's personnel file?
22  A.  I don't know.
23  Q.  Are there any other documents that should

Page 48

1   be in his personnel file that you know of?
2  A.  I don't know.
3  Q.  Do you know if there are files where
4   employee records are kept other than the
5   personnel file?
6  A.  I don't know, sir.
7  Q.  If an employee violates a company policy
8   and some kind of disciplinary action is
9   going to be taken, how is that handled?
10  A.  Each engineer -- I take that back. Each
11   project manager has their own group of
12   people. They handle their own issues
13   themselves.
14  Q.  Is there a process whereby an employee may
15   be formally reprimanded or suspended
16   without pay, suspended with pay, that sort
17   of thing?
18  A.  I don't know.
19  Q.  Have you ever known of an employee to be
20   reprimanded where a notice of that
21   reprimand was placed in the personnel
22   file?
23  A.  While at Euro-Pro?

12 (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 69

1   soils, we'll say, and then you vacuum them
2   up. I'm sure there are other things to go
3   along with that. But, basically, he was
4   to make sure that the vacuum performance
5   group could operate, all the lab techs and
6   temporaries under him could perform their
7   functions.
8  **Q.  Okay. All right. So that's what he was**
9  **doing, was Cleanability?**
10 A.  Correct.
11 **Q.  Now, he was taken off that and placed on**
12  **another project, correct?**
13 A.  Right. Like I said, the reason for the
14   second shift was, we had a huge amount of
15   work to get done. It just made more sense
16   to run two shifts instead of one. It
17   worked out better for some of the
18   employees, some of the guys that were
19   working there, because they worked better
20   on the night shift than during the
21   daytime.
22      We started having trouble keeping the
23   second shift full, plus the workload

Page 70

1   required on the night shift was not
2   necessary anymore. The workload wasn't
3   there anymore. So the night shift really
4   wasn't necessary. We brought all the
5   people back to the daytime shift. And
6   then we offered Victor the position to
7   move into the Life test area, which really
8   is where I got my start.
9  **Q.  What is the Life test area?**
10 A.  As I said, Euro-Pro makes a variety of
11   products, from typical vacuum cleaners,
12   portable steam cleaners, clothes irons,
13   hand mixers, toaster ovens, a variety of
14   stuff. Part of that process -- Any
15   responsible manufacturer will conduct what
16   we call Life testing. We are trying to --
17   We do two things -- well, several things
18   in this business. We are trying to
19   evaluate how well the product works over
20   the course of its lifetime, making sure
21   that the consumer gets a fair value for
22   their money when they buy the product, as
23   well as -- At the end of the process, at

Page 71

1   the end of the Life test, if the unit does
2   fail, to make sure that it fails in a safe
3   manner so that it doesn't literally blow
4   up while you're trying to vacuum your
5   house and catch your house on fire, those
6   types of things, as well as evaluating the
7   product during the design process to see
8   if there are things we can make to make it
9   an even better product. Various things
10   come out of that, comes out of that Life
11   testing that most companies do to
12   determine. Are you making a safe product?
13   Is it reliable? Will the consumer get a
14   good value for it? Can we continue to
15   stay in business, basically?
16 **Q.  So when you say Life testing, the term**
17  **"Life" refers to the life of the product?**
18 A.  Correct.
19 **Q.  All right. What job was Victor given when**
20  **he moved into Life testing?**
21 A.  When he moved into it, he was responsible
22   for the entire maintenance of everything
23   on tests. I'm not sure if we even had

Page 72

1   anything on tests at that time, other than
2   a few things I had been able to cobble
3   together. So his main responsibility was
4   to start building the fixtures to allow us
5   to put units on test so that they could
6   run in an automated fashion, as opposed to
7   having -- Say, for a clothes iron, instead
8   of having to have somebody there to push
9   the iron back and forth and turn it on and
10   fill it up with water and do all the
11   things you need to do for a clothes iron,
12   it would have been Victor's
13   responsibility. And I'm using clothes
14   iron. But now that I think about it, we
15   didn't install irons until later.
16      For a deep fryer, for example,
17   something he did have involvement with, he
18   would put the oil in. He would set up a
19   system to turn that deep fryer on and off
20   per our own specifications and record the
21   number of times the unit was turned on; to
22   make sure that when it came on, it
23   actually was working and heating oil.

18 (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

### Page 81

1 A.  Yes, sir.

2 Q.  Now we move to "Teamwork and Cooperation,"
3     which is the next area.  And there
4     Victor's performance met the standards in
5     all important aspects; good contributor.
6     That was your opinion at that time?

7 A.  Yes, sir.

8 Q.  "Interpersonal and Communication Skills."
9     Again, you rated his performance as
10    meeting the standards in all important
11    aspects, correct?

12 A.  Yes, sir.

13 Q.  And then "Initiative/Commitment."  In that
14    area you rated his performance as meeting
15    the standards in all important aspects;
16    good contributor?

17 A.  Yes, sir.  That he met the minimum
18    standards.

19 Q.  Okay.  Then we go to, I guess, some more
20    particular observations.  And you indicate
21    that his main strength is building test
22    fixtures.  So he had been working on this
23    steam cleaning fixture; is that right?

### Page 82

1 A.  He had had some work on the steam cleaning
2     fixture.  This was more to the previous
3     fixtures he had built.  He had probably
4     built five fixtures before we gave him a
5     steam cleaner, and he did a pretty good
6     job with those five, which made us think
7     he -- Those were very simple fixtures.
8     The steam cleaner was a -- was a step up
9     in challenge.  But he had done such a good
10    job on the first ones, we thought taking
11    it to the next level was an obvious
12    choice.

13 Q.  And it indicates that he's not afraid to
14    ask for assistance when needed?

15 A.  That's true.

16 Q.  He's dependable?

17 A.  Yeah.

18 Q.  Very exacting in accomplishing his
19    assigned tasks?

20 A.  Yes.  At that time he was doing fine.

21 Q.  "Areas that need improvement."  You note
22    that he needs to accept the entire role
23    for which he was hired, and that the role

### Page 83

1     is constantly changing and growing.  Is
2     there anything in particular that caused
3     you to make that observation?

4 A.  Several things.  The room he was working
5     in was a large area and it's his area.  We
6     tried to make it very clear it was his
7     responsibility to make sure that the area
8     was kept neat and tidy.  It didn't
9     necessarily mean he had to go and sweep up
10    everything that was put on the floor.  It
11    was okay with me if he went and got
12    somebody else and said, "Hey, you made
13    this mess, so help me clean it up."  But
14    at the same time it's also important to
15    point out that Mr. Robertson, whose title,
16    I believe, was executive vice-president,
17    was not afraid to pick up a broom and
18    sweep himself.  So if he's setting that
19    example, then it's pretty obvious that
20    everybody in the group needs to be
21    cleaning up.  And Victor seemed to have a
22    specific problem with that specific part
23    of the duties, just keeping the area neat

### Page 84

1     and clean.  The other sentence in there
2     is, "These changes are expected to be
3     accomplished without additional
4     compensation."

5     Victor had come to me a couple of
6     times talking about he wasn't making
7     enough money.  I told him at the time,
8     "You don't get paid for the job you're
9     doing now.  You work for your raise next
10    year."  That's just my philosophy.  The
11    work I do is reflected in my raise next
12    year.  If I don't do very good this year,
13    I don't deserve much next year.  But I
14    don't go and complain about what I'm doing
15    now based on my current salary.

16 Q.  Okay.  Then we go to number 2 under "Areas
17    that need improvement."  And it says there
18    is a concern with accomplishing routine
19    tasks.  "An example is cleaning his work
20    area."  So we're back to keeping the work
21    area clean here?

22 A.  That's a bit of it.  It also goes back,
23    and some of this, again, is back into the

# FREEDOM COURT REPORTING

Page 85

1  first issue. When a product is on test,
2  is it actually working or is the PLC, the
3  computer that controls it, is it just
4  turning on and it looks like the product
5  is working? To actually go and touch the
6  thing, is it getting hot or getting cold?
7      We even provided him -- I gave him a
8  little, small, hand-held infrared
9  thermometer that he would just have to
10  shoot and point at the side of the device
11  to use to see if it was getting warm.
12  Just some way to record that we know the
13  thing is getting hot the way it's supposed
14  to. And these are starting to creep in
15  that he's not doing these types of things.
16  Q. **"Needs to improve Initiative. Take it**
17  **upon himself to correct problems seen,**
18  **either fixtures or products on test.**
19  **Don't just report that a product has quit**
20  **working. Look to see if he can find the**
21  **trouble." And that's basically what you**
22  **just related to me?**
23  A.   More of that. Again, and the last

Page 86

1  sentence, I think, is key -- last two
2  sentences, rather. "In time, he," meaning
3  Victor, "will become the main analyst to
4  determine the Life test failures." We
5  needed a guy in that lab that if that
6  toaster oven stops working, he can then
7  take that toaster oven apart and then
8  either go to the technician or the
9  engineer and show them, well, this thing
10  failed right here. It wasn't expected for
11  him to do it necessarily at this day. But
12  if he's not even opening the units to
13  start looking at them, then he'll never
14  get to the point to where he can identify
15  problems. And at this point he wasn't
16  even wanting to open the unit. He was
17  just going to tell somebody that that
18  thing failed.
19  Q.   On the next page of this evaluation, I'm
20  **just looking at under "Comments," the**
21  **third line down at the end of that line,**
22  **it says, "He is now in the midst of**
23  **developing an automated fixture for steam**

Page 87

1  **cleaners and will implement a preventive**
2  **maintenance system for all Life test**
3  **fixtures." So at this point in time, when**
4  **this report was done, he was working on**
5  **the steam cleaner testing fixture?**
6  A.  Yes, sir.
7  Q.  **And his overall performance, it looks like**
8  **a 3.5. Is that like 3.5 out of 5?**
9  A.  Out of 5. Which, by the way, was the
10  lowest score I gave anybody.
11  Q.  **But it is -- You do indicate he's meeting**
12  **standards in all important aspects and is**
13  **a good contributor?**
14  A.  I do say that. Rightly or wrongly, the
15  way I was taught to give evaluations is,
16  you never go too high and you never go too
17  low. You never go too high because
18  nobody's perfect. You never go too low
19  because then you kill morale. I did make
20  it clear that this was -- in my opinion,
21  this was a low score; that things needed
22  to start picking up. I didn't want to --
23  again, I didn't want to grade him too low,

Page 88

1  because if you have a potential morale
2  problem and then you grade them very low,
3  then that morale problem just gets worse.
4  Q.  **Let me ask you to look at Plaintiff's**
5  **Exhibit 2, which are the interrogatories.**
6  A.  Okay.
7  Q.  **And if you'd look at number 7. And what**
8  **this question is asking, just to review,**
9  **is to list the occasions in which the**
10  **plaintiff was reprimanded, written up or**
11  **counseled for anything related to his**
12  **employment. And there are about, I don't**
13  **know, seven or eight -- I guess there are**
14  **eleven items. The first one involves a**
15  **confrontation with Sam Hickman. Do you**
16  **know when that happened?**
17  A.  Not specifically. It was while Victor --
18  I believe it was while Victor was running
19  the second shift. See, there was an
20  overlap. If I remember right, the first
21  shift would start at 6 and work till 2:30,
22  and then Victor would come on at 2 and
23  work till 10 or 10:30, something like

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1    that. So there was a half-hour overlap
2    where Victor could then go over what was
3    done in the morning so he could continue
4    on for the second shift, and then he could
5    give his status for the group for the next
6    morning.
7    Q.    Okay.
8    A.    So I'm -- I know it happened during that 2
9    or 2:30 time frame. I'm just not exactly
10   sure what day it happened.
11   Q.    This happened several months before the
12         last evaluation, didn't it?
13   A.    Oh, yes, sir.
14   Q.    And once you counseled him about that, did
15         you have any more problem with him
16         confronting other workers in an aggressive
17         or disrespectful way?
18   A.    I didn't have any specific -- Nobody would
19   come up with any -- come to me with any
20   specific instances. There still seemed to
21   be a general feeling within the group that
22   he was a little bit overbearing, and
23   that's the reason for some of the comments

Page 90

1    in the earlier -- in the May discussion.
2    Q.    Number 2 just sort of reiterates the first
3         point about the confrontation with Sam
4         Hickman?
5    A.    Yes, sir.
6    Q.    What was Sam Hickman's job?
7    A.    He was one of the temporary test
8    technicians in the Cleanability Group.
9    Q.    Now, number 3 talks about the plaintiff,
10        Victor Smith, being counseled; that he
11        needed to quit wasting time on non-work
12        matters, like the telephone and the
13        Internet. Do you recall him being
14        personally singled out and counseled for
15        excessive use of the telephone and the
16        Internet?
17   A.    I know there was an instance where he was
18   counseled about use of the telephone. I
19   don't know if Mr. Robertson singled him
20   out additionally or not.
21   Q.    Weren't all the employees warned about
22        excessive use of Internet and telephone?
23   A.    That's true.

Page 91

1    Q.    That's just a general warning that was
2         issued?
3    A.    Yes, sir.
4    Q.    To everyone?
5    A.    Yes, sir.
6    Q.    Let's go to number 4. It says that you
7         and Chad Reese, after learning that the
8         plaintiff had called a female employee
9         from work during his working hours not
10        related to work, which was against company
11        policy and which made her uncomfortable,
12        and then you counseled the plaintiff about
13        that. Who was the employee that he
14        called?
15   A.    Ashley Sheffield.
16   Q.    And what policy did that violate?
17   A.    When she reported it to me, she said she
18   got the call about 9 or 9:30, which,
19   again, his working day ended at 10 or
20   10:30. Again, I forget which. It should
21   -- It would not have been -- There were no
22   scheduled breaks. But it was -- it would
23   be highly unusual and we would discourage

Page 92

1    taking a break at 9:30 if you leave at 10
2    -- take a fifteen-minute break from 9:30
3    to 9:45 and then come back to work for
4    fifteen minutes. The breaks generally
5    were supposed to be, you'd have your
6    lunchtime at the midpoint of your day,
7    midpoint of whatever your day was, and
8    then the breaks generally are equal
9    distance apart from those two times.
10        Ashley knew the times that they were
11   working, 2 to 10, I believe it was, maybe
12   10:30. We had just been counseled. As a
13   matter of fact, Ashley had just been
14   talked with about the use of telephone and
15   Internet. And the whole group had been
16   counseled about that. So she felt it was
17   incorrect for somebody who was on the
18   night shift to be calling her while they
19   were supposed to be working.
20   Q.    Okay. Now, if I understand this, you
21        don't know what break schedule he was on?
22   A.    There was no hard-and-fast break schedule
23   due to the nature of the job. I didn't

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 101

1  mentioned in that same sentence, then
2  there's -- there's easily a dozen, if not
3  more. They may not have all said, you've
4  got to bring the job to a higher level.
5  It may have been something like, we need a
6  maintenance system for these test fixtures
7  so we know how often they need to get --
8  how often they need service or the last
9  time they had service. We've talked about
10  this before, about the maintenance of --
11  just the maintenance of the entire room,
12  whether the product is working properly or
13  not. As I said, verifying the operation
14  of all testing fixtures and buying the
15  correct and appropriate number of parts
16  for the steam cleaner he was trying to
17  build. There were several times when,
18  okay, we bought the wrong part. Not only
19  did we buy one wrong, we bought four, five
20  or six of the wrong thing and then we've
21  got to send them all back and get new
22  ones.
23  The work of the steam cleaner, as it

Page 102

1  says, it's a steam cleaner. So the water
2  is going to get to a boiling point. And
3  there were times we buy parts that weren't
4  rated for -- to handle hot water. So
5  you've got to send those back and get new
6  parts in. Adding all that together, at
7  least a dozen.
8  Q.  Okay. But none of that was in writing,
9      except to the extent it's reflected in the
10     two written evaluations that we've gone
11     over?
12 A.  Correct.
13 Q.  Okay. Number 11. You counseled the
14     plaintiff on at least one occasion, that
15     the building of a steam cleaner testing
16     station was progressing too slowly and
17     costing too much money?
18 A.  Right.
19 Q.  That was the project Victor was working on
20     at the time he was terminated, correct?
21 A.  That's correct.
22 Q.  Let me ask you about -- Go back to Ashley
23     Sheffield for a moment. She was a lab

Page 103

1      tech; is that right?
2  A.  Yes, sir.
3  Q.  Did she work in close proximity to Victor
4      at the facility or --
5  A.  Their assigned spaces were a little apart.
6      But, I mean, we all worked in close
7      proximity.
8  Q.  Did she ever complain in any way about
9      Victor, other than that one time?
10 A.  Not that I recall.
11 Q.  And she never specifically said anything
12     to indicate that what Victor said to her
13     was in the nature of sexual harassment?
14 A.  That's correct.
15 Q.  That's an assumption that was made based
16     on things other than what she directly
17     told you?
18         MR. LIGHTFOOT: Objection. Go
19         ahead. You can answer.
20 A.  That's correct. That's correct.
21 Q.  When Victor Smith was moved to Life
22     testing, his supervisor did not change?
23 A.  Correct.

Page 104

1  Q.  That was still you?
2  A.  Right.
3  Q.  The group of people that he could have
4      access to for assistance maybe in
5      designing or building the things he was
6      supposed to design and build, did they
7      change?
8  A.  Well, he had no responsibility. So, yes,
9      they did. I mean, yeah. He was no longer
10     over Vacuum performance, which I was
11     pretty much -- if there was an authority,
12     it was me. He came into another realm,
13     which I was still pretty much the
14     authority on, but we had other people who
15     had experience that could help. So in
16     that manner it did change.
17 Q.  Okay. Who did he have he could go to for
18     help?
19 A.  Of course, myself, Chad Reese.
20 Q.  Is Chad Reese an engineer?
21 A.  Yes, sir. Mechanical. We like to funnel
22     the resources through one or two other
23     individuals, Brian McGhee and Andres

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 113

1  constructing this machine?
2  A.   A lot of it's detailed. The first thing
3  he missed was the expected completion
4  date. Several instances of buying the
5  wrong parts. As I stated earlier, some
6  things we -- some assumptions we made --
7  The product is generating steam. So any
8  component that's going to -- that that
9  steam is going to touch needs to be rated
10  for a high-temperature component, as well
11  as a fairly high-pressure device.
12      There were times when he would buy
13  components that were neither high-pressure
14  nor high-temperature. So there's an
15  expenditure there that didn't need to be
16  done. We get the parts in. They don't
17  work. So we have to install them. They
18  don't work. We've got to take those off.
19  We've got to identify new components,
20  order those and install those. That
21  happened several different times in the
22  process.
23      I'm sure there's others that will

Page 114

1  come to me. The main thing to me was that
2  it wasn't complete on time. We were
3  almost wasting money because we were
4  buying the wrong parts that obviously
5  wouldn't go into this fixture. And then
6  after we started to bring it to his
7  attention that it was taking too much time
8  and costing too much money, it seemed like
9  the project just drug on longer and
10  longer. As I said, I'm sure there's other
11  things that I can add to it. Those are
12  the main points in my mind right now as to
13  what was wrong with the steam fixture.
14      (Lunch recess)
15  Q.   Mr. Hudnall, I want to ask you now -- I
16  want to move to the date that Victor Smith
17  was terminated --
18  A.   Yes, sir.
19  Q.   -- as an employee of Euro-Pro. When did
20  that happen?
21  A.   I believe it was something like December
22  3rd. I think that's when it was.
23  Something in that neighborhood.

Page 115

1  Q.   Of '04?
2  A.   Of '04. Yes, sir.
3  Q.   And who made the decision to terminate his
4  employment?
5  A.   Terry Robertson.
6  Q.   Were there discussions that you had with
7  Terry Robertson before that decision was
8  made?
9  A.   Yes, sir.
10  Q.   And when did you first start talking with
11  Terry Robertson about anything to do with
12  the possibility of terminating Victor
13  Smith?
14  A.   Well, I never approached Terry with the
15  idea of a termination. I approached Terry
16  which some specific instances of some
17  concern that I knew he would be -- would
18  want to know about. That was probably --
19  I don't know the dates. Late in November,
20  in and around the Thanksgiving time frame.
21  Q.   Okay. And when you first approached him,
22  what was the issue you discussed with him?
23  A.   Victor had taken vacation. And I felt I

Page 116

1  had made it very evident that I would need
2  to be able to operate the steam cleaner
3  fixtures properly while Victor was on
4  vacation. I actually wanted to take that
5  opportunity to go through and kind of
6  critique his work. I don't like to do
7  that in front of the employee because it
8  can sometimes become belittling, and that
9  was not my intention to belittle anybody.
10  I just wanted to take a chance and look
11  through the whole thing myself, knowing
12  it's a fairly complex fixture, to see how
13  well it was operating and see if there was
14  any things I could help Victor -- either
15  help the machine get better or help Victor
16  to get it better the next time we have
17  another similar project to work on.
18  Q.   Let me just interrupt here a second. At
19  this time, in November, had he completed
20  building the testing machine?
21  A.   I would say it was not fully operational.
22  It seemed like that every -- it would fail
23  often enough that -- or have to be stopped

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  -- We found a problem often enough that I
2  couldn't say it was completely
3  operational, but it would run probably
4  eighty percent of the time it needed to
5  run. So it was in an operational
6  condition, but there's still probably some
7  bugs to be figured out about it.
8  Q.   But that's typical any time you build a
9       machine of this complexity, isn't it, that
10      there are bugs you have to get out of it?
11          MR. LIGHTFOOT: Objection.
12          THE WITNESS: I still answer,
13              right?
14          MR. LIGHTFOOT: You do.
15  A. Yes. That's not uncommon. It's not
16  uncommon.
17  Q.   Okay. All right. So he was going --
18      Victor was going on vacation or I guess
19      had gone on vacation, and then continue
20      on.
21  A.  He was on vacation. Monday morning I go
22  to work. And as is my normal routine, I
23  start turning the equipment on, knowing

Page 118

1  that, you know, it's my job to do this. I
2  get to the steam cleaner and I can't -- I
3  see that there are wires disconnected from
4  the fixture itself. And I'm afraid to
5  turn it on because I don't know what the
6  wires are there for, why they're there --
7  rather, why they're not connected, and
8  what that's going to do if I do turn the
9  machine on. Because, again, portable
10  steam cleaners -- any steam-generating
11  vessel, if you don't vent the steam but
12  you allow the unit to continue to heat
13  becomes a bomb, literally becomes a bomb.
14  It will explode. If you're making steam
15  and you don't release that pressure --
16  It's just like the old-style pressure
17  cookers that blow up and blow the meat
18  sauce all over the roof. This is what
19  you've got. Steam cleaners, by their
20  operation, make more pressure than a
21  pressure cooker. So that makes the
22  explosion that much worse.
23          I was not going to turn this thing on

Page 119

1  not knowing if it's safe to operate and
2  knowing that people are going to be
3  passing by. Either the building gets
4  blown up or the thing blows up and hurts
5  somebody, or anything could happen if the
6  -- if we're not properly discharging the
7  steam. So I look at the fixture. I see
8  some -- I see loose wires on every
9  station. I'm concerned about how to --
10  should I even turn it on now. I go back
11  to my desk. I call Victor. Got him on
12  the phone. He reminded me that he had had
13  some issues with the steam cleaner, and
14  that he had disconnected these wires. I'm
15  not sure if he told me at that time or if
16  we -- I think he did say at that time that
17  he had spoken to Chad about it and that
18  everything was okay. Chad was in the
19  hospital with -- at least with chest
20  pains. I don't know exactly what the
21  condition was. But I believe he was in
22  the hospital room -- this comes out after
23  the fact -- when Victor and Chad had their

Page 120

1  discussion.
2          Anyway, I asked Victor, "Where do the
3  wires go?" He said he would take care of
4  it when he got back. I indicated that
5  that wasn't acceptable because we had to
6  run it this week while he's gone -- or the
7  time he's gone. I think I said something
8  to the effect of, "I'll see if I can't
9  figure it out. But if I can't figure it
10  out, I've got to be able to talk to you so
11  I can put this thing back into running
12  order."
13          I went back to the steam cleaner to
14  -- We hung up. I went back to the steam
15  cleaner to see if I could figure out where
16  the wires went. I couldn't. I tried to
17  call Victor again and I couldn't get him
18  back on the phone. At that point I went
19  to Mr. Robertson and explained that the
20  steam cleaner is not working. These wires
21  are disconnected. I can't get in touch
22  with Victor. My only option at this point
23  is to take everything out and see what all

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1    goes back in and to rebuild it. I'd
2    rather not do that because that's going to
3    take another couple of months to get it
4    figured out. "What do you want to do?"
5    Basically asking Terry, "How do you want
6    to handle this?" My instruction was to
7    then attempt to make it work. If I can't
8    make it work, we'll deal with it when
9    Victor comes back.
10   Q.   Did you then try to make it work?
11   A.   Yes, sir.
12   Q.   Were you able to make it work?
13   A.   No, not at all.
14   Q.   Did Victor have any discussion with you
15        before he left to go on vacation about the
16        problems -- about the issues with the
17        steam cleaner? You said he reminded you
18        that there were issues with it.
19   A.   He said something about -- We use a
20        transducer to determine -- A transducer is
21        a device that takes an analog signal --
22        "analog" being a natural signal -- and
23        transposes it into an electrical impulse

Page 122

1    that a machine can then read. So we use
2    this transducer -- we wanted to use the
3    transducer to monitor the steam output so
4    we'd know when to refill it. He said he
5    was having some trouble making the
6    transducer operate. My comment back to
7    that was, "Can you make this fixture
8    operational?" He said, "Yes." I said,
9    "Well, make it operational, and we'll
10   worry about the transducers at a later
11   point." The final direction was, "Make it
12   operational or make sure I understand why
13   it is not operational."
14   Q.   And when was the last moment he was on the
15        job before he left to go on vacation,
16        before his vacation began?
17   A.   I'm not sure if I understand.
18   Q.   Well, was it -- I mean, what day did his
19        vacation begin? Was it like a week
20        vacation, beginning on a Monday?
21   A.   Oh, yes, yes. I'm sorry. His vacation
22        started on a Monday and it was supposed to
23        run through the week.

Page 123

1    Q.   Did he work on Saturday and Sunday?
2    A.   No, sir. It would have been Friday.
3    Q.   Okay. So did he work a full day that
4         Friday?
5    A.   He asked me about taking off early. And I
6         said that if he would make the thing
7         operational and get me up to speed on how
8         to make it work, leaving a little early
9         probably wouldn't be a problem. But
10        you've got to meet these conditions first.
11   Q.   Did he talk with you before he left?
12   A.   No, sir.
13   Q.   He was out a week?
14   A.   Yes, sir.
15   Q.   All right.
16   A.   I would need to review it, but I believe
17        it was a one-week vacation. I don't think
18        it was two. I think it was one.
19   Q.   Okay. Now, when he got back, was that on
20        a Monday?
21   A.   Yes, sir.
22   Q.   Is that the day he was terminated?
23   A.   Yes, sir.

Page 124

1    Q.   How many conversations did you have during
2         the week of his vacation with Terry
3         Robertson about Victor Smith?
4    A.   I don't know. I honestly don't know.
5    Q.   At what point did you become aware that
6         Terry Robertson was going to terminate
7         Victor Smith's employment?
8    A.   After it happened.
9    Q.   You didn't know what was going to happen
10        before it happened?
11   A.   That's correct.
12   Q.   Who all -- Well, when did Terry Robertson
13        meet with Victor Smith to tell him he was
14        fired?
15   A.   It's my understanding it was the morning
16        of his return from vacation.
17   Q.   Were you present in the office when that
18        meeting occurred? I say "in the office."
19        I assume it was done in Mr. Robertson's
20        office?
21   A.   I think it was done in his office. Was I
22        present in Mr. Robertson's office?
23   Q.   Yes.

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 157

1    13. That's another part of the policy
2    manual.
3  A.   Okay.
4  Q.   Have you reviewed that before?
5  A.   Probably.
6  Q.   And that deals with what?
7  A.   Performance reviews.
8  Q.   And were the performance reviews of Victor
9    Smith that we've gone over and talked
10    about here today conducted in accordance
11    with that policy?
12  A.   Let me read it. I would have to say no to
13    that.
14  Q.   In what way were they not?
15  A.   Well, the third sentence indicates that
16    performance reviews should take place
17    during the month of April. And at the
18    earliest I reviewed with Victor was in
19    May.
20  Q.   Well, is that the only thing?
21  A.   As far as the review goes, I believe so.
22  Q.   Okay. Let me ask you, backing up to the
23    August evaluation of Victor Smith.

Page 158

1  A.   Okay.
2  Q.   I believe that's Plaintiff's Exhibit 6 or
3    it may be 5.
4  A.   Okay.
5  Q.   If you go to the last page where the
6    overall evaluations -- may be the
7    next-to-the-last page. There is the
8    number 3.5 down there on the bottom left.
9    I want to ask you again about what scale
10    that's on.
11  A.   Scale of 5.
12  Q.   Is it possibly a 1-to-4 scale?
13  A.   No, sir.
14  Q.   You're certain about that?
15  A.   Absolutely.
16  Q.   I may or may not mark this. I want to ask
17    you about it first. It may be irrelevant.
18    This document here is several pages long
19    that's been produced. It says "PLC
20    Instruction."
21  A.   Yes, sir.
22  Q.   Can you tell me what this is?
23  A.   Yes, sir.

Page 159

1  Q.   What is it?
2  A.   This is a handout -- Let me back up a
3    little bit. Brian McGhee, that we've
4    mentioned before, was hired into Euro-Pro
5    from Auburn University. He was a very
6    recent graduate of their Master's in
7    Electrical Engineering Program. His -- I
8    don't know for how long. But for some
9    time during his last -- during his
10    Master's work he instructed the electrical
11    engineering students at Auburn University
12    under Programmable Logic Controller
13    instruction. Programmable Logic
14    Controllers are commonly referred to as
15    PLC's within the industry. He gave a
16    general class to the students at Auburn
17    University on how to program -- generally
18    how to program PLC's. I asked him to then
19    give a class to our employees on the
20    specific direct Soft 32 program that we
21    use. So this is a handout from that class
22    that specifically details how to program
23    the exact PLC units that we use at

Page 160

1    Euro-Pro. The nomenclature may be
2    different. Some terms may be different.
3    This is detailed to the ones that we
4    purchased.
5  Q.   Victor Smith, did he sit in on this class?
6  A.   I believe so. Yes, sir.
7  Q.   Was any part of his job to program the
8    computers with this program?
9  A.   Yes, sir.
10  Q.   And was he able to do that? Did you ever
11    have a problem with him not properly doing
12    that part of his job?
13  A.   No, sir.
14  Q.   Okay. Who is Jeff Garrison?
15  A.   Jeff works for us.
16  Q.   When was he hired?
17  A.   December of '04.
18  Q.   After Victor left?
19  A.   I believe so.
20  Q.   Now, Jeff Garrison is an engineer?
21  A.   That's correct.
22  Q.   When was the decision made to hire an
23    engineer?

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1 A.  Honestly, I don't know.
2 Q.  Who made the decision?
3 A.  I don't know that either.
4 Q.  Do you know if the decision to hire an
5      engineer was made before or after Victor
6      Smith was terminated?
7 A.  I don't know.  I'd have to guess.
8 Q.  But at any rate, we do know that Jeff
9      Garrison was hired after Victor was
10     terminated?
11 A.  That's correct.
12 Q.  And do you know the exact date he came in?
13     MR. LIGHTFOOT:  He's already said
14         he didn't.
15 A.  I don't.
16 Q.  Okay.
17 A.  I will say this:  Jeff was part of -- I
18     want to get this right.  The word escapes
19     me.  We approached Auburn University,
20     their electrical group -- actually, their
21     electrical group and their mechanical
22     group, for senior design projects.  They
23     routinely -- It's routine in the

Page 162

1      engineering field for the senior students
2      to design a product, and that tells their
3      professors how well they can design a
4      project and if they deserve to graduate or
5      not.  We approached Auburn University for
6      two electrical projects and one or two
7      mechanical projects.
8          Brian McGhee, as the lead of the
9      Electrical Engineering Group, had gotten
10     to the point where he needed help in his
11     work, the electrical -- design of
12     electronic circuits.  Jeff and one other
13     guy were noted during that time -- and
14     this is -- You approach these guys at the
15     beginning of their semester.  So it would
16     have been in September, I think, of '03,
17     whenever school starts -- to here's a
18     couple of projects we'd like to see if
19     your design students could help us with.
20     Jeff and Larry Frost were identified
21     fairly early on as possible candidates.
22     Once they graduated school, they were
23     hired.

Page 163

1 Q.  Was someone else hired at the same time
2      Jeff was?
3 A.  Yes, sir.
4 Q.  Who?
5 A.  Larry Frost.
6 Q.  Okay.  Were they hired both in December of
7      '04?
8 A.  I would say so.  All coming out of this
9      Electrical Engineering Senior Project
10     Design Group.
11 Q.  At the time Victor left, as I understand
12     it, the steam testing device was
13     operational but not fully operational?
14         MR. LIGHTFOOT:  Objection.  Asked
15             and answered.  Go ahead.
16 A.  It seemed to be operational before he
17     left.  When we found the exposed wires, we
18     were -- it then became non-operational
19     because we weren't sure if it was safe to
20     operate.
21 Q.  Well, let me -- Right.  I understand,
22     because of the exposed wires, it was not
23     operational.  But I understood you to say

Page 164

1      earlier, exposed wires aside, it was maybe
2      only eighty percent operational?
3          MR. LIGHTFOOT:  Objection.  Go
4              ahead.
5 Q.  Is that what you said?
6 A.  Yes.  That's what I said.
7          MR. LIGHTFOOT:  Objection.
8 Q.  Whose job did it become after Victor's
9      termination to bring that machine into
10     full operation?
11 A.  Mine.
12 Q.  What part, if any, did Mr. Garrison play
13     in working on the steam cleaner testing
14     device?
15 A.  Jeff assisted.  Once I got into it and
16     realized how much work it would take, we
17     were faced with the choice of me doing
18     nothing but steamers and steam cleaners or
19     getting a little bit -- a little bit of
20     help, and I could continue to run the
21     other projects as well as my own workload.
22     And, so, in that role Jeff helped.
23 Q.  All right.  Are you saying that it would

41  (Pages 161 to 164)

# FREEDOM COURT REPORTING

### Page 165

1  have been pretty much a full-time job for
2  you to work on the steam cleaner tester?
3  A.  Yes, sir. Basically, I would have had to
4  fill Victor's shoes completely. And with
5  my current workload I just didn't have
6  time.
7  Q.  So Victor's job was then divided between
8  you and Jeff Garrison; is that correct?
9  MR. LIGHTFOOT:  Objection.
10  A.  I would characterize it as saying I took
11  on the job and Jeff gave me a little help.
12  Q.  So how much of your time, after Victor
13  Smith left, was spent working on the
14  things Victor had been working on?
15  A.  Eventually that became my full-time job.
16  It eventually became my full-time job.
17  It's a full-time -- that's a full-time
18  position. In order to keep the things
19  running, you've got to have somebody back
20  there making sure they are running.
21  Q.  Is that your full-time position now?
22  A.  Pretty much.
23  Q.  And you say that no one has been hired to

### Page 166

1  replace Victor?
2  A.  That's correct.
3  Q.  Is anyone going to be hired?
4  A.  We've had some subsequent changes. And I
5  may be changing roles, and we'll deal --
6  bring somebody in to fill mine or Victor's
7  position at this point.
8  Q.  Is Mr. Garrison still with the company?
9  A.  Yes, sir.
10  Q.  Is he white?
11  A.  Yes, sir.
12  Q.  What age person is he?
13  A.  I don't know.
14  Q.  He just recently graduated from Auburn
15  University?
16  A.  That's correct.
17  Q.  He's an engineer?
18  A.  Yes, sir.
19  Q.  When he came to work for Euro-Pro,
20  Mr. Garrison, how much of his -- what
21  percentage of his time would you estimate
22  was devoted to completing the steam
23  cleaner tester?

### Page 167

1  MR. LIGHTFOOT:  For what period
2  of time?
3  Q.  Well, over the first -- say the first
4  three months.
5  A.  On the steam cleaner?
6  Q.  Yeah.
7  A.  I would estimate he put what I call
8  one-man month into it. Four weeks, forty
9  hours a day, over a three-month period or
10  so.
11  Q.  So over a three-month period it was -- he
12  devoted about a third of his time to it?
13  A.  That's a fair estimate, I think.
14  Q.  Let me ask you this:  If it was eighty
15  percent operational when Victor Smith
16  left, how long did it take to get it up to
17  a hundred percent?
18  MR. LIGHTFOOT:  Objection. I
19  believe he testified he had
20  to start over. But anyway,
21  go ahead.
22  A.  We did. We had to start over from
23  scratch. Not knowing -- Again, not

### Page 168

1  knowing about the wires, we had to start
2  over from scratch.
3  Q.  How long did it take to start over from
4  scratch and get it fully operational?
5  A.  I think at least two months. Maybe a
6  little longer.
7  Q.  And during that time Mr. Garrison spent
8  approximately a third of his time on that
9  project?
10  A.  I think that's fair. I mean, again, we
11  hired him because we had other things for
12  him to do.
13  Q.  Of the employees that are currently
14  employed in the Lee County facility of
15  Euro-Pro, how many of them are black?
16  A.  One.
17  Q.  And what's that employee's name?
18  A.  Duvell Robinson.
19  Q.  And he's a lab tech?
20  A.  Yes, sir.
21  Q.  Have there been any other black employees
22  hired since Victor Smith was terminated?
23  A.  No, sir, not permanent.

42  (Pages 165 to 168)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 169

1  Q.  Have there been some hired temporarily?
2  A.  Yes, sir.
3  Q.  Through a temp agency?
4  A.  Through a temp agency. Yes, sir.
5  Q.  And they were not kept full-time, or they
6      were not --
7  A.  I'm sorry. One more. I completely forgot
8      about Patricia.
9  Q.  Patricia?
10 A.  I honestly -- I don't remember her last
11     name.
12 Q.  What department does she work in?
13 A.  She's a lab tech now.
14        MR. LIGHTFOOT: Temp or regular?
15        THE WITNESS: She's full-time. I
16        think around June of last
17        year she was made full-time.
18        Sorry. Might have been June
19        of this year she was made
20        full-time. Sorry.
21 Q.  Now, Mr. Hudnall, I want to cover one
22     other area. There's been testimony in
23     Mr. Victor Smith's deposition of the use

Page 170

1      of some offensive words. I want to ask
2      you this: Personally, does the use of the
3      word "nigger" offend you?
4  A.  Absolutely.
5  Q.  Is that a word that is frequently used
6      around the Euro-Pro factory?
7  A.  No, sir.
8  Q.  Do you consider it to be inappropriate to
9      use that word?
10 A.  Yes, sir.
11 Q.  Are there any written policies that are
12     directed toward the use of that kind of
13     offensive language?
14 A.  I don't know what the 401 posters say
15     about language.
16 Q.  The 401 posters being
17     anti-discrimination --
18 A.  Those. Right.
19 Q.  -- information?
20        Have you ever used the word "nigger"
21     during work hours in front of Victor
22     Smith?
23 A.  No, sir. I don't believe so.

Page 171

1  Q.  You don't believe so?
2  A.  No, sir.
3  Q.  Have you ever repeated any routines by
4      some comedian wherein that comedian used
5      that word?
6  A.  I believe so. Yes, sir.
7  Q.  All right. And was Victor Smith present
8      when you repeated that?
9  A.  Yes, sir.
10 Q.  And as you were repeating this, did you
11     use the word "nigger"?
12 A.  No, sir.
13 Q.  Did you use any other word that you would
14     consider offensive had it just been
15     mentioned in ordinary conversation?
16 A.  It's hard to know what offends someone
17     without them telling you. But I don't
18     believe so.
19 Q.  Okay. Did you ever hear any other
20     employee use that word or any other word
21     that you would consider to be racially
22     offensive?
23 A.  No, sir.

Page 172

1  Q.  Who was the comedian that you were talking
2      about when we just went over that? David
3      Chappelle?
4  A.  That would have been one. Yes, sir.
5  Q.  Do you recall any conversation you ever
6      had in Victor Smith's presence where you
7      were talking about David Chappelle and
8      anything he said during a comedy routine?
9  A.  We would discuss him, that he had -- About
10     the time Victor came to work for us, he
11     started a show on comedy central. I
12     thought it was a point -- a point of
13     common interest. And, so, it seemed like
14     water-cooler talk, for lack of a better
15     term. You come in the next morning. "Did
16     you see the show? Yeah, we saw the show."
17     A lot of his comedy is racially motivated.
18     But you try to say to yourself -- You're
19     trying to get the funniness across and not
20     the mean-spirited part.
21 Q.  I understand. Okay. I think that's all.
22     Let me take about five minutes and then
23     we'll come back.

43  (Pages 169 to 172)

CasCase 3:05-cv-01186-MEF-WC    Document 18    Filed 11/15/2006    Page 52 of 59

# FREEDOM COURT REPORTING

## Page 177

1 never felt a current sensor was going to
2 do the job.
3 Q. Do you remember that Victor did believe
4 that that was something necessary?
5 A. I remember talking about it.
6 Q. Okay.
7 A. I remember we did talk about it.
8 Q. You don't remember any resolution that the
9 two of you came to about whether it was
10 necessary or not?
11 A. I seem -- I know I expressed my hesitation
12 for such a device. I didn't understand
13 how the current sensor was going to do
14 anything over and above what we already
15 had.
16 Q. Do you recall Victor saying that he would
17 be available during the vacation to come
18 back up there and put the current sensor
19 device or do any other repairs or
20 maintenance to this steam cleaner tester?
21 A. I believe he said something to that
22 effect. When I called him Monday, I
23 reminded him I may need his help. And

## Page 178

1 then when I called him back Monday, he
2 didn't answer the phone. When I called
3 him back Tuesday, he didn't answer the
4 phone. I made several calls back that
5 week he was on vacation to get this
6 fixture running. We talked Monday
7 morning. I told him, "I'm going to see
8 what I can do to get it going. If I
9 can't, I'm going to call you back." When
10 I called back, I didn't get an answer.
11 Q. Did you get an answering machine?
12 A. Nothing. Just the phone would ring.
13 Q. How many times did you call?
14 MR. LIGHTFOOT: The whole time?
15 MR. COTTLE: Yeah.
16 Q. During that week.
17 A. I think twice on Monday. Of course, we
18 talked once. I think I called back twice
19 on Monday and I tried another time
20 Tuesday. By that time I got frustrated
21 and gave up.
22 Q. Does Euro-Pro run regular hours on
23 Saturday and Sunday?

## Page 179

1 A. No, sir.
2 Q. Can the employees come in and work on
3 those days if they are behind or need to
4 or want to?
5 A. They can. If it's going to be testing
6 work, we do require that someone else be
7 in the building for safety reasons. But
8 if a person had something that was
9 non-threatening to do, we have -- The
10 doors are magnetically locked. We all
11 have a magnetic little fob that allows you
12 access to go in and out. And most
13 everybody that has that fob also has a key
14 to the front door.
15 Q. Isn't it true that Victor Smith frequently
16 worked on weekends?
17 A. I don't know how frequently. I would see
18 him there occasionally on the weekends.
19 Q. Saturdays and Sundays?
20 A. I can't speak to Sundays. I don't work on
21 Sundays. I would come up on Saturdays and
22 he'd there be. Attendance was never a
23 problem, never a problem.

## Page 180

1 Q. That's all. Thank you.
2 MR. LIGHTFOOT: I've got none.
3
4 * * * * * * * * * * * *
5 FURTHER DEPONENT SAITH NOT
6 * * * * * * * * * * * *
7
8 REPORTER'S CERTIFICATE
9 STATE OF ALABAMA,
10 MONTGOMERY COUNTY,
11 I, Jackie Parham, Certified Shorthand
12 Reporter and Commissioner for the State of
13 Alabama at Large, do hereby certify that I
14 reported the deposition of:
15 RALPH HUDNALL,
16 who was first duly sworn by me to speak the
17 truth, the whole truth, and nothing but the
18 truth, in the matter of:
19
20 IN THE UNITED STATES DISTRICT COURT
21 FOR THE MIDDLE DISTRICT OF ALABAMA
22 EASTERN DIVISION
23

45 (Pages 177 to 180)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

VICTOR SMITH,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CASE NO: 3:05 CV 1186
                                       )
EURO-PRO OPERATING, L.L.C.,            )
EURO-PRO MANAGEMENT COMPANY            )
CORP. and STANRO-EP CORP.,             )
                                       )
        Defendants.                    )

## DECLARATION OF TERRY ROBERTSON

Terry Robertson declares as follows:

1.      My name is Terry Robertson. I am over the age of eighteen, and I have personal

knowledge of the facts and information set forth in this declaration.

2.      I live at 4864 Brandon Creek Drive  Boulder, CO  80301

3.      I was employed at Euro-Pro facility in Auburn, Alabama at all relevant times as

the Executive Vice President of Quality and Engineering.

4.      In December 2004, I alone made the decision to terminate Victor Smith. Just prior

to my decision, Ralph Hudnall reported to me the incident of Smith's insubordination and poor

handling of the  situation relating to the non-operational fixture when he went on vacation in

November 2004.

5.      Hudnall was not a part of the decision-making process, and I never discussed

terminating Smith's employment with Hudnall.

6.    I did not inform Hudnall that I had made the decision to terminate Smith's employment, and I did not inform Hudnall that I would be terminating Smith's employment when he returned from vacation.

7.    I terminated Smith's employment for poor performance, including his failure to complete the Steam Cleaner Testing fixture. The final straw of his unacceptable performance related to his actions surrounding his leaving for vacation and dealings with Hudnall.

8.    My reasons for terminating Smith are more fully set forth in the termination memo I authored labeled "Victor Smith (General)." This memo is attached as Exhibit 1.

9.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of November, 2006.

Terry Robertson

### Victor Smith (General)

1.  *Don't appear to want to be here?*

2.  *Steam station life testing station  - Already total investment, 25K could have built outside not any testing for six months. We have been waiting for this item to run for six months, as of today it is still not running, we have spent so much money trying to get this item up and running, this is just not acceptable.  –*

3.  *We acquired lab view software controls from Auburn University, this was brought here, there have been no attempts to get this free software up and running to tie into all of the stations, this is ill use of the equipment and free information that we have been given, but nothing has been utilized.*

4.  *Pant press has been in the reliability stations for many months, I have come upon this unit not working, while inquiring with Victor he indicated that he was not running this item, did not have time, which is totally unacceptable.*

5.  *Failure and analysis of failed items in reliability are defined in his job description, I have had problem with Victor getting these done, he always relies on someone else to do these, this has been overall problem with him taking responsibility of reviewing and analyzing things first hand and giving reports, he always seem to want someone else to perform and do this, instead of himself.*

6.  *Clean up of area – always seemed painful that he did not want to pick up or clean up as the other employees, this is his area. He even went to order signs and said that everyone else was responsible for making a mess and not him. Point for the company is that we are all responsible, I sweep at least twice a week and pick up trash daily, so I believe everyone should be responsible. He would not take responsibility for his area, this was a major problem, same trash would sit there for weeks.*

7.  *Totally changed personality after being made permanent, he was made permanent before many other temp employess, based on his resume and skills of what he was capable of doing electrically and electronically. In his exit review it was interesting that he said he was given a task he could not complete, was not given help (we had degreed engineers offering to help, but their help was refused) and this is where the problems started and ended.*

8.  *There were previous issues that were discussed, 1. Did not like the fact that he could not discuss bonuses with other employees, said this did not make sense, when actually he was being given a bonus based on my recommendation only, he was not eligible for bonus anyway. 2. Was accused while here of a problem with two other female employees of harassment both from the office and outside the office, this created a problem area very early on, but we discussed and allowed this to pass as warning.*

12/2004

# Exhibit D

EEOC Form 161 (5/96)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: Victor Smith
6472 County Road 155
Lafayette, AL 36862

From: Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2005-00853 | Charles A. Hullett, Investigator | (205) 212-2109 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*[signature]*

Bernice Williams-Kimbrough,
District Director

2 6 SEP 2005

*(Date Mailed)*

Enclosure(s)

cc: Francine Rosenzweig, Gen Counsel
STANRO-EP
1210 Washington Street
West Newton, MA 02465

John Cottle, III, Att.
Bowles & Cottle
P.O. Box 780397
Tallassee, AL
36078

Enclosure with EEOC
Form 161 (3/98)

**INFORMATION RELATED TO FILING SUIT
UNDER THE LAWS ENFORCED BY THE EEOC**

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge <u>within
90 days</u> of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day
period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an
attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the
date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent
that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the Notice is
signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after
talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement
of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the
charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.
Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be
brought where relevant employment records are kept, where the employment would have been, or where the
respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk
of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy
decisions for you.

**PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred more than <u>2 years (3 years)</u> before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit <u>before
7/1/02</u> -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is
separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also
plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90
days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION -- Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, please make your review request <u>within 6 months</u> of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*