IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:05-cv-1186-MEF |
| | ) | |
| EURO-PRO MANAGEMENT | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff and in response to the Motion for Summary Judgment

filed herein by Defendant Euro-Pro Management Services, Inc., says as follows:

### FACTS

Plaintiff is a 36 year old African-American residing in Montgomery, Alabama.

(Plaintiff's depo. p. 8)  Plaintiff graduated from high school in 1988, spent seven (7)

years in the United States Navy, and then attended Gadsden State Community College for

two (2) years, earning an Associate's Degree in Electronic Engineering Technology.

(Plaintiff's depo. p. 14-15)  In December of 2003, Euro-Pro Management Services, Inc.

(hereinafter referred to as "Defendant" or "Euro-Pro") hired Plaintiff to work at Euro-

Pro's facility in Auburn, Alabama.  (Plaintiff's depo. p. 30-31) [1]  Euro-Pro is in the

business of designing and selling a variety of small home appliances such as "vacuum

---

[1] Prior to Plaintiff's hiring in December of 2003, Plaintiff had worked at Euro-Pro's Auburn facility as a temporary employee through an employment agency.  (Hudnall Depo p. 33-34)

cleaners, steam cleaners, battery-charged sweepers, kitchen products," and the like.
(Hudnall depo p. 11-12) Plaintiff was hired as a lead technician for Defendant's
Cleanability Division, which is a division of the Defendant's business dealing with
vacuum cleaners. (Hudnall depo. p. 34) Ralph Hudnall was the Plaintiff's supervisor at
the time of hire, and remained so for the duration of Plaintiff's employment with Euro-
Pro. (Hudnall depo. p. 53)

After Plaintiff began his employment with Defendant, there were two incidents
involving Plaintiff and white female co-employees that caught the attention of
management. On one occasion, Plaintiff, while on break, placed a personal telephone call
to a co-employee, Ashleigh Sheffield, at her home. (Smith depo. p. 60-61) Sheffield
reported the incident to Hudnall. Sheffield had recently been counseled about her
improper use of the telephone and internet during working hours and felt that it was
improper for the Plaintiff to be calling her during his working hours. (Hudnall depo. p.
92-94) Sheffield did not accuse the Plaintiff of any offensive or harassing conduct
toward her. (Hudnall depo. p. 94-95) Nevertheless, Hudnall decided to investigate in
order "to make sure there was no sexual harassment." (Hudnall depo. p. 95)

On another occasion, Plaintiff asked another white female co-employee, Allison
Rhodes[2], whether she dated black men. Rhodes, who felt neither offended nor harassed
by the question, discussed the matter with Sheffield. Sheffield apparently reported the
matter to management and shortly thereafter, Sheffield and Rhodes were summoned to
the office of Chad Reese, a Euro-Pro engineer with management responsibilities. Reese
inquired about the Plaintiff's contact with Sheffield and asked Rhodes if the Plaintiff
were harassing her. Rhodes has stated that Plaintiff never harassed her and that she never

---

[2] Allison Rhodes has since married and is now known as Allison Rhodes Lott.

told anyone at Euro-Pro that the Plaintiff harassed or offended her in any way. (*See,* Allison Rhodes Lott Declaration)  Furthermore, Hudnall, after learning that Plaintiff had asked Rhodes about interracial dating, approached Rhodes and questioned her about the Plaintiff, wanting to know if she was offended "by being asked that question by a black man." (Hudnall depo. p. 145) Hudnall made this inquiry of Rhodes even though no one had alleged sexual harassment and even though there was no company policy prohibiting co-employee dating. (Hudnall depo. p. 145)

At the time of these incidents, the top executive at the Auburn Euro-Pro facility was Terry Robertson, the Executive Vice President of Quality and Engineering. Even though neither Sheffield nor Lott had complained of harassment of offensive conduct on the part of Plaintiff, Robertson called the Plaintiff into his office and counseled with him about what had happened and warned him to "be careful." (Plaintiff depo. p. 66)

Approximately one week after the incident with Sheffield, Euro-Pro transferred Plaintiff from the Cleanability Division to the Life Cycle Test Area, the area where Euro-Pro tests its products to evaluate how they will perform over the course of their useful life. (Hudnall depo. p. 70 and Plaintiff depo. p. 67)  This transfer occurred in either April or May, according to Hudnall. (Hudnall depo. p. 77)  It was at this point that Plaintiff's problems with Defendant began to take shape. In Plaintiff's new position, he was responsible for the entire maintenance of everything being tested.  (Hudnall depo. p. 71-72)  One of Plaintiff's first assignments after the transfer was to design and construct a machine to test a portable steam cleaner which Euro-Pro manufactures.  (Hudnall depo. p. 74) Plaintiff had no experience in designing this type of machine and Hudnall was aware that Plaintiff had no such experience. (Hudnall depo. p. 77)  Plaintiff was given no

budget for the project nor any information about what kind of money he was expected to spend on the project. (Hudnall depo. p. 109-110) Plaintiff asked to be provided a schematic or diagram from an engineer of the type of machine he was expected to build. (Plaintiff depo. P. 81) After several meetings among Plaintiff, Hudnall and Chad Reese, an engineer at Euro-Pro, Reese produced a sketch of the proposed machine which he drew in about three minutes time. (Plaintiff depo. p. 78-82) A copy of said sketch is attached hereto as Exhibit "A." Plaintiff felt the sketch was "unprofessional" and expressed his dissatisfaction with the drawing to Hudnall. (Plaintiff depo. p. 81) Nevertheless, Plaintiff was given a deadline of July 28th in which to complete assembly of the testing machine and have it operational. (Plaintiff depo. p. 79-80) Plaintiff informed Hudnall that he could not finish the project within the time allocated. (Plaintiff depo. p. 80) Hudnall told Plaintiff not to worry about it, that he would have other people help the Plaintiff. (Hudnall depo. p. 80-81) Plaintiff also expressed to Reese his unhappiness with the schematic and told Reese he did not believe the machine would work, as drawn. (Plaintiff depo. p. 82-83) Reese told the Plaintiff that the machine would work as designed and instructed the Plaintiff to "go build it." (Plaintiff depo. p. 82)

Plaintiff started on the project in either May or June. (Plaintiff depo. p. 84-85) Shortly after commencing work, Plaintiff informed Hudnall that he was in over his head on the project and asked for assistance. (Plaintiff depo. p. 136) Hudnall assigned a Euro-Pro engineer, Andres Simon, to assist the Plaintiff for one day. (Plaintiff Depo. p. 136-137) When the Plaintiff subsequently asked Andres for additional assistance, Andres told

him that Hudnall had instructed Andres that the Plaintiff was to do the job himself.
(Plaintiff's Depo. p. 184)

Plaintiff was scheduled to take a vacation in November.  At that time, the steam
cleaner tester was about 80% operational.  (Hudnall Depo. p. 163-164)  On the Friday
before his vacation was to begin, Plaintiff asked Hudnall, for permission to leave early to
take care of personal business.  Hudnall replied that that would be no problem because
he, himself, was going to leave early that day.  (Plaintiff Depo. p. 115)  Before leaving,
the Plaintiff informed Hudnall that the steam cleaner tester needed a current sensor and
that it would be unsafe to run in its current condition.  (Plaintiff Depo. p. 117)  Because
of this safety issue, Plaintiff disabled the machine before leaving that Friday.  (Plaintiff
depo. p. 117)  Plaintiff informed Hudnall that he would be at home during his vacation
and that if Hudnall needed his assistance with anything, he would be glad to help if
Hudnall would call him.  (Hudnall depo. p. 177)  Plaintiff does not recall ever receiving
any call from Hudnall during his vacation.  (Plaintiff depo. p. 116)

Plaintiff returned to work on December 1st.  (Plaintiff depo. p. 129)  He came in
that morning at 7:30 a.m. and was called into Terry Robertson's office.  (Plaintiff depo. p.
129)  Robertson told the Plaintiff that "they needed to eliminate the technician in that
area and hire an engineer" and that the Plaintiff was being terminated.  (Plaintiff depo. p.
129-130)  Robertson also told the Plaintiff that he, the Plaintiff, had not performed well
in connection with the steam cleaner tester project.  (Plaintiff depo. p. 130)  Robertson
complained about the cost and the time that it took to construct the machine.  (Plaintiff
depo. p. 130-134)  After the meeting, Plaintiff turned in his key and left the premises.
(Plaintiff depo. p. 132)

In December of 2004, shortly after the Plaintiff was terminated, Defendant hired Jeff Garrison, an engineer. (Hudnall depo. p. 160) Garrison is white. (Hudnall depo. p. 166) After Garrison's hiring, Garrison and Hudnall worked together on the steam cleaner tester until they got it fully operational. (Hudnall depo. p. 164-166) For the first three months that Garrison worked with Defendant, he devoted approximately one-third of his time to the steam cleaner tester project. (Hudnall depo. p. 166-168) Garrison is still an employee of Euro-Pro. (Hudnall depo. p. 166)

During the Plaintiff's course of employment with the Defendant, he was evaluated twice. The first evaluation occurred on May 5, 2004. (Hudnall depo. p. 45) On that occasion, Hudnall noted that the Plaintiff was eager to take on new responsibilities, had continued to improve his understanding of test standards, had demonstrated an ability to complete assigned tasks, had developed and assembled new life test setups, had shown good organizational skills, had provided accurate update on product testing, had sought help when needed, had demonstrated an ability to take assigned tasks to the next level of work, had assisted in improving cleanability testing and scheduling, and had taken responsibility for monitoring and setting up life tests for all Euro-Pro products being tested in Alabama. (Plaintiff's Exhibit "6" to Hudnall depo.) The evaluation also mentioned several goals and areas for improvement, but contained no specific complaints about Plaintiff's job performance.

Plaintiff was evaluated by Hudnall a second time on August 27, 2004. In this second evaluation, Hudnall assessed the Plaintiff's performance as meeting or exceeding standards in all important aspects in the areas of job knowledge and competency, quality of work, dependability, teamwork, interpersonal and communication skills, and initiative

and commitment.  (Plaintiff's Exhibit 5 to Hudnall depo.)  Hudnall noted that the

Plaintiff's "main strength is building test fixtures.  He is not afraid to ask for assistance

when needed, but he also has his own ideas about the construction of the fixture."

Hudnall also noted that the Plaintiff was "very dependable" and was "continually in the

office before 8:00 a.m. and never leaves before 5:00 p.m." (Plaintiff's Exhibit 5 to

Hudnall Depo.)  Hudnall further noted that the Plaintiff was "very exacting in

accomplishing his assigned tasks" and that he was "detail oriented and sees his

assignments through to completion."  (Plaintiff's Exhibit "5" to Hudnall depo.)  Both

Hudnall and Terry Robertson were in accord with what this evaluation indicated.

(Hudnall depo. p. 67)

         On at least one occasion during working hours and in the Plaintiff's presence,

Hudnall used the word "nigger" while repeating a joke he had heard on television the

night before.  (Plaintiff depo. p. 51-57)  Hudnall recalls repeating certain lines he heard

from a television comedian in the presence of the Plaintiff, but does not "believe" that he

used the word "nigger."  (Hudnall depo. p. 170-171)  Plaintiff was offended by Hudnall's

use of the word, but did not complain to anyone in management about the incident.

(Plaintiff depo. p. 56-58)


# **ARGUMENT**


I.     **Summary Judgment Standard**

         This matter is before the Court upon the Defendant's Motion for Summary

Judgment.  In assessing a summary judgment motion, the Court must construe the

evidence and factual inferences arising therefrom in the light most favorable to the non-moving party. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144 (1970). In this case, the Defendant – the moving party – must show that there is "no genuine issue as to any material fact and that the moving party [the Defendant] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute of material fact is genuine if the evidence is such that a reasonable trier of fact could find the evidence in favor of the non-moving party. *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).

The party seeking summary judgment has the initial burden of demonstrating the basis for the motion and establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Once this has been accomplished, the burden of production shifts to the non-moving party. The non-moving party must then "go beyond the pleadings" through depositions, affidavits, or other discovery, to demonstrate that there is a genuine issue of material fact. *Id.* at 324.

## II.    Plaintiff Established a Prima Facie Case of Racial Discrimination under both 42 U.S.C. §1981 and 42 U.S.C. §2000 e-2 (hereinafter Title VII).

The polestar case for analyzing a claim of racial discrimination under both §1981 and Title VII is *McDonald Douglas Corp. v. Green*, 411 U.S. 792 (1973). That case establishes the burden shifting framework under which §1981 and Title VII cases are analyzed, in cases where proof of discrimination is made by circumstantial evidence. The Plaintiff stipulates that proof of discrimination in the case now before the Court is based on circumstantial evidence. Therefore, the framework established in *McDonald Douglas* applies.

Plaintiff must first establish a prima facie case of racial discrimination.  Under *McDonald Douglas*, Plaintiff may do this by showing the following: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications." *McDonald Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The above formulation is not a "one size fits all" formula, and there are a number of other ways that a Plaintiff may establish a prima facie case pursuant to *McDonald Douglas. U.S. Postal Service Bd. of Governors v. Aikens* 460 U.S. 711 (1983).  Thus, in a case where a Plaintiff claims termination for discriminatory reasons (as opposed to simply not being hired) the proper formulation for making a prima facie case is for Plaintiff to show:  (1) that he was a member of a protective class; (2) that he was qualified for the position; (3) that he was fired; and (4) that he was replaced by one outside the protective class. *Marks v. Prattco*, 607 F.2d 1153, 1155 (5th Cir. 1979).[3]

The Defendant concedes in its brief that the first three prongs of the *McDonald Douglas/Prattco* formulation have been established.  (*See*, Defendant's Brief, p. 13) What is in dispute is therefore the fourth prong of the test – whether Plaintiff was replaced by a person outside the protective class or, in this case, a non-minority. The

---

[3] An alternative method of meeting the fourth prong of this test would be for the claimant to show that he was discharged for misconduct similar that tolerated from other similarly situated employees outside the protected class. *Hawkins v. Ceco Corp.*, 883 F.2d 977 (11th Cir. 1989). Defendant's brief devotes considerable attention to the issue of whether similarly situated employees were treated more favorably than Plaintiff. This issue is not relevant to the resolution of the present case. Plaintiff claims to satisfy the forth prong of the *McDonald Douglas* formulation because he was replaced by a white employee, not because similarly situated employees were treated more favorably.

Plaintiff contends that he was replaced by Jeff Garrison, a white employee, thus establishing a prima facie case according to the *McDonald Douglas/Prattco* formulation.

Jeff Garrison, a white engineer, was hired by the Defendant in December of 2004, just after the Plaintiff was terminated. (Hudnall depo., p. 160-163) At the time Plaintiff was terminated, his principal duty was constructing and making operational a machine to test steam cleaners. After Plaintiff was terminated, Garrison was assigned to work on the steam cleaner tester together with Plaintiff's supervisor, Hudnall. During the first three months of his employment, Garrison spent approximately one-third of his time working on the steam cleaner tester.

> MR. COTTLE QUESTIONING MR. HUDNALL:

> **Q.**    When he came to work for Euro-Pro, Mr. Garrison, how much of his –
> what percentage of his time would you estimate was devoted to
> completing the steam cleaner tester?

>        MR. LIGHTFOOT: For what period of time?

> **Q.**    Well, over the first – say the first three months.

> **A.**    On the steam cleaner?

> **Q.**    Yeah.

> **A.**    I would estimate he put what I call one-man month into it. Four weeks,
> forty hours a day, over a three month period or so.

> **Q.**    So over a three month period it was – he devoted about a third of his time
> to it?

> **A.**    That's a fair estimate, I think. (Hudnall depo., p. 166-167)

Plaintiff submits that this evidence is more than sufficient to meet the fourth prong of the *McDonald Douglas/Prattco* formulation. It is not necessary, in order to meet this fourth prong, for the Plaintiff to show that the person hired to "replace" him

assumed his exact same duties and responsibilities.  A key case in this regard is *Rollins v. TechSouth, Inc.,* 833 F.2d 1525 (11th Cir. 1987).  In *Rollins*, the Plaintiff was hired by TechSouth as an ad verifier and was later moved to a non-supervisory position in the accounting department.  TechSouth later decided to change its billing procedures in a way that eliminated Rollins's job.  After Rollins was terminated, TechSouth hired Richardson who was not a member of the same protective class as Rollins.  Rollins contended that Richardson was hired as her replacement, while TechSouth argued that Rollins's position had been eliminated and no one had been hired to replace her.  The evidence showed that after Rollins's termination, "Richardson took over Rollins' (sic) duties; although this *purportedly takes up very little of Richardson's time*, it still comprises part of his work." *Id.* 1529. (Emphasis added)  In the present case, Plaintiff's alleged replacement, Garrison, spent a *full one-third of his time* working on the same project that Plaintiff was working on when he was terminated.  Under the holding in *Rollins*, this alone would suffice to meet the fourth prong of the *McDonald Douglas/Prattco* formulation.  There is, however, an important distinction between the present case and *Rollins* which presents an even more compelling reason for the Court to find that the Plaintiff has made a prima facie case.  Here, the Plaintiff was terminated allegedly for poor job performance.  Unlike *Rollins*, there is no contention that the Plaintiff's position was eliminated.[4]  During the first three months following Plaintiff's termination, Garrison devoted a full one-third of his time to completing the steam cleaner tester.  Clearly, Plaintiff's job had not simply "played out" as might be the case if the

---

[4] While there is evidence that Terry Robertson told Plaintiff his position was being eliminated, this position is belied by the many and varied reasons Defendant has now advanced in justification of the Plaintiff's termination, as well as the undisputed fact that the project Plaintiff was working on was ongoing at the time of Plaintiff's termination and took another three months to complete. In any event, the Defendant has not attempted to argue that Plaintiff's termination was anything other than a firing for cause.

position were, as in *Rollins*, being eliminated. In the present case, there was an undisputed need for someone, regardless of title or job description, to assume the Plaintiff's duties and get the steam cleaner tester operational. That person, in this case, was Garrison. Under *Rollins*, Garrison must be found to be the Plaintiff's replacement.

The fact that Garrison was an engineer and thus more highly qualified than the Plaintiff is of no consequence to the *McDonald Douglas* analysis. There is no "relative qualification" element to the fourth prong of the *McDonald Douglas/Prattco* analysis, and this is true even in cases where the employee was not discharged, but merely passed over for promotion. *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998). Thus, all that is necessary for Plaintiff to meet the fourth prong of the test is to show that Garrison was his replacement. It is undisputed that Garrison partially assumed Plaintiff's duties after he was hired by Euro-Pro. Under *Rollins*, this is sufficient to satisfy the fourth prong of the *McDonald Douglas/Prattco* analysis.

## III.    Defendant's Burden to Articulate Non-Discriminatory Reason for Plaintiff's Termination

Once Plaintiff has made out a prima facie case of discrimination, it is then incumbent upon the Defendant to come forward with some non-discriminatory reason as to why the Plaintiff was terminated. The Defendant has come forward with a truckload of allegations involving impropriety on the part of the Plaintiff which Defendant now wishes this Court to accept as its reasons for terminating the Plaintiff. These reasons include everything from failure to keep the work area clean to discussing bonuses with other employees. Terry Robertson, the manager with the Defendant who made the decision to terminate the Plaintiff, authored a memo in which he set out eight specific

reasons for terminating the Defendant. Robertson also indicates in his affidavit that he terminated the Plaintiff for "poor performance, including his failure to complete the steam cleaner testing fixture." Plaintiff will concede that the reasons set forth in the Robertson memo, taken in the aggregate, would be a sufficient justification for terminating the Plaintiff under the prevailing case law. The inquiry, however, does not end here. If the Plaintiff can demonstrate that the reasons relied upon by Defendant for his termination are a pretext for discrimination, Plaintiff is entitled to proceed to trial and have the issues determined by the trier of fact. Plaintiff contends that the evidence will clearly demonstrate that the reasons offered by Defendant are a pretext and that summary judgment is inappropriate.

IV.     **The Reasons Offered by Defendant to Justify the Termination of Plaintiff's Employment are a Pretext for Racial Discrimination.**

Once Defendant has established a legitimate reason for terminating the Plaintiff, the burden then shifts back to Plaintiff to offer evidence that the reasons advanced by the Defendant are a mere pretext for discrimination. In the context of resisting a summary judgment motion, Plaintiff must present evidence from which a trier of fact "could reasonably infer discrimination if the facts presented [by Plaintiff] remain unrebutted." *Jameson v. Arrow Co.,* 75 F.3d 1528, 1531 (11th Cir. 1996). Plaintiff may clear this hurdle in two ways. He may adduce evidence that directly establishes discrimination, or he can produce evidence sufficient to permit the trier of fact to disbelieve the proffered reason for the termination. *Ross v. Rhodes Furniture Inc.,* 146 F.3d 1286, 1290 (11th Cir. 1998). Here, Plaintiff has produced sufficient evidence from which a trier of fact could infer discrimination, as well as evidence which would permit that same trier of fact to

disbelieve the reasons advanced by Defendant. Summary judgment is therefore not appropriate in this case.

### A. Reasons Relied upon by Defendant in Support of Termination.

Terry Robertson, the Euro-Pro manager who made the decision to terminate the Plaintiff, produced a memo in which he set out his reasons for terminating the Plaintiff. In addition to the reasons delineated in the memo, Robertson states in his declaration that the "final straw" which led to his decision to fire Plaintiff was the "actions surrounding his leaving for vacation and dealings with Hudnall." Plaintiff will address each stated reason and show that there is, at minimum, a factual question as to whether the stated reasons are pretextural.

### 1. Robertson's conclusion that the Plaintiff did not "want to be here."

This statement is a mere conclusion without a shred of underlying factual support. It is contrary to Hudnall's own opinion on the subject (*see*, Hudnall depo. p. 127) and is completely at odds with the two evaluations received by Plaintiff before his termination. The statements in Plaintiff's written evaluations that Plaintiff is "very dependable," that he is "constantly in the office before 8AM, and never leaves before 5PM," and that he "is very exacting in accomplishing assigned tasks," totally undermine Robertson's assertion that the Plaintiff did not "want to be here."

### 2. The steam cleaner tester issue.

The Robertson memo complains about both the cost and time involved in getting the steam cleaner tester operational. It is odd that Robertson would assert cost overrun as a justification for terminating Plaintiff, especially since Euro-Pro never gave Plaintiff a

budget for the project or provided him with any indication of how much money he was expected to spend on it. (Hudnall depo. p. 109-110) This reason is extremely suspect in light of all of the surrounding facts. In fact, it appears that Plaintiff was set up to fail. First, Hudnall knew that Plaintiff was not an engineer and had no experience designing such machines. Nevertheless, Plaintiff was never given a schematic or blueprint of what he was expected to build. The handwritten diagram that Reese provided to the Plaintiff (Exhibit A to this brief) speaks for itself. Plaintiff was also denied free access to engineering support. When Plaintiff complained to Hudnall that the project could not be completed in the time given, Hudnall told the Plaintiff not to worry, that he would get him help. Further, the Plaintiff's evaluations, one of which was given during the time Plaintiff was working on the project, gave no indication that the Plaintiff's work was not proceeding satisfactorily. It is also more than curious that the Plaintiff was transferred to this project shortly after Euro-Pro learned that Plaintiff had asked a white female whether she dated blacks.  Taken together, this evidence is sufficient for a trier of fact to infer that Euro-Pro management, after learning that Plaintiff was inquiring about dating a white co-employee, consciously decided to assign Plaintiff a task he could not possible complete given his training, experience, and the paucity of backup support he was provided. There is plainly a factual dispute as to whether the reasons advanced in paragraph two of the Robertson memo are a pretext for discrimination.

### 3. Failure to use software provided by Auburn University.

The Robertson memo states that Plaintiff failed to make use of LabVIEW, a computer software program provided to Euro-Pro at no cost by Auburn University. LabVIEW is software designed to allow the user to have immediate access to all the

various life testing on Euro-Pro products that is being conducted at any given time. (Hudnall depo. p. 127) According to Plaintiff, he used the system as directed. (Plaintiff depo. p. 120-121) Hudnall testified that Plaintiff was working on the steam cleaner project at the time and that, "it would have made sense at that point after he was done – after he was done with the steamer to start looking into the lab view. (sic)" (Hudnall depo. p. 130-131) Furthermore, Hudnall could not even say for certain whether Plaintiff had the knowledge and experience to install the program in the manner he was instructed. (Hudnall depo. p. 130) Clearly, Plaintiff was not terminated because of anything to do with installation of the LabVIEW program. A trier of fact could easily find this reason to be a pretext for discrimination.

### 4. The pant press testing station.

Paragraph four of the Robertson memo complains that Plaintiff was not properly running a pant press testing machine. The pant press tester was not automated and had to be manually turned on and off every ten minutes. (Plaintiff depo. p. 123) During the time Plaintiff was working on the steam cleaner tester, he did not have time to stop every ten minutes and turn on the pant press tester and he informed Hudnall of this fact. (Plaintiff depo. p. 123). Euro-Pro's piling this task on top of the steam cleaner tester task is further evidence that Plaintiff was being set up to fail. The evaluations Plaintiff had received from Hudnall (which also reflected Robertson's opinion (*See*, Hudnall depo. p. 67)) belie the assertion that Plaintiff would deliberately fail and refuse to perform any reasonable task assigned to him by Euro-Pro management. There is sufficient evidence from which a trier of fact could infer that the complaint contained in paragraph four of the Robertson memo is a pretext.

### 5. Analysis of failed items.

The complaints contained in paragraph five of the Robertson memo are conclusary and not supported by any underlying facts. Moreover, Hudnall's written evaluations of the Plaintiff's performance emasculate this attempted justification for the Plaintiff's termination. It is obviously a factual question as to whether the justification attempted in paragraph five is a pretext for discrimination.

### 6. Cleanliness of work area.

Defendant would have the court believe that Plaintiff was fired from his job because he didn't keep his work area clean. Admittedly, there were issues of work area cleanliness raised with Plaintiff during his employment with Defendant. Plaintiff accepted the criticism and undertook to keep not only his work area, but the entire life testing area clean. Plaintiff worked in areas with many other employees and apparently not everyone adhered to the same standards of cleanliness. (Plaintiff depo. p. 126) Plaintiff met with Hudnall to discuss ways to address the cleanliness issue, with everyone assisting. (Plaintiff depo. p. 126) Plaintiff even purchased signs to put up in the work area saying "keep this area clean." (Plaintiff depo. p. 127-128) It has been held that the "work rule" justification for terminating an employee "is arguable pretextural when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354,1363 (11th Cir. 1999). Clearly, Plaintiff did as much or more than any other employee to keep the work area clean. The complaint of an unclean work area has all the marks of a pretext, and a trier of fact could so find.

### 7. Plaintiff's totally changed personality.

This is certainly one of the more curious reasons advanced in justification of the Plaintiff's termination. The Robertson memo asserts that Plaintiff's personality "totally changed" after "being made permanent." Again, this is a mere conclusion without factual support or underpinning. Moreover, the Plaintiff was made permanent in December of 2003. It seems logical that some indication of this striking change of personality would have shown up on one of the written evaluations of the Plaintiff, somewhere along the way. The absence of any mention of this change in the written evaluations suggests that this reason was no more than an afterthought advanced to justify the Plaintiff's firing. Moreover, Hudnall himself questioned whether "changed personality" was the "right word" to describe the Plaintiff. (Hudnall depo. p. 135-136) A trier of fact might easily conclude that the "changed personality" justification was nothing more than a pretext.

### 8. Discussions of bonuses and sexual harassment.

On one occasion, Plaintiff discussed his bonus with another employee. Hudnall does not know if such discussion was against an existing company policy or whether Euro-Pro's desire that employees not discuss bonuses with each other had been communicated to Euro-Pro's employees in any manner. (Hudnall depo. p. 60-61) While the Plaintiff expressed his disagreement with this "policy" he did not violate it once it had been explained to him. (Hudnall depo. p. 98) Plainly, this will not suffice as a justification for terminating the Plaintiff's employment.

The Robertson memo also states that Plaintiff "[w]as accused while here of a problem with two other female employees of harassment both from the office and outside the office." The two females in question were Ashleigh Sheffield and Allison Rhodes.

(Hudnall depo. p. 138) Hudnall concedes that neither Sheffield nor Rhodes ever made a sexual harassment complaint against the Plaintiff. (Hudnall depo. p. 138) Rhodes specifically states in her declaration that Plaintiff never offended or harassed her in any way and that she never reported Plaintiff for harassment to any Euro-Pro supervisor. (See Allison Rhodes Lott Declaration) It is extraordinary, under these facts, that Robertson would advance sexual harassment as a reason supporting his decision to terminate Plaintiff. There is overwhelming evidence that the sexual harassment allegation is nothing but a pretext.

### 9. The "final straw."

Robertson states in his declaration that the "final straw" with respect to the decision to fire Plaintiff was Plaintiff's "actions surrounding his leaving for vacation and dealings with Hudnall." Presumable this would include the allegation that Plaintiff left for vacation without having the steam cleaner tester operational. Plaintiff's deposition testimony is sufficient to rebut this as a legitimate justification for his firing. According to Plaintiff, he had permission to leave early on the Friday when his vacation began. (Plaintiff's depo. p. 115) Hudnall does not dispute this. Hudnall contends that Plaintiff was instructed to have the steam cleaner tester operational, but plaintiff contradicts this, saying that he explained to Hudnall that the machine was unsafe to operate without a current sensor and that Plaintiff had therefore disconnected the machine from the power source. Hudnall admits that Plaintiff offered to be on call during his vacation, and said he would come in if called. (Hudnall depo. p. 177) Hudnall says he called Plaintiff twice without getting an answer and without leaving a message. (Hudnall depo. p. 178) Plaintiff denies receiving a call from Hudnall during his vacation. There is a considerable factual

dispute concerning the events leading up to the "final straw" that Robertson says resulted in the Plaintiff's firing. Summary judgment in inappropriate in light of the magnitude of this factual conflict.

### B. Evidence from which Discrimination may be Inferred.

Plaintiff has presented evidence sufficient to raise an inference of discrimination, independent and apart from his challenge to the reasons advanced by Defendant in support of Plaintiff's termination. That evidence may be summarized as follows:

### 1. The context in which the sexual harassment allegations were leveled against the Plaintiff.

Robertson's employment of the sexual harassment justification, when viewed against the entire background of facts developed in the depositions, is pregnant with inferences of discriminatory intent. Why, for example, would Robertson consider it sexual harassment for Plaintiff to ask Rhodes if she dated blacks? There was no policy at Euro-Pro against co-employees dating each other. (Hudnall depo. p.145) Why would Hudnall, in the absence of any complaint by anyone, take it upon himself to confront Rhodes and ask her about Plaintiff's inquiring as to whether she dated blacks? Moreover, why did Euro-Pro, shortly after these events, assign Plaintiff to a project he was not fully qualified for by training or experience, fail to provide him with a budget, fail to provide him with a reasonable schematic of the machine he was supposed to construct, and fail to provide him adequate backup support? A strong inference can be drawn from these facts that someone in Euro-Pro management objected to the notion of a black male employee dating a white female employee, and thereafter set out to get rid of the offender. How a trier of fact might answer these questions is undetermined at this point, but it should be

clear from the evidence heretofore developed that a material issue of fact has been raised

as to whether the reasons advanced by Defendant for terminating Plaintiff's employment

are a pretext for discrimination.

### 2. The shifting reasons advanced for Plaintiff's termination.

When Robertson called Plaintiff into his office to fire him, the first thing he told

the Plaintiff is that Euro-Pro "needed to eliminate the technician in that area and hire an

engineer." (Plaintiff depo. p. 129) Elimination of the Plaintiff's position is inconsistent

with the Plaintiff being terminated based upon all the reasons Defendant is now

advancing. This inconsistency is sufficient to raise an inference that the reasons now

being relied upon are pretextural. When viewed in light of all of the evidence before the

court, this inconsistency could be considered a substantial piece of evidence of

discriminatory intent.

### 3. Hudnall's use of racial slurs.

Hudnall's use of the word "nigger" in the presence of Plaintiff, while repeating a

joke he had heard on television, can be considered, along with the rest of the evidence, as

bearing on the issue of discriminatory intent. Although such a remark is not considered

direct evidence of discrimination, even an isolated racial epithet has been held to

constitute circumstantial evidence supporting an inference of discrimination. *Ross v.

Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir. 1998). And this is true even when

the speaker in not the decision maker responsible for terminating the employee. *Walden

v. Georgia-Pacific Corp.,* 126 F.3d 506,521 (3rd Cir. 1997). When considered in

conjunction with the other evidence in  this case – particularly the way Hudnall pursued

the sexual harassment investigation against Plaintiff based on nothing more than Plaintiff

asking a white co-employee whether she dated blacks – this utterance is revealing and could constitute the basis for a finding of discriminatory intent on the part of Defendant.

## V.     Conclusion.

For the foregoing reasons, the Defendant's motion for summary judgment is due to be denied.

John I. Cottle III (COT004)
Attorney for Plaintiff

OF COUNSEL:
Bowles & Cottle
Attorneys at Law
P.O. Box 780397
2 South Dubois Avenue
Tallassee, Alabama 36078
(334) 283-6548
Fax: (334) 283-5366
(Email) BowlesandCottle@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on Warren B.

Lightfoot, Jr., Esquire, Maynard, Cooper & Gale, P.C., 1901 Sixth Avenue North, 2400

AmSouth/Harbert Plaza, Birmingham, Alabama 35203-2618, attorney for Defendant, by

mailing a copy thereof, postage prepaid, to him at his property mailing address on this the

28th day of Nov. , 2006.

Of Counsel