# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5  CASE NUMBER:  3:05-CV-1186
6  VICTOR SMITH,
7          Plaintiff,
8          vs.
9  EURO-PRO OPERATING, L.L.C., et al.,
10          Defendants.
11
12      S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by and
14  between the parties through their respective
15  counsel, that the deposition of Victor Smith
16  may be taken before Angela Smith, RPR, CRR,
17  at the offices of Bowles & Cottle, at 2
18  South Dubois Avenue, Tallassee, Alabama
19  36078, on the 24th day of May, 2006.
20
21      DEPOSITION OF VICTOR SMITH
22
23

Page 2

1      IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8      IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17      IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21      * * * * * * * * * * * * *
22
23

Page 3

1      * * * * * * * * * * * * *
2          I N D E X
3          EXAMINATION
4                      PAGE
5  By Mr. Lightfoot ................... 5
6  DEFENDANT'S EXHIBITS
7                      PAGE
8  Ex. 1 - Mr. Smith's resume ......... 29
9  Ex. 2 - Job description for
10          position in life cycle
11          testing .................. 69
12  Ex. 3 - The sketch of the steam
13          cleaning testing
14          machine .................. 79
15  Ex. 4 - 6/28/04 e-mail from Chad
16          to Mr. Smith ............. 86
17  Ex. 5 - 5/5/04 evaluation from
18          Mr. Hudnall from
19          meeting .................. 90
20  Ex. 6 - 8/31/04 evaluation ........ 103
21      * * * * * * * * * * * * *
22
23

Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4  CASE NUMBER: 3:05-CV-1186
5  VICTOR SMITH,
6          Plaintiff,
7          vs.
8  EURO-PRO OPERATING, L.L.C., et al.,
9          Defendant.
10  BEFORE:
11      ANGELA SMITH, Commissioner.
12  APPEARANCES:
13      JOHN I. COTTLE, ESQUIRE, of BOWLES
14  & COTTLE, 2 South Dubois Avenue, Tallassee,
15  Alabama 36078, appearing on behalf of the
16  Plaintiff.
17      WARREN B. LIGHTFOOT, JR., ESQUIRE,
18  of MAYNARD, COOPER & GALE, 2400
19  AmSouth/Harbert Plaza, Birmingham, Alabama
20  35203, appearing on behalf of the Defendant.
21      ALSO PRESENT:  Terry Robertson
22                      Ralph Hudnall
23                      Tiffany Threlkeld

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1    * * * * * *
2         I, ANGELA SMITH, RPR, CRR, a Court
3    Reporter of Wetumpka, Alabama, acting as
4    Commissioner, certify that on this date, as
5    provided by the Federal Rules of Civil
6    Procedure and the foregoing stipulation of
7    counsel, there came before me at the offices
8    of Bowles & Cottle, 2 South Dubois Avenue,
9    Tallassee, Alabama 36078, beginning at 10:18
10   a.m., Victor Smith, witness in the above
11   cause, for oral examination, whereupon the
12   following proceedings were had:
13        VICTOR SMITH,
14   being first duly sworn, was examined and
15   testified as follows:
16        COURT REPORTER:  Usual
17   stipulations?
18        MR. COTTLE:  Yes.
19        MR. LIGHTFOOT:  Yes.
20        EXAMINATION
21   BY MR. LIGHTFOOT:
22   Q.    Okay.  Good morning,
23   Mr. Smith.

Page 6

1    A.    Good morning.
2    Q.    My name is Warren Lightfoot.
3    We just met.  I represent Euro-Pro that you
4    have sued in this lawsuit.
5    A.    Uh-huh.
6    Q.    I'm going to be taking your
7    deposition here today.  Have you ever been
8    in a deposition before?
9    A.    No.
10   Q.    Okay.  As I'm sure your lawyer
11   has told you, I'll just be asking you a
12   series of questions.  The court reporter
13   will be taking down every question that I
14   ask and every answer that you give.  And
15   please let me know if you want to take a
16   break at any time.
17   A.    Uh-huh.
18   Q.    I will ask you, you'll need to
19   answer every question that I ask you
20   verbally, out loud, please.  And if, for
21   instance, if it's a yes or no question, I'll
22   ask you to answer it with a yes or a no,
23   instead of like a uh-huh, a huh-uh or a

Page 7

1    shaking or a nodding of the head, the way we
2    all communicate normally, but it makes it
3    very hard to keep a good Record.  So if you
4    say uh-huh or huh-uh, I may just say:  Do
5    you mean yes or no, and then if you'll just
6    then say it.
7    A.    Okay.
8    Q.    You understand you're under
9    oath here today, and that you've sworn to
10   tell the truth?
11   A.    Yes.
12   Q.    Okay.  And are you on any
13   medication or anything else that prevents
14   you from thinking clearly, hearing me or
15   understanding me?
16   A.    No.
17   Q.    All right.  Let me know at any
18   time if you don't understand the question
19   that I'm asking and I'll be happy to clarify
20   it until you do understand.  Okay?
21   A.    Okay.
22   Q.    Otherwise, if you answer my
23   question, I'm going to assume that you

Page 8

1    understood the question that I was asking.
2    Okay?
3    A.    Okay.
4    Q.    All right.  State your name
5    for the Record, please.
6    A.    Victor D. Smith.
7    Q.    All right.  Please give me
8    your Social Security number and date of
9    birth, please.
10   A.    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.  Date of birth,
11   April 2, 1970.
12   Q.    1970.  That makes you how old
13   right now?
14   A.    Thirty-six.
15   Q.    Okay.  What's your address?
16   A.    5600 Carmichael Road,
17   Apartment 2411, Montgomery, Alabama 36117.
18   Q.    Okay.  Are you married?
19   A.    Single.
20   Q.    Have you ever been married?
21   A.    Yes.
22   Q.    How many times?
23   A.    Once.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1    Q.    All right. And when were --
2    Were you divorced?
3    A.    Yes.
4    Q.    All right. When were you
5    married and when were you divorced?
6    A.    I was married in 1992.
7    Q.    Okay.
8    A.    Divorced in 1997.
9    Q.    Okay. And to whom?
10    A.    Tanisha D. Blue.
11    Q.    Can you spell those, please?
12    A.    T-A-N-I-S-H-A, D, Blue,
13    B-L-U-E.
14    Q.    Okay. Where does she reside?
15    A.    Raleigh, North Carolina.
16    Q.    Okay. Do you have any
17    children?
18    A.    No.
19    Q.    All right. Is there anyone
20    who is dependent on you? Do you have any
21    dependents?
22    A.    No.
23    Q.    All right. Have you ever --

Page 10

1    You said you'd never given a deposition
2    before. Have you ever testified in Court or
3    given an affidavit or otherwise given a
4    sworn statement at all before? In other
5    words, given testimony under oath before?
6    A.    No.
7    Q.    Okay. Have you ever been a
8    party to a lawsuit before this?
9    A.    No.
10    Q.    Either as a plaintiff or a
11    defendant?
12    A.    No.
13    Q.    Okay. You brought an EEOC
14    charge. Do you remember going to the EEOC
15    and filing a charge?
16    A.    Uh-huh.
17    Q.    Is that a yes?
18    A.    Yes.
19    Q.    Okay. Have you ever gone to
20    another -- to the EEOC, or to any other
21    agency, federal or State government agency
22    before to make a complaint?
23    A.    No.

Page 11

1    Q.    What documents did you review
2    to prepare yourself for this deposition?
3    A.    None.
4    Q.    Okay. Just to be sure I'm
5    clear on that, I assume you talked with your
6    lawyer at some point. I don't get to know
7    about that and don't want to know about
8    that. But I do want to know of any
9    documents that you reviewed in any way,
10    whether it was yesterday or whether it was
11    in the six months leading up to this -- to
12    today, that you reviewed in any way that
13    relate to giving your testimony today.
14        Just to be clear, your
15    testimony is you've not reviewed any
16    documents to prepare?
17    A.    I reviewed my lawyer's
18    letters. I reviewed evaluations from the
19    company.
20    Q.    Okay.
21    A.    I reviewed -- If memory serves
22    correctly, that's the only documents I have
23    reviewed.

Page 12

1    Q.    Was the evaluation from the
2    company and letters from your lawyer?
3    A.    Right.
4        MR. COTTLE: If you don't mind
5    me jumping in here.
6        MR. LIGHTFOOT: Sure.
7        MR. COTTLE: We did look over
8    the whole packet of information in your
9    initial disclosures, which consisted, I
10    think, primarily of evaluations. But there
11    was some other documents maybe in there he's
12    not remembering.
13        MR. LIGHTFOOT: Okay. Did
14    that have -- That had, like, the
15    job-description-type stuff in there?
16        MR. COTTLE: Yeah. It had a
17    diagram and it had a job description.
18        MR. LIGHTFOOT: So he did
19    review?
20        MR. COTTLE: Yes.
21    Q.    Okay. Do you remember
22    reviewing those now?
23    A.    Yes.

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1    Q.    Okay.  What all else do you
2    remember that was in that packet?
3        A.    I reviewed my resume.
4        Q.    Okay.  That's the packet
5    itself?
6        A.    Yes.
7        Q.    Okay.  All right.  That's
8    fine.  I remember sending it and know what's
9    in it.
10            All right.  How far did you go
11    in school, Mr. Smith?
12        A.    I have an associate's degree.
13        Q.    Okay.  Did you graduate from
14    high school?
15        A.    Yes.
16        Q.    All right.  Let's back up to
17    there.
18        A.    Okay.
19        Q.    Where did you graduate from?
20        A.    Woodland High School.
21        Q.    Woodland?
22        A.    Uh-huh.
23        Q.    Where is that?

Page 14

1        A.    Woodland, Alabama.
2        Q.    Where is Woodland, Alabama?
3    I'm just not familiar with it.  Is it around
4    here?
5        A.    It's about two hours away from
6    here.
7        Q.    Okay.  What's the nearest
8    biggest city?  Is that a hard one to --
9        A.    Yes.  Atlanta is about two
10    hours away from Woodland.
11        Q.    Oh, okay.  All right.  On the
12    eastern part of the state?
13        A.    Yes.
14        Q.    Okay.  All right.  What year
15    did you graduated from there?
16        A.    1988.
17        Q.    '88?
18        A.    Uh-huh.  1988.
19        Q.    Okay.  All right.  Then where
20    did you go after that?
21        A.    United States Navy.
22        Q.    All right.  How long were you
23    in the Navy?

Page 15

1        A.    Seven years.
2        Q.    All right.  Do you have any
3    schooling after the Navy?
4        A.    Gadsden State Community
5    College.
6        Q.    How long did you go there?
7        A.    Two years.
8        Q.    And got your associate's
9    degree?
10        A.    Yes.
11        Q.    In what?
12        A.    Electronic Engineering
13    Technology.
14        Q.    Say that again.  Electronic
15    Engineering Technology?
16        A.    Technology.
17        Q.    Okay.  And I've got your
18    resume.  When did you get that degree?
19        A.    1999.
20        Q.    All right.  Let's back up to
21    the Navy.  Navy for seven years.  It looks
22    like it was from '88 to '95; is that
23    correct?

Page 16

1        A.    Yes.
2        Q.    All right.  And in the Navy,
3    you did troubleshooting and testing of
4    armament weapons systems
5        A.    Yes.
6        Q.    All right.  At Gadsden State,
7    do you call it a degree, an associate's
8    degree in Electronic Engineering Technology?
9        A.    Yes.
10        Q.    All right.  Associate in
11    Applied Science.  Okay.  And what did you
12    want to do with that degree?
13        A.    Work as an electronic
14    technician.
15        Q.    Okay.  All right.  On your
16    resume it lists -- It starts out with your
17    employment in '99 at Control Screening, then
18    goes to Keystone International, then goes to
19    General Dynamics, then goes to Volt
20    Technical Services.  Did you work for all
21    those employers?
22        A.    Yes.
23        Q.    Okay.  Did you work for any

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1 employers that are not listed on there?
2    A.    Before or after '99?
3    Q.    Let's see. Yeah. Did you
4 work while you were getting your degree at
5 Gadsden State?
6    A.    Yes.
7    Q.    Who for?
8    A.    Keystone Foods.
9    Q.    Is that different from
10 Keystone International?
11    A.    Yes.
12    Q.    Where are they located?
13    A.    Gadsden, Alabama.
14    Q.    What did you do for them?
15    A.    Machine operator.
16    Q.    All right. How long were you
17 there?
18    A.    Around two years.
19    Q.    All right. Did you leave
20 voluntarily or involuntarily? Did you quit
21 or were you fired?
22    A.    I left voluntarily.
23    Q.    You quit.

Page 18

1    A.    Yes.
2    Q.    Okay. Why did you quit?
3    A.    I graduated from college and
4 moved to Dallas.
5    Q.    Okay. All right. Anywhere
6 else that you worked during Gadsden State?
7    A.    I worked at Wendy's, fast
8 food.
9    Q.    What did you do there?
10    A.    Food service prep.
11    Q.    Okay. All right. After
12 college, did you go straight to Control
13 Screening?
14    A.    No. I worked for airport
15 security.
16    Q.    Okay. Is that for the
17 government?
18    A.    No. That's for an independent
19 company called Globus.
20    Q.    Globus. Where was that based
21 out of?
22    A.    Dallas, Texas.
23    Q.    All right. What did you do

Page 19

1 for them?
2    A.    Security screening.
3    Q.    How long did you do that?
4    A.    Approximately four months.
5    Q.    All right. Did you quit or
6 were you fired?
7    A.    I quit.
8    Q.    Why did you quit?
9    A.    Found a better job at Control
10 Screening.
11    Q.    Okay. All right. And then
12 you -- Did you start with Control Screening
13 somewhere around October of '99?
14    A.    Yes.
15    Q.    And you were there just a few
16 months?
17    A.    Yes.
18    Q.    What did you do there?
19    A.    Performed periodic maintenance
20 on X-ray equipment.
21    Q.    Is this in -- Is this aviation
22 security as well?
23    A.    No.

Page 20

1    Q.    What kind of X-ray equipment?
2    A.    Well, yes, excuse me. I'm
3 sorry. It's doing maintenance on X-ray
4 equipment in airports.
5    Q.    Okay. Were these jobs where
6 you sort of were involved with X-ray and
7 security stuff with equipment for airports,
8 was this using your electronic engineering
9 technology background?
10    A.    Yes.
11    Q.    Okay. All right. And why did
12 you leave there?
13    A.    Got a better position at
14 Keystone International.
15    Q.    Did you quit?
16    A.    Yes.
17    Q.    All right. Keystone is out in
18 Dallas as well?
19    A.    Yes.
20    Q.    All right. What did you do
21 for them?
22    A.    I did bench tech
23 troubleshooting with IC board, integrated

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  control boards, testing good or bad boards.
2      Q.    Boards for what?
3      A.    Various of equipment, ranging
4  from routers to computers.
5      Q.    Okay. Looks like you were
6  there about eight months, something like
7  that?
8      A.    Yes.
9      Q.    Did you quit or were you
10 fired?
11     A.    I quit.
12     Q.    Why did you quit?
13     A.    Got a better position with
14 General Dynamics.
15     Q.    All right. General Dynamics,
16 looks like you were there a year and a half?
17     A.    Yes.
18     Q.    What did you do there?
19     A.    Various job tasks involved
20 there. I installed BTS equipment for AT&T.
21 We upgrade AT&T and Nokia systems throughout
22 the Northeast -- the Northwest and all the
23 way to Miami.

Page 22

1      Q.    What is BTS?
2      A.    It's base station equipment.
3  It's actual cell phone -- cell phone
4  equipment. Every sales site has cell phone
5  equipment that if you were riding in a car,
6  that cell phone would actually pick up --
7  the equipment will pick up the cell phone
8  and relay it to another station.
9      Q.    All right. And did you quit
10 or were you fired?
11     A.    Laid off.
12     Q.    Okay. How many -- Were others
13 laid off at the same time you were?
14     A.    Yes. Two others.
15     Q.    How many employees were there
16 at General Dynamics, approximately?
17     A.    I don't know how to answer
18 that question.
19     Q.    Hundreds?
20     A.    Thousands.
21     Q.    Thousands. A huge employer?
22     A.    Yes.
23     Q.    Okay. I just don't know

Page 23

1  anything about that company. And what was
2  the reason given for your layoff?
3      A.    Recession.
4      Q.    Okay. Did you apply for
5  unemployment?
6      A.    No.
7      Q.    Did you get another job
8  quickly?
9      A.    Yes.
10     Q.    With Volt?
11     A.    Volt Technical Services.
12     Q.    Is that in Dallas?
13     A.    Yes.
14     Q.    What did you do for them?
15     A.    I worked with -- It's an
16 independent contracting company, and I
17 worked for Texas Instruments. I was a
18 machine manufacturing specialist, installing
19 -- installing various equipment from
20 computer chips to make computer chips, what
21 they call wafer fab technology.
22     Q.    Okay. Looks like you were
23 there a couple of years -- one year.

Page 24

1      A.    Uh-huh.
2      Q.    A little over?
3      A.    Uh-huh.
4      Q.    Did you quit or were you
5  terminated?
6      A.    I quit.
7      Q.    Why did you quit?
8      A.    The relationship I had at that
9  time, we was moving out of state. So I quit
10 and moved out of state.
11     Q.    Where did you move to?
12     A.    I moved to Baton Rouge,
13 Louisiana.
14     Q.    What job -- Did you take a job
15 in Baton Rouge?
16     A.    No.
17     Q.    How long were you in Baton
18 Rouge?
19     A.    Approximately a month and a
20 half.
21     Q.    Where did you go after that?
22     A.    Woodland, Alabama.
23     Q.    You came back home?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.    Yes.
2    Q.    Okay.  And did you still have
3  family in Woodland?
4    A.    Yes.
5    Q.    Do you still have family in
6  Woodland now?
7    A.    Yes.
8    Q.    Okay.  Tell me what -- what
9  family members -- What county is Woodland
10  in?
11    A.    Randolph County.
12        MR. LIGHTFOOT:  Is that Middle
13  District?
14        MR. COTTLE:  I believe it is.
15  I'm not a hundred percent sure, but I
16  believe it is.
17    Q.    Yeah.  What relatives do you
18  have that live either in Randolph County or
19  sort of in the greater Montgomery area?
20  What are the last names of your relatives?
21    A.    Turner.
22    Q.    Okay.  Is that all?
23    A.    Wright.

Page 26

1    Q.    W-R-I-G-H-T?
2    A.    Yes.  Uh-huh.
3    Q.    All right.  Are there any
4  Smiths?
5    A.    Smiths.
6    Q.    Okay.
7    A.    Phillips.
8    Q.    Okay.
9    A.    Pearsons.
10    Q.    All right.
11    A.    I'm pretty sure there are
12  more, but I can't remember.  That's the
13  immediate.
14    Q.    All right.  Tell me what
15  counties all those folks live in, like the
16  Turners.
17    A.    Randolph County.
18    Q.    Wright?
19    A.    Randolph.
20    Q.    Smiths?
21    A.    Randolph.
22    Q.    Phillips?
23    A.    Chambers.

Page 27

1    Q.    Okay.  Pearson?
2    A.    Chambers.
3    Q.    Okay.  Is that all you can
4  think of right now?
5    A.    Yes.
6    Q.    All right.  Where did you work
7  when you went back to Woodland?
8    A.    I'm sorry I paused.  I'm
9  trying to think did I have a job before I
10  went to Euro-Pro.  I don't think I did.  I
11  think I went directly to Euro-Pro from
12  there.
13    Q.    Okay.  Well, did you go --
14  When you went -- You went to Euro-Pro
15  through a temp agency; right?
16    A.    Right.
17    Q.    Did you work at other places
18  through the temp agency first?
19    A.    No.
20    Q.    Okay.  What was the name of
21  the temp agency?
22    A.    I can't remember.
23    Q.    Okay.  When did you get back

Page 28

1  to Woodland?  Was that sometime in July of
2  '03 or August of '03?
3    A.    I don't remember the exact
4  date, but it was in '03.
5    Q.    All right.  And then you
6  started with Euro-Pro -- with the temp
7  agency, working for Euro-Pro, somewhere
8  around December of '03; right?
9    A.    Right.
10    Q.    But was there a period of time
11  where you weren't employed?
12    A.    Yes.
13    Q.    Okay.  And who did you rely on
14  to get by then?
15    A.    Family members.
16    Q.    Okay.  All right.  And then
17  you started with the temp agency, and you
18  don't remember the name of that temp agency;
19  right?
20    A.    No.
21    Q.    But they placed you at
22  Euro-Pro?
23    A.    Yes.

# FREEDOM COURT REPORTING

Page 29

1    Q.    Did they place other temps at
2  Euro-Pro as well?
3    A.    Yes.
4    Q.    All right.  And that was in
5  December of '03?
6    A.    Yes.
7            (Defendant's Exhibit 1 was
8            marked for identification
9            purposes.)
10   Q.    All right.  And what job did
11  you start out working at Euro-Pro?
12  Actually, hang on one second.  I'm sorry.
13  One second on that.
14            Down here on your resume, and
15  we'll just make this Defendant's Exhibit 1
16  to your deposition.  Did you -- Where it
17  talks about your skills at the bottom of
18  that page, do you see that?
19   A.    Uh-huh.  Yes.
20   Q.    All right.  Did you have all
21  of those skills by the time you -- Actually,
22  this is your resume as of the time you came
23  to Euro-Pro; right?

Page 30

1    A.    Right.
2    Q.    All right.  So, did you have
3  all these skills before you came to
4  Euro-Pro?
5    A.    Yes.
6    Q.    Okay.  And tell me what
7  knowledge you had in programmable logic
8  controls.
9    A.    College.
10   Q.    Okay.  That's something called
11  -- That's called PLC; is that right?
12   A.    Right.
13   Q.    All right.  So at college,
14  tell me what they -- Did you have a course
15  on it or what did you know about it?
16   A.    Yes.  I had a semester course
17  on programmable logic control.
18   Q.    And that would have been at
19  Gadsden State?
20   A.    Yes.
21   Q.    Okay.  All right.  So you were
22  telling me in December of 2003, you began
23  working at Euro-Pro.  And what was your

Page 31

1  position, starting out?
2    A.    My position at starting out, I
3  don't know the exact title when I started
4  out.  I was working with a temp agency.  I
5  don't think I had a title.
6    Q.    Okay.  All right.  There are
7  -- At the facility -- At Euro-Pro's facility
8  in Auburn, there's sort of two divisions,
9  right, there's the cleanability project and
10  the life cycle project; right?
11   A.    Yes.
12   Q.    Which project were you on?
13   A.    Cleanability.
14   Q.    Okay.  And is that where the
15  other -- what the other temps there working
16  with you were on the cleanability project?
17   A.    Yes.
18   Q.    Okay.  All right.  And what
19  were y'all doing on the cleanability
20  project?
21   A.    We would record data and get
22  data on carpet and vacuum pick up of dirt
23  out of carpet, off of carpet.

Page 32

1    Q.    Okay.
2    A.    Basically, that's what we did.
3    Q.    Yeah.  And the cleanability
4  just deals with the product of a vacuum
5  cleaner; right?
6    A.    Yes.
7    Q.    The other -- Life cycle dealt
8  with other types of products?
9    A.    Yes.
10   Q.    Okay.  Were there already two
11  temporary employees working there before you
12  got there?
13   A.    I'm not sure.
14   Q.    Were there other temps?
15   A.    Yes.
16   Q.    Okay.  All right.  When you
17  started out, were you reporting to Ralph
18  Hudnall?
19   A.    Yes.
20   Q.    Okay.  So, did you and the
21  other temps in cleanability report to Ralph?
22  Is that the way it was set up?
23   A.    Yes.

8  (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 33

1     Q.     And he was the director of lab
2  testing?
3     A.     I don't know if that was his
4  title. We reported to him.
5     Q.     Okay. And when you first
6  started, there was only the first shift,
7  right, there was that eight-to-five shift?
8     A.     Yes.
9     Q.     All right. And then at some
10 point within a -- shortly after you began,
11 the company started a second shift; right?
12    A.     Yes.
13    Q.     And that shift went from two
14 p.m. to ten p.m.; is that correct?
15    A.     I think so. I'm not sure, but
16 I think that's correct.
17    Q.     Okay. And at the point that
18 they started the second shift, did they tell
19 you -- did Ralph tell you that they were
20 making you a permanent employee, or did
21 Euro-Pro tell you they were making you a
22 permanent employee?
23    A.     I don't recall if it was right

Page 34

1  at that point. I don't know that it went
2  that fast.
3     Q.     Okay.
4     A.     But I think around that time I
5  was made a permanent employee.
6     Q.     Okay. And do you remember
7  what you were making, compensation-wise?
8     A.     I think my salary was
9  twenty-eight thousand, six hundred.
10    Q.     Twenty-eight thousand, six
11 hundred?
12    A.     Yes. I think. I'm not sure.
13    Q.     Okay. And did you know that
14 you were being compensated higher than the
15 other employees that were temporary
16 employees?
17    A.     That was temporary employees,
18 yes.
19    Q.     Did you also know that you
20 were being compensated more than every
21 employee there who wasn't a management
22 employee?
23    A.     No.

Page 35

1     Q.     You didn't know that? Do you
2  know that now, as we sit here?
3     A.     I know you told me that. I'm
4  not certain of that.
5     Q.     Okay. I understand. Yeah. I
6  was asking if you knew it. Not that you
7  have to rely on me to for that. I was
8  asking you if you knew that.
9            When you started with
10 Euro-Pro, did you -- did you have meetings
11 and such with Ralph Hudnall in terms of --
12 and Terry Robertson in terms of what was
13 expected as a Euro-Pro employee?
14    A.     Yes.
15    Q.     Okay. And were they clear
16 that they expected you to work during work
17 hours?
18    A.     Yes.
19    Q.     Okay. Did they tell you they
20 expected everybody at that facility to treat
21 each other with respect?
22    A.     Yes.
23    Q.     All right. Did they tell you

Page 36

1  that they expected you to be a team player?
2     A.     Yes.
3     Q.     Did you pull your share of the
4  workload?
5     A.     Yes.
6     Q.     Did they tell you it was
7  important to keep the work areas clean?
8     A.     Yes.
9     Q.     All right. Did they tell you
10 it was also important to show initiative, to
11 not just do what's asked, but to go above
12 and beyond the call of duty?
13    A.     Yes.
14    Q.     And did you believe in all
15 those things anyway, from your Navy training
16 and from all your prior work experience?
17    A.     Yes.
18    Q.     Okay. When they made you --
19 Did they actually sort of make you the lead
20 employee for the evening shift, where you
21 sort of were not a supervisor, but where you
22 were sort of in charge of the evening shift?
23    A.     Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1    Q.    Did they call you a lead
2    employee or was it just sort of -- did you
3    just play that role?
4        A.    I think I just played that
5    role.
6        Q.    Okay.  And based on your prior
7    work experience, it was appropriate for you
8    to be the lead employee; right?  I mean, did
9    you feel like it was appropriate for you to
10   be in that role?
11       A.    Yes.
12       Q.    And yet, you were made that
13   sort of lead -- You played that lead
14   employee role, and, yet, you were not the
15   most senior, in terms of experience, of the
16   employees that were on that evening shift;
17   correct?
18       A.    Correct.
19       Q.    You were the least senior;
20   right?  You were the newest guy there?
21       A.    Can we go back to the next
22   question -- the question before that?
23       Q.    Sure.

Page 38

1        A.    On the evening shift.
2        Q.    Yes.
3        A.    There was only two, if my
4    memory serves me correctly, only two
5    employees, and I was the only permanent
6    employee.
7        Q.    You mean three total, you and
8    two others, or just two, total.
9        A.    Me and another.  It was two
10   total.
11       Q.    Oh, okay.
12       A.    And I was the only permanent
13   employee on the evening shift.
14       Q.    Okay.  Did you go from -- Once
15   they put you on the evening shift in that
16   lead role, did you go from being an hourly
17   employee to a salaried employee?
18       A.    Yes.
19       Q.    And were you pleased with the
20   increase in pay and the added
21   responsibilities?
22       A.    Not exactly.
23       Q.    Oh, all right.  Did you not

Page 39

1    want to be the lead employee on the evening
2    shift?
3        A.    That's not what I -- I thought
4    I should have got paid more.  I wasn't -- I
5    wasn't satisfied with the amounts at the
6    time.
7        Q.    Okay.  Well, were you pleased
8    with the increase in pay, even if it wasn't
9    as much as you wanted?
10       A.    Was I pleased?
11       Q.    Yeah.
12       A.    Yes.
13       Q.    Okay.  All right.  And were
14   you pleased to take on a position of more
15   leadership and added responsibility?
16       A.    Yes.
17       Q.    Okay.  And are you the kind of
18   employee that likes to be challenged and to
19   get increases in responsibility?
20       A.    Yes.
21       Q.    All right.  How did you get
22   along with Sam Hickman?
23       A.    Not well.

Page 40

1        Q.    Okay.  Were you -- Did you
2    always treat him respectfully?
3        A.    Yes.
4        Q.    Was he a -- Was he an hourly
5    employee?
6        A.    No.  He was a contractor.
7        Q.    Oh, a contracted employee?
8        A.    Yes.
9        Q.    Who did he work for?
10       A.    I don't know the company.
11       Q.    Like a temp agency?
12       A.    Yes.
13       Q.    Okay.  He was a temporary
14   employee?
15       A.    Yes.
16       Q.    Like you had been before?
17       A.    Yes.
18       Q.    Okay.  Did you have an
19   incident where there was sort of a near
20   fight between you and him?
21       A.    I wouldn't call it a near
22   fight.  We had a disagreement.
23       Q.    An altercation?

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    A.    A disagreement.
2    Q.    All right. And did you -- Did
3 you -- During the disagreement, did you come
4 up out of your chair and with heated words
5 talk with him?
6    A.    Yes.
7    Q.    Okay. Were there other
8 employees around when it happened?
9    A.    Yes.
10    Q.    All right. Tell me what the
11 words were that you said to him when you
12 came out of your chair and were -- Were you
13 speaking with him in a raised voice?
14    A.    Yes.
15    Q.    Tell me what words you said to
16 him, please.
17    A.    I told him don't ever
18 disrespect my manhood.
19    Q.    What did he say that
20 precipitated that?
21    A.    I can't recall. What did he
22 say to cause me to say that?
23    Q.    To cause that. Yeah.

Page 42

1    A.    Just -- I'm not giving you
2 exact words, but around what he said was:
3 Why don't I be a man and say what I really
4 thought.
5    Q.    All right. Did management
6 learn that this disagreement had occurred?
7    A.    Yes.
8    Q.    All right. And at some point,
9 did Ralph come and talk with you about it?
10    A.    I can't recall.
11    Q.    Was it -- Well, was it that
12 day or was it on a day or so later when he
13 -- or when someone came to talk to you?
14    A.    It was a day or so later, I
15 think. I can't recall exactly.
16    Q.    Okay. And you don't remember
17 whether it was Ralph or Terry or Chad, or do
18 you just not recall or do you think it was
19 Ralph?
20    A.    I remember talking to Terry.
21    Q.    You remember talking to Terry.
22 All right. Did Terry tell you it was
23 unacceptable to have disagreements like

Page 43

1 that?
2    A.    I don't think so. I don't
3 remember that that word was used or if that
4 -- even that phrase was used.
5    Q.    Okay. Did he say words to the
6 effect of: It's inappropriate to have a
7 disagreement like that where there's a
8 raised voice in the workplace?
9    A.    No.
10    Q.    All right. What did he say?
11    A.    I can't recall exactly what he
12 said.
13    Q.    All right. Was the purpose
14 for him talking to you to tell you: We
15 can't have anymore of this, or words to that
16 effect?
17    A.    He asked me what had happened.
18    Q.    Okay.
19    A.    I told him what had happened.
20    Q.    All right. And then what did
21 he say?
22    A.    I think he told me he had
23 spoken to Sam about what he had done.

Page 44

1    Q.    He had spoken with Sam as
2 well?
3    A.    Right.
4    Q.    All right. And then what did
5 he say?
6    A.    He said Sam was lucky to have
7 a job.
8    Q.    Okay. Did he tell you words
9 to the effect: We can't have that anymore?
10 Or that that's not acceptable conduct in the
11 workplace?
12    A.    No.
13    Q.    Nothing like that?
14    A.    No.
15    Q.    Did Ralph ever tell you words
16 to that effect?
17    A.    No.
18    Q.    The Euro-Pro rules were that
19 you could not use the phone for personal
20 calls, except in emergencies and during your
21 break times; correct?
22    A.    I don't understand what you're
23 saying.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    Q.    Okay.  Did Euro-Pro have a --
2    have rules that you can -- employees are
3    only supposed to use the telephone for
4    personal reasons during emergencies or
5    during your break time, otherwise if you're
6    using the phone it needs to be for business
7    rules?
8    A.    I never heard of that rule.
9    Q.    Okay.  You recall a meeting
10   where Terry Robertson met with all employees
11   and spoke about those kinds of rules with
12   all of the employees?
13   A.    Yes.
14   Q.    Okay.  Did Terry say that he
15   had understood that there was too much
16   nonbusiness activity going on during
17   business hours?
18   A.    Yes.
19   Q.    Did he say that people were
20   abusing the phone, or words to that effect,
21   were using the phone too much?
22   A.    Yes.
23   Q.    Okay.  And then what did he

Page 46

1    say -- Did he say, you know:  From now on,
2    that you can only use the phone for
3    emergency reasons or for -- or if you're on
4    your break time?
5    A.    I don't recall him saying
6    that.
7    Q.    Okay.  Well, then, what did he
8    set down as the ground rules going forward,
9    that you recall?
10   A.    If I recall that, it was also
11   the Internet and the phone.  And he was
12   telling everybody that people are using the
13   Internet too much and the phone too much.
14   Q.    During business time?
15   A.    Yes.  We were not allowed at
16   that time to use the Internet, unless it was
17   business purposes.
18   Q.    And the same thing with the
19   phone?
20   A.    The phone, I don't remember
21   the phone because it wasn't the main issue.
22   He could have said that, but I don't
23   remember.

Page 47

1    Q.    I understand.
2    A.    The Internet, at that time,
3    was the main issue.
4    Q.    I understand.
5    A.    And that's what I focused on.
6    Q.    Sure.  You had dealings with
7    -- Well, scratch that.
8         Ralph Hudnall, was -- was he
9    always your supervisor?  Let's see.  Let me
10   ask that.  Was he always your supervisor?
11   A.    As far as I can remember, yes.
12   Q.    Okay.  And then Terry was
13   above him, correct, Terry Robertson?
14   A.    I think it was Chad Reese and
15   Terry Robertson.
16   Q.    And then Terry.  Okay.  Did
17   all three of those men always treat you with
18   respect?
19   A.    Sometime.
20   Q.    Well, I mean --
21   A.    Not always.
22   Q.    I want to know if they always
23   treated you, in the workplace, with respect?

Page 48

1    A.    No.
2    Q.    Okay.  Terry Robertson, were
3    there times that he did not treat you with
4    respect?
5    A.    There was -- No.
6    Q.    Okay.  Was there ever a time
7    that Ralph Hudnall did not treat you with
8    respect?
9    A.    Rephrase that question,
10   please.
11   Q.    Sure.  Was there ever a time
12   that Ralph Hudnall did not treat you with
13   respect?
14   A.    Yes.
15   Q.    When did Ralph Hudnall not
16   treat you with respect?
17   A.    There was a time I thought he
18   was making inappropriate jokes or
19   inappropriate comments about something he
20   saw on TV.
21   Q.    All right.  When was that?
22   A.    I can't give you the exact
23   time or exact date.  I don't remember the

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  exact date.
2      Q.    Okay.  You were only there a
3  year, so it would have been -- and you
4  started in December of '03, so would it have
5  been sometime in 2004?
6      A.    Yes.
7      Q.    Okay.  Are you able to say
8  summertime?  Did it happen on one occasion?
9      A.    It happened more than one
10 occasion.
11     Q.    Okay.  How many occasions?
12     A.    Approximately four or five.
13     Q.    All right.  When -- And you
14 can't tell me when any of those four or five
15 were?
16     A.    Exactly no.  Exact time, no.
17     Q.    And you can't even give me a
18 ballpark; is that right?
19     A.    No.
20     Q.    What were the inappropriate
21 jokes that you thought he said or he laughed
22 about or whatever?
23     A.    He would make inappropriate

Page 50

1  comments about a Dave Chappelle episode
2  that, really, I felt like it was
3  inappropriate for him to make that towards
4  me because there were racial jokes that
5  David Chappelle would make and he would
6  repeat those racial jokes to me.
7      Q.    Okay.  So, on these four or
8  five occasions, were they all approximately
9  the same, I mean, it's the same type stuff?
10     A.    The same type thing.  The same
11 type stuff.
12     Q.    Okay.  And did you watch the
13 Dave Chappelle Show?
14     A.    Yes.
15     Q.    Did he watch the Dave
16 Chappelle Show?
17     A.    Yes.
18     Q.    Is that something that y'all
19 talked about on occasion?
20     A.    That's something that he had
21 brought up on occasion.
22     Q.    Did other employees talk about
23 the Dave Chappelle show as well?

Page 51

1      A.    Not as I recall.
2      Q.    You don't recall any other
3  employee ever talking about the Dave
4  Chappelle Show?
5      A.    I don't recall that anybody
6  has ever -- other employees come to me about
7  the Dave Chappelle show.
8      Q.    Did you hear Ashley Sheffield
9  ever talk about the Dave Chappelle Show?
10     A.    Not as I recall.
11     Q.    Okay.  You don't recall
12 anybody else talking about it?
13     A.    No.
14     Q.    Okay.  Tell me, if you can,
15 any of these four or five incidents, what
16 the substance of it was.
17     A.    There was one I can remember
18 he was doing -- Dave Chappelle was blind and
19 he thought he was white and he was black.
20 And when he found out that he was white, he
21 divorced his white wife.  And they asked him
22 why he divorced his white wife.  He said:
23 Because she's a nigger lover.  And he

Page 52

1  actually repeated that scene and I didn't
2  think that was funny.
3      Q.    Okay.  He didn't use the "N"
4  word, did he?
5      A.    Yes.
6      Q.    Did Dave Chappelle use the "N"
7  word as well?
8      A.    Yes.
9      Q.    Okay.  All right.  You didn't
10 complain to anybody about that, did you?
11     A.    I think I talked to Ashley
12 about it once or twice, that I didn't think
13 that he should be making comments like that.
14     Q.    Okay.  But you didn't talk to
15 anybody -- You didn't complain to anybody in
16 management about that?
17     A.    No.
18     Q.    You just mentioned -- You say
19 you may have talked to Ashley about it?
20     A.    Yes.
21     Q.    Okay.  Is that the only person
22 you would have mentioned it to?
23     A.    I think so.  She was -- We

13 (Pages 49 to 52)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 53

1 talked. I think that's the only person I
2 mentioned it to.
3      Q.    And you didn't tell Ralph you
4 were offended by it, did you?
5      A.    No.
6      Q.    And you didn't tell Ralph to
7 stop saying it, did you?
8      A.    No.
9      Q.    Did you laugh? I mean, did
10 you kind of talk along with him?
11      A.    I think I mentioned I saw the
12 scene, yes.
13      Q.    Did you tell him you thought
14 it was funny, too?
15      A.    No.
16      Q.    Did he say he thought it was
17 funny?
18      A.    I mean, yes.
19      Q.    And did you say you thought it
20 was funny, too, you'd seen it?
21      A.    I told him I saw it. I didn't
22 think it was funny.
23      Q.    Okay. Did you think some of

Page 54

1 Dave Chappelle's stuff was funny?
2      A.    Some of it.
3      Q.    Did you think that some of
4 Dave Chappelle's stuff was funny and okay,
5 and some of it was not funny and over the
6 line, is that kind of --
7      A.    Some of it's over the line.
8      Q.    Is that your general
9 impression of Dave Chappelle?
10      A.    Yes.
11      Q.    Okay. A lot of other people
12 feel that way too, right, that some of it's
13 okay and some of it's over the line?
14      A.    I imagine so.
15      Q.    I mean, you've talked to
16 people that feel the same way you do; right?
17      A.    Yes.
18      Q.    All right. So you remember
19 that one time where he talked -- you say he
20 talked about that there was a -- Well, you
21 told me the story about a blind man. All
22 right. Can you remember any other stories
23 that you say y'all talked about?

Page 55

1      A.    Not at this time, no.
2      Q.    Okay. Take your time and
3 think about it. If there's any -- I mean,
4 we've got all day. If there's anything else
5 that you think he said that -- from the Dave
6 Chappelle show that you thought wasn't
7 funny, whether you complained or not.
8            To be clear, I'm not
9 interested in what the Dave Chappelle Show,
10 if Ralph -- if you're saying Ralph Hudnall
11 said something from that show.
12      A.    I can't recall anything else
13 at this time.
14      Q.    Okay. So, that's the only
15 specific you recall that Ralph ever said to
16 you about the Dave Chappelle Show?
17      A.    Yes.
18      Q.    Okay. Who was -- Who was
19 around when Ralph -- you say Ralph made this
20 one statement to you about a blind man?
21      A.    Nobody.
22      Q.    Where were y'all standing?
23      A.    In a life test area.

Page 56

1      Q.    How did the conversation
2 start?
3      A.    Exactly, I think he said:
4 Have you -- Do you -- Have you ever saw the
5 Dave Chappelle Show? And I said: Yeah. I
6 saw it before. He said: Do you remember
7 the scene about him being blind and black in
8 the Ku Klux Klan rally? I said: Yeah, I
9 saw it. And from there, the conversation
10 went on to that, the phrase I gave you
11 earlier.
12      Q.    Did you actually raise the
13 issue of the Dave Chappelle Show on the
14 first occasion to Ralph?
15      A.    No.
16      Q.    You've told me that you
17 thought it wasn't funny, but you weren't
18 offended, were you?
19      A.    I was offended by the word.
20      Q.    By the "N" word?
21      A.    Yes.
22      Q.    Not by the rest of it?
23      A.    I was offended by him saying

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  the "N" word, nigger.
2      Q.    Right. But not by the rest of
3  the -- not by the recounting the rest of the
4  Dave Chappelle skit; right? Do you see what
5  I'm saying?
6      A.    I don't understand what you're
7  saying.
8      Q.    I hear you saying that you
9  were offended by him saying the "N" word,
10  but you weren't offended by him relating to
11  you the rest of the skit, were you?
12      A.    I was offended by the whole
13  situation of the racial comments, I meant
14  even the whole skit of the Dave Chappelle
15  Show.
16      Q.    But not offended enough to
17  complain to anybody; right?
18      A.    I talked to a friend about it.
19      Q.    Who is the friend?
20      A.    Ashley Sheffield.
21      Q.    Okay. And you told me about
22  that?
23      A.    Yes.

Page 58

1      Q.    What did you tell Ashley?
2      A.    That I didn't think Ralph
3  Hudnall should be making comments like that.
4  It was inappropriate in the workplace.
5      Q.    And you certainly knew that
6  you could talk to Terry Robertson if
7  something Ralph had done had offended you or
8  bothered you and you wanted it to stop;
9  right?
10      A.    I knew that he was available.
11      Q.    Did Terry -- Was Terry a good
12  boss, in terms of being open door,
13  available, if you had something that you
14  needed to talk about, when he was in town?
15      A.    Yes.
16      Q.    Okay. All right. Any other
17  time that Ralph Hudnall did not treat you
18  with respect throughout your whole
19  employment?
20      A.    I can't recall right now.
21      Q.    Okay. Did Chad Reese always
22  treat you with respect?
23      A.    Yes.

Page 59

1      Q.    Do you have any reason to
2  believe that Terry Robertson or Ralph
3  Hudnall or Chad Reese was racist in any way?
4      A.    Before I was fired, I believed
5  that, I believe that that's what that was
6  going to, that I was going to be
7  discriminated against.
8      Q.    Yeah. All right. That's not
9  my question. And we'll get to that. My
10  question is, do you have any reason to
11  believe that Terry Robertson, Ralph Hudnall
12  or Chad Reese were racist in any way?
13      A.    I've never heard -- I never
14  heard Terry Robertson or Chad Reese make a
15  racial comment.
16      Q.    Have you ever heard Ralph
17  Hudnall make a racist comment?
18      A.    I've heard Ralph Hudnall make
19  a racist comment as far as the Dave
20  Chappelle Show.
21      Q.    Oh, the one you've already
22  told me about?
23      A.    Yes.

Page 60

1      Q.    Okay. But other than that,
2  have you ever heard him making a racist
3  statement in any way?
4      A.    To anybody? No.
5      Q.    To anybody. Have you ever
6  heard of him making a racist statement to
7  anybody about anything?
8      A.    No.
9      Q.    One night when you were
10  working on the evening shift at 9:30 on a
11  Friday night, approximately, did you call
12  Ashley Sheffield at home?
13      A.    Yes.
14      Q.    And you just called her for
15  personal reasons; right? I mean, you didn't
16  have a business reason for calling her;
17  correct?
18      A.    Correct.
19      Q.    And did you just ask her what
20  she was up to that weekend, things like
21  that?
22      A.    Yes. I was on my break and I
23  made a phone call to her.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    Q.    What time was your break?
2    A.    I don't think it was a
3  scheduled break. We had breaks -- I don't
4  know the exact -- what -- how many breaks we
5  had or whatever, but I think we had one and
6  then we had a lunch and then we went home.
7  So there was no set scheduled time for a
8  break.
9    Q.    When you called her, it was
10  after the time that Terry had had the
11  conversation with all the employees about
12  the Internet use and the telephone use;
13  correct?
14    A.    I was on my break, correct.
15    Q.    And after you called her and
16  spoke with her -- Was that a short
17  conversation?
18    A.    Yes.
19    Q.    Five minutes, maybe?
20    A.    Approximately.
21    Q.    Okay. After that time, did
22  you try to call her again that night?
23    A.    Yes.

Page 62

1    Q.    And she didn't answer; right?
2    A.    Right.
3    Q.    How many times did you call
4  her again?
5    A.    That night?
6    Q.    Yeah.
7    A.    I think that was -- Twice was
8  the only time, I think. I'm not sure, but
9  I'm sure it was only twice.
10    Q.    Twice after the time you
11  talked to her?
12    A.    No. Once after the time.
13    Q.    Once after, twice total.
14  Okay. Did you have a conversation with
15  Allison, another employee, at one point
16  around that time period where you talked
17  about dating issues?
18    A.    Yes.
19    Q.    All right. Did you ask her if
20  she would be -- Tell me what you asked her
21  about dating issues.
22    A.    Allison asked me did I know of
23  anybody, any friends. And I asked Allison:

Page 63

1  What is your preference? Do you date black
2  men, white men or whatever?
3    Q.    Okay. Did you also ask the
4  same or similar question to Ashley Sheffield
5  on one occasion about: Would you date a
6  black man, or words to that effect?
7    A.    No.
8    Q.    You didn't ever do that to
9  Ashley Sheffield?
10    A.    No. Ashley Sheffield already
11  had a boyfriend. Why would I ask her that?
12    Q.    All right. At some point
13  after you had made the statement to Allison
14  you just told me about and after you had
15  called Ashley, did Chad Reese and Ralph
16  Hudnall tell you they wanted to speak with
17  you?
18    A.    Yes.
19    Q.    Did they explain to you that
20  you need to be careful about the types of
21  things you say in the workplace about dating
22  and things of that nature?
23    A.    No. They did not tell me

Page 64

1  that.
2    Q.    All right. Did they tell you
3  that you needed to be careful about not
4  saying something that could be offensive to
5  a coworker?
6    A.    No, they did not tell me that
7  neither.
8    Q.    Okay. Did they tell you you
9  shouldn't be using the phone during business
10  hours?
11    A.    And I explained to them I was
12  on my break.
13    Q.    I'm asking you, did they tell
14  you that you shouldn't be using the phone
15  during business hours?
16    A.    Yes.
17    Q.    All right. Is it also your
18  testimony that he didn't say anything to you
19  about the appropriateness or not about your
20  either phone call or conversations with the
21  coworker women?
22    A.    Yes. They told me about the
23  conversation with Ashley.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1    Q.    Okay.  What did they say?
2    A.    They told me when I went to
3  the office that Ashley had talked to Ralph.
4  And they talked to me that Ashley had talked
5  to Ralph that I had called her.
6          And I asked them, I said:  Why
7  is that a problem?  And if I remember
8  correctly, they said that Ashley said she
9  didn't think it was appropriate for me to
10  call her by me being a supervisor in the
11  cleanability area.  It just -- We shouldn't
12  talk like that.
13    Q.    Did you tell them that you
14  hadn't intended to be offensive?
15    A.    Yes.
16    Q.    Okay.  And did they just say:
17  Just don't let it happen again, or words to
18  that effect?
19    A.    Yes.
20    Q.    Okay.  And was that the end of
21  it, in terms of did it ever even come up
22  again?
23    A.    Terry Robertson talked to me

Page 66

1  when he came back about it.
2    Q.    Around this same time period?
3    A.    I think it was like a couple
4  of weeks.  I don't know what the schedule
5  was.  I think it was like a week or two
6  after he came back.
7    Q.    Okay.  So, Chad and Ralph met
8  with you when Terry was out of town?
9    A.    Yes.
10    Q.    All right.  And they told you,
11  basically, just don't do it again, or words
12  to that effect.  And then Terry met with
13  you, whenever he got back in town, and then
14  tell me what was said in that conversation,
15  same type thing?
16    A.    Exactly what Terry say, I
17  can't recall.  He said he heard about what
18  had happened.  And I don't -- I think he
19  told me to be careful.
20    Q.    And did you assure him that
21  you would?
22    A.    I explained to him what the
23  situation was, and that it wasn't nothing to

Page 67

1  begin with.
2    Q.    Okay.  And after that meeting
3  with Terry, did it ever come up again?
4    A.    No.
5    Q.    At all, during your
6  employment?
7    A.    No.
8    Q.    Did the second shift at
9  Euro-Pro end after a few months?
10    A.    Actually, it ended probably
11  about a -- approximately a week after I
12  talked to Terry about that incident.
13    Q.    Okay.  At that point, did the
14  company offer for you to go into life cycle
15  testing?
16    A.    It was not an offer.  It was
17  that:  We're going to put you in the life
18  cycle test area.
19    Q.    All right.  And this was in
20  April of '04?
21    A.    I think, correct.
22    Q.    This was basically testing of
23  all the other products and how they would

Page 68

1  last on the market, their reliability?
2    A.    Yes.
3    Q.    And were you excited about the
4  opportunity?
5    A.    I was excited, yes.
6    Q.    And based on your skill set
7  and your past experience, was it something
8  -- was it a challenge that you wanted to
9  take on?
10    A.    In the beginning.
11    Q.    And did you understand it as
12  an opportunity to grow and advance in the
13  company?
14    A.    Yes.
15    Q.    And didn't you, in fact, learn
16  that Ralph Hudnall had sort of gotten his
17  start before he made supervisor doing a
18  similar type thing?
19    A.    I don't know.
20    Q.    You don't recall that?
21    A.    No.
22    Q.    Did you view it as a promotion
23  of sorts?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1    A.    No.
2    Q.    You did not?
3    A.    No.
4    Q.    Why not?
5    A.    There was no more money, there
6    wasn't a raise, it wasn't a promotion.
7    Q.    That position was not offered
8    to anybody else, was it?
9    A.    I don't know.
10   Q.    As far as you know, it wasn't,
11   correct?
12   A.    Correct.
13   Q.    All right.  And you were given
14   a position description or a job description;
15   correct?
16   A.    Correct.
17         (Defendant's Exhibit 2 was
18         marked for identification
19         purposes.)
20   Q.    All right.  I'll show you what
21   I'm marking as Defendant's Exhibit 2.  Why
22   don't you just -- You can put those up, if
23   you don't mind.  Thanks.  Because I'm just

Page 70

1    going to -- It's the same stuff, though.
2         MR. LIGHTFOOT:  Do you need
3    this, John?
4         MR. COTTLE:  It's the same
5    thing in here?
6         MR. LIGHTFOOT:  It's the same
7    stuff you've got.
8         MR. COTTLE:  Okay.
9    Q.    All right.  Was this the
10   position description that was given to you?
11   A.    Yes.
12   Q.    All right.  And who talked
13   with you on the front end about this new
14   opportunity for you?  Was it --
15   A.    Can you rephrase that?
16   Q.    Sure.  Well, did Terry and
17   Ralph and Chad talk with you about this new
18   opportunity?  I know Ralph did, I just want
19   to know who all talked with you about this?
20   A.    Ralph and Terry.
21   Q.    Ralph and Terry.  Okay.  And
22   how many times did they talk with you before
23   you began it, before you started doing it?

Page 71

1    A.    If my memory serves me
2    correctly, it was only once.
3    Q.    Okay.  All right.  And would
4    that have been where you expressed
5    excitement in the new opportunity?
6    A.    When -- Yes.
7    Q.    Okay.  And can you remember
8    the specifics of what they talked about in
9    that meeting?
10   A.    Specifically, Terry Robertson
11   said that he need to get the life test
12   system up and going.  And they was going to
13   move me from cleanability area into the life
14   test system, to get it up and running.
15   Q.    Okay.
16   A.    And that's what I can recall
17   specifically.
18   Q.    Okay.  Do you remember Ralph
19   adding anything to that discussion?
20   A.    I don't remember.
21   Q.    Okay.  Did you have a -- Did
22   you sit down with Ralph and Terry and walk
23   through the job description?  I'll ask that

Page 72

1    first.
2    A.    I remember seeing this.  I
3    don't remember that we sat down and walked
4    through it.
5    Q.    Okay.  Would that have been in
6    the first meeting with Ralph and Terry or in
7    a subsequent meeting with Ralph?
8    A.    I don't remember.  I think
9    this was after that meeting.  I don't
10   remember.
11   Q.    Okay.  So, this would have
12   probably been with just Ralph?
13   A.    I think.  I don't recall
14   actually when it happened or who I talked
15   to.
16   Q.    Okay.  And when Ralph or
17   Terry, whoever was walking through this with
18   you, did they sort of walk through these
19   five main areas of responsibilities?
20         MR. COTTLE:  Object to the
21   form.  I think he said no one had walked
22   through it with him.
23   Q.    Did Ralph discuss these five

18   (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  areas with you?
2      A.   Yes.
3      Q.   Okay.  Did you ask any
4  questions about it?
5      A.   I think we talked about it.  I
6  don't remember asking any questions, but we
7  did -- I think we did discuss it.
8      Q.   Okay.  Did Ralph or Terry say
9  words to you to the effect of -- in one of
10  these initial meetings that they wanted you
11  to take the life cycle testing to the next
12  level?
13      A.   Yes.
14      Q.   And you felt, based on your
15  skills and experience, that that was
16  something that you could do; correct?
17      A.   Yes.
18      Q.   They also told you that if you
19  need any help doing your job, you should
20  rely on Ralph primarily as your supervisor;
21  correct?
22      A.   Yes.
23      Q.   And Chad Reese and Andras were

Page 74

1  also available to help you; correct?
2      A.   Ralph and Chad Reese was
3  available.  Andras, he was available in the
4  beginning, but he became not available, for
5  one day.
6      Q.   Okay.  Let me try to break
7  that down a little bit.  You say Ralph and
8  Chad were always available?
9      A.   Ralph and Chad was available.
10      Q.   Okay.  You say --
11      A.   Andras was not always
12  available.
13      Q.   Okay.  Did Andras work there?
14      A.   Yes.
15      Q.   Okay.  How was he unavailable?
16      A.   In the beginning of the
17  project that I was working on, doing --
18  building life tests, Andras became available
19  for me for one day.  And I expressed the
20  fact that on this project, I needed an
21  engineer on this project with me.  For one
22  day, Andras became available.  The next day
23  he was not available.

Page 75

1      Q.   All right.  When was it that
2  he was available, what one day?
3      A.   The project began --
4      Q.   -- in May; right?
5      A.   Right.
6      Q.   Okay.  Was it somewhere in the
7  start?
8      A.   He was beginning -- He was
9  available from the start, in May.  And the
10  next day I came to work, he was not
11  available.  And he expressed that Ralph had
12  told him that I was to do it by myself.
13      Q.   Okay.  From those first
14  meetings that you had with Ralph and Terry,
15  was it clear to you that the life cycle
16  testing was important to Euro-Pro?
17      A.   Yes.
18      Q.   Was it also clear to you that
19  they wanted you to succeed in that role?
20      A.   Yes.
21      Q.   And wasn't that the reason why
22  they said:  We want to make these three
23  folks available to you?  Was that part of

Page 76

1  why you say that?
2      A.   There was two people available
3  for me.  Andras was not available for me.
4      Q.   Okay.  Now, you sought the
5  help of Brian McGee a lot during the life
6  cycle testing, didn't you?
7      A.   If you want to call it a lot.
8  Sometimes.
9      Q.   Well, on a weekly basis, you
10  did, didn't you?
11      A.   No.
12      Q.   Well, he was regularly
13  available to you; correct?
14      A.   No.
15      Q.   All right.  How was he not
16  available?
17      A.   He was working on another
18  project.  I didn't -- He wasn't available to
19  work on a project with me.  He wasn't
20  regularly available.
21      Q.   Okay.  But he helped you on
22  several occasions, didn't he?
23      A.   On some occasions, yes.

19  (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    Q.    And he's an engineer; right?
2    A.    Yes.
3    Q.    Okay.  Now, in terms of
4  getting set up to do your new job, it was
5  what was called a lab technician, wasn't it?
6    A.    Yes.
7    Q.    The first -- Let's see.
8  Sometime within a month of your starting,
9  the largest project that you were assigned
10  was the steam cleaner life cycle testing;
11  correct?
12    A.    Correct.
13    Q.    When you first started on
14  that, you had several meetings with Ralph
15  and Chad to get you started; correct?
16    A.    Correct.
17    Q.    All right.  And, let's see,
18  was it at one of the earlier meetings when
19  the group of you put together the diagram?
20    A.    I think it was, like, a week
21  after when Chad came up with that sketch.
22    Q.    Okay.  So, you knew that --
23  Well, you knew actually going in that

Page 78

1  building and installing the automated steam
2  cleaner fixture was going to be a big part
3  of your job; correct?  You'll see it listed
4  there about three-fourths of the way down.
5    A.    Yes.
6    Q.    Okay.  So you said it was,
7  what, maybe early on -- I can't remember
8  what you said, maybe a couple of meetings
9  into it this diagram was come up with?
10    A.    Yes.
11    Q.    Okay.  So, the early meetings
12  would have been with Ralph and Chad; is that
13  right?
14    A.    Correct.
15    Q.    Okay.  And then you said maybe
16  the third meeting is when y'all came up with
17  this diagram; correct?
18    A.    We came up with that sketch,
19  yes.
20    Q.    The sketch.  Okay.  And this
21  was a schedule that y'all wrote on the white
22  board; correct?
23    A.    Correct.

Page 79

1    Q.    And then y'all have a
2  technology that reduces it to a piece of
3  paper; right?
4    A.    Correct.
5    Q.    Okay.  And what y'all do is,
6  it looks like y'all sort of went through and
7  set up the various stages that would need to
8  be accomplished to complete the project; is
9  that what it was?
10    A.    Correct.
11    Q.    Okay.  And y'all agreed that
12  these were the appropriate stages; correct?
13    A.    Correct.
14        (Defendant's Exhibit 3 was
15          marked for identification
16          purposes.)
17    Q.    All right.  I'll go ahead and
18  just let you -- You can see it from a
19  distance.  I'll mark this as Defendant's
20  Exhibit 3.  That's the sketch we're talking
21  about; correct?
22    A.    Correct.
23    Q.    Okay.  And y'all all agreed on

Page 80

1  the project completion date of July 28th;
2  correct?
3    A.    No.
4    Q.    Well, who came up with that
5  date?
6    A.    Chad Reese.
7    Q.    Okay.  You didn't disagree
8  with that date, did you?
9    A.    Yes.
10    Q.    Well, you didn't say:  That's
11  not a good date, did you?
12    A.    I talked to Ralph Hudnall that
13  no way I could finish that alone by that
14  date.
15    Q.    Okay.  And what did Ralph say?
16    A.    He said:  Don't worry about
17  it.
18    Q.    Okay.
19    A.    He said:  It will be all
20  right.  Just do the best you can.
21    Q.    Okay.  And was that where
22  Ralph also told you that you could rely on
23  other people to get help?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 81

1    A.    And I asked him: Could I get
2  an engineer on the project? And that's when
3  Andras had came into the project.
4    Q.    Okay.
5    A.    And the next day he was gone.
6    Q.    All right. After y'all came
7  up with this sketch -- And you had input
8  into this sketch, didn't you?
9    A.    No.
10    Q.    Okay. Are you saying there's
11  some other part of this sketch or the
12  staging deadlines that you thought was wrong
13  or inappropriate?
14    A.    I asked for a schematic or a
15  diagram from an engineer of how to build --
16  or how to install the handles for the steam
17  cleaner and this is the sketch I came up
18  with. And I totally disagreed with Ralph
19  Hudnall that: This right here is
20  unprofessional. I don't know what to do
21  with this.
22    Q.    Who drew this sketch?
23    A.    Chad Reese.

Page 82

1    Q.    And Chad is an engineer;
2  right?
3    A.    And that's what he told me.
4  He said: I'm an engineer. I'll draw you a
5  sketch. And he drew that in three minutes.
6    Q.    Well, did you say: Chad,
7  that's not good enough?
8    A.    I said: Chad, that's not good
9  enough and that's not going to work.
10    Q.    You said that in front of Chad
11  and Ralph?
12    A.    Yes.
13    Q.    What did they say when you
14  said: That's not good enough?
15    A.    Chad said: It will work. He
16  said: It will work. Go build it.
17    Q.    Why did you say that wouldn't
18  work?
19    A.    Because you have a ball coming
20  out of an air piston hitting a trigger.
21  There's no way that that ball is going to
22  ever be stable in hitting that trigger at
23  the exact same point every time, because it

Page 83

1  is round.
2    Q.    You didn't point out that
3  specific problem to Chad, did you?
4    A.    Yes.
5    Q.    What did Chad say?
6    A.    Again, he said: I'm an
7  engineer. Go build it.
8    Q.    So did Chad -- So Chad clearly
9  thought it would work; right?
10    A.    Yes.
11    Q.    Okay. Was it clear that Ralph
12  thought it would work as well?
13    A.    It was not clear that Ralph
14  thought it was going to work.
15    Q.    Did Ralph say he disagreed
16  with it?
17    A.    Ralph had some -- I think
18  Ralph didn't say that he disagreed with it,
19  but he had some questions on whether it
20  would work or not.
21    Q.    All right. After this
22  schematic was drawn, did you have a series
23  of meetings with Ralph about sort of going

Page 84

1  forward and what was the basic set-ups of
2  the life test fixture?
3    A.    I think so. After this
4  sketch, yes, I think so.
5    Q.    Okay. And that would have
6  been, what, within the week or two right
7  after this sketch?
8    A.    Yes.
9    Q.    All right. And were those --
10  Would some of them take all morning, or were
11  they one hour, or how long would those
12  meetings take?
13    A.    Oh, not even an hour. It
14  wasn't no hour-long meetings.
15    Q.    Okay. They were -- Would you
16  sit down with Ralph and talk through the
17  basics of sort of creating this fixture as
18  you were getting started?
19    A.    Yes.
20    Q.    Okay. All right. So, that is
21  somewhere in the -- Do you remember if that
22  was in early May?
23    A.    Yes.

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  Q.  Okay.  So that was in early
2  May.  So, basically, the setup was for you
3  to do this and have it done in about three
4  months' time, is that correct; by the end of
5  July, so May, June, July?  Sounds like it's
6  a little less, depending on when it was in
7  early May; right?
8  A.  Honestly, I don't know if this
9  came off in early May.  I think it was more
10  like early June when the project had came
11  about.  I'm not for sure.  But I think the
12  project started in, like, early June.  I'm
13  not sure.
14  Q.  Okay.  After the series of
15  meetings that you had at the beginning with
16  Ralph, did you ever seek Ralph's help on the
17  project?
18  A.  Yes.
19  Q.  All right.  On how many
20  occasions, after those early meetings, did
21  you seek Ralph's help on the project?
22  A.  Mostly -- I don't know how
23  many occasions that I talked to Ralph about

Page 86

1  the project, but I had to consult with Ralph
2  about anything that I wanted to do with the
3  project.
4  Q.  All right.  I'll show you an
5  e-mail --
6  MR. LIGHTFOOT:  John, I
7  produced this, didn't I?
8  MR. COTTLE:  Yeah.  If it's
9  the one I think --
10  MR. LIGHTFOOT:  I certainly
11  meant to, if I didn't.
12  (Defendant's Exhibit 4 was
13  marked for identification
14  purposes.)
15  Q.  All right.  I'll show you an
16  e-mail that I am showing you from late June.
17  Did you ask Chad for some help on an
18  occasion somewhere around June 28, 2004?
19  A.  I asked Chad for the
20  specifications of a steamer.
21  Q.  Okay.  And did he provide them
22  to you?
23  A.  Yes.

Page 87

1  Q.  Okay.  And is that what is
2  noted there on the e-mail that's dated
3  Monday, June 28, at 10:55 a.m.?
4  A.  Correct.
5  Q.  Okay.  Then, after that, you
6  sent him a response in which you asked him
7  for some more information; correct?
8  A.  Yes.
9  Q.  All right.  But his response
10  is, that that information is not something
11  he can give you because it changes and is
12  variable and you've got to go figure that
13  out yourself; correct?
14  A.  No.  I don't know if that was
15  his response.
16  Q.  Okay.  You tell me how you
17  interpret his response.  It's up on the top
18  of the page.  They go backwards.
19  MR. COTTLE:  It's just
20  backwards.
21  A.  Okay.  If that's what he
22  wrote, yes.
23  Q.  Okay.  On how many other

Page 88

1  occasions, after the initial meetings that
2  you had with Chad and then Ralph, did you
3  ever seek Chad's help with this project?
4  A.  I consulted with Chad whenever
5  I needed to buy equipment for the project,
6  and Ralph.
7  Q.  All right.  How about, though,
8  in terms of designing or the engineering of
9  the project?  Did you ever talk with Chad
10  about that, other than this one occasion on
11  June 28th?
12  A.  Yes.
13  Q.  How many times?
14  A.  More than five.  We
15  probably --
16  Q.  Less than ten?
17  A.  Less than ten.
18  Q.  All right.  And then the times
19  you talked with Ralph, would that be less
20  than ten as well, about the design or --
21  A.  I'm not sure.
22  Q.  I'm sorry.  Let me finish the
23  question, if you don't mind.

22  (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1    A.    I'm sorry.
2    Q.    -- about the design or the
3  engineering on the project?
4    A.    I'm not sure of the exact
5  time, how many times that me or Chad or
6  Ralph had talked about this project.
7    Q.    Okay.  You've answered me
8  about Chad, but with regard to Ralph, would
9  it be less than ten?
10    A.    I'm not sure.
11    Q.    Did Ralph give you an initial
12  evaluation somewhere around May 5, 2004?
13    A.    Yes.
14    Q.    All right.  And I believe you
15  said you think that was before the life
16  cycle design project was underway?
17    A.    I think so, yes.
18    Q.    Okay.  And did he have a
19  sit-down discussion with you?
20    A.    Yes.
21    Q.    All right.  And did he tell
22  you the things in which he thought you were
23  doing well on?

Page 90

1    A.    Yes.
2    Q.    Did he tell you the ways in
3  which he thought you needed to improve?
4    A.    Yes.
5        (Defendant's Exhibit 5 was
6         marked for identification
7         purposes.)
8    Q.    Okay.  And if you'll -- Let's
9  mark that as -- Is what I'm marking as
10  Defendant's Exhibit 5, is that the write-up
11  that you got from that meeting with Ralph?
12    A.    Yes.
13    Q.    Okay.  And you agreed with his
14  assessment; correct?
15    A.    Yes.
16    Q.    And you signed it?
17    A.    Yes.
18    Q.    Okay.  Looking under
19  improvements, did he discuss with you the
20  second bullet point about remaining focused
21  on your current assigned projects?
22    A.    Yes.
23    Q.    Okay.  Did he talk about, the

Page 91

1  next bullet point:  Taking life testing to
2  the next level?
3    A.    Yes.
4    Q.    All right.  How about the next
5  bullet point, did he talk about:  Start
6  developing life test specifications and
7  methods for additional products?
8    A.    Yes.
9    Q.    All right.  And the next one
10  about:  You need to continue to learn and
11  understand the life test standards?
12    A.    Yes.
13    Q.    All right.  Did he also tell
14  you to strive to become more independent?
15    A.    Yes.
16    Q.    Okay.  He talks about there:
17  Getting away from asking Brian for help with
18  the setups; correct?  Do you see that
19  written there?
20    A.    Yes.
21    Q.    He talked about that; right?
22    A.    Well, it's mentioned in here
23  I've read it, but I don't think we had a

Page 92

1  discussion about it -- or a lengthy
2  discussion about it.
3    Q.    Had you been relying on Brian
4  a lot?
5    A.    No.
6    Q.    Okay.  Well, then what was
7  talked about in here if you had not been
8  relying on Brian a lot?
9    A.    I had been relying on Brian in
10  the beginning of me going into life testing,
11  but --
12    Q.    But not specifically with the
13  steam cleaner life testing design?
14    A.    I don't recall that I talked
15  to Brian a lot with the steam cleaner
16  design.
17    Q.    Okay.  Did he tell you to --
18  words to the effect of:  You needed to treat
19  your coworkers appropriately in the way you
20  talk to them?
21    A.    Yes.
22    Q.    Did you take it as a positive
23  meeting?

23  (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 93

1   A.   Yes. I agreed. I signed it.
2   Q.   Okay. At some point after you
3   had this evaluation meeting with Ralph
4   Hudnall, did Ralph speak with you about you
5   communicating with other employees about a
6   bonus or a pay raise issue?
7   A.   Yes.
8   Q.   Had you, in fact, been talking
9   with employees about bonuses or pay raises
10  and things of that nature?
11  A.   Employees had been talking to
12  me, yes.
13  Q.   Which employees?
14  A.   Almost -- Ashley, Andras, I'm
15  trying to think of his name. I forgot. Can
16  I ask a question?
17  Q.   No. You -- I mean --
18  A.   I don't remember his name.
19  Q.   That's fine. I mean, yeah,
20  I'd rather you not ask it right now. He can
21  ask you later or you can come back and tell
22  me if you remember it later.
23  A.   Okay.

Page 94

1   Q.   I mean, there's no game to it.
2   But just telling me you don't remember is
3   fine. There was someone else that you just
4   can't remember the name right now?
5   A.   Correct.
6   Q.   Was it a technician or an
7   engineer?
8   A.   Engineer.
9   Q.   All right. In fact, were you
10  -- In this time period, were you
11  dissatisfied with your pay?
12  A.   Yes.
13  Q.   Okay. And were you wanting
14  more pay?
15  A.   We all were, yes.
16  Q.   Okay. And were you wanting a
17  bonus as well?
18  A.   We had already had a bonus.
19  We was wondering when we were going to get
20  our bonus.
21  Q.   You mean you had already been
22  given a bonus?
23  A.   Yes. We all had been promised

Page 95

1   a bonus, but we hadn't received it yet. So
2   we all was talking about when we was going
3   to receive our bonus.
4   Q.   At one point, did Ralph
5   Hudnall approach you and say: You shouldn't
6   be talking about that stuff, or words to
7   that effect?
8   A.   Correct.
9   Q.   Okay. And did you get upset
10  with him?
11  A.   Yes.
12  Q.   And did you, in fact, raise
13  your voice at him?
14  A.   After he raised his voice to
15  me, yes.
16  Q.   And did you, in fact, say:
17  This is bull shit, or words to that effect?
18  A.   Yes.
19  Q.   Okay. He never cussed at you,
20  did he?
21  A.   Yes.
22  Q.   What did he say? What do you
23  say he said?

Page 96

1   A.   Specifically, I cannot
2   remember, but I know that we both was -- it
3   was that -- profanity was used on both
4   parts.
5   Q.   Okay. But you can't remember
6   what profanity he used; correct?
7   A.   Correct. Not right now, at
8   this point.
9   Q.   Okay. And did Ralph say:
10  That's the way things are around here, you
11  need to cut it out, or words to that
12  effect --
13  A.   I can't remember.
14  Q.   -- after you yelled: This is
15  bull shit?
16  A.   I can't remember.
17  Q.   And did you then repeat
18  yourself, still yelling?
19  A.   No. I don't think so. I
20  can't remember.
21  Q.   At some point, did Terry
22  Robertson and Ralph call you in to Terry's
23  office to talk about it, that same subject?

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 97 |
| --- |

1    A.    Talk about the bonuses, yes.
2    Q.    Okay.  Did you understand that
3  as a lab technician, that you technically
4  should not have been eligible for a bonus?
5  Did Terry explain that to you?
6    A.    No, I did not.  I didn't
7  understand it until he explained it.
8    Q.    Okay.  Did he explain to you
9  that you otherwise should not have been
10  eligible for a bonus, but that Euro-Pro had
11  actually gotten you a bonus?
12    A.    Euro-Pro has gotten other lab
13  technicians and me a bonus, yes.
14    Q.    What other lab technicians?
15    A.    Ashley Sheffield.
16    Q.    Okay.  So, you understood that
17  Euro-Pro got other lab technicians a bonus,
18  as well as you?
19    A.    Yes.
20    Q.    Prior to that, were you aware
21  that bonuses had only been for management
22  employees?
23    A.    No.

| Page 98 |
| --- |

1    Q.    Who, nonmanagement, were you
2  aware of getting bonuses before that time?
3    A.    Before that time, I wasn't
4  aware of anybody getting bonuses.
5    Q.    Oh, you just weren't aware one
6  way or the other?
7    A.    Correct.
8    Q.    All right.  So, Terry
9  explained to you who was eligible for
10  bonuses and who was not?
11    A.    Correct.
12    Q.    He explained to you the effort
13  that the management at that facility had
14  gone to get bonuses for people who otherwise
15  wouldn't get them, like lab technicians;
16  correct?
17        MR. COTTLE:  Object to the
18  form of the question.  You can answer.
19    Q.    He explained that to you in
20  that meeting; correct?
21    A.    Correct.
22    Q.    All right.  Did he also
23  explain to you that it was inappropriate to

| Page 99 |
| --- |

1  be talking about bonuses and things like
2  that out in the workplace, for a variety of
3  reasons?
4    A.    I think he talked to me and
5  some other people about it, yes.
6    Q.    Okay.  Well, you were the only
7  one in this meeting, right, with Terry and
8  Ralph?
9    A.    Oh, yes.
10    Q.    Okay.  And he explained to you
11  it was inappropriate to be talking about
12  that kind of stuff?
13    A.    Yes.
14    Q.    He explained to you it could
15  cause morale problems and all sorts of
16  issues?
17    A.    He explained to me it was
18  inappropriate to be talking about that.
19    Q.    Okay.  And what did you say in
20  response to that?
21    A.    I can't recall.  I think it
22  was probably: Okay.  I can't recall.
23    Q.    And you didn't yell or curse

| Page 100 |
| --- |

1  at Terry, did you?
2    A.    No.
3    Q.    You just did that with Ralph?
4    A.    As Ralph done it with me, yes.
5    Q.    You got your bonus, didn't
6  you?
7    A.    The next week after I got
8  fired, yes.
9    Q.    You didn't get your bonus in
10  the spring of '04?
11    A.    No.  I don't remember a bonus
12  in the spring of '04.
13    Q.    How much was your bonus?
14    A.    It was five hundred dollars.
15  I got three hundred dollars, after taxes,
16  somewhere around three hundred dollars.
17    Q.    And you're saying you got that
18  after you were terminated?
19    A.    Correct.  As far as I recall,
20  it was the only bonus I ever got.
21    Q.    Okay.  So you -- Okay.  If you
22  got one in the spring, you don't recall it?
23    A.    I don't recall.

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1    Q.   Let me show you what I'm
2  marking as Defendant's Exhibit 6. Well,
3  hold on.
4       As of July 31, or I guess the
5  end of July -- As of the end of July, you
6  did not have the steam cleaner life test
7  project completed; correct?
8    A.   Correct.
9    Q.   And you told that to Ralph;
10 right?
11   A.   Before I started the project,
12 it wasn't going to get finished at that
13 time, yes.
14   Q.   In late July or August, when
15 it wasn't completed, did Ralph tell you
16 words to the effect of: Get it done as
17 quickly as you can, even though we realize
18 you're not going to meet this July 28th
19 deadline?
20   A.   I can't recall that we ever
21 talked about that.
22   Q.   Okay. Well, you understood it
23 was of significant importance to the company

Page 102

1  that it be completed as quickly as possible;
2  correct?
3    A.   Of course.
4    Q.   And you understood that it
5  needed to work and work well; correct?
6    A.   Of course.
7    Q.   And you knew that Euro-Pro was
8  number one in the world in steam cleaners;
9  correct?
10   A.   I didn't know that exact -- I
11 did not know that, no.
12   Q.   You didn't know they're the
13 market leader in steam cleaners?
14   A.   No, actually, I didn't.
15   Q.   Did you know -- Did you know
16 the reason why it was important that the
17 steam cleaner life test be designed and
18 constructed and working well as soon as
19 possible?
20   A.   I mean, I understood that it
21 should have been working well and done --
22 that's anything that we should do, that we
23 should do it like that, quickly as possible

Page 103

1  and working well, yes, I understood that.
2    Q.   Okay. And sometime around
3  July 28th or early August, or whenever it
4  became apparent it wasn't going to be done
5  by then, did Ralph say words to the
6  effect of: You need to be reporting to me
7  on a weekly basis on the update as to how
8  it's coming and how close we're getting to
9  completion so that I can report to Terry
10 Robertson where we stand?
11   A.   No. I never had that
12 conversation.
13   Q.   All right. Did you understand
14 that Ralph was reporting to Terry about how
15 the design was going and how well it was
16 working?
17   A.   I did not -- I didn't know
18 that, no.
19   Q.   You didn't know that at all?
20   A.   No.
21       (Defendant's Exhibit 6 was
22        marked for identification
23        purposes.)

Page 104

1    Q.   All right. Let me show you
2  what I'm marking as Defendant's Exhibit 6.
3       MR. LIGHTFOOT: You've got it,
4  John.
5    Q.   Is this the evaluation you
6  were given on -- somewhere around August 20
7  -- August 31, 2004?
8       (Off-the-Record discussion
9        was held.)
10   A.   Ask the question again.
11   Q.   Sure. Is what I've just given
12 you, which I've marked as Defendant's
13 Exhibit 6, is that the evaluation that you
14 were given somewhere around August 31, 2004?
15   A.   Correct.
16   Q.   Okay. And Ralph gave it to
17 you; correct?
18   A.   Correct.
19   Q.   And you signed it?
20   A.   Correct.
21   Q.   Okay. And you agreed with it?
22   A.   Correct.
23   Q.   Okay. And do you have any

26 (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1  idea how he rated you compared to the other
2  employees that he rated?
3      A.    No.
4      Q.    Okay.  And he talked about --
5  He talked about, once again, your strengths;
6  is that correct?
7      A.    Correct.
8      Q.    And also talked about the
9  areas in which you needed improvement;
10  correct?
11     A.    Correct.
12     Q.    And you didn't disagree with
13  any of the areas in which you needed
14  improvement; correct?
15     A.    Correct.
16     Q.    Now, you encountered some
17  significant problems in designing the steam
18  cleaner life cycle test; correct?
19     A.    Correct.
20     Q.    And some of those problems
21  were within your control and some of those
22  were outside of your control; correct?
23     A.    Correct.

Page 106

1      Q.    One of the ones that was
2  within your control would have been when you
3  ordered the wrong valves; correct?
4      A.    I don't recall ordering wrong
5  valves.
6      Q.    All right.
7      A.    I don't recall.
8      Q.    Okay.  Do you recall ordering
9  parts that needed to be able to withstand a
10  very high temperature, but then it turns out
11  that the parts you ordered could not
12  withstand those temperatures?
13     A.    Correct.
14     Q.    Okay.  Was that the valves?
15     A.    Those are parts I consulted
16  with Chad Reese about, and they were -- I
17  was told to order those parts.
18     Q.    Okay.  Now, you didn't talk
19  with Chad about the number of -- the amount
20  of degree that it needed to withstand, did
21  you?  That was part of your job; right?
22     A.    Correct.  I talked to Chad
23  Reese about that.

Page 107

1      Q.    Yeah, but you -- Let's see.
2  You made the decision on which parts to
3  order; correct?
4      A.    No.  Chad Reese made the
5  decision to order those parts.
6      Q.    Well, was it your job, as the
7  designer of the life cycle test, or was it
8  Chad's job to order the parts?
9      A.    It was my job to build the
10  life test fixture.  Before the project, I
11  repeatedly asked for an engineer to do the
12  design and the schematics for the job,
13  correct.
14     Q.    My question is, in terms of
15  ordering the correct parts, whose job would
16  that be?
17     MR. COTTLE:  Which parts are
18  you talking about, now?
19     MR. LIGHTFOOT:  Any of the
20  parts.
21     A.    It would be left on me to
22  order the right parts.  But I consulted with
23  Chad to order the parts.

Page 108

1      Q.    Are you saying that you
2  consulted with Chad before you ordered every
3  part?
4      A.    Any part that was over a
5  hundred dollars, I had to let Terry
6  Robertson know, Ralph Hudnall know and Chad
7  Reese know.  And just about every part on
8  that life test fixture was over a hundred
9  dollars.
10     Q.    Did you design handles that
11  did not work properly?
12     A.    No.
13     Q.    Did you design the handles?
14     A.    No.
15     Q.    What role did you play in the
16  handles?
17     A.    The handles was contracted out
18  to an independent contractor.  They was
19  designed by an independent contractor.
20     Q.    Did you try to do them first?
21     A.    I tried to do what's on this
22  sketch that I was shown and it wouldn't
23  work, because Chad Reese told me to try it

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1   to see if it would work. I'm a technician,
2   not an engineer.
3       Q.    Were the problems with the
4   handles that you used was that they weren't
5   as flexible as they needed to be?
6       A.    The problem was, it was a
7   design flaw in the beginning, as I
8   previously expressed to Chad Reese at the
9   beginning of the project.
10      Q.    Okay. So, you're blaming that
11  on Chad Reese, the handles; is that correct?
12      A.    The handles -- This diagram,
13  this schematic, yes, this is Chad Reese.
14  This is a flaw in Chad Reese's design.
15      Q.    How much time did you spend on
16  the handles?
17      A.    I spent -- I don't know. I
18  don't have the exact time.
19      Q.    Approximately?
20      A.    I can't approximate. I mean,
21  I was on the project. So it was probably
22  all the time.
23      Q.    Okay. Tell me about the

Page 110

1   problems in the design that would have been
2   your fault, not Chad Reese's fault, or in
3   the construction.
4       A.    Like I said before, the
5   handles and everything was contracted out.
6   And it was all -- The engineers and me
7   looked at what the construction schematic
8   was. And I didn't see no problems with the
9   handles or the design of the handles, and
10  still don't.
11      Q.    But they didn't work, did
12  they?
13      A.    Yes, they did.
14      Q.    You mean the ones that were
15  contracted out?
16      A.    Yes.
17      Q.    Okay. But the ones you had
18  before that didn't work?
19      A.    No. But it was a design flaw
20  from Chad Reese.
21      Q.    Well, to be clear, you're not
22  blaming every construction problem on the
23  life test for the steam cleaners on Chad

Page 111

1   Reese, are you?
2       A.    I was not aware that there was
3   a lot of construction problems on the life
4   test.
5       Q.    Well, what were the problems
6   that y'all encountered in constructing the
7   life test for steam cleaners?
8       A.    The beginning problem was the
9   holdup on the design of the handles.
10      Q.    Okay.
11      A.    I expressed the fact that I
12  think they need to be contracted out because
13  we don't have the tools or the equipment
14  here to do it.
15      Q.    And did management report back
16  to you: We want you to construct them?
17      A.    Management in the beginning
18  reported to me they wanted me to design this
19  sketch and see would it work. And I -- They
20  wanted me to put this sketch together on the
21  handle to see would it work and I did so,
22  and it did not work.
23          At that point, we did not have

Page 112

1   the materials there to make it work. And I
2   expressed that in order to get it done, a
3   way that we needed it done, we need to
4   contract it out.
5       Q.    Okay. What other significant
6   problems arose with the construction of the
7   life test for steam cleaners?
8       A.    I'm not aware of any other
9   construction problems of it, I guess.
10      Q.    Sometime in November, did you
11  request a two-week vacation?
12      A.    I requested a two-week
13  vacation, I think, way before November.
14      Q.    Well, were you granted a
15  two-week vacation in November?
16      A.    Yes.
17      Q.    Around Thanksgiving?
18      A.    Yes.
19      Q.    Okay. You also asked Ralph
20  Hudnall if you could leave early the last
21  day of work; correct?
22      A.    Correct.
23      Q.    And Ralph said words to the

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  effect:  No, not unless it's fully
2  operational; is that correct?
3      A.    No.
4      Q.    What did he say?
5      A.    I went to a meeting with Ralph
6  and I explained to Ralph that there was a
7  situation going on with the life test that I
8  think that we could buy a different part, it
9  would have improved the dependability of the
10  life test.  And I explained to him what the
11  part was, and how we need to do it.
12          And after that, I asked him --
13  I told him I needed something to do before I
14  go on vacation, can I leave early?  He said:
15  No -- He said:  Not a problem.  I'm going to
16  leave early, too, just shut everything down.
17      Q.    Now, Ralph met with you the
18  morning -- that Friday morning before you
19  left for vacation; right, November the 19th?
20      A.    Yes.  That's the conversation
21  we just had, yes.
22      Q.    Okay.  And he told you that
23  before vacation, he needed to know about any

Page 114

1  problems with the life cycle for steam
2  cleaners; correct?
3      A.    Correct.  And I told him the
4  problems I had with the steam cleaner.
5      Q.    All right.  What problems did
6  you tell him in that meeting that morning?
7      A.    That there was -- We needed to
8  buy a current censor that would actually
9  turn the life test system on and off better
10  than what we had.  And he agreed, that would
11  be a better equipment to buy.
12      Q.    Okay.  Are there any other
13  problems that y'all discussed?
14      A.    Not as I can recall.
15      Q.    Okay.  Did he also tell you
16  that it was -- Did he tell you it was
17  important that they be -- that the test be
18  fully operational before you went on
19  vacation?
20      A.    No.
21      Q.    Words to that effect?
22      A.    No.
23      Q.    All right.  He did confirm

Page 115

1  with you that you would be available for him
2  to talk to on vacation, if he needed you?
3      A.    Correct.
4      Q.    All right.  Did you leave at
5  -- What time did you leave, noon?
6      A.    I think lunchtime, yes.
7      Q.    Now, are you -- Are you
8  claiming that you had permission to go?
9      A.    Yes.
10      Q.    From whom?
11      A.    Ralph Hudnall.
12      Q.    And how is it that you say he
13  gave -- What is it that -- How is it that
14  you say you have permission?
15      A.    I asked him could I leave
16  early, I have some personal business to take
17  care of.  He said:  No problem, no problem,
18  I'm going to leave early, too.  So just shut
19  everything down in the life test bay because
20  I'm leaving early, too.  He had some
21  personal business to take care of.
22      Q.    And is it your testimony that
23  he did not say:  It's okay to leave early,

Page 116

1  if the life test was running, or if you were
2  aware of any minor problems that needed to
3  be dealt with?
4      A.    No.  He never told me that.
5  We had discussed a minor problem earlier,
6  but that was not an issue.
7      Q.    All right.  On Monday morning,
8  November 22nd, Ralph called you at home;
9  correct?
10      A.    I never received a phone call
11  from Ralph while I was on vacation.  Not as
12  I know of.  I can't recall if I ever
13  receive a phone call from Ralph.
14      Q.    Do you recall Ralph calling
15  you and telling you that the wires were
16  disconnected on Monday, November 22nd, and
17  reaching you and talking to you at your
18  home?
19      A.    I don't remember him ever
20  calling me while I was on vacation.
21      Q.    Okay.  So, you just -- You
22  don't recall that?
23      A.    I don't recall that.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1    Q.    You're not denying that, you
2  just don't recall it?
3    A.    I don't recall that.
4    Q.    Okay. You had disconnected
5  the wires before vacation; correct?
6    A.    Correct.
7    Q.    Okay. And did you report to
8  Ralph that the life test was not safe to
9  run?
10    A.    I reported that to him earlier
11  before I left, that we needed a current
12  censor to sense the current in the life
13  test. And right at that moment, I don't
14  think it was safe to run.
15    Q.    Okay. Did you also tell him
16  that on the Monday, do you recall?
17    A.    That -- I don't recall Ralph
18  ever calling me while I was on vacation.
19    Q.    Okay. Do you recall saying
20  words to him on that Monday that you would
21  look into it after your vacation?
22    A.    I don't recall Ralph ever
23  calling me while I was on vacation.

Page 119

1    A.    It was that Friday I left
2  early on vacation.
3    Q.    And is that when they thought
4  he had had a heart attack?
5    A.    Yes.
6    Q.    Did you talk with Chad about
7  anything business related?
8    A.    I talked to him about the
9  situation about the current censor. And he
10  said: The current censor would work a whole
11  lot better. He agreed.
12    Q.    Was he physically in a
13  hospital bed when you talked to him?
14    A.    Yes.
15    Q.    You didn't tell him you had
16  disconnected the wires, did you?
17    A.    We didn't get deep into it.
18  He asked me how is things going, I asked him
19  how he was. We talked about a lot of
20  things.
21    Q.    Is the answer no, you didn't
22  tell him you disconnected the wires?
23    A.    No.

Page 118

1    Q.    Okay. Do you recall having a
2  discussion with Ralph about talking with
3  Chad Reese?
4    MR. COTTLE: At what time?
5    Q.    On Monday, or at any time
6  after you went on vacation.
7    A.    As I said before, I don't
8  recall ever talking to Ralph while I was on
9  vacation.
10    Q.    Fair enough. Where did you go
11  on vacation?
12    A.    Nowhere.
13    Q.    Okay. And you only had one
14  home phone number; correct?
15    A.    Correct.
16    Q.    What is your home phone
17  number, or what was it then?
18    A.    Okay. Area code (334)
19  863-4893.
20    Q.    Did you go visit Chad Reese at
21  the hospital?
22    A.    Yes.
23    Q.    What day?

Page 120

1    Q.    I may be asking it wrong. Am
2  I correct that you did not ask him -- I'm
3  sorry. Let me start over. Am I correct
4  that you did not tell him that you had
5  disconnected the wires; is that correct?
6    A.    I don't remember ever telling
7  him that. I may have. I don't remember.
8    Q.    But you say you all did talk
9  about the current censor?
10    A.    Correct.
11    Q.    And what was said about that?
12    A.    He thought that it would be
13  better. He agreed.
14    Q.    Do you recall when the company
15  got the LabVIEW software from Auburn?
16    A.    Do I recall when they got the
17  LabVIEW software?
18    Q.    Yes.
19    A.    No, I don't recall.
20    Q.    Were you aware that the
21  company had gotten LabVIEW software at some
22  time?
23    A.    Yes.

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1    Q.    Okay.  And were you told to
2  use that in your job?
3    A.    Yes.
4    Q.    Was that Ralph or Terry?
5    A.    I can't recall who told me
6  that.
7    Q.    It would have been one of
8  those two?
9    A.    More than likely, yes.
10    Q.    Okay.  And what did Ralph tell
11  you about using the software?
12    A.    I can't recall exactly what he
13  told me about using the software.
14    Q.    But he told you he wanted you
15  to use it; correct?
16    A.    He wanted me to use it on
17  another project -- another system that was
18  already built before I got there.
19    Q.    Did you ever use the LabVIEW
20  software?
21    A.    On another system, yes.
22    Q.    Which other system?
23    A.    On the hand-held vacuum

1  system.  It was already installed.
2    Q.    Was one of your assignments in
3  your job to get the pant press life cycle
4  test working correctly?
5    A.    It was part of my job to run
6  the pant press life cycle, yes.
7    Q.    Did you?
8    A.    Yes.
9    Q.    Did you get it working well?
10    A.    It wasn't a working -- It was
11  already working, I just needed to run it,
12  run it per specification or to run it -- it
13  wasn't even a specification on it.
14    Q.    Okay.  Were you asked to
15  improve it, then, is that what you --
16    A.    No.
17    Q.    Okay.  Did you keep it
18  running?
19    A.    Yes.
20    Q.    Did you run it continuously
21  throughout the time you were lab technician?
22    A.    No.
23    Q.    Why not?

1    A.    I couldn't.
2    Q.    Why not?
3    A.    Because it wasn't automated,
4  it was manually.  I had to manually actually
5  turn it off and on.  And I couldn't.  I was
6  working on the steam cleaner project.  I
7  couldn't just manually turn it off and on
8  every ten minutes.
9    Q.    Okay.  Did you tell anybody
10  that you couldn't do that?
11    A.    Yes.
12    Q.    Who did you tell that?
13    A.    Ralph Hudnall.
14    Q.    What did he say?
15    A.    I can't recall.  I mean, I
16  just -- The steam cleaner was actually the
17  main focus at that time.
18    Q.    That was where all -- or the
19  vast majority --
20    A.    Most of my time was spent.
21    Q.    -- of your time was spent?
22    A.    Yes.
23    Q.    Okay.  Ralph Hudnall spoke

1  with you on several occasions about keeping
2  your area clean; correct?
3    A.    Correct.
4    Q.    And Terry Robertson actually
5  spoke with you about that as well; correct?
6    A.    Correct.
7    Q.    And did they tell you that
8  they did not think you were keeping it very
9  clean?
10    A.    Correct.
11    Q.    And they told you you needed
12  to improve on that; correct?
13    A.    Correct.
14    Q.    Did you ever express to them
15  that you didn't think that was a part of
16  your job?
17    A.    No.
18    Q.    After Ralph had told you you
19  needed to keep your area clean, did he ever
20  have to come back to you and tell you you
21  needed to keep it -- that you weren't
22  getting it done?
23    A.    After we talked about the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**Page 125**

1  situation, I can't recall that he did.
2      Q.    Terry Robertson, himself,
3  actually do a lot of cleaning at the plant?
4      A.    Yes.
5      Q.    He actually swept himself;
6  correct?
7      A.    Correct.
8      Q.    Did you see him sweeping?
9      A.    Correct.
10     Q.    Did you see him picking up
11 trash?
12     A.    Correct.
13     Q.    Did you think that you didn't
14 need to sweep or pick up trash?
15     A.    No.
16     Q.    Did you sweep?
17     A.    Yes.
18     Q.    Did you pick up trash?
19     A.    Yes.
20     Q.    Was your area kept as neat as
21 the other areas?
22     A.    No.
23     Q.    Did you know that was a source

**Page 126**

1  of concern to Ralph and Terry?
2      A.    Yes.
3      Q.    Why didn't you?
4      A.    I expressed my views with
5  Ralph Hudnall that it was more than probably
6  seven or eight people working in my area.
7  And I -- And I asked Ralph, and actually we
8  had a meeting with everybody who worked in
9  that area, that we all should keep whatever
10 area we're working in clean so we can keep
11 the whole life test system clean.
12     Q.    Okay. Did you try to blame it
13 on others, about your area?
14     A.    No.
15     Q.    And you certainly took
16 responsibility, as the head of that area, to
17 keep your area clean; correct?
18     A.    I took it that Terry Robertson
19 was looking at me to keep the whole area
20 clean. And I expressed to Ralph Hudnall how
21 we can do it proficiently, professionally,
22 with everybody.
23     Q.    You didn't think there was

**Page 127**

1  anything inappropriate about them looking to
2  you for the responsibility to keep that area
3  clean; correct?
4      A.    I thought it was -- I thought
5  it was unfair, yes.
6      Q.    Why did you think it was
7  unfair?
8      A.    Because there is anywhere from
9  fifteen to twenty people working in that
10 area. Probably -- Excuse me. Probably not
11 that many, but there was a lot of people
12 working in that area.
13         And I expressed to Ralph
14 Hudnall that if people was working in that
15 area and doing a job, they should clean up
16 after when they get through doing a job, and
17 that would help keep the area clean.
18     Q.    You knew that keeping your
19 area clean was a priority to Terry
20 Robertson, wasn't it?
21     A.    Correct.
22     Q.    At some point, did you
23 actually go and buy signs to put up about

**Page 128**

1  keeping the area clean?
2      A.    Correct.
3      Q.    You didn't ask anybody before
4  you did that, did you?
5      A.    Yes.
6      Q.    Who did you talk to?
7      A.    I talked to Barbara, I think
8  that's her name, about it.
9      Q.    What did the signs say?
10     A.    Keep this area clean.
11     Q.    But even after that sign was
12 put up, the area still wasn't kept clean,
13 was it?
14     A.    By my areas that I worked in,
15 I kept them clean. If I worked in a certain
16 area, I kept that area clean. And after we
17 had the meeting with the other employees
18 working in that area, it got better.
19     Q.    When was the meeting with the
20 other employees?
21     A.    I can't remember the exact
22 date, but it was on a Monday. And Chad
23 Reese -- Chad Reese actually said in the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1  meeting: Yes, we can't allow Victor to pick
2  up after ourselves. So we need to keep our
3  area clean when we go working in those
4  areas.
5      Q.  Did you return from vacation
6  on December 1, 2004?
7      A.  Correct.
8      Q.  Was that a Monday?
9      A.  Correct.
10     Q.  Did you come -- Did you start
11  somewhere around 7:30 in the morning?
12     A.  I came in around 7:30 in the
13  morning, yes.
14     Q.  All right. Were you called
15  into Terry's office?
16     A.  Yes.
17     Q.  And was Chad Reese in there?
18     A.  Yes.
19     Q.  All right. Did Terry -- What
20  did Terry tell you?
21     A.  I think Terry said that they
22  needed to eliminate the technician in that
23  area and hire an engineer. And I asked him:

Page 130

1  Do you mean eliminate me? And he responded:
2  Yes.
3      Q.  All right. Did he tell you
4  about -- that he felt that you had not
5  performed well doing -- completing the life
6  cycle for steam cleaner?
7      A.  Yes.
8      Q.  What did he say about that?
9      A.  He thought that it was -- cost
10  too much. And I responded to him: I didn't
11  -- I did not have a budget plan or a maximum
12  or a minimum of how much it should cost. He
13  thought, he said, that it took too long.
14     Q.  Did he talk about the
15  condition that you left the test in before
16  you went on vacation?
17     A.  Yes. And I explained to him I
18  talked to Ralph Hudnall about that.
19     Q.  Did he say that you had left
20  it not fully operational, or words to that
21  effect?
22     A.  Words to that effect.
23     Q.  Did he say that you had not

Page 131

1  informed Ralph of the issues like you were
2  supposed to before you went on vacation?
3      A.  And I explained to him I did.
4      Q.  Okay. Did he explain to you
5  about the wires being disconnected and how
6  it wouldn't run?
7      A.  Correct.
8      Q.  Did he explain to you about
9  how Ralph had to rip out the wires and
10  rebuild the wiring?
11     A.  I don't remember that.
12     Q.  Did you ever learn that, that
13  that had happened?
14     A.  No.
15     Q.  All right. So he told you
16  about those things. And did he tell you
17  that he thought that was inappropriate on
18  your part, that you had done those things?
19     A.  Yes.
20     Q.  All right. And what was your
21  response to that?
22     A.  I explained to him that I
23  talked to Ralph about that before I left. I

Page 132

1  explained to him that Ralph said it was okay
2  for me to leave early that day because he
3  was leaving early that day, too.
4          And he said: Well, you didn't
5  tell me. And my thoughts were that I
6  thought I was supposed to report to Ralph.
7      Q.  Did he talk to you about Ralph
8  talking to you while on vacation?
9      A.  I can't recall.
10     Q.  All right. Any other --
11  Anything else that was said by Terry or you
12  at the start of that conversation?
13     A.  I can't recall of anything
14  else.
15     Q.  At some point, did you jump up
16  and raise your voice?
17     A.  No, I jumped up and gave him
18  my keys and left.
19     Q.  What did you say? What words
20  did you say when you jumped up?
21     A.  I can't recall.
22     Q.  What comments did you make
23  about the life cycle for steam cleaners

33 (Pages 129 to 132)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1  project that you had been working on?
2      A.    I don't recall of any comments
3  I made, other than that I didn't know how
4  much that he thought it was costing too much
5  or that there was a maximum budget plan.
6  And I told him how long it took. I told
7  Terry I did the best I could with no help.
8      Q.    Why did you leave in the
9  middle of the meeting?
10     A.    What meeting?
11     Q.    The meeting where he was
12 telling you that you were being let go.
13     A.    I didn't leave in the middle
14 of the meeting. I left at the end of the
15 meeting.
16     Q.    Tell me -- You said you --
17 Didn't you say you jumped up?
18     A.    I didn't jump up. I stood up.
19 And he said he wanted my keys and I gave him
20 my keys off my key ring.
21     Q.    But he was still in
22 mid-conversation with you, wasn't he?
23     A.    No, no.

Page 134

1      Q.    How long were you in there?
2      A.    I don't recall. Five or ten
3  minutes, I think.
4      Q.    So, what's your best
5  recollection of the reason that he said to
6  you that you were being terminated?
7      A.    Like I explained, he said that
8  it cost too much, the project cost too much.
9  He said it took too long.
10         He also said that a vacuum had
11 burned up while I was on vacation; that
12 somebody had turned the voltage up on the
13 volt meter while I was on vacation. I
14 explained to him I was on vacation. I can't
15 stop somebody from going and turning the
16 knob up. And I think that was it.
17     Q.    You just told me then and a
18 little bit earlier about the things that
19 were said and why Terry Robertson said why
20 you were being terminated. Do you have any
21 reason to think that you were terminated for
22 any reason other than what he said?
23     A.    I have reason to feel I was

Page 135

1  discriminated against, yes.
2      Q.    Okay. And tell me everything
3  you base that on.
4      A.    Of the recent incident with
5  Ashley Sheffield. And after the accident --
6  incident with Ashley Sheffield, I was moved
7  into that position. I was given the steam
8  cleaner task, which I thoroughly told my
9  supervisor was way over my head.
10         And I felt like that they knew
11 that a technician didn't have the
12 capabilities of doing what they did, and
13 that's why they did hire an engineer. I
14 felt like that I was put in that position to
15 get rid of.
16     Q.    Any other reason that you
17 think that you were terminated for some
18 reason other than what Terry Robertson told
19 you?
20     A.    Not as I can recall at this
21 time.
22     Q.    You just said that you told
23 your supervisor you were in over your head?

Page 136

1      A.    Correct.
2      Q.    When did that -- When are you
3  claiming that you said that?
4      A.    I said that to Ralph Hudnall
5  right before the -- that they wanted the
6  life test system and how they wanted to
7  build -- right after the meeting with the
8  schematic, yes.
9      Q.    All right. Now you're
10 testifying that you told Ralph Hudnall after
11 the meeting with the schematic that you were
12 in over your head?
13     A.    That's why I asked him for an
14 engineer to be on this project.
15     Q.    And what was Ralph's response?
16     A.    I think his response was:
17 Don't worry, we'll get you an engineer,
18 we'll get you help. And that's when Andras
19 had came.
20     Q.    And it was his response that
21 -- He told you he was available to help;
22 right?
23     A.    Correct.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1    Q.    And he was always available to
2  help; correct?
3    A.    Not always.
4    Q.    For the most part?
5    A.    Correct.
6    Q.    Okay.  And he told you Andras
7  would be available?
8    A.    He assigned Andras for one
9  day.
10    Q.    Okay.  And you knew Chad Reese
11  was available?
12    A.    Correct.
13    Q.    Tell me the information that
14  you have from any source that Euro-Pro's
15  decision to terminate your employment was
16  based on your race.
17    A.    Any information I have?
18    Q.    Yeah.  From any source that
19  makes you think that Euro-Pro's decision was
20  in any way based on your race?
21    A.    I don't have any information.
22    Q.    The only claim that you're
23  making in this lawsuit of discrimination is

Page 138

1  that this -- that your termination was
2  unfair and based on your race; correct?
3    A.    Correct.
4    Q.    Are you aware of any white
5  employees who did the same things you did,
6  and was similarly situated to you, who was
7  treated more favorably than you?
8    A.    Yes.
9    Q.    Who is that?
10    A.    I believe that Ashley
11  Sheffield was treated more favorably than
12  me.
13    Q.    Anybody else?
14    A.    No.
15    Q.    Okay.  Now, Ashley Sheffield,
16  was she an hourly employee or salaried
17  employee?
18    A.    Salary, I believe.
19    Q.    She was a technician?
20    A.    Yes.
21    Q.    All right.  And she was in
22  cleanability; right?
23    A.    No.

Page 139

1    Q.    Oh, was she on life testing?
2    A.    No.
3    Q.    What was she in?
4    A.    She was a lab technician.  She
5  worked inside the lab.
6    Q.    Oh, so, she wasn't considered
7  in either of those other two categories?
8    A.    What other two categories?
9  I'm sorry.
10    Q.    I said cleanability or life
11  testing -- life cycle testing.
12    A.    No.
13    Q.    All right.  What performance
14  problems are you claiming that she had --
15  Well, tell me in which way you believe she
16  was treated more favorably than you.
17    A.    I believe that she would come
18  in late every day, almost every day, five,
19  ten, fifteen, twenty minutes late.  And
20  she's never got -- I don't believe, I don't
21  know that she got written up or anything for
22  that.
23        She also got caught numerous

Page 140

1  times on the Internet.  I never knew that
2  she ever got written up or anything after
3  that.
4    Q.    Do you know one way or the
5  other whether she was ever spoken to by
6  management about what you say is coming in
7  late every day?
8    A.    I think she was spoken to by
9  management once.
10    Q.    Okay.  Are you aware of that
11  ever being a problem after that?
12    A.    Yes.  If she continued.
13    Q.    Did you keep up with her when
14  she started and when she stopped each day?
15    A.    No.
16    Q.    Did you supervise her?
17    A.    No.
18    Q.    Were you in the same area as
19  her?
20    A.    No.
21    Q.    Are you aware of her ever
22  being spoken to about being on the Internet?
23    A.    Yes.

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1    Q.   Are you aware of her ever
2  doing it after that?
3    A.   Yes.
4    Q.   All right.  Did you -- But you
5  didn't work in the same department as she
6  did?
7    A.   No.
8    Q.   Are you aware of it ever
9  affecting the performance of her job?
10    A.   No.
11    Q.   Are you aware of what her
12  performance evaluations were like, in terms
13  of how she was performing her job?
14    A.   No.
15    Q.   All right.  Any other white
16  employees that you're aware of who you would
17  say had performance issues or violated rules
18  and that weren't terminated?
19    A.   Not that I'm aware of, no.
20    Q.   Did anyone ever tell you that
21  race was a factor in the company's decision
22  to terminate your employment?
23    A.   I don't think I understand the

Page 142

1  question.
2    Q.   Well, do you have any
3  information from any other source, whether
4  you know it or whether someone else knows
5  it, that leads you to think that race had
6  anything to do with your termination?
7    A.   I think so, yes.
8    Q.   Yeah, but -- And I'm asking
9  you, do you have any basis for saying that,
10  other than just your subjective belief and
11  what you told me about Ashley Sheffield
12  being moved into the position after that?
13    A.   No.  Not at this time, no.
14    Q.   Is there any other way in
15  which you believe Euro-Pro discriminated
16  against you on the basis of race at any
17  time?
18    A.   No.
19    Q.   Are you aware who took your
20  place at Euro-Pro?
21    A.   No.
22    Q.   Do you even know if you were
23  replaced?

Page 143

1    A.   I was told when I was fired I
2  was going to be replaced by an engineer.
3    Q.   That was in that meeting with
4  Terry Robertson and Chad Reese?
5    A.   Yes.
6    Q.   You never complained to
7  Euro-Pro about race discrimination at any
8  time during your employment, did you?
9    A.   No.
10    Q.   Did you ever tell jokes in the
11  workplace, jokes of a racial nature?
12    A.   No.
13    Q.   Did you ever tell them outside
14  the work place, but with folks that you
15  worked with?
16    A.   No.
17    Q.   Do you use the "N" word, ever?
18    A.   No.
19    Q.   Have you ever?
20    A.   I'm sure I have said it.  I've
21  said it in this deposition before.
22    Q.   Other than this deposition?
23    A.   Yeah.  Yes.

Page 144

1    Q.   You use it with your -- Have
2  you used it with your friends?
3    A.   No.
4    Q.   When is it that you have used
5  it?
6    A.   If it's in context when the
7  "N" word has been used or -- I don't call my
8  friends the "N" word.  I don't do that.  But
9  if it's a subject matter that's dealing with
10  the "N" word, I have used it.
11    Q.   Have you talked with your
12  friends about the Dave Chappelle Show?
13    A.   No.
14    Q.   Did you talk with Ashley
15  Sheffield and other coworkers about the Dave
16  Chappelle Show fairly regularly while it was
17  on TV?
18    A.   No.
19    Q.   Was that a common subject
20  amongst the employees at the office, whether
21  you were a part of it or not, about the Dave
22  Chappelle Show?
23    A.   It was a common subject with

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1 Ralph, but it wasn't a common subject with
2 the employees of the company.
3    Q.    Was it a common subject with
4 anybody other than Ralph that you're aware
5 of?
6    A.    No.
7    Q.    Did you ever tell a friend or
8 coworker that you used to be a racist
9 yourself?
10    A.    No.
11    Q.    Where are you employed?
12    A.    Hyundai Motor Company.
13    Q.    Did you say Hyundai?
14    A.    Yes.
15    Q.    Where is Hyundai?
16    A.    Montgomery, Alabama.
17    Q.    What do you do for them?
18    A.    I am a production worker.
19    Q.    When did you get that job?
20    A.    The exact date, April the 11th
21 of 2005.
22    Q.    Okay. And you've been there
23 since that -- Let's see. April 11th. So

Page 146

1 you've been there a little over a year?
2    A.    Yes.
3    Q.    What do you do -- Oh, you're a
4 production worker. What do you make,
5 annualized?
6    A.    Annually?
7    Q.    Yeah. How are you paid, by
8 the hour or salary?
9    A.    Hourly, I make 18.65. I don't
10 -- Not exactly that. I don't know the exact
11 cent.
12    Q.    18.65, something like that?
13    A.    Yes.
14    Q.    Per hour?
15    A.    Yes.
16    Q.    Do you work overtime?
17    A.    Yes.
18    Q.    How many hours do you average
19 of overtime a week?
20    A.    Average a week is fourteen.
21    Q.    Fourteen hours of overtime a
22 week, you average?
23    A.    We work every other Sunday.

Page 147

1 So that's not a correct average -- I mean,
2 every other Saturday. I'm sorry. I'd say
3 approximately ten.
4    Q.    Did you -- Where did you go to
5 work after you were let go at Euro-Pro?
6    A.    I didn't. I went to work at
7 Hyundai after I left Euro-Pro, four months
8 after.
9    Q.    Okay. Did you file for
10 unemployment?
11    A.    Yes.
12    Q.    Did you get it?
13    A.    Yes.
14    Q.    Did you tell the truth on your
15 unemployment application?
16    A.    Unemployment application?
17    Q.    Unemployment application.
18    A.    Yes.
19    Q.    As to the reason for your
20 discharge?
21    A.    I believe so, yes.
22    Q.    What did you put?
23    A.    I put -- I think I put

Page 148

1 terminated.
2    Q.    Did you state what the reason
3 was?
4    A.    Yeah. I explained the reason,
5 yes.
6    Q.    How did you explain it?
7    A.    That I was terminated because
8 that my boss wanted an engineer for the
9 project. Actually, I think it was a -- It
10 was a question. And he questioned me --
11 talked to me about that situation.
12    Q.    Did you get unemployment?
13    A.    Yes.
14    Q.    But you probably didn't get
15 the full six months, right, because you
16 found a job?
17    A.    Yes.
18    Q.    You got it up until you
19 found --
20    A.    Exactly.
21    Q.    You got benefits until you got
22 employed?
23    A.    Exactly.

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1    Q.    Did you look for employment
2  right after you were let go?
3    A.    Yes.
4    Q.    How many places did you look
5  for employment?
6    A.    The unemployment office, for
7  one. I'd go there every day, almost.
8    Q.    Did you fill out any
9  applications for jobs?
10   A.    Yes.
11   Q.    Where?
12   A.    I'm not sure.
13   Q.    What kinds of jobs were you
14 looking for?
15   A.    Technician.
16   Q.    Were you waiting until you
17 found a technician job to take a job at
18 first?
19   A.    At first, yes.
20   Q.    Did you apply for any
21 technician jobs?
22   A.    I think so.
23   Q.    Do you have a copy of your

Page 150

1  applications?
2    A.    No.
3    Q.    Did you keep your -- Well,
4  does someone have your applications?
5    A.    I imagine so.
6    Q.    Who?
7    A.    I don't remember all the
8  places I went to.
9    Q.    Did you get on Monster or
10 anything like that?
11   A.    I got on the Alabama
12 Unemployment Web page of employment.
13   Q.    Did you get any interviews?
14   A.    No. Other than Hyundai.
15   Q.    Are you claiming that you
16 suffered any emotional distress based upon
17 Euro-Pro's decision to terminate your
18 employment?
19   A.    Yes.
20   Q.    All right. What kind of
21 distress have you had?
22   A.    Sleepless nights, stress of
23 being unemployed, mentally stressed. That's

Page 151

1  all.
2    Q.    When did the sleepless nights
3  end?
4    A.    Immediately -- Well, I'm
5  sorry. I don't recall when they ended.
6    Q.    Before you found your job at
7  Hyundai?
8    A.    Around that time, yes.
9    Q.    You never sought any
10 professional help for your emotional
11 distress, did you?
12   A.    I sought the counsel of my
13 pastor.
14   Q.    And who is he?
15   A.    He was Pastor Freeman, Justin
16 Freeman.
17   Q.    Is he deceased?
18   A.    No. He's not my pastor --
19   Q.    I see. What church is that?
20   A.    It's Greater Pine Hill Baptist
21 Church, in Penton, Alabama.
22   Q.    In Penton?
23   A.    Penton, Alabama.

Page 152

1    Q.    You didn't seek the help of a
2  medical doctor, did you?
3    A.    No.
4    Q.    You didn't seek the help of a
5  psychiatrist or anyone like that, did you?
6    A.    No.
7    Q.    You never took any medication
8  for this distress, did you?
9    A.    No.
10   Q.    Do you -- How is it you say
11 that you were damaged by the decision -- by
12 Euro-Pro's decision to terminate your
13 employment?
14   A.    I'm more on guard of white
15 employees, wondering if this person is after
16 me to get me fired or -- because I've never
17 been terminated.
18   Q.    Okay.
19   A.    And so I'm more -- I don't
20 look at white employees as -- I look at them
21 sometimes as they're out to get me, to be
22 honest.
23   Q.    Are you claiming any monetary

38  (Pages 149 to 152)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1  damages as a result of your termination?
2      A.    Explain monetary.
3      Q.    Are you seeking any money from
4  Euro-Pro?
5      A.    Whatever the Court decides the
6  judgment would be, I will be -- whatever.
7      Q.    Are you claiming that you've
8  suffered any damages, though, any monetary
9  damages as a result of their termination
10  decision?
11      A.    Any financial damage?  Yes.
12      Q.    What's that?
13      A.    The lifestyle that I had
14  before I got fired was ultimately changed.
15  And I got in debt, which normally happens
16  when a person is terminated.  So my
17  lifestyle change was different.
18      Q.    Okay.  Are you claiming
19  back-pay damages, is that what you're
20  claiming?
21      A.    I don't know what you're
22  asking.  I mean --
23      Q.    Are you out any money, other

Page 154

1  than the money that you claim you, I guess,
2  would have made if you had remained
3  employed?
4          MR. LIGHTFOOT:  John, I guess
5  that's as much a question for you.  I assume
6  he's not, I just want to make sure.
7          THE WITNESS:  I don't
8  understand what you're asking.
9          MR. COTTLE:  We're claiming
10  any back pay for the time he was out and any
11  other damages we're entitled to recover
12  whether it, be it for mental anguish,
13  punitive damages or what have you.
14          MR. LIGHTFOOT:  Okay.
15      Q.    Who have you talked to about
16  this lawsuit, other than your lawyer, or
17  about your claims or your complaints against
18  Euro-Pro?
19      A.    I have friends and family I
20  talk to.
21      Q.    Okay.  Have you talked with
22  any folks that either worked at Euro-Pro
23  when you did, or work there now?

Page 155

1      A.    Me and Ashley Sheffield has
2  talked about it before, yes.
3      Q.    How many times have you talked
4  to Ashley?
5      A.    It was in the beginning,
6  probably once or twice.
7      Q.    And what was said?
8      A.    I don't know exactly what was
9  said.
10      Q.    Well, this was shortly after
11  you were terminated?
12      A.    Exactly.
13      Q.    Okay.  What did you tell her,
14  or what did you ask her?
15      A.    I didn't ask her anything.  I
16  just told her what happened.
17      Q.    Okay.
18      A.    And that's all I can remember.
19      Q.    When is the last time you
20  talked to Ashley?
21      A.    About three weeks ago.
22      Q.    Okay.  And what did you talk
23  to her about?

Page 156

1      A.    Her marriage.  She talked to
2  me about her husband.  That's what we
3  normally talk about.
4      Q.    Do you talk with her fairly
5  regularly?
6      A.    We talk probably once or twice
7  a month.
8      Q.    Have you asked her if she
9  would be a witness for you in this lawsuit?
10      A.    No.
11      Q.    Have you talked with her about
12  your claims?
13      A.    No.  My claims?  I don't
14  understand what you mean.
15      Q.    Well, have you talked with her
16  about the fact you're suing Euro-Pro for
17  race discrimination?
18      A.    Yes, I talked to her that -- I
19  told her that:  Yes, that was going on, yes.
20      Q.    Have you talked with her about
21  what facts she may know, if any, relating to
22  this lawsuit?
23      A.    No.

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1    Q.    Have you talked with anyone
2    else that worked at Euro-Pro or that works
3    at Euro-Pro?
4    A.    No.
5          MR. LIGHTFOOT:  All right.
6    Can we take a break?
7          MR. COTTLE:  Sure.
8          (Recess taken.)
9    Q.    When you were made the lead --
10   We talked about you being the lead person on
11   the evening shift.  Were you the lead person
12   for all of cleanability?
13   A.    Yes.
14   Q.    So, you were sort of in charge
15   of getting out the assignments or --
16   throughout all of cleanability; correct?
17   A.    Yes.
18   Q.    Which would include day shift
19   and -- first shift and second shift?
20   A.    Yes.
21   Q.    We talked earlier about the
22   altercation or disagreement that you had
23   with Sam Hickman.  Do you remember talking

Page 158

1    about that?
2    A.    Yes.
3    Q.    Do you recall if you spoke
4    with Ralph that day?
5    A.    I can't recall.
6    Q.    Okay.  Have you ever said that
7    people say that you look like Dave Chappelle
8    to anybody?
9    A.    I probably have, yes.
10   Q.    Back when the evening shift
11   was going, the break times -- Let's see.
12   There were two break times and one
13   lunchtime; correct?
14   A.    I think that's what it was,
15   yes.
16   Q.    And the lunchtime would have
17   been right in the middle of the shift;
18   right?
19   A.    Correct.
20   Q.    And then the break time would
21   have been one fifteen-minute slot during the
22   first four hours and one fifteen-minute slot
23   during the last four hours; correct?

Page 159

1    A.    Correct.
2    Q.    Do you know if that was just
3    stated or if it was in writing?
4    A.    I'm not sure.
5    Q.    And the break times were at
6    the midway point between the start of the
7    shift and the lunchtime, and then the
8    lunchtime and the end of the shift; correct?
9    A.    Correct.
10   Q.    You stated that you wanted --
11   that you expected -- I'm sorry.
12          You stated that you needed
13   some engineering help doing your job in the
14   life cycle testing.  Do you recall -- Do you
15   recall telling me that?
16   A.    I needed an engineer to help
17   doing the steam cleaner.
18   Q.    For the steam cleaner?
19   A.    Right.  Correct.
20   Q.    All right.  What did you
21   expect the engineer to do?
22   A.    Consult and advise, and also I
23   needed some designs at that time for the

Page 160

1    handle fixtures.
2    Q.    Now, there were no existing
3    designs for the handle fixtures; right?
4    A.    Correct.
5    Q.    In fact, that's what you were
6    tasked with coming up with; correct?
7    A.    I was tasked -- I wasn't
8    tasked to come up with the fixture designs
9    -- I don't think I understand your question.
10   Q.    Were you tasked with handles
11   that worked right as a part of the design?
12   A.    I was tasked with coming up
13   with fixtures.  This was all worked out with
14   the independent contractors.  They came up
15   with the designs and the schematics and also
16   the installation of what -- the installation
17   of the fixtures.
18   Q.    Well, for the steam cleaner
19   fixture, there were no drawings that were
20   more detailed -- there were no schematics or
21   drawings that were more detailed than the
22   one drawing that we have on the sketch?
23   A.    Correct.

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    Q.    In fact, part of your job was
2  to help create it so that there would be a
3  design that would work for steam cleaners;
4  correct?
5    A.    No.
6    Q.    That wasn't your job?
7    A.    Well, it was my job to come up
8  with a solution. My job -- The independent
9  contractors did all the blueprints and
10  schematics for the steam cleaner fixtures.
11  I expressed to Ralph and Terry I never did
12  any kind of design. I'm not an engineer,
13  I'm a technician.
14    Q.    Well, you understood going in
15  that Euro-Pro was hiring you as a
16  technician, and not hiring an engineer, to
17  come up with this steam cleaner fixture?
18    MR. COTTER: Going into what,
19  now, his job or this project?
20    MR. LIGHTFOOT: This project.
21    Q.    Going into this project, you
22  understood that it was you, as a lab
23  technician, that they were expecting to come

Page 162

1  up with this steam cleaning fixture, not an
2  engineer; right?
3    A.    No. I did not understand
4  that. I did not understand that was the
5  reason -- That was not even the case. They
6  knew that a technician that has no
7  experience in this would not come up with a
8  design for this.
9    Q.    What did you think your job
10  was with regard to this steam clean fixture?
11  It was to build it, wasn't it?
12    A.    It was to build it correctly.
13    Q.    Okay. And there was no
14  schematic, in terms of how to take steps
15  one, two, three, four or an already- ready
16  drawing?
17    A.    An engineer does that.
18    Q.    All right. Was an engineer
19  assigned to build that fixture or were you
20  assigned to build that fixture?
21    A.    I was assigned that fixture, I
22  was assigned that project, yes.
23    Q.    Not an engineer?

Page 163

1    A.    Correct.
2    Q.    That was the whole point;
3  correct?
4    A.    I don't know what the whole
5  point was. But I was designed for the -- I
6  was put in -- tasked with that project, yes.
7    Q.    Ashley Sheffield was still a
8  temp after you were made permanent; correct?
9    A.    Ashley Sheffield was already
10  made permanent, I think, before I was made
11  permanent.
12    Q.    Okay. Do you know if it was
13  around the same time?
14    A.    I think it was actually the
15  same time or the same actual week.
16    Q.    Sometime in April -- around
17  April of '04?
18    A.    Correct.
19    Q.    Okay. And she was never the
20  lead person at any time, was she?
21    A.    No.
22    Q.    And did you understand whether
23  her pay was lower than yours or not?

Page 164

1    A.    We don't -- We didn't talk
2  about that.
3    Q.    You didn't talk about that
4  with her?
5    A.    No.
6    Q.    When you were lead person over
7  cleanability you had more responsibility
8  than she did; correct?
9    A.    It's safe to say correct. I
10  don't know what her responsibilities was.
11    Q.    Yeah. But even -- You knew
12  you had more responsibility than she did?
13    A.    No, I didn't know what her
14  responsibilities was. I knew what my
15  responsibilities was.
16    Q.    Right.
17    A.    Right.
18    Q.    But you were giving out -- For
19  instance, you were giving out assignments
20  to, what, seven people; right?
21    A.    Correct.
22    Q.    And she didn't have anything
23  like that? She didn't have responsibilities

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  like that, did she?
2      A.   No.
3      Q.   Okay.  When you became the lab
4  technician for the life cycle testing, you
5  had more responsibility than Ashley
6  Sheffield in her job, didn't you?
7      A.   I assume so, yes.
8      Q.   And you dealt with more
9  projects than she did, didn't you?
10     A.   Correct.
11     Q.   And you had more experience
12 than she did, didn't you?
13     A.   Correct.
14     Q.   And you had more education
15 than she did, didn't you, at that time?
16     A.   No, I think, if my memory
17 serves me correctly, we both had an
18 associate's degree in technical engineering
19 technology.
20     Q.   Do you remember going to the
21 EEOC, Mr. Smith?
22     A.   Correct.  Yes.
23     Q.   Did you tell the EEOC the

Page 166

1  truth when you gave them your charge?
2      A.   As far as I know, yes.
3      Q.   You're not claiming in this
4  lawsuit, are you, that Dave Richards was
5  treated more favorably than you, are you?
6      A.   David Richards, I believe so,
7  yes.
8      Q.   Are you claiming he was a
9  white employee that was treated more
10 favorably than you?
11     A.   Yes.
12     Q.   Okay.  Are there any other
13 employees that you're claiming were treated
14 more favorably than you?
15     A.   Not as I can remember, no.
16     Q.   Okay.  So, are you claiming
17 that Dave Richards or Ashley Sheffield was
18 treated more favorable than you?
19     A.   Both.
20     Q.   All right.  How is it that you
21 allege that David Richards was treated more
22 favorably than you?
23     A.   David Richards, numerous times

Page 167

1  called in sick and never showed to work.
2  More than five or six occasions I can think
3  of off the top of my head.  I'm pretty sure
4  there was more.
5          And any other job that I ever
6  worked at, anybody that would show up late
7  like that, and call in to work almost once a
8  week or twice a week, would be terminated.
9      Q.   What time period -- Are you
10 talking about when y'all were in
11 cleanability together?
12     A.   When we was in cleanability
13 together and also when I was in life
14 testing.
15     Q.   Well, you said it happened
16 five or six times.  Are you talking about --
17     A.   I said off the top of my head.
18 I'm pretty sure it's more than that.
19     Q.   Was that in cleanability?
20     A.   In cleanability and also when
21 I was in life testing.
22     Q.   Okay.  When you were in life
23 testing, you were working a different area

Page 168

1  than he was; right?
2      A.   But I could see what's going
3  on, yes.
4      Q.   You weren't his supervisor,
5  were you?
6      A.   No.
7      Q.   Was he one of the employees
8  that -- Was he in -- Was he in cleanability
9  at the same time you were in cleanability,
10 or was he hired later?
11     A.   Let me think.  I'm not sure.
12     Q.   As far as you know, you were
13 never over him?
14     A.   No.
15     Q.   You were not ever his
16 supervisor or lead person?
17     A.   I don't think so.
18     Q.   Okay.  So, the time we're
19 talking about, when you say five or six
20 times, then you're talking about when you
21 were in life cycle and he was a temp in
22 cleanability; is that correct?
23     A.   That's correct.

42  (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1    Q.    Was he ever even made a
2  permanent employee while you were there?
3    A.    I'm not sure when he was made
4  permanent.
5    Q.    And his job certainly didn't
6  carry the responsibilities that yours did;
7  correct?
8    A.    Correct.
9    Q.    What was his job as a temp in
10  cleanability?
11    A.    He recorded data, picked up
12  dirt and sand and -- off the vacuum -- off
13  of carpets and recorded the vacuum cleaner
14  results.
15    Q.    The things you did, like, the
16  first month?
17    A.    Correct.
18    Q.    Any other reason that you
19  think -- that you claim that Mr. Richards
20  was treated more favorably than you?
21    A.    Other than him being white,
22  no.
23    Q.    Did you ever talk with any of

Page 170

1  his supervisors to know how they evaluated
2  his performance?
3    A.    No.  That's something that I
4  didn't -- That's none of my business.
5    Q.    Did you ever talk to Ashley
6  Sheffield's supervisors to know how they
7  evaluated her performance?
8    A.    No.
9    Q.    Are you aware of either Ashley
10  Sheffield or Dave Richards telling their
11  supervisor they would do something and then
12  not doing it?
13    A.    I'm not aware of that, no.
14    Q.    Are you aware of Ashley
15  Sheffield or Dave Richards ever failing to
16  do a big project that they were assigned by
17  their supervisor in a timely and good
18  manner?
19    A.    No.
20    Q.    You told me about what you
21  claim was a -- you said a racially
22  inappropriate thing that you thought Ralph
23  Hudnall said to you.  Do you remember that?

Page 171

1    A.    Correct.
2    Q.    I believe you also told me
3  that you're not aware of any other racist
4  statements or jokes or comments that were
5  ever made by anyone while you were at
6  Euro-Pro; is that correct?
7    A.    Not as I can recall, no.
8    Q.    On your initial disclosures
9  you list James Lee, I guess he's the EEOC
10  investigator, as someone who may have
11  information that supports your claim.  What
12  would -- What does James Lee have to say
13  about your claims, if you know?
14    A.    I have no idea what you're
15  talking about.
16        MR. LIGHTFOOT:  John, is he
17  just listed because he was the EEOC --
18        MR. COTTLE:  Yeah.  I mean,
19  you know -- And that's a document I
20  prepared.  Victor didn't have anything to do
21  with that, other than it's based on what he
22  told me.
23        I listed him out of abundance

Page 172

1  of precaution.  I don't have any idea that
2  he knows anything more than -- I mean, he
3  obviously knows something about it because
4  he conducted an investigation.
5    Q.    What were you making at
6  Euro-Pro at the time you were terminated?
7    A.    Twenty-eight thousand, six
8  hundred.
9    Q.    All right.  I attached to your
10  deposition notice a request for production
11  of documents.  Did you review those before
12  this deposition?
13    A.    Yes.
14    Q.    The requests?
15    A.    Yes.
16    Q.    Okay.  As I understand from
17  John earlier, you don't have any responsive
18  documents except for tax returns, which
19  you'll be getting to me.  So I just want to
20  make sure about that.
21    A.    Okay.
22    Q.    Sort of an overall question
23  that would cover a lot of these is:  Do you

# FREEDOM COURT REPORTING

Page 173

1 have any other documents which supports your
2 claims of discrimination? I guess, what you
3 -- Do you have any others?
4    A.   No.
5    Q.   No. All right. Do you have
6 any diaries or audiotapes relating to your
7 employment?
8    A.   No.
9    Q.   Do you have any documents in
10 your possession that Euro-Pro gave you
11 during your employment, at all?
12    A.   I'm not sure.
13    Q.   What documents might you have?
14    A.   Preemployment package of
15 benefits. I know I think I do have those.
16 Other than that, I don't think I have
17 anything else.
18    Q.   How about relating to your job
19 description or job performance or parts that
20 you ordered, anything relating to
21 performance?
22    A.   Other than the documents that
23 you gave me, no, I don't have any other

Page 174

1 documents.
2    Q.   We talked about this a little
3 bit. Applications that you would have had
4 for jobs. You said you don't know if there
5 are any that you still have after you were
6 let go?
7    A.   I don't know if I ever had any
8 applications, copies, that I applied for any
9 jobs.
10    Q.   How many jobs did you apply
11 for --
12    A.   I'm not sure.
13    Q.   -- from the time that you were
14 let go, until you were hired at Hyundai?
15    A.   I'm not sure.
16    Q.   Less than ten?
17    A.   No. More than ten. I went
18 down to the unemployment office every day.
19    Q.   I'm talking about that you
20 actually applied for.
21    A.   I applied for some down there,
22 too. Actually, I have my job at Hyundai
23 because I applied for a job at the

Page 175

1 unemployment office.
2    Q.   Did you work with a recruiting
3 service or any kind of temporary agency --
4    A.   No.
5    Q.   -- to try to find a job?
6    A.   No.
7    Q.   What income did you have from
8 the time that you left Euro-Pro until you
9 began working at Hyundai?
10    A.   Unemployment.
11    Q.   You didn't work any jobs at
12 all?
13    A.   No.
14    Q.   Where were you living at that
15 time?
16    A.   In LaFayette, Alabama.
17    Q.   In where?
18    A.   LaFayette, Alabama.
19    Q.   And what, in a house, an
20 apartment, or where?
21    A.   House.
22    Q.   Who did you live there with?
23    A.   I was living there with my

Page 176

1 grandparents. But at the time I got fired,
2 I was living by myself.
3    Q.   Where? In LaFayette?
4    A.   In LaFayette, Alabama.
5    Q.   At where?
6    A.   What you mean?
7    Q.   At a house?
8    A.   Yes.
9    Q.   Okay. But it wasn't at your
10 grandparents' house?
11    A.   Yes.
12    Q.   Okay. During the entire time
13 you worked at Euro-Pro, just tell me where
14 you lived, please.
15    A.   With my grandparents in my
16 grandparents' house.
17    Q.   In LaFayette?
18    A.   In LaFayette. My granddaddy
19 passed on in February and my grandmother
20 passed on in October. That's why I was
21 taking vacation.
22    Q.   Okay. Your grandfather passed
23 away in early --

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1   A.   In February.
2   Q.   -- February?  And did some of
3   the Euro-Pro employees come to the funeral?
4   A.   Correct.
5   Q.   Who came?
6   A.   They came to the wake.
7   Q.   To the wake.  I'm sorry.  Who
8   came to the wake?
9   A.   Mason.
10  Q.   Mason.
11  A.   Brian.
12  Q.   Brian McGee?
13  A.   Yes.
14  Q.   Okay.
15  A.   I think Eric, but I'm not
16  sure.
17  Q.   Eric?
18  A.   I don't know Eric's last name.
19  Q.   Do you know Mason's last name?
20  A.   No.
21  Q.   Did you ever go over to Ralph
22  Hudnall's house?
23  A.   Yes.

Page 178

1   Q.   For what?
2   A.   We was having a -- I think it
3   was a Christmas party.  And I didn't want to
4   drive all the way back home.  He let me come
5   over and change clothes -- take a shower and
6   change clothes.
7   Q.   Did you appreciate him doing
8   that?
9   A.   Correct.
10  Q.   Did you consider him a friend
11  through work?
12  A.   I considered him an associate,
13  yes.
14  Q.   An associate?
15  A.   I mean --
16  Q.   I mean, were y'all on friendly
17  terms?
18  A.   We was on -- Yes, yes.
19  Q.   I mean, you didn't hesitate to
20  go to his house and shower, did you?
21  A.   After I asked him, no.
22  Q.   And when was that?  You said
23  it was a Christmas party?

Page 179

1   A.   I'm pretty sure it was.
2   Q.   Was that in '03?
3   A.   It was right after I got
4   hired, I think.
5   Q.   Yeah.  So it would have been
6   '03, if it was the Christmas party, I guess.
7        Have you ever been convicted
8   of a crime?
9   A.   Yes.
10  Q.   What was that?
11  A.   In 1991 or '92, for DUI.
12  Q.   Which county?
13  A.   San Diego County.
14  Q.   Is that in California?
15  A.   California.
16  Q.   Is that while you were in the
17  Navy?
18  A.   Yes.
19  Q.   Okay.  Did you ever serve any
20  time?
21  A.   Overnight.
22  Q.   Any other convictions?
23  A.   Gadsden, Alabama.  Public

Page 180

1   intoxication.
2   Q.   When was that, approximately?
3   A.   '97.  Around '97, '98.
4   Q.   Where were you when you were
5   arrested?
6   A.   At a nightclub.
7   Q.   Were you incarcerated?
8   A.   Overnight.
9   Q.   Any other convictions?
10  A.   No.
11  Q.   Did you keep a copy of the
12  documents that you sent the EEOC?
13  A.   I think so.
14       MR. LIGHTFOOT:  Will you get
15  me those, please, along with the tax
16  returns, John?
17       MR. COTTLE:  What documents
18  did you send to the EEOC?
19       THE WITNESS:  I did not send
20  anything to the EEOC.
21  A.   You asked me did I keep the
22  documents that the EEOC or that I sent the
23  EEOC?

45  (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1    Q.    Oh, I asked you that you sent
2  the EEOC.
3    A.    Oh, no. I don't have any
4  documents that I sent the EEOC.
5    Q.    Okay. You kept some documents
6  they sent you?
7    A.    Correct. I'm sorry. I
8  misunderstood the question.
9    MR. LIGHTFOOT: Same thing,
10  though, John, would you produce those as
11  well.
12    MR. COTTLE: I produced that.
13  I mean, all I have is --
14    MR. LIGHTFOOT: The Right To
15  Sue Notice.
16    MR. COTTLE: Yeah. That's all
17  I've got. Now, I've got some
18  correspondence. I might not have given you
19  this. I don't know.
20    MR. LIGHTFOOT: Okay.
21    MR. COTTLE: Let me just let
22  you look at it.
23    MR. LIGHTFOOT: Sure.

Page 182

1    MR. COTTLE: And I'll copy it
2  right now if you don't have it.
3    MR. LIGHTFOOT: Sure. These
4  are just from the Venable firm?
5    MR. COTTLE: Yes. I think she
6  copied Mrs. Rozenzweig with all that stuff.
7    MR. LIGHTFOOT: Oh, yeah. I
8  forgot about that.
9    MR. COTTLE: I don't if
10  there's anything in there that's -- I'll be
11  glad to copy that if you want it, if you
12  don't have it.
13    MR. LIGHTFOOT: Yeah, who --
14  John, this may be the same -- Yeah. I don't
15  need that. Thanks.
16    Q.    Which employee did your lawyer
17  contact? Which former coworker of yours did
18  your employer contact -- did your lawyer
19  contact?
20    A.    I think he contacted Ashley
21  Sheffield.
22    Q.    Are you aware of him
23  contacting any others?

Page 183

1    A.    No.
2    MR. COTTLE: I can tell you
3  that I did not, after I had a conversation
4  about that with Ms. Rozenzweig.
5    MR. LIGHTFOOT: All right.
6  Why don't you give me a few minutes. I
7  think I'm very close.
8    (Recess taken.)
9    MR. LIGHTFOOT: My question,
10  John, this is as much for you. I think
11  we've already -- I know we've already
12  covered it, I just want to make doubly sure.
13  I asked him if this was his only claim of
14  discrimination, of race discrimination and
15  he said yes. And I -- There's no claim of
16  racial harassment, hostile environment.
17  I've not seen that anywhere or seen that
18  claim nor heard that claim, but I just want
19  to make sure.
20    MR. COTTLE: Well, we're not
21  really making it, no.
22    Q.    Okay. All right. Mr. Smith,
23  you talked about one time when you asked

Page 184

1  Andras for help, and you said that was only
2  one day and then after that day he was
3  unavailable. Do you remember telling me
4  that?
5    A.    Correct.
6    Q.    Okay. Did you ever ask Andras
7  for help again after that time?
8    A.    I think I -- I think I did,
9  yes.
10    Q.    And did he help you?
11    A.    Actually, Andras told me that
12  Ralph told him that I was to do the job
13  myself.
14    Q.    Okay. But did you ever ask
15  him again?
16    A.    He have helped me after that,
17  yes.
18    Q.    He still helped you after that
19  time?
20    A.    Occasionally.
21    Q.    Occasionally? Three to five
22  times?
23    A.    Once or twice.

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1    Q.    Was there ever a time after
2   that, after he told you that Ralph had said
3   you need to do it on your own or whatever,
4   and you said he helped you occasionally, was
5   there ever a time after that time that you
6   asked him for help that he didn't help you?
7    A.    Yes.
8    Q.    When?
9    A.    I can remember asking him for
10  his opinion on certain things and he told me
11  he was busy doing something else.
12   Q.    Oh, okay.
13   A.    I don't know actually the
14  dates.
15   Q.    Okay.  But he never refused to
16  help you again unless he was -- I mean, in
17  other words, sort of for a reason other than
18  being busy; correct?
19   A.    Correct.
20   Q.    To be clear on that, so even
21  after he said to you:  Ralph said you kind
22  of need to figure it out on your own, even
23  after he said that to you, he still helped

Page 186

1   you out occasionally.
2         There were times when you
3   asked him for help after that and he would
4   say:  I can't right now, I'm too busy.  But
5   he never turned you down and refused to help
6   you unless he was busy, as far as you know?
7    A.    There was times that I got the
8   feeling that he didn't want to help me, so I
9   stopped asking him for help.
10   Q.    And on the times where you
11  didn't ask Andras for help, you were always
12  able to ask Chad or Ralph if you needed
13  help; correct?
14   A.    Correct.
15   Q.    Or Brian, you were also able
16  to ask Brian for help?
17   A.    I've asked Brian, yes.
18   Q.    Have you told me today every
19  piece of information that you're aware of
20  that supports your claim in this lawsuit
21  that Euro-Pro discriminated against you on
22  the basis of race, in terminating your
23  employment?

Page 187

1    A.    Yes.
2         MR. LIGHTFOOT:  No further
3   questions.  Thank you.
4         MR. COTTLE:  No questions.
5   (The deposition was concluded at 2:52 p.m.,
6   May 24, 2006.)

Page 188

1         REPORTER'S CERTIFICATE
2   STATE OF ALABAMA,
3   ELMORE COUNTY,
4         I, Angela Smith, Registered
5   Professional Reporter and Commissioner for
6   the State of Alabama at Large, do hereby
7   certify that the above and foregoing
8   proceeding was taken down by me by
9   stenographic means, and that the content
10  herein was produced in transcript form by
11  computer aid under my supervision, and
12  that the foregoing represents, to the best
13  of my ability, a true and correct
14  transcript of the proceedings occurring on
15  said date and at said time.
16        I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21
22        _____
          Angela Smith, RPR, CRR,
          for the State of
23        Alabama at Large.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**A**

ability 188:13
able 49:7 106:9
  186:12,15
abundance
  171:23
abusing 45:20
acceptable
  44:10
accident 135:5
accomplished
  79:8
acting 5:3
action 188:18
activity 45:16
actual 22:3
  163:15
added 38:20
  39:15
adding 71:19
additional 91:7
address 8:15
advance 68:12
advise 159:22
affidavit 10:3
agency 10:21
  10:21 27:15
  27:18,21 28:7
  28:17,18 31:4
  40:11 175:3
ago 155:21
agreed 1:13
  2:2,9,18
  79:11,23
  90:13 93:1
  104:21
  114:10
  119:11
  120:13
ahead 79:17
aid 188:11
air 82:20
airport 18:14
airports 20:4,7

al 1:9 4:8
Alabama 1:2
  1:18 4:2,15
  4:19 5:3,9
  8:17 14:1,2
  17:13 24:22
  145:16
  150:11
  151:21,23
  175:16,18
  176:4 179:23
  188:2,6,23
allege 166:21
Allison 62:15
  62:22,23
  63:13
allow 129:1
allowed 46:15
altercation
  40:23 157:22
amount 106:19
amounts 39:5
AmSouth/H...
  4:19
Andras 73:23
  74:3,11,13,18
  74:22 76:3
  81:3 93:14
  136:18 137:6
  137:8 184:1,6
  184:11
  186:11
Angela 1:16
  4:11 5:2
  188:4,22
anguish 154:12
annualized
  146:5
Annually
  146:6
answer 6:14,19
  6:22 7:22
  22:17 62:1
  98:18 119:21

answered 89:7
anybody 51:5
  51:12 52:10
  52:15,15
  57:17 60:4,5
  60:7 62:23
  69:8 98:4
  123:9 128:3
  138:13 145:4
  158:8 167:6
anymore 43:15
  44:9
anyway 36:15
apartment
  8:17 175:20
apparent
  103:4
APPEARAN...
  4:12
appearing 4:15
  4:20
application
  147:15,16,17
applications
  149:9 150:1,4
  174:3,8
applied 16:11
  174:8,20,21
  174:23
apply 23:4
  149:20
  174:10
appreciate
  178:7
approach 95:5
appropriate
  37:7,9 65:9
  79:12
appropriately
  92:19
appropriate...
  64:19
approximate
  109:20

approximately
  19:4 22:16
  24:19 49:12
  50:8 60:11
  61:20 67:11
  109:19 147:3
  180:2
April 8:11
  67:20 145:20
  145:23
  163:16,17
area 25:19
  55:23 65:11
  67:18 71:13
  118:18 124:2
  124:19
  125:20 126:6
  126:9,10,13
  126:16,17,19
  127:2,10,12
  127:15,17,19
  128:1,10,12
  128:16,16,18
  129:3,23
  140:18
  167:23
areas 36:7
  72:19 73:1
  105:9,13
  125:21
  128:14 129:4
armament
  16:4
arose 112:6
arrested 180:5
Ashley 51:8
  52:11,19
  57:20 58:1
  60:12 63:4,9
  63:10,15
  64:23 65:3,4
  65:8 93:14
  97:15 135:5,6
  138:10,15

142:11
  144:14 155:1
  155:4,20
  163:7,9 165:5
  166:17 170:5
  170:9,14
  182:20
asked 36:11
  43:17 51:21
  62:20,22,23
  65:6 81:1,14
  86:19 87:6
  107:11
  112:19
  113:12
  115:15
  119:18,18
  122:14 126:7
  129:23
  136:13 156:8
  178:21
  180:21 181:1
  183:13,23
  185:6 186:3
  186:17
asking 6:11
  7:19 8:1 35:6
  35:8 64:13
  73:6 91:17
  120:1 142:8
  153:22 154:8
  185:9 186:9
assessment
  90:14
assign 2:13
assigned 77:9
  90:21 137:8
  162:19,20,21
  162:22
  170:16
assignments
  122:2 157:15
  164:19
associate 16:10

# FREEDOM COURT REPORTING

178:12,14
**associate's**
  13:12 15:8
  16:7 165:18
**assume** 7:23
  11:5 154:5
  165:7
**assure** 66:20
**Atlanta** 14:9
**attached** 172:9
**attack** 119:4
**AT&T** 21:20
  21:21
**Auburn** 31:8
  120:15
**audiotapes**
  173:6
**August** 28:2
  101:14 103:3
  104:6,7,14
**automated**
  78:1 123:3
**available** 58:10
  58:13 74:1,3
  74:3,4,8,9,12
  74:18,22,23
  75:2,9,11,23
  76:2,3,13,16
  76:18,20
  115:1 136:21
  137:1,7,11
**Avenue** 1:18
  4:14 5:8
**average** 146:18
  146:20,22
  147:1
**aviation** 19:21
**aware** 97:20
  98:2,4,5
  111:2 112:8
  116:2 120:20
  138:4 140:10
  140:21 141:1
  141:8,11,16

141:19
142:19 145:4
170:9,13,14
171:3 182:22
186:19
**a.m** 5:10 87:3

———————
**B**
**B** 4:17
**back** 13:16
  15:20 24:23
  27:7,23 37:21
  66:1,6,13
  93:21 111:15
  124:20
  154:10
  158:10 178:4
**background**
  20:9
**backwards**
  87:18,20
**back-pay**
  153:19
**bad** 21:1
**ball** 82:19,21
**ballpark** 49:18
**Baptist** 151:20
**Barbara** 128:7
**base** 22:2
  135:3
**based** 18:20
  37:6 68:6
  73:14 137:16
  137:20 138:2
  150:16
  171:21
**basic** 84:1
**basically** 32:2
  66:11 67:22
  85:2
**basics** 84:17
**basis** 76:9
  103:7 142:9
  142:16

186:22
**Baton** 24:12,15
  24:17
**bay** 115:19
**bed** 119:13
**began** 30:22
  33:10 70:23
  75:3 175:9
**beginning** 5:9
  68:10 74:4,16
  75:8 85:15
  92:10 109:7,9
  111:8,17
  155:5
**behalf** 4:15,20
**belief** 142:10
**believe** 25:14
  25:16 36:14
  59:2,5,11
  89:14 138:10
  138:18
  139:15,17,20
  142:15
  147:21 166:6
  171:2
**believed** 59:4
**bench** 20:22
**benefits** 148:21
  173:15
**best** 80:20
  133:7 134:4
  188:12
**better** 19:9
  20:13 21:13
  114:9,11
  119:11
  120:13
  128:18
**beyond** 36:12
**big** 78:2
  170:16
**biggest** 14:8
**Birmingham**
  4:19

**birth** 8:9,10
**bit** 74:7 134:18
  174:3
**black** 51:19
  56:7 63:1,6
**blame** 126:12
**blaming**
  109:10
  110:22
**blind** 51:18
  54:21 55:20
  56:7
**Blue** 9:10,12
**blueprints**
  161:9
**board** 20:23
  78:22
**boards** 21:1,1
  21:2
**bonus** 93:6
  94:17,18,20
  94:22 95:1,3
  97:4,10,11,13
  97:17 100:5,9
  100:11,13,20
**bonuses** 93:9
  97:1,21 98:2
  98:4,10,14
  99:1
**boss** 58:12
  148:8
**bothered** 58:8
**bottom** 29:17
**Bowles** 1:17
  4:13 5:8
**boyfriend**
  63:11
**break** 6:16
  44:21 45:5
  46:4 60:22
  61:1,3,8,14
  64:12 74:6
  157:6 158:11
  158:12,20

159:5
**breaks** 61:3,4
**Brian** 76:5
  91:17 92:3,8
  92:9,15
  177:11,12
  186:15,16,17
**brought** 10:13
  50:21
**BTS** 21:20
  22:1
**budget** 130:11
  133:5
**build** 81:15
  82:16 83:7
  107:9 136:7
  162:11,12,19
  162:20
**building** 74:18
  78:1
**built** 121:18
**bull** 95:17
  96:15
**bullet** 90:20
  91:1,5
**burned** 134:11
**business** 45:6
  45:17 46:14
  46:17 60:16
  64:9,15
  115:16,21
  119:7 170:4
**busy** 185:11,18
  186:4,6
**buy** 88:5 113:8
  114:8,11
  127:23
**B-L-U-E** 9:13

———————
**C**
**California**
  179:14,15
**call** 16:7 23:21
  36:12 37:1

# FREEDOM COURT REPORTING

40:21 60:11
60:23 61:22
62:3 64:20
65:10 76:7
96:22 116:10
116:13 144:7
167:7
**called** 18:19
30:10,11
60:14 61:9,15
63:15 65:5
77:5 116:8
129:14 167:1
**calling** 60:16
116:14,20
117:18,23
**calls** 44:20
**capabilities**
135:12
**car** 22:5
**care** 115:17,21
**careful** 63:20
64:3 66:19
**Carmichael**
8:16
**Carolina** 9:15
**carpet** 31:22
31:23,23
**carpets** 169:13
**carry** 169:6
**case** 1:5 4:4
162:5 188:19
**categories**
139:7,8
**caught** 139:23
**cause** 5:11
41:22,23
99:15
**cell** 22:3,3,4,6
22:7
**censor** 114:8
117:12 119:9
119:10 120:9
**cent** 146:11

**certain** 35:4
128:15
185:10
**certainly** 58:5
86:10 126:15
169:5
**CERTIFIC...**
188:1
**certify** 5:4
188:7,16
**Chad** 3:15
42:17 47:14
58:21 59:3,12
59:14 63:15
66:7 70:17
73:23 74:2,8
74:9 77:15,21
78:12 80:6
81:23 82:1,6
82:8,10,15
83:3,5,8,8
86:17,19 88:2
88:4,9 89:5,8
106:16,19,22
107:4,23
108:2,6,23
109:8,11,13
109:14 110:2
110:20,23
118:3,20
119:6 128:22
128:23
129:17
137:10 143:4
186:12
**Chad's** 88:3
107:8
**chair** 41:4,12
**challenge** 68:8
**challenged**
39:18
**Chambers**
26:23 27:2
**change** 153:17

178:5,6
**changed**
153:14
**changes** 87:11
**Chappelle** 50:1
50:5,13,16,23
51:4,7,9,18
52:6 54:9
55:6,9,16
56:5,13 57:4
57:14 59:20
144:12,16,22
158:7
**Chappelle's**
54:1,4
**charge** 10:14
10:15 36:22
157:14 166:1
**children** 9:17
**chips** 23:20,20
**Christmas**
178:3,23
179:6
**church** 151:19
151:21
**city** 14:8
**Civil** 5:5
**claim** 137:22
154:1 169:19
170:21
171:11
183:13,15,18
183:18
186:20
**claiming** 115:8
136:3 139:14
150:15
152:23 153:7
153:18,20
154:9 166:3,8
166:13,16
**claims** 154:17
156:12,13
171:13 173:2

**clarify** 7:19
**clean** 36:7
124:2,9,19
126:10,11,17
126:20 127:3
127:15,17,19
128:1,10,12
128:15,16
129:3 162:10
**cleanability**
31:9,13,16,19
32:3,21 65:11
71:13 138:22
139:10
157:12,16
164:7 167:11
167:12,19,20
168:8,9,22
169:10
**cleaner** 32:5
77:10 78:2
81:17 92:13
92:15 101:6
102:17
105:18 114:4
123:6,16
130:6 135:8
159:17,18
160:18
161:10,17
169:13
**cleaners** 102:8
102:13
110:23 111:7
112:7 114:2
132:23 161:3
**cleaning** 3:13
125:3 162:1
**clear** 11:5,14
35:15 55:8
75:15,18
83:11,13
110:21
185:20

**clearly** 7:14
83:8
**close** 103:8
183:7
**clothes** 178:5,6
**code** 118:18
**college** 15:5
18:3,12 30:9
30:13
**come** 41:3 42:9
51:6 65:21
67:3 78:9
93:21 124:20
129:10
139:17 160:8
161:7,17,23
162:7 177:3
178:4
**coming** 82:19
103:8 140:6
160:6,12
**comment**
59:15,17,19
**comments**
48:19 50:1
52:13 57:13
58:3 132:22
133:2 171:4
**Commissioner**
2:19 4:11 5:4
188:5
**common**
144:19,23
145:1,3
**communicate**
7:2
**communicati...**
93:5
**Community**
15:4
**company**
11:19 12:2
18:19 23:1,16
33:11 40:10

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 67:14 68:13 | 114:23 | 160:14 161:9 | 95:8 96:6,7 | 188:13 |
| 101:23 | consider | control 16:17 | 98:7,11,16,20 | correctly 11:22 |
| 120:14,21 | 178:10 | 18:12 19:9,12 | 98:21 100:19 | 38:4 65:8 |
| 145:2,12 | considered | 21:1 30:17 | 101:7,8 102:2 | 71:2 122:4 |
| company's | 139:6 178:12 | 105:21,22 | 102:5,9 | 162:12 |
| 141:21 | consisted 12:9 | 106:2 | 104:15,17,18 | 165:17 |
| compared | construct | controls 30:8 | 104:20,22 | corresponde... |
| 105:1 | 111:16 | conversation | 105:6,7,10,11 | 181:18 |
| compensated | constructed | 56:1,9 61:11 | 105:14,15,18 | cost 130:9,12 |
| 34:14,20 | 102:18 | 61:17 62:14 | 105:19,22,23 | 134:8,8 |
| compensatio... | constructing | 64:23 66:14 | 106:3,13,22 | costing 133:4 |
| 34:7 | 111:6 | 103:12 | 107:3,13,15 | COTTER |
| complain | construction | 113:20 | 109:11 | 161:18 |
| 52:10,15 | 110:3,7,22 | 132:12 183:3 | 112:21,22 | Cottle 1:17 |
| 57:17 | 111:3 112:6,9 | conversations | 113:2 114:2,3 | 4:13,14 5:8 |
| complained | consult 86:1 | 64:20 | 115:3 116:9 | 5:18 12:4,7 |
| 55:7 143:6 | 159:22 | convicted | 117:5,6 | 12:16,20 |
| complaint | consulted 88:4 | 179:7 | 118:14,15 | 25:14 70:4,8 |
| 10:22 | 106:15 | convictions | 120:2,3,5,10 | 72:20 86:8 |
| complaints | 107:22 108:2 | 179:22 180:9 | 121:15 124:2 | 87:19 98:17 |
| 154:17 | contact 182:17 | COOPER 4:18 | 124:3,5,6,10 | 107:17 118:4 |
| complete 79:8 | 182:18,19 | copied 182:6 | 124:12,13 | 154:9 157:7 |
| completed | contacted | copies 174:8 | 125:6,7,9,12 | 171:18 |
| 101:7,15 | 182:20 | copy 149:23 | 126:17 127:3 | 180:17 |
| 102:1 | contacting | 180:11 182:1 | 127:21 128:2 | 181:12,16,21 |
| completing | 182:23 | 182:11 | 129:7,9 131:7 | 182:1,5,9 |
| 130:5 | content 188:9 | correct 15:23 | 136:1,23 | 183:2,20 |
| completion | context 144:6 | 33:14,16 | 137:2,5,12 | 187:4 |
| 80:1 103:9 | continue 91:10 | 37:17,18 | 138:2,3 147:1 | counsel 1:15 |
| compliance 2:5 | continued | 44:21 47:13 | 157:16 | 2:10,12 5:7 |
| computer | 140:12 | 60:17,18 | 158:13,19,23 | 151:12 |
| 23:20,20 | continuously | 61:13,14 | 159:1,8,9,19 | 188:17 |
| 188:11 | 122:20 | 67:21 69:11 | 160:4,6,23 | counties 26:15 |
| computers | contract 112:4 | 69:12,15,16 | 161:4 163:1,3 | county 25:9,11 |
| 21:4 | contracted | 73:16,21 74:1 | 163:8,18 | 25:18 26:17 |
| concern 126:1 | 40:7 108:17 | 76:13 77:11 | 164:8,9,21 | 179:12,13 |
| concluded | 110:5,15 | 77:12,15,16 | 165:10,13,22 | 188:3 |
| 187:5 | 111:12 | 78:3,14,17,22 | 168:22,23 | couple 23:23 |
| condition | contracting | 78:23 79:4,10 | 169:7,8,17 | 66:3 78:8 |
| 130:15 | 23:16 | 79:12,13,21 | 171:1,6 177:4 | course 30:14 |
| conduct 44:10 | contractor | 79:22 80:2 | 178:9 181:7 | 30:16 102:3,6 |
| conducted | 40:6 108:18 | 85:4 87:4,7 | 184:5 185:18 | court 1:1 2:6 |
| 172:4 | 108:19 | 87:13 90:14 | 185:19 | 4:1 5:2,16 |
| confirm | contractors | 91:18 94:5 | 186:13,14 | 6:12 10:2 |

# FREEDOM COURT REPORTING

153:5
cover 172:23
covered 183:12
coworker 64:5
  64:21 145:8
  182:17
coworkers
  92:19 144:15
create 161:2
creating 84:17
crime 179:8
CRR 1:16 5:2
  188:22
current 90:21
  114:8 117:11
  117:12 119:9
  119:10 120:9
curse 99:23
cussed 95:19
cut 96:11
cycle 3:10
  31:10 32:7
  67:14,18
  73:11 75:15
  76:6 77:10
  89:16 105:18
  107:7 114:1
  122:3,6 130:6
  132:23
  139:11
  159:14 165:4
  168:21

_____
**D**
**D** 3:2 8:6 9:10
  9:12
**Dallas** 18:4,22
  20:18 23:12
**damage** 153:11
**damaged**
  152:11
**damages** 153:1
  153:8,9,19
  154:11,13

**data** 31:21,22
  169:11
**date** 5:4 8:8,10
  28:4 48:23
  49:1 63:1,5
  80:1,5,8,11
  80:14 128:22
  145:20
  188:15
**dated** 87:2
**dates** 185:14
**dating** 62:17
  62:21 63:21
**Dave** 50:1,13
  50:15,23 51:3
  51:7,9,18
  52:6 54:1,4,9
  55:5,9,16
  56:5,13 57:4
  57:14 59:19
  144:12,15,21
  158:7 166:4
  166:17
  170:10,15
**David** 50:5
  166:6,21,23
**day** 1:19 42:12
  42:12,14 55:4
  74:5,19,22,22
  75:2,10 81:5
  112:21
  118:23 132:2
  132:3 137:9
  139:18,18
  140:7,14
  149:7 157:18
  158:4 174:18
  184:2,2
**deadline**
  101:19
**deadlines**
  81:12
**dealing** 144:9
**dealings** 47:6

**deals** 32:4
**dealt** 32:7
  116:3 165:8
**debt** 153:15
**deceased**
  151:17
**December** 28:8
  29:5 30:22
  49:4 129:6
**decides** 153:5
**decision** 107:2
  107:5 137:15
  137:19
  141:21
  150:17
  152:11,12
  153:10
**deep** 119:17
**defendant** 4:9
  4:20 10:11
**Defendants**
  1:10
**Defendant's**
  3:6 29:7,15
  69:17,21
  79:14,19
  86:12 90:5,10
  101:2 103:21
  104:2,12
**degree** 13:12
  15:9,18 16:7
  16:8,12 17:4
  106:20
  165:18
**denying** 117:1
**department**
  141:5
**dependability**
  113:9
**dependent**
  9:20
**dependents**
  9:21
**depending**

85:6
**deposition**
  1:15,21 2:3,4
  2:15,19 6:7,8
  10:1 11:2
  29:16 143:21
  143:22
  172:10,12
  187:5
**depositions** 2:7
**description** 3:9
  12:17 69:14
  69:14 70:10
  71:23 173:19
**design** 88:20
  89:2,16 92:13
  92:16 103:15
  107:12
  108:10,13
  109:7,14
  110:1,9,19
  111:9,18
  160:11 161:3
  161:12 162:8
**designed**
  102:17
  108:19 163:5
**designer** 107:7
**designing** 88:8
  105:17
**designs** 159:23
  160:3,8,15
**detailed**
  160:20,21
**developing**
  91:6
**diagram** 12:17
  77:19 78:9,17
  81:15 109:12
**diaries** 173:6
**Diego** 179:13
**different** 17:9
  113:8 153:17
  167:23

**directly** 27:11
**director** 33:1
**dirt** 31:22
  169:12
**disagree** 80:7
  105:12
**disagreed**
  81:18 83:15
  83:18
**disagreement**
  40:22 41:1,3
  42:6 43:7
  157:22
**disagreements**
  42:23
**discharge**
  147:20
**disclosures**
  12:9 171:8
**disconnected**
  116:16 117:4
  119:16,22
  120:5 131:5
**discriminated**
  59:7 135:1
  142:15
  186:21
**discrimination**
  137:23 143:7
  156:17 173:2
  183:14,14
**discuss** 72:23
  73:7 90:19
**discussed**
  114:13 116:5
**discussion**
  71:19 89:19
  92:1,2 104:8
  118:2
**disrespect**
  41:18
**dissatisfied**
  94:11
**distance** 79:19

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

distress 150:16
150:21
151:11 152:8
District 1:1,2
4:1,2 25:13
DIVISION 1:3
4:3
divisions 31:8
divorced 9:2,5
9:8 51:21,22
doctor 152:2
document
171:19
documents
11:1,9,16,22
12:11 172:11
172:18 173:1
173:9,13,22
174:1 180:12
180:17,22
181:4,5
doing 20:3
31:19 51:18
68:17 70:23
73:19 74:17
89:23 127:15
127:16 130:5
135:12 141:2
159:13,17
170:12 178:7
185:11
dollars 100:14
100:15,16
108:5,9
door 58:12
doubly 183:12
draw 82:4
drawing
160:22
162:16
drawings
160:19,21
drawn 83:22
drew 81:22

82:5
drive 178:4
Dubois 1:18
4:14 5:8
DUI 179:11
duly 5:14
duty 36:12
Dynamics
16:19 21:14
21:15 22:16

—— E ——
E 3:2
earlier 56:11
77:18 116:5
117:10
134:18
157:21
172:17
early 78:7,11
84:22 85:1,7
85:9,10,12,20
103:3 112:20
113:14,16
115:16,18,20
115:23 119:2
132:2,3
176:23
eastern 1:3 4:3
14:12
education
165:14
EEOC 10:13
10:14,20
165:21,23
171:9,17
180:12,18,20
180:22,23
181:2,4
effect 2:5 43:6
43:16 44:9,16
45:20 63:6
65:18 66:12
73:9 92:18

95:7,17 96:12
101:16 103:6
113:1 114:21
130:21,22
effort 98:12
eight 21:6
126:6
eight-to-five
33:7
either 10:10
25:18 64:20
139:7 154:22
170:9
electronic
15:12,14 16:8
16:13 20:8
eligible 97:4,10
98:9
eliminate
129:22 130:1
ELMORE
188:3
emergencies
44:20 45:4
emergency
46:3
emotional
150:16
151:10
employed
28:11 145:11
148:22 154:3
employee
33:20,22 34:5
34:21,22
35:13 36:20
37:2,8,14
38:6,13,17,17
39:1,18 40:5
40:7,14 51:3
62:15 138:16
138:17 166:9
169:2 182:16
employees

22:15 32:11
34:15,16,17
37:16 38:5
41:8 45:2,10
45:12 50:22
51:6 61:11
93:5,9,11,13
97:22 105:2
128:17,20
138:5 141:16
144:20 145:2
152:15,20
166:13 168:7
177:3
employer
22:21 182:18
employers
16:21 17:1
employment
16:17 58:19
67:6 137:15
141:22 143:8
149:1,5
150:12,18
152:13 173:7
173:11
186:23
encountered
105:16 111:6
ended 67:10
151:5
engineer 74:21
77:1 81:2,15
82:1,4 83:7
94:7,8 107:11
109:2 129:23
135:13
136:14,17
143:2 148:8
159:16,21
161:12,16
162:2,17,18
162:23
engineering

15:12,15 16:8
20:8 88:8
89:3 159:13
165:18
engineers
110:6
entire 176:12
entitled 154:11
environment
183:16
episode 50:1
equipment
19:20 20:1,4
20:7 21:3,20
22:2,4,5,7
23:19 88:5
111:13
114:11
Eric 177:15,17
Eric's 177:18
ESQUIRE
4:13,17
et 1:9 4:8
Euro-Pro 1:9
4:8 6:3 27:10
27:11,14 28:6
28:7,22 29:2
29:11,23 30:4
30:23 33:21
35:10,13
44:18 45:1
67:9 75:16
97:10,12,17
102:7 142:15
142:20 143:7
147:5,7 153:4
154:18,22
156:16 157:2
157:3 161:15
171:6 172:6
173:10 175:8
176:13 177:3
186:21
Euro-Pro's

31:7 137:14
137:19
150:17
152:12
**evaluated**
170:1,7
**evaluation**
3:17,20 12:1
89:12 93:3
104:5,13
**evaluations**
11:18 12:10
141:12
**evening** 36:20
36:22 37:16
38:1,13,15
39:1 60:10
157:11
158:10
**everybody**
35:20 46:12
126:8,22
**evidence** 2:15
**Ex** 3:8,9,12,15
3:17,20
**exact** 28:3 31:3
42:4 48:22,23
49:1,16 61:4
82:23 89:4
102:10
109:18
128:21
145:20
146:10
**exactly** 38:22
42:15 43:11
49:16 56:3
66:16 121:12
146:10
148:20,23
155:8,12
**examination**
3:3 5:11,20
**examined** 5:14

**excited** 68:3,5
**excitement**
71:5
**excuse** 20:2
127:10
**Exhibit** 29:7
29:15 69:17
69:21 79:14
79:20 86:12
90:5,10 101:2
103:21 104:2
104:13
**EXHIBITS** 3:6
**existing** 160:2
**expect** 159:21
**expected** 35:13
35:16,20 36:1
159:11
**expecting**
161:23
**experience**
36:16 37:7,15
68:7 73:15
162:7 165:11
**explain** 63:19
97:5,8 98:23
131:4,8 148:6
153:2
**explained**
64:11 66:22
97:7 98:9,12
98:19 99:10
99:14,17
113:6,10
130:17 131:3
131:22 132:1
134:7,14
148:4
**express** 124:14
**expressed** 71:4
74:19 75:11
109:8 111:11
112:2 126:4
126:20

127:13
161:11
**e-mail** 3:15
86:5,16 87:2

———————
**F**
**fab** 23:21
**facility** 31:7,7
35:20 98:13
**fact** 68:15
74:20 93:8
94:9 95:12,16
111:11
156:16 160:5
161:1
**factor** 141:21
**facts** 156:21
**failing** 170:15
**Fair** 118:10
**fairly** 144:16
156:4
**familiar** 14:3
**family** 25:3,5,9
28:15 154:19
**far** 13:10 47:11
59:19 69:10
100:19 166:2
168:12 186:6
**fast** 18:7 34:2
**fault** 110:2,2
**favorable**
166:18
**favorably**
138:7,11
139:16 166:5
166:10,14,22
169:20
**February**
176:19 177:1
177:2
**federal** 5:5
10:21
**feel** 37:9 54:12
54:16 134:23

**feeling** 186:8
**felt** 50:2 73:14
130:4 135:10
135:14
**fifteen** 127:9
139:19
**fifteen-minute**
158:21,22
**fight** 40:20,22
**figure** 87:12
185:22
**file** 147:9
**filing** 2:18
10:15
**fill** 149:8
**financial**
153:11
**find** 175:5
**fine** 13:8 93:19
94:3
**finish** 80:13
88:22
**finished**
101:12
**fired** 17:21
19:6 21:10
22:10 59:4
100:8 143:1
152:16
153:14 176:1
**firm** 182:4
**first** 5:14 27:18
33:5,6 56:14
72:1,6 75:13
77:7,13
108:20
149:18,19
157:19
158:22
169:16
**five** 49:12,14
50:8 51:15
61:19 72:19
72:23 88:14

100:14 134:2
139:18 167:2
167:16
168:19
184:21
**fixture** 78:2
84:2,17
107:10 108:8
160:8,19
161:17 162:1
162:10,19,20
162:21
**fixtures** 160:1
160:3,13,17
161:10
**flaw** 109:7,14
110:19
**flexible** 109:5
**focus** 123:17
**focused** 47:5
90:20
**folks** 26:15
75:23 143:14
154:22
**following** 5:12
**follows** 5:15
**food** 18:8,10
**Foods** 17:8
**force** 2:4
**foregoing** 5:6
188:7,12
**forgot** 93:15
182:8
**form** 2:11
72:21 98:18
188:10
**former** 182:17
**forward** 46:8
84:1
**found** 19:9
51:20 148:16
148:19
149:17 151:6
**four** 19:4

# FREEDOM COURT REPORTING

51:15 147:7
158:22,23
162:15
**fourteen**
146:20,21
**Freeman**
151:15,16
**Friday** 60:11
113:18 119:1
**friend** 57:18
57:19 145:7
178:10
**friendly**
178:16
**friends** 62:23
144:2,8,12
154:19
**front** 70:13
82:10
**full** 2:5 148:15
**fully** 113:1
114:18
130:20
**funeral** 177:3
**funny** 52:2
53:14,17,20
53:22 54:1,4
54:5 55:7
56:17
**further** 2:1,8
2:17 187:2
188:16

_____

**G**

**Gadsden** 15:4
16:6 17:5,13
18:6 30:19
179:23
**GALE** 4:18
**game** 94:1
**general** 16:19
21:14,15
22:16 54:8
**getting** 17:4

77:4 84:18
91:17 98:2,4
103:8 124:22
157:15
172:19
**give** 6:14 8:7
48:22 49:17
87:11 89:11
183:6
**given** 10:1,3,3
10:5 23:2
69:13 70:10
94:22 104:6
104:11,14
135:7 181:18
**giving** 11:13
42:1 164:18
164:19
**glad** 182:11
**Globus** 18:19
18:20
**go** 13:10 14:20
15:6 18:12
24:21 27:13
36:11 37:21
38:14,16
67:14 79:17
82:16 83:7
87:12,18
113:14 115:8
118:10,20
127:23 129:3
133:12 147:4
147:5 149:2,7
174:6,14
177:21
178:20
**goes** 16:18,18
16:19
**going** 6:6 7:23
10:14 45:16
46:8 59:6,6
67:17 70:1
71:12,12

77:23 78:2
82:9,21 83:14
83:23 92:10
94:19 95:2
101:12,18
103:4,15
113:7,15
115:18
119:18
134:15 143:2
156:19
158:11
161:14,18,21
165:20 168:2
**good** 5:22 6:1
7:3 21:1
58:11 80:11
82:7,8,14
170:17
**gotten** 68:16
97:11,12
120:21
**government**
10:21 18:17
**graduate** 13:13
13:19
**graduated**
14:15 18:3
**granddaddy**
176:18
**grandfather**
176:22
**grandmother**
176:19
**grandparents**
176:1,10,15
176:16
**granted** 112:14
**greater** 25:19
151:20
**ground** 46:8
**grounds** 2:13
**group** 77:19
**grow** 68:12

**guard** 152:14
**guess** 101:4
112:9 154:1,4
171:9 173:2
179:6
**guy** 37:20

_____

**H**

**half** 21:16
24:20
**handle** 111:21
160:1,3
**handles** 81:16
108:10,13,16
108:17 109:4
109:11,12,16
110:5,9,9
111:9 160:10
**hand-held**
121:23
**hang** 29:12
**happen** 49:8
65:17
**happened** 41:8
43:17,19 49:9
66:18 72:14
131:13
155:16
167:15
**happens**
153:15
**happy** 7:19
**harassment**
183:16
**hard** 7:3 14:8
**head** 7:1
126:16 135:9
135:23
136:12 167:3
167:17
**hear** 51:8 57:8
**heard** 45:8
59:13,14,16
59:18 60:2,6

66:17 183:18
**hearing** 7:14
**heart** 119:4
**heated** 41:4
**held** 104:9
**help** 73:19
74:1 76:5
80:23 85:16
85:21 86:17
88:3 91:17
127:17 133:7
136:18,21
137:2 151:10
152:1,4
159:13,16
161:2 184:1,7
184:10 185:6
185:6,16
186:3,5,8,9
186:11,13,16
**helped** 76:21
184:16,18
185:4,23
**hesitate** 178:19
**Hickman**
39:22 157:23
**high** 13:14,20
106:10
**higher** 34:14
**Hill** 151:20
**hire** 129:23
135:13
**hired** 168:10
174:14 179:4
**hiring** 161:15
161:16
**hitting** 82:20
82:22
**hold** 101:3
**holdup** 111:9
**home** 24:23
60:12 61:6
116:8,18
118:14,16

# FREEDOM COURT REPORTING

178:4
honest 152:22
Honestly 85:8
hospital
  118:21
  119:13
hostile 183:16
hour 84:11,13
  146:8,14
hourly 38:16
  40:4 138:16
  146:9
hours 14:5,10
  35:17 45:17
  64:10,15
  146:18,21
  158:22,23
hour-long
  84:14
house 175:19
  175:21 176:7
  176:10,16
  177:22
  178:20
Hudnall 3:18
  4:22 32:18
  35:11 47:8
  48:7,12,15
  55:10 58:3,17
  59:3,11,17,18
  63:16 68:16
  80:12 81:19
  93:4 95:5
  108:6 112:20
  115:11
  123:13,23
  126:5,20
  127:14
  130:18 136:4
  136:10
  170:23
Hudnall's
  177:22
huge 22:21

huh-uh 6:23
  7:4
hundred 25:15
  34:9,11
  100:14,15,16
  108:5,8 172:8
Hundreds
  22:19
husband 156:2
Hyundai
  145:12,13,15
  147:7 150:14
  151:7 174:14
  174:22 175:9

————
I
IC 20:23
idea 105:1
  171:14 172:1
identification
  29:8 69:18
  79:15 86:13
  90:6 103:22
imagine 54:14
  150:5
immediate
  26:13
Immediately
  151:4
importance
  101:23
important 36:7
  36:10 75:16
  102:16
  114:17
impression
  54:9
improve 90:3
  122:15
  124:12
improved
  113:9
improvement
  105:9,14

improvements
  90:19
inappropriate
  43:6 48:18,19
  49:20,23 50:3
  58:4 81:13
  98:23 99:11
  99:18 127:1
  131:17
  170:22
incarcerated
  180:7
incident 40:19
  67:12 135:4,6
incidents 51:15
include 157:18
income 175:7
increase 38:20
  39:8
increases
  39:19
independent
  18:18 23:16
  91:14 108:18
  108:19
  160:14 161:8
information
  12:8 87:7,10
  137:13,17,21
  142:3 171:11
  186:19
informed
  131:1
initial 12:9
  73:10 88:1
  89:11 171:8
initiative 36:10
input 81:7
inside 139:5
install 81:16
installation
  160:16,16
installed 21:20
  122:1

installing
  23:18,19 78:1
  44:7 69:14
instance 6:21
  164:19
Instruments
  23:17
integrated
  20:23
intended 65:14
interested 55:9
  188:18
International
  16:18 17:10
  20:14
Internet 46:11
  46:13,16 47:2
  61:12 140:1
  140:22
interpret 87:17
interviews
  150:13
intoxication
  180:1
investigation
  172:4
investigator
  171:10
involuntarily
  17:20
involved 20:6
  21:19
issue 46:21
  47:3 56:13
  93:6 116:6
issues 62:17,21
  99:16 131:1
  141:17

————
J
James 171:9
  171:12
job 3:9 12:17
  19:9 21:19
  23:7 24:14,14

27:9 29:10
  44:7 69:14
  71:23 73:19
  77:4 78:3
  106:21 107:6
  107:8,9,12,15
  121:2 122:3,5
  124:16
  127:15,16
  141:9,13
  145:19
  148:16
  149:17,17
  151:6 159:13
  161:1,6,7,8
  161:19 162:9
  165:6 167:5
  169:5,9
  173:18,19
  174:22,23
  175:5 184:12
jobs 20:5 149:9
  149:13,21
  174:4,9,10
  175:11
job-descripti...
  12:15
John 4:13 70:3
  86:6 104:4
  154:4 171:16
  172:17
  180:16
  181:10
  182:14
  183:10
jokes 48:18
  49:21 50:4,6
  143:10,11
  171:4
JR 4:17
judgment
  153:6
July 28:1 80:1
  85:5,5 101:4

101:5,5,14,18
103:3
**jump** 132:15
133:18
**jumped** 132:17
132:20
133:17
**jumping** 12:5
**June** 85:5,10
85:12 86:16
86:18 87:3
88:11
**Justin** 151:15

_____
**K**
**keep** 7:3 36:7
122:17
124:19,21
126:9,10,17
126:19 127:2
127:17
128:10 129:2
140:13 150:3
180:11,21
**keeping** 124:1
124:8 127:18
128:1
**kept** 125:20
128:12,15,16
181:5
**key** 133:20
**keys** 132:18
133:19,20
**Keystone**
16:18 17:8,10
20:14,17
**kin** 188:17
**kind** 20:1
39:17 53:10
54:6 99:12
150:20
161:12 175:3
185:21
**kinds** 45:11

149:13
**Klan** 56:8
**Klux** 56:8
**knew** 35:6,8
58:5,10 77:22
77:23 102:7
127:18
135:10
137:10 140:1
162:6 164:11
164:14
**knob** 134:16
**know** 6:15
7:17 11:6,7,8
13:8 22:17,23
30:15 31:3
33:3 34:1,13
34:19 35:1,2
35:3 40:10
46:1 47:22
61:4 62:22
66:4 68:19
69:9,10 70:18
70:19 81:20
85:8,22 87:14
96:2 102:10
102:11,12,15
102:15
103:17,19
108:6,6,7
109:17
113:23
116:12
125:23 133:3
139:21 140:4
142:4,22
146:10
153:21 155:8
156:21 159:2
163:4,12
164:10,13
166:2 168:12
170:1,6
171:13,19

173:15 174:4
174:7 177:18
177:19
181:19
183:11
185:13 186:6
**knowledge**
30:7
**knows** 142:4
172:2,3
**Ku** 56:8

_____
**L**
**L** 1:12
**lab** 33:1 77:5
97:3,12,14,17
98:15 122:21
139:4,5
161:22 165:3
**LabVIEW**
120:15,17,21
121:19
**LaFayette**
175:16,18
176:3,4,17,18
**laid** 22:11,13
**Large** 188:6,23
**largest** 77:9
**late** 86:16
101:14
139:18,19
140:7 167:6
**laugh** 53:9
**laughed** 49:21
**laws** 2:6
**lawsuit** 6:4
10:8 137:23
154:14 156:9
156:22 166:4
186:20
**lawyer** 6:10
11:6 12:2
154:16
182:16,18

**lawyer's** 11:17
**layoff** 23:2
**lead** 36:19 37:1
37:8,13,13
38:16 39:1
157:9,10,11
163:20 164:6
168:16
**leader** 102:13
**leadership**
39:15
**leading** 2:11
11:11
**leads** 142:5
**learn** 42:6
68:15 91:10
131:12
**leave** 17:19
20:12 112:20
113:14,16
115:4,5,15,18
115:23 132:2
133:8,13
**leaving** 115:20
132:3
**Lee** 171:9,12
**left** 17:22
107:21
113:19
117:11 119:1
130:15,19
131:23
132:18
133:14 147:7
175:8
**lengthy** 92:1
**letters** 11:18
12:2
**let's** 13:16
15:20 17:3
47:9 77:7,17
90:8 107:1
145:23
158:11

**level** 73:12
91:2
**life** 3:10 31:10
32:7 55:23
67:14,17
71:11,13
73:11 74:18
75:15 76:5
77:10 84:2
89:15 91:1,6
91:11 92:10
92:13 101:6
102:17
105:18 107:7
107:10 108:8
110:23 111:3
111:7 112:7
113:7,10
114:1,9
115:19 116:1
117:8,12
122:3,6
126:11 130:5
132:23 136:6
139:1,10,11
159:14 165:4
167:13,21,22
168:21
**lifestyle** 153:13
153:17
**Lightfoot** 3:5
4:17 5:19,21
6:2 12:6,13
12:18 25:12
70:2,6 86:6
86:10 104:3
107:19 154:4
154:14 157:5
161:20
171:16
180:14 181:9
181:14,20,23
182:3,7,13
183:5,9 187:2

# FREEDOM COURT REPORTING

likes 39:18
line 54:6,7,13
list 171:9
listed 17:1 78:3
  171:17,23
lists 16:16
little 24:2 74:7
  85:6 134:18
  146:1 174:2
live 25:18
  26:15 175:22
lived 176:14
living 175:14
  175:23 176:2
located 17:12
logic 30:7,17
long 14:22
  15:6 17:16
  19:3 24:17
  84:11 130:13
  133:6 134:1,9
look 12:7
  117:21 149:1
  149:4 152:20
  152:20 158:7
  181:22
looked 110:7
looking 90:18
  126:19 127:1
  149:14
looks 15:21
  21:5,16 23:22
  79:6
lot 54:11 76:5
  76:7 92:4,8
  92:15 111:3
  119:11,19
  125:3 127:11
  172:23
loud 6:20
Louisiana
  24:13
lover 51:23
lower 163:23

lucky 44:6
lunch 61:6
lunchtime
  115:6 158:13
  158:16 159:7
  159:8
L.L.C 1:9 4:8
—————
**M**
machine 3:14
  17:15 23:18
main 46:21
  47:3 72:19
  123:17
maintenance
  19:19 20:3
majority
  123:19
making 33:20
  33:21 34:7
  48:18 52:13
  58:3 60:2,6
  137:23 172:5
  183:21
man 42:3
  54:21 55:20
  63:6
management
  34:21 42:5
  52:16 97:21
  98:13 111:15
  111:17 140:6
  140:9
manhood
  41:18
manner 170:18
  188:18
manually
  123:4,4,7
manufacturi...
  23:18
mark 79:19
  90:9
marked 29:8

69:18 79:15
  86:13 90:6
  103:22
  104:12
market 68:1
  102:13
marking 69:21
  90:9 101:2
  104:2
marriage
  156:1
married 8:18
  8:20 9:5,6
Mason 177:9
  177:10
Mason's
  177:19
materials
  112:1
matter 144:9
maximum
  130:11 133:5
MAYNARD
  4:18
McGee 76:5
  177:12
mean 7:5 37:8
  38:7 47:20
  50:9 53:9,18
  54:15 55:3
  60:15 93:17
  93:19 94:1,21
  102:20
  109:20
  110:14
  123:15 130:1
  147:1 153:22
  156:14
  171:18 172:2
  176:6 178:15
  178:16,19
  181:13
  185:16
means 188:9

meant 57:13
  86:11
medical 152:2
medication
  7:13 152:7
meet 101:18
meeting 3:19
  45:9 67:2
  71:9 72:6,7,9
  78:16 90:11
  92:23 93:3
  98:20 99:7
  113:5 114:6
  126:8 128:17
  128:19 129:1
  133:9,10,11
  133:14,15
  136:7,11
  143:3
meetings 35:10
  73:10 75:14
  77:14,18 78:8
  78:11 83:23
  84:12,14
  85:15,20 88:1
members 25:9
  28:15
memory 11:21
  38:4 71:1
  165:16
men 47:17 63:2
  63:2
mental 154:12
mentally
  150:23
mentioned
  52:18,22 53:2
  53:11 91:22
met 6:3 45:10
  66:7,12
  113:17
meter 134:13
methods 91:7
Miami 21:23

middle 1:2 4:2
  25:12 133:9
  133:13
  158:17
midway 159:6
mid-convers...
  133:22
mind 12:4
  69:23 88:23
minimum
  130:12
minor 116:2,5
minutes 61:19
  82:5 123:8
  134:3 139:19
  183:6
misundersto...
  181:8
moment
  117:13
Monday 87:3
  116:7,16
  117:16,20
  118:5 128:22
  129:8
monetary
  152:23 153:2
  153:8
money 69:5
  153:3,23
  154:1
Monster 150:9
Montgomery
  8:17 25:19
  145:16
month 24:19
  77:8 156:7
  169:16
months 11:11
  19:4,16 21:6
  67:9 85:4
  147:7 148:15
morale 99:15
morning 5:22

# FREEDOM COURT REPORTING

6:1 84:10
113:18,18
114:6 116:7
129:11,13
**Motor** 145:12
**move** 24:11
71:13
**moved** 18:4
24:10,12
135:6 142:12
**moving** 24:9

### N

**N** 1:12 3:2 52:3
52:6 56:20
57:1,9 143:17
144:7,8,10
**name** 6:2 8:4
27:20 28:18
93:15,18 94:4
128:8 177:18
177:19
**names** 25:20
**nature** 63:22
93:10 143:11
**Navy** 14:21,23
15:3,21,21
16:2 36:15
179:17
**near** 40:19,21
**nearest** 14:7
**neat** 125:20
**necessary** 2:9
**need** 6:18
63:20 70:2
71:11 73:19
79:7 91:10
96:11 103:6
111:12 112:3
113:11
125:14 129:2
182:15 185:3
185:22
**needed** 58:14

64:3 74:20
88:5 90:3
92:18 102:5
105:9,13
106:9,20
109:5 112:3
113:13,23
114:7 115:2
116:2 117:11
122:11
124:11,19,21
129:22
159:12,16,23
186:12
**needs** 45:6
**neither** 64:7
188:16
**never** 10:1
45:8 59:13,13
95:19 103:11
116:4,10
139:20 140:1
143:6 151:9
152:7,16
161:11
163:19 167:1
168:13
185:15 186:5
**new** 70:13,17
71:5 77:4
**newest** 37:20
**nigger** 51:23
57:1
**night** 60:9,11
61:22 62:5
**nightclub**
180:6
**nights** 150:22
151:2
**nodding** 7:1
**Nokia** 21:21
**nonbusiness**
45:16
**nonmanage...**

98:1
**noon** 115:5
**normally** 7:2
153:15 156:3
**North** 9:15
**Northeast**
21:22
**Northwest**
21:22
**noted** 87:2
**notice** 2:18
172:10
181:15
**November**
112:10,13,15
113:19 116:8
116:16
**number** 1:5
4:4 8:8 102:8
106:19
118:14,17
**numerous**
139:23
166:23

### O

**O** 1:12
**oath** 7:9 10:5
**Object** 72:20
98:17
**objections** 2:10
2:13
**obviously**
172:3
**occasion** 49:8
49:10 50:19
50:21 56:14
63:5 86:18
88:10
**occasionally**
184:20,21
185:4 186:1
**occasions**
49:11 50:8

76:22,23
85:20,23 88:1
124:1 167:2
**occurred** 42:6
**occurring**
188:14
**October** 19:13
176:20
**offended** 53:4
56:18,19,23
57:9,10,12,16
58:7
**offensive** 64:4
65:14
**offer** 67:14,16
**offered** 2:15
69:7
**office** 65:3
96:23 129:15
144:20 149:6
174:18 175:1
**offices** 1:17 5:7
**Off-the-Reco...**
104:8
**Oh** 14:11
38:11,23 40:7
59:21 84:13
98:5 99:9
139:1,6 146:3
181:1,3 182:7
185:12
**okay** 5:22 6:10
7:7,12,20,21
8:2,3,15,18
9:7,9,14,16
10:7,13,19
11:4,20 12:13
12:21 13:1,4
13:7,13,18
14:7,11,14,19
15:17 16:11
16:15,23 18:2
18:5,11,16
19:11 20:5,11

21:5 22:12,23
23:4,22 25:2
25:8,22 26:6
26:8 27:1,3
27:13,20,23
28:13,16 30:6
30:10,21 31:6
31:14,18 32:1
32:10,16,20
33:5,17 34:3
34:6,13 35:5
35:15,19
36:18 37:6
38:11,14 39:7
39:13,17 40:1
40:13,18 41:7
42:16 43:5,18
44:8 45:1,9
45:14,23 46:7
47:12,16 48:2
48:6 49:2,7
49:11 50:7,12
51:11,14 52:3
52:9,14,21
53:23 54:4,11
54:13 55:2,14
55:18 57:21
58:16,21 60:1
61:21 62:14
63:3 64:8
65:1,16,20
66:7 67:2,13
70:8,21 71:3
71:7,15,18,21
72:5,11,16
73:3,8 74:6
74:10,13,15
75:6,13 76:4
76:21 77:3,22
78:6,11,15,20
79:5,11,23
80:7,15,18,21
81:4,10 83:11
84:5,15,20

# FREEDOM COURT REPORTING

85:1,14 86:21
87:1,5,16,21
87:23 89:7,18
90:8,13,18,23
91:16 92:6,17
93:2,23 94:13
94:16 95:9,19
96:5,9 97:2,8
97:16 99:6,10
99:19,22
100:21,21
101:22 103:2
104:16,21,23
105:4 106:8
106:14,18
109:10,23
110:17
111:10 112:5
112:19
113:22
114:12,15
115:23
116:21 117:4
117:7,15,19
118:1,13,18
121:1,10
122:14,17
123:9,23
126:12 131:4
132:1 135:2
137:6,10
138:15
140:10
145:22 147:9
152:18
153:18
154:14,21
155:13,17,22
158:6 162:13
163:12,19
165:3 166:12
166:16
167:22
168:18

172:16,21
176:9,12,22
177:14
179:19 181:5
181:20
183:22 184:6
184:14
185:12,15
**old** 8:12
**once** 8:23
38:14 52:12
62:12,13 71:2
105:5 140:9
155:6 156:6
167:7 184:23
**ones** 106:1
110:14,17
**open** 58:12
**OPERATING**
1:9 4:8
**operational**
113:2 114:18
130:20
**operator** 17:15
**opinion** 185:10
**opportunity**
68:4,12 70:14
70:18 71:5
**oral** 5:11
**order** 106:17
107:3,5,8,22
107:23 112:2
**ordered** 106:3
106:11 108:2
173:20
**ordering** 106:4
106:8 107:15
**outside** 105:22
143:13
**overall** 172:22
**Overnight**
179:21 180:8
**overtime**
146:16,19,21

|   | **P** |   |
| --- | --- | --- |

**P** 1:12
**package**
173:14
**packet** 12:8
13:2,4
**page** 3:4,7
29:18 87:18
150:12
**paid** 39:4
146:7
**pant** 122:3,6
**paper** 79:3
**part** 14:12
75:23 78:2
81:11 106:21
108:3,4,7
113:8,11
122:5 124:15
131:18 137:4
144:21
160:11 161:1
**parties** 1:14
2:12 188:17
**parts** 96:4
106:9,11,15
106:17 107:2
107:5,8,15,17
107:20,22,23
173:19
**party** 10:8
178:3,23
179:6
**passed** 176:19
176:20,22
**pastor** 151:13
151:15,18
**paused** 27:8
**pay** 38:20 39:8
93:6,9 94:11
94:14 154:10
163:23
**Pearson** 27:1
**Pearsons** 26:9

**Penton** 151:21
151:22,23
**people** 45:19
46:12 54:11
54:16 76:2
80:23 98:14
99:5 126:6
127:9,11,14
158:7 164:20
**percent** 25:15
**performance**
139:13 141:9
141:12,17
170:2,7
173:19,21
**performed**
19:19 130:5
**performing**
141:13
**period** 28:10
62:16 66:2
94:10 167:9
**periodic** 19:19
**permanent**
33:20,22 34:5
38:5,12 163:8
163:10,11
169:2,4
**permission**
115:8,14
**person** 52:21
53:1 152:15
153:16
157:10,11
163:20 164:6
168:16
**personal** 44:19
45:4 60:15
115:16,21
**Phillips** 26:7
26:22
**phone** 22:3,3,4
22:6,7 44:19
45:6,20,21

46:2,11,13,19
46:20,21
60:23 64:9,14
64:20 116:10
116:13
118:14,16
**phrase** 43:4
56:10
**physically**
119:12
**pick** 22:6,7
31:22 125:14
125:18 129:1
**picked** 169:11
**picking** 125:10
**piece** 79:2
186:19
**Pine** 151:20
**piston** 82:20
**place** 29:1
142:20
143:14
**placed** 28:21
**places** 27:17
149:4 150:8
**plaintiff** 1:7
4:6,16 10:10
**plan** 130:11
133:5
**plant** 125:3
**play** 37:3
108:15
**played** 37:4,13
**player** 36:1
**Plaza** 4:19
**PLC** 30:11
**please** 6:15,20
8:5,7,9 9:11
41:16 48:10
176:14
180:15
**pleased** 38:19
39:7,10,14
**point** 11:6

# FREEDOM COURT REPORTING

33:10,17 34:1
42:8 62:15
63:12 67:13
82:23 83:2
90:20 91:1,5
93:2 95:4
96:8,21
111:23
127:22
132:15 159:6
163:2,5
**position** 3:10
20:13 21:13
31:1,2 39:14
69:7,14 70:10
135:7,14
142:12
**positive** 92:22
**possession**
173:10
**possible** 102:1
102:19,23
**precaution**
172:1
**precipitated**
41:20
**Preemploym...**
173:14
**preference**
63:1
**prep** 18:10
**prepare** 11:2
11:16
**prepared**
171:20
**PRESENT**
4:21
**press** 122:3,6
**pretty** 26:11
167:3,18
179:1
**prevents** 7:13
**previously**
109:8

**primarily**
12:10 73:20
**prior** 2:15
36:16 37:6
97:20
**priority** 127:19
**probably**
67:10 72:12
88:15 99:22
109:21 126:5
127:10,10
148:14 155:6
156:6 158:9
**problem** 65:7
83:3 109:6
110:22 111:8
113:15
115:17,17
116:5 140:11
**problems**
99:15 105:17
105:20 109:3
110:1,8 111:3
111:5 112:6,9
114:1,4,5,13
116:2 139:14
**Procedure** 5:6
**proceeding**
188:8
**proceedings**
5:12 188:14
**produce**
181:10
**produced** 86:7
181:12
188:10
**product** 32:4
**production**
145:18 146:4
172:10
**products** 32:8
67:23 91:7
**profanity** 96:3
96:6

**professional**
151:10 188:5
**professionally**
126:21
**proficiently**
126:21
**programma...**
30:7,17
**project** 31:9,10
31:12,16,20
74:17,20,21
75:3 76:18,19
77:9 79:8
80:1 81:2,3
85:10,12,17
85:21 86:1,3
88:3,5,9 89:3
89:6,16 101:7
101:11
107:10 109:9
109:21
121:17 123:6
133:1 134:8
136:14 148:9
161:19,20,21
162:22 163:6
170:16
**projects** 90:21
165:9
**promised**
94:23
**promotion**
68:22 69:6
**properly**
108:11
**provide** 86:21
**provided** 5:5
**psychiatrist**
152:5
**Public** 179:23
**pull** 36:3
**punitive**
154:13
**purpose** 43:13

**purposes** 29:9
46:17 69:19
79:16 86:14
90:7 103:23
**put** 38:15
67:17 69:22
77:19 111:20
127:23
128:12
135:14
147:22,23,23
163:6
**p.m** 33:14,14
187:5

_____

## Q

**question** 6:13
6:19,21 7:18
7:23 8:1
22:18 37:22
37:22 48:9
59:9,10 63:4
88:23 93:16
98:18 104:10
107:14 142:1
148:10 154:5
160:9 172:22
181:8 183:9
**questioned**
148:10
**questions** 2:11
2:12 6:12
73:4,6 83:19
187:3,4
**quickly** 23:8
101:17 102:1
102:23
**quit** 17:20,23
18:2 19:5,7,8
20:15 21:9,11
21:12 22:9
24:4,6,7,9

_____

## R

**race** 137:16,20

138:2 141:21
142:5,16
143:7 156:17
183:14
186:22
**racial** 50:4,6
57:13 59:15
143:11
183:16
**racially** 170:21
**racist** 59:3,12
59:17,19 60:2
60:6 145:8
171:3
**raise** 56:12
69:6 93:6
95:12 132:16
**raised** 41:13
43:8 95:14
**raises** 93:9
**Raleigh** 9:15
**rally** 56:8
**Ralph** 4:22
32:17,21
33:19 35:11
42:9,17,19
44:15 47:8
48:7,12,15
53:3,6 55:10
55:10,15,19
55:19 56:14
58:2,7,17
59:2,11,16,18
63:15 65:3,5
66:7 68:16
70:17,18,20
70:21 71:18
71:22 72:6,7
72:12,16,23
73:8,20 74:2
74:7,9 75:11
75:14 77:14
78:12 80:12
80:15,22

# FREEDOM COURT REPORTING

81:18 82:11
83:11,13,15
83:17,18,23
84:16 85:16
85:23 86:1
88:2,6,19
89:6,8,11
90:11 93:3,4
95:4 96:9,22
99:8 100:3,4
101:9,15
103:5,14
104:16 108:6
112:19,23
113:5,6,17
115:11 116:8
116:11,13,14
117:8,17,22
118:2,8 121:4
121:10
123:13,23
124:18 126:1
126:5,7,20
127:13
130:18 131:1
131:9,23
132:1,6,7
136:4,10
145:1,4 158:4
161:11
170:22
177:21
184:12 185:2
185:21
186:12
**Ralph's** 85:16
85:21 136:15
**Randolph**
25:11,18
26:17,19,21
**ranging** 21:3
**rated** 105:1,2
**reaching**
116:17

**read** 91:23
**reading** 2:2
**ready** 162:15
**realize** 101:17
**really** 42:3
50:2 183:21
**reason** 23:2
59:1,10 60:16
75:21 102:16
134:5,21,22
134:23
135:16,18
147:19 148:2
148:4 162:5
169:18
185:17
**reasons** 45:4
46:3 60:15
99:3
**rebuild** 131:10
**recall** 33:23
41:21 42:10
42:15,18
43:11 45:9
46:5,9,10
51:1,2,5,10
51:11 55:12
55:15 58:20
66:17 68:20
71:16 72:13
92:14 99:21
99:22 100:19
100:22,23
101:20 106:4
106:7,8
114:14
116:12,14,22
116:23 117:2
117:3,16,17
117:19,22
118:1,8
120:14,16,19
121:5,12
123:15 125:1

132:9,13,21
133:2 134:2
135:20 151:5
158:3,5
159:14,15
171:7
**receive** 95:3
116:13
**received** 95:1
116:10
**Recess** 157:8
183:8
**Recession** 23:3
**recollection**
134:5
**record** 7:3 8:5
31:21
**recorded**
169:11,13
**recounting**
57:3
**recover** 154:11
**recruiting**
175:2
**reduces** 79:2
**Reese** 47:14
58:21 59:3,12
59:14 63:15
73:23 74:2
80:6 81:23
106:16,23
107:4 108:7
108:23 109:8
109:11,13
110:20 111:1
118:3,20
128:23,23
129:17
137:10 143:4
**Reese's** 109:14
110:2
**refused** 185:15
186:5
**regard** 89:8

162:10
**Registered**
188:4
**regularly**
76:12,20
144:16 156:5
**relate** 11:13
**related** 119:7
**relating** 2:6
57:10 156:21
173:6,18,20
**relationship**
24:8
**relatives** 25:17
25:20
**relay** 22:8
**reliability** 68:1
**rely** 28:13 35:7
73:20 80:22
**relying** 92:3,8
92:9
**remained**
154:2
**remaining**
90:20
**remember**
10:14 12:21
13:2,8 26:12
27:22 28:3,18
34:6 42:16,20
42:21 43:3
46:20,23
47:11 48:23
51:17 54:18
54:22 56:6
65:7 71:7,18
71:20 72:2,3
72:8,10 73:6
78:7 84:21
93:18,22 94:2
94:4 96:2,5
96:13,16,20
100:11
116:19 120:6

120:7 128:21
131:11 150:7
155:18
157:23
165:20
166:15
170:23 184:3
185:9
**remembering**
12:12
**repeat** 50:6
96:17
**repeated** 52:1
**repeatedly**
107:11
**rephrase** 48:9
70:15
**replaced**
142:23 143:2
**report** 32:21
103:9 111:15
117:7 132:6
**reported** 33:4
111:18
117:10
**reporter** 5:3,16
6:12 188:5
**REPORTER...**
188:1
**reporting**
32:17 103:6
103:14
**represent** 6:3
**represents**
188:12
**request** 112:11
172:10
**requested**
112:12
**requests**
172:14
**reside** 9:14
**respect** 35:21
47:18,23 48:4

# FREEDOM COURT REPORTING

48:8,13,16
58:18,22
**respectfully**
40:2
**respective** 1:14
**responded**
130:1,10
**response** 87:6
87:9,15,17
99:20 131:21
136:15,16,20
**responsibilit...**
38:21 72:19
164:10,14,15
164:23 169:6
**responsibility**
39:15,19
126:16 127:2
164:7,12
165:5
**responsive**
172:17
**rest** 56:22 57:2
57:3,11
**result** 153:1,9
188:19
**results** 169:14
**resume** 3:8
13:3 15:18
16:16 29:14
29:22
**return** 129:5
**returns** 172:18
180:16
**review** 11:1
12:19 172:11
**reviewed** 11:9
11:12,15,17
11:18,21,23
13:3
**reviewing**
12:22
**Richards**
166:4,6,17,21

166:23
169:19
170:10,15
**rid** 135:15
**riding** 22:5
**right** 7:17 8:4
8:7,13 9:1,4
9:19,23 12:3
13:7,10,16
14:11,14,19
14:22 15:2,20
16:2,6,10,15
17:16,19 18:5
18:11,23 19:5
19:11 20:11
20:17,20
21:15 22:9
26:3,10,14
27:4,6,15,16
28:5,8,9,16
28:19 29:4,10
29:20,23 30:1
30:2,11,12,13
30:21 31:6,9
31:10,18 32:5
32:16 33:7,9
33:11,23
35:23 36:9
37:8,20 38:23
39:13,21 41:2
41:10 42:5,8
42:22 43:10
43:13,20 44:3
44:4 48:21
49:13,18 52:9
54:12,16,18
54:22 57:2,4
57:17 58:9,16
58:20 59:8
60:15 62:1,2
62:19 63:12
64:2,17 66:10
67:19 69:13
69:20 70:9,12

71:3 75:1,4,5
76:15 77:1,17
78:13 79:3,17
80:20 81:6,19
82:2 83:9,21
84:6,9,20
85:7,19 86:4
86:15 87:9
88:7,18 89:14
89:21 91:4,9
91:13,21
93:20 94:4,9
96:7 98:8,22
99:7 101:19
103:13 104:1
106:6,21
107:22
113:19 114:5
114:23 115:4
116:7 117:13
129:14,19
130:3 131:15
131:20
132:10 136:5
136:7,9,22
138:21,22
139:13 141:4
141:15
148:15 149:2
150:20 157:5
158:17,18
159:19,20
160:3,11
162:2,18
164:16,17,20
166:20 168:1
172:9 173:5
179:3 181:14
182:2 183:5
183:22 186:4
**ring** 133:20
**rip** 131:9
**Road** 8:16
**Robertson**

4:21 35:12
45:10 47:13
47:15 48:2
58:6 59:2,11
59:14 65:23
71:10 96:22
103:10 108:6
124:4 125:2
126:18
127:20
134:19
135:18 143:4
**role** 37:3,5,10
37:14 38:16
75:19 108:15
**Rouge** 24:12
24:15,18
**round** 83:1
**routers** 21:4
**Rozenzweig**
182:6 183:4
**RPR** 1:16 5:2
188:22
**rule** 45:8
**rules** 2:6 5:5
44:18 45:2,7
45:11 46:8
141:17
**run** 117:9,14
122:5,11,12
122:12,20
131:6
**running** 71:14
116:1 122:18

——————
**S**
——————
**S** 1:12
**safe** 117:8,14
164:9
**salaried** 38:17
138:16
**salary** 34:8
138:18 146:8
**sales** 22:4

**Sam** 39:22
43:23 44:1,6
157:23
**San** 179:13
**sand** 169:12
**sat** 72:3
**satisfied** 39:5
**Saturday**
147:2
**saw** 48:20
53:11,21 56:4
56:6,9
**saying** 44:23
46:5 53:7
55:10 56:23
57:5,7,8,9
64:4 81:10
100:17 108:1
117:19 142:9
**scene** 52:1
53:12 56:7
**schedule** 66:4
78:21
**scheduled** 61:3
61:7
**schematic**
81:14 83:22
109:13 110:7
136:8,11
162:14
**schematics**
107:12
160:15,20
161:10
**school** 13:11
13:14,20
**schooling** 15:3
**Science** 16:11
**scratch** 47:7
**screening**
16:17 18:13
19:2,10,12
**second** 29:12
29:13 33:11

# FREEDOM COURT REPORTING

33:18 67:8
90:20 157:19
security 8:8
18:15 19:2,22
20:7
see 17:3 29:18
47:9 57:4
77:7,17 78:3
79:18 91:18
107:1 109:1
110:8 111:19
111:21 125:8
125:10
145:23
151:19
158:11 168:2
seeing 72:2
seek 85:16,21
88:3 152:1,4
seeking 153:3
seen 53:20
183:17,17
semester 30:16
send 180:18,19
sending 13:8
senior 37:15
37:19
sense 117:12
sent 87:6
180:12,22
181:1,4,6
series 6:12
83:22 85:14
serve 179:19
serves 11:21
38:4 71:1
165:17
service 18:10
175:3
Services 16:20
23:11
set 32:22 46:8
61:7 68:6
77:4 79:7

setup 85:2
setups 91:18
set-ups 84:1
seven 15:1,21
126:6 164:20
shaking 7:1
share 36:3
Sheffield 51:8
57:20 60:12
63:4,9,10
97:15 135:5,6
138:11,15
142:11
144:15 155:1
163:7,9 165:6
166:17
170:10,15
182:21
Sheffield's
170:6
shift 33:6,7,11
33:13,18
36:20,22
37:16 38:1,13
38:15 39:2
60:10 67:8
157:11,18,19
157:19
158:10,17
159:7,8
shit 95:17
96:15
short 61:16
shortly 33:10
155:10
show 36:10
50:13,16,23
51:4,7,9 55:6
55:9,11,16
56:5,13 57:15
59:20 69:20
86:4,15 101:1
104:1 144:12
144:16,22

167:6
showed 167:1
shower 178:5
178:20
showing 86:16
shown 108:22
shut 113:16
115:18
sick 167:1
sign 128:11
signature 2:2
signed 90:16
93:1 104:19
significant
101:23
105:17 112:5
signs 127:23
128:9
similar 63:4
68:18
similarly 138:6
Single 8:19
sit 35:2 71:22
84:16
site 22:4
situated 138:6
situation 57:13
66:23 113:7
119:9 125:1
148:11
sit-down 89:19
six 11:11 34:9
34:10 148:15
167:2,16
168:19 172:7
sketch 3:12
77:21 78:18
78:20 79:20
81:7,8,11,17
81:22 82:5
84:4,7 108:22
111:19,20
160:22
skill 68:6

skills 29:17,21
30:3 73:15
skit 57:4,11,14
sleepless
150:22 151:2
slot 158:21,22
Smith 1:6,15
1:16,21 3:16
4:5,11 5:2,10
5:13,23 8:6
13:11 165:21
183:22 188:4
188:22
Smiths 26:4,5
26:20
Smith's 3:8
Social 8:8
software
120:15,17,21
121:11,13,20
solution 161:8
somebody
134:12,15
soon 102:18
sorry 20:3 27:8
29:12 88:22
89:1 120:3
139:9 147:2
151:5 159:11
177:7 181:7
sort 20:6 25:19
31:8 36:19,21
36:22 37:2,13
40:19 68:16
72:18 79:6
83:23 84:17
157:14
172:22
185:17
sorts 68:23
99:15
sought 76:4
151:9,12
Sounds 85:5

source 125:23
137:14,18
142:3
South 1:18
4:14 5:8
speak 63:16
93:4
speaking 41:13
specialist
23:18
specific 55:15
83:3
specifically
71:10,17
92:12 96:1
specification
122:12,13
specifications
86:20 91:6
specifics 71:8
spell 9:11
spend 109:15
spent 109:17
123:20,21
spoke 45:11
61:16 123:23
124:5 158:3
spoken 43:23
44:1 140:5,8
140:22
spring 100:10
100:12,22
stable 82:22
stages 79:7,12
staging 81:12
stand 103:10
standards
91:11
standing 55:22
start 19:12
29:11 56:2
68:17 75:7,9
91:5 120:3
129:10

# FREEDOM COURT REPORTING

132:12 159:6
**started** 28:6,17
  31:3 32:17
  33:6,11,18
  35:9 49:4
  70:23 77:13
  77:15 84:18
  85:12 101:11
  140:14
**starting** 31:1,2
  77:8
**starts** 16:16
**state** 8:4 10:21
  14:12 15:4
  16:6 17:5
  18:6 24:9,10
  30:19 148:2
  188:2,6,22
**stated** 159:3,10
  159:12
**statement** 10:4
  55:20 60:3,6
  63:13
**statements**
  171:4
**States** 1:1 4:1
  14:21
**station** 22:2,8
**steam** 3:12
  77:10 78:1
  81:16 92:13
  92:15 101:6
  102:8,13,17
  105:17
  110:23 111:7
  112:7 114:1,4
  123:6,16
  130:6 132:23
  135:7 159:17
  159:18
  160:18 161:3
  161:10,17
  162:1,10
**steamer** 86:20

**stenographic**
  188:9
**steps** 162:14
**STIPULAT...**
  1:13 2:1,8,17
**stipulation** 5:6
**stipulations**
  5:17
**stood** 133:18
**stop** 53:7 58:8
  134:15
**stopped** 140:14
  186:9
**stories** 54:22
**story** 54:21
**straight** 18:12
**strengths**
  105:5
**stress** 150:22
**stressed**
  150:23
**strive** 91:14
**stuff** 12:15
  20:7 50:9,11
  54:1,4 70:1,7
  95:6 99:12
  182:6
**subject** 96:23
  144:9,19,23
  145:1,3
**subjective**
  142:10
**subsequent**
  72:7
**substance**
  51:16
**succeed** 75:19
**Sue** 181:15
**sued** 6:4
**suffered**
  150:16 153:8
**suing** 156:16
**summertime**
  49:8

**Sunday** 146:23
**supervise**
  140:16
**supervision**
  188:11
**supervisor**
  36:21 47:9,10
  65:10 68:17
  73:20 135:9
  135:23 168:4
  168:16
  170:11,17
**supervisors**
  170:1,6
**supports**
  171:11 173:1
  186:20
**supposed** 45:3
  131:2 132:6
**sure** 6:10 11:4
  12:6 25:15
  26:11 32:13
  33:15 34:12
  37:23 47:6
  48:11 62:8,9
  70:16 85:11
  85:13 88:21
  89:4,10
  104:11
  143:20
  149:12 154:6
  157:7 159:4
  167:3,18
  168:11 169:3
  172:20
  173:12
  174:12,15
  177:16 179:1
  181:23 182:3
  183:12,19
**sweep** 125:14
  125:16
**sweeping**
  125:8

**swept** 125:5
**sworn** 5:14 7:9
  10:4
**system** 71:12
  71:14 114:9
  121:17,21,22
  122:1 126:11
  136:6
**systems** 16:4
  21:21

---

**T**

**T** 1:12,12
**take** 6:15
  24:14 39:14
  55:2 68:9
  73:11 84:10
  84:12 92:22
  115:16,21
  149:17 157:6
  162:14 178:5
**taken** 1:16
  157:8 183:8
  188:8
**talk** 41:5 42:9
  42:13 50:22
  51:9 52:14
  53:10 58:6,14
  65:12 70:17
  70:22 84:16
  88:9 90:23
  91:5 92:20
  96:23 97:1
  106:18 115:2
  119:6 120:8
  128:6 130:14
  132:7 144:14
  154:20
  155:22 156:3
  156:4,6 164:1
  164:3 169:23
  170:5
**talked** 11:5
  50:19 52:11

52:19 53:1
  54:15,19,20
  54:23 57:18
  62:11,16 65:3
  65:4,4,23
  67:12 70:12
  70:19 71:8
  72:14 73:5
  80:12 85:23
  88:19 89:6
  91:21 92:7,14
  99:4 101:21
  105:4,5,8
  106:22 119:8
  119:13,19
  124:23 128:7
  130:18
  131:23
  144:11
  148:11
  154:15,21
  155:2,3,20
  156:1,11,15
  156:18,20
  157:1,10,21
  174:2 183:23
**talking** 42:20
  42:21 43:14
  51:3,12 79:20
  93:8,11 95:2
  95:6 99:1,11
  99:18 107:18
  116:17 118:2
  118:8 132:8
  157:23
  167:10,16
  168:19,20
  171:15
  174:19
**talks** 29:17
  91:16
**Tallassee** 1:18
  4:14 5:9
**Tanisha** 9:10

# FREEDOM COURT REPORTING

task 135:8
tasked 160:6,7
  160:8,10,12
  163:6
tasks 21:19
tax 172:18
  180:15
taxes 100:15
team 36:1
tech 20:22
technical 16:20
  23:11 165:18
technically
  97:3
technician
  16:14 77:5
  94:6 97:3
  109:1 122:21
  129:22
  135:11
  138:19 139:4
  149:15,17,21
  161:13,16,23
  162:6 165:4
technicians
  97:13,14,17
  98:15
technology
  15:13,15,16
  16:8 20:9
  23:21 79:2
  165:19
telephone 45:3
  61:12
tell 7:10 25:8
  26:14 30:6,14
  33:18,19,21
  35:19,23 36:6
  36:9 41:10,15
  42:22 43:14
  44:8,15 49:14
  51:14 53:3,6
  53:13 58:1
  62:20 63:16

63:23 64:2,6
64:8,13 65:13
66:14 87:16
89:21 90:2
91:13 92:17
93:21 101:15
109:23 114:6
114:15,16
117:15
119:15,22
120:4 121:10
123:9,12
124:7,20
129:20 130:3
131:16 132:5
133:16 135:2
137:13
139:15
141:20
143:10,13
145:7 147:14
155:13
165:23
176:13 183:2
telling 30:22
  46:12 94:2
  116:15 120:6
  133:12
  159:15
  170:10 184:3
temp 27:15,18
  27:21 28:6,17
  28:18 31:4
  40:11 163:8
  168:21 169:9
temperature
  106:10
temperatures
  106:12
temporary
  32:11 34:15
  34:17 40:13
  175:3
temps 29:1

31:15 32:14
32:21
ten 33:14
88:16,17,20
89:9 123:8
134:2 139:19
147:3 174:16
174:17
terminate
  137:15
  141:22
  150:17
  152:12
terminated
  24:5 100:18
  134:6,20,21
  135:17
  141:18 148:1
  148:7 152:17
  153:16
  155:11 167:8
  172:6
terminating
  186:22
termination
  138:1 142:6
  153:1,9
terms 35:11,12
  37:15 58:12
  65:21 77:3
  88:8 107:14
  141:12
  162:14
  178:17
Terry 4:21
  35:12 42:17
  42:20,21,22
  45:10,14
  47:12,13,15
  47:16 48:2
  58:6,11,11
  59:2,11,14
  61:10 65:23
  66:8,12,16

67:3,12 70:16
70:20,21
71:10,22 72:6
72:17 73:8
75:14 96:21
97:5 98:8
99:7 100:1
103:9,14
108:5 121:4
124:4 125:2
126:1,18
127:19
129:19,20,21
132:11 133:7
134:19
135:18 143:4
161:11
Terry's 96:22
  129:15
test 55:23
  67:18 71:11
  71:14 84:2
  91:6,11 101:6
  102:17
  105:18 107:7
  107:10 108:8
  110:23 111:4
  111:7 112:7
  113:7,10
  114:9,17
  115:19 116:1
  117:8,13
  122:4 126:11
  130:15 136:6
testified 5:15
  10:2
testifying
  136:10
testimony 10:5
  11:13,15
  64:18 115:22
testing 3:11,13
  16:3 21:1
  33:2 67:15,22

73:11 75:16
76:6 77:10
91:1 92:10,13
139:1,11,11
159:14 165:4
167:14,21,23
tests 74:18
Texas 18:22
  23:17
Thank 187:3
Thanks 69:23
  182:15
Thanksgiving
  112:17
thereto 2:16
thing 46:18
  50:10 66:15
  68:18 70:5
  170:22 181:9
things 36:15
  60:20 63:21
  63:22 89:22
  93:10 96:10
  99:1 119:18
  119:20
  131:16,18
  134:18 138:5
  169:15
  185:10
think 12:10
  27:4,9,10,11
  31:5 33:15,16
  34:4,8,12
  37:4 42:15,18
  43:2,22 47:14
  52:2,11,12,23
  53:1,11,22,23
  54:3 55:3,5
  56:3 58:2
  61:2,5 62:7,8
  65:9 66:3,5
  66:18 67:21
  72:8,13,21
  73:5,7 77:20

# FREEDOM COURT REPORTING

83:17 84:3,4
85:9,11 86:9
89:15,17
91:23 93:15
96:19 99:4,21
111:12
112:13 113:8
115:6 117:14
124:8,15
125:13
126:23 127:6
128:7 129:21
134:3,16,21
135:17
136:16
137:19 140:8
141:23 142:5
142:7 147:23
148:9 149:22
158:14 160:9
162:9 163:10
163:14
165:16 167:2
168:11,17
169:19
173:15,16
177:15 178:2
179:4 180:13
182:5,20
183:7,10
184:8,8
**thinking** 7:14
**third** 78:16
**Thirty-six** 8:14
**thoroughly**
135:8
**thought** 39:3
42:4 48:17
49:21 51:19
53:13,16,19
55:6 56:17
81:12 83:9,12
83:14 89:22
90:3 119:3

120:12 127:4
127:4 130:9
130:13
131:17 132:6
133:4 170:22
**thoughts** 132:5
**thousand** 34:9
34:10 172:7
**Thousands**
22:20,21
**three** 38:7
47:17 75:22
82:5 85:3
100:15,16
155:21
162:15
184:21
**three-fourths**
78:4
**Threlkeld** 4:23
**Tiffany** 4:23
**time** 2:14,14
6:16 7:18
22:13 24:9
28:10 29:21
29:22 34:4
39:6 45:5
46:4,14,16
47:2 48:6,11
48:17,23
49:16 54:19
55:1,2,13
58:17 61:1,7
61:10,21 62:8
62:10,12,16
66:2 82:23
85:4 89:5
94:10 98:2,3
101:13
109:15,18,22
115:5 118:4,5
120:22
122:21
123:17,20,21

135:21
142:13,17
143:8 151:8
154:10
155:19
158:20
159:23
163:13,15,20
165:15 167:9
168:9,18
172:6 174:13
175:8,15
176:1,12
179:20
183:23 184:7
184:19 185:1
185:5,5
188:15
**timely** 170:17
**times** 8:22
44:21 48:3
62:3 70:22
88:13,18 89:5
140:1 155:3
158:11,12
159:5 166:23
167:16
168:20
184:22 186:2
186:7,10
**title** 31:3,5
33:4
**today** 6:7 7:9
11:12,13
186:18
**told** 6:11 35:3
41:17 43:19
43:22 53:21
54:21 56:16
57:21 59:22
63:14 64:22
65:2 66:10,19
73:18 75:12
80:22 82:3

101:9 106:17
108:23
113:13,22
114:3 116:4
121:1,5,13,14
124:11,18
131:15 133:6
133:6 134:17
135:8,18,22
136:10,21
137:6 142:11
143:1 155:16
156:19
170:20 171:2
171:22
184:11,12
185:2,10
186:18
**tools** 111:13
**top** 87:17
167:3,17
**total** 38:7,8,10
62:13
**totally** 81:18
**town** 58:14
66:8,13
**training** 36:15
**transcript**
188:10,14
**trash** 125:11
125:14,18
**treat** 35:20
40:2 47:17
48:3,7,12,16
58:17,22
92:18
**treated** 47:23
138:7,11
139:16 166:5
166:9,13,18
166:21
169:20
**trial** 2:14
**tried** 108:21

**trigger** 82:20
82:22
**troubleshoot...**
16:3 20:23
**true** 188:13
**truth** 7:10
147:14 166:1
**try** 61:22 74:6
108:20,23
126:12 175:5
**trying** 27:9
93:15
**turn** 114:9
123:5,7
**turned** 134:12
186:5
**Turner** 25:21
**Turners** 26:16
**turning** 134:15
**turns** 106:10
**TV** 48:20
144:17
**twenty** 127:9
139:19
**twenty-eight**
34:9,10 172:7
**twice** 52:12
62:7,9,10,13
155:6 156:6
167:8 184:23
**two** 14:5,9 15:7
17:18 22:14
31:8 32:10
33:13 38:3,4
38:8,8,9 66:5
76:2 84:6
121:8 139:7,8
158:12
162:15
**two-week**
112:11,12,15
**type** 50:9,10,11
66:15 68:18
**types** 32:8

# FREEDOM COURT REPORTING

63:20
T-A-N-I-S-H...
9:12

**U**

U 1:12
uh-huh 6:5,17
6:23 7:4
10:16 13:22
14:18 24:1,3
26:2 29:19
ultimately
153:14
unacceptable
42:23
unavailable
74:15 184:3
understand
7:8,18,20
35:5 44:22
47:1,4 57:6
68:11 91:11
97:2,7 103:13
141:23 154:8
156:14 160:9
162:3,4
163:22
172:16
understanding
7:15
understood 8:1
45:15 97:16
101:22 102:4
102:20 103:1
161:14,22
underway
89:16
unemployed
150:23
unemployme...
23:5 147:10
147:15,16,17
148:12 149:6
150:12

174:18 175:1
175:10
unfair 127:5,7
138:2
United 1:1 4:1
14:21
unprofessional
81:20
update 103:7
upgrade 21:21
upset 95:9
use 44:19 45:3
46:2,16 52:3
52:6 61:12,12
121:2,15,16
121:19
143:17 144:1
Usual 5:16

**V**

vacation
112:11,13,15
113:14,19,23
114:19 115:2
116:11,20
117:5,18,21
117:23 118:6
118:9,11
119:2 129:5
130:16 131:2
132:8 134:11
134:13,14
176:21
vacuum 31:22
32:4 121:23
134:10
169:12,13
valves 106:3,5
106:14
variable 87:12
variety 99:2
various 21:3
21:19 23:19
79:7

vast 123:19
Venable 182:4
verbally 6:20
Victor 1:6,15
1:21 4:5 5:10
5:13 8:6
129:1 171:20
view 68:22
views 126:4
violated
141:17
visit 118:20
voice 41:13
43:8 95:13,14
132:16
volt 16:19
23:10,11
134:13
voltage 134:12
voluntarily
17:20,22
vs 1:8 4:7

**W**

wafer 23:21
waiting 149:16
waived 2:3,19
wake 177:6,7,8
walk 71:22
72:18
walked 72:3,21
walking 72:17
want 6:15 11:7
11:8 16:12
39:1 47:22
70:18 75:22
76:7 111:16
154:6 172:19
178:3 182:11
183:12,18
186:8
wanted 39:9
58:8 63:16
68:8 73:10

75:19 86:2
111:18,20
121:14,16
133:19 136:5
136:6 148:8
159:10
wanting 94:13
94:16
Warren 4:17
6:2
wasn't 34:21
39:4,5,8
46:21 55:6
56:17 66:23
69:6,6,10
75:21 76:18
76:19 77:5
84:14 98:3
101:12,15
103:4 122:10
122:13 123:3
127:20
128:12
133:22 139:6
145:1 160:7
161:6 162:11
176:9
watch 50:12,15
way 7:1 11:9
11:12 21:23
32:22 54:12
54:16 59:3,12
60:3 78:4
80:13 82:21
92:19 96:10
98:6 112:3,13
135:9 137:20
139:15 140:4
142:14 178:4
ways 90:2
weapons 16:4
Web 150:12
week 66:5
67:11 77:20

84:6 100:7
146:19,20,22
163:15 167:8
167:8
weekend 60:20
weekly 76:9
103:7
weeks 66:4
155:21
Wendy's 18:7
went 27:7,10
27:11,14,14
33:13 34:1
56:10 61:6
65:2 79:6
113:5 114:18
118:6 130:16
131:2 147:6
150:8 174:17
weren't 28:11
56:17 57:10
98:5 109:4
124:21
141:18 168:4
Wetumpka 5:3
we'll 29:15
59:9 136:17
136:18
we're 67:17
79:20 103:8
126:10 154:9
154:11
168:18
183:20
we've 55:4
183:11,11
white 51:19,20
51:21,22 63:2
78:21 138:4
141:15
152:14,20
166:9 169:21
wife 51:21,22
wires 116:15

# FREEDOM COURT REPORTING

Page 210

117:5 119:16
119:22 120:5
131:5,9
**wiring** 131:10
**withstand**
106:9,12,20
**witness** 2:3
5:10 154:7
156:9 180:19
**women** 64:21
**wondering**
94:19 152:15
**Woodland**
13:20,21 14:1
14:2,10 24:22
25:3,6,9 27:7
28:1
**word** 43:3 52:4
52:7 56:19,20
57:1,9 143:17
144:7,8,10
**words** 10:5
41:4,11,15
42:2 43:5,15
44:8,15 45:20
63:6 65:17
66:11 73:9
92:18 95:6,17
96:11 101:16
103:5 112:23
114:21
117:20
130:20,22
132:19
185:17
**work** 16:13,20
16:23 17:4
27:6,17 35:16
35:16 36:7,16
37:7 40:9
74:13 75:10
76:19 82:9,15
82:16,18 83:9
83:12,14,20

102:5,5
108:11,23
109:1 110:11
110:18
111:19,21,22
112:1,21
119:10 141:5
143:14
146:16,23
147:5,6
154:23 161:3
167:1,7 175:2
175:11
178:11
**worked** 18:6,7
18:14 23:15
23:17 126:8
128:14,15
139:5 143:15
154:22 157:2
160:11,13
167:6 176:13
**worker** 145:18
146:4
**working** 28:7
29:11 30:23
31:4,15 32:11
60:10 74:17
76:17 102:18
102:21 103:1
103:16 122:4
122:9,10,11
123:6 126:6
126:10 127:9
127:12,14
128:18 129:3
133:1 167:23
175:9
**workload** 36:4
**workplace**
43:8 44:11
47:23 58:4
63:21 99:2
143:11

**works** 157:2
**world** 102:8
**worry** 80:16
136:17
**wouldn't** 40:21
82:17 98:15
108:22 131:6
**Wright** 25:23
26:18
**write-up** 90:10
**writing** 159:3
**written** 91:19
139:21 140:2
**wrong** 81:12
106:3,4 120:1
**wrote** 78:21
87:22
**W-R-I-G-H-T**
26:1

___

**X**

**X** 3:2
**X-ray** 19:20
20:1,3,6

___

**Y**

yeah 12:16
17:3 25:17
32:3 35:5
39:11 41:23
56:5,8 59:8
62:6 86:8
93:19 107:1
137:18 142:8
143:23 146:7
148:4 164:11
171:18 179:5
181:16 182:7
182:13,14
**year** 14:14
21:16 23:23
49:3 146:1
**years** 15:1,7,21
17:18 23:23
**yell** 99:23

**yelled** 96:14
**yelling** 96:18
**yesterday**
11:10
**y'all** 31:19
50:18 54:23
55:22 78:16
78:21 79:1,5
79:6,11,23
81:6 111:6
114:13
167:10
178:16

___

**0**

**03** 28:2,2,4,8
29:5 49:4
179:2,6
**04** 67:20
100:10,12
163:17

___

**1**

**1** 3:8 29:7,15
129:6
**10:18** 5:9
**10:55** 87:3
**103** 3:20
**11th** 145:20,23
**18.65** 146:9,12
**19th** 113:19
**1970** 8:11,12
**1988** 14:16,18
**1991** 179:11
**1992** 9:6
**1997** 9:8
**1999** 15:19

___

**2**

**2** 1:17 3:9 4:14
5:8 8:11
69:17,21
**2:52** 187:5
**20** 104:6
**2003** 30:22

**2004** 49:5
86:18 89:12
104:7,14
129:6
**2005** 145:21
**2006** 1:19
187:6
**22nd** 116:8,16
**24** 187:6
**24th** 1:19
**2400** 4:18
**2411** 8:17
**28** 86:18 87:3
**28th** 80:1
88:11 101:18
103:3
**29** 3:8

___

**3**

**3** 3:12 79:14,20
**3:05-CV-1186**
1:5 4:4
**31** 101:4 104:7
104:14
**334** 118:18
**35203** 4:20
**36078** 1:19
4:15 5:9
**36117** 8:17

___

**4**

**4** 3:15 86:12
**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**
8:10

___

**5**

**5** 3:5,17 89:12
90:5,10
**5/5/04** 3:17
**5600** 8:16

___

**6**

**6** 3:20 101:2
103:21 104:2
104:13

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **6/28/04** 3:15<br>**69** 3:11 | | | | |
| **7** | | | | |
| **7:30** 129:11,12<br>**79** 3:14 | | | | |
| **8** | | | | |
| **8/31/04** 3:20<br>**86** 3:16<br>**863-4893**<br>  118:19<br>**88** 14:17 15:22 | | | | |
| **9** | | | | |
| **9:30** 60:10<br>**90** 3:19<br>**92** 179:11<br>**95** 15:22<br>**97** 180:3,3<br>**98** 180:3<br>**99** 16:17 17:2<br>  19:13 | | | | |