# FREEDOM COURT REPORTING

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  VICTOR SMITH,
6  Plaintiff,
7  versus            3:05-CV-1186-MEF
8  EURO-PRO MANAGEMENT
9  SERVICES, INC.,
10  Defendant.
11
12
13
14  * * * * * * * * * * * * *
15
16  DEPOSITION OF RALPH HUDNALL,
17  taken pursuant to stipulation and agreement
18  before Jackie Parham, Certified Shorthand
19  Reporter and Commissioner for the State of
20  Alabama at Large, in the law offices of Bowles
21  & Cottle, 2 South Dubois Street, Tallassee,
22  Alabama, on Wednesday, the 4th day of October,
23  2006, commencing at approximately 10:15 a.m.

**Page 2**

1  APPEARANCES
2
3  APPEARING ON BEHALF OF THE PLAINTIFF:
4  JOHN I. COTTLE, III, ESQUIRE
5  Bowles & Cottle
6  2 South Dubois Street
7  Tallassee, Alabama  36078
8
9  Also present:  Victor Smith
10
11
12  APPEARING ON BEHALF OF THE DEFENDANT:
13  WARREN B. LIGHTFOOT, ESQUIRE
14  Maynard, Cooper & Gale
15  1901 Sixth Avenue North
16  2400 AmSouth/Harbert Plaza
17  Birmingham, Alabama  35203
18
19
20  * * * * * * * * * * * * *
21
22
23

**Page 3**

1  STIPULATION
2  It is hereby stipulated and agreed by
3  and between counsel representing the parties
4  that the deposition of
5  RALPH HUDNALL
6  may be taken before Jackie Parham, Certified
7  Shorthand Reporter and Commissioner for the
8  State of Alabama at Large, without the
9  formality of a commission, and all formality
10  with respect to other procedural requirements
11  is waived; that objections to questions, other
12  than objections as to the form of the question,
13  need not be made at this time, but may be
14  reserved for a ruling at such time as the said
15  deposition may be offered in evidence or used
16  for any other purpose, by either party, as
17  provided for by the Federal Rules of Civil
18  Procedure.
19  It is further stipulated and agreed by
20  and between the parties hereto and the witness
21  that the signature of the witness to this
22  deposition is hereby not waived.
23

**Page 4**

1  INDEX
2
3  PX-1 (Notice of Depo) ................. 17
4  PX-2 (Responses and Requests for .... 20
5  Production)
6  PX-3 (Victor Smith's Resume') ........ 41
7  PX-4 (Position Description) .......... 41
8  PX-5 (Employee Evaluation) ........... 41
9  PX-6 (Evaluation of Victor Smith) .... 44
10  PX-7 (W-2 Forms) ..................... 46
11  PX-8 (List of Topics for ............ 46
12  Termination)
13  PX-9 (E-Mail Messages) ............... 47
14  PX-10 (Drawing) ...................... 107
15  PX-11 (Deductions Per Pay Period) ... 147
16  PX-12 (Memo Regarding Interim ...... 155
17  Personnel Policies)
18  PX-13 (Memo Regarding Performance .. 156
19  Review Policy)
20
21
22
23

1  (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1         RALPH HUDNALL,
2     The witness, after having first been
3   duly sworn to speak the truth, the whole truth,
4   and nothing but the truth, testified as follows:
5         EXAMINATION
6   BY MR. COTTLE:
7   Q.   Would you state your name, please?
8   A.   Full name?
9   Q.   Yes.
10  A.   Ralph Alexander Hudnall.
11  Q.   Spell your last name, please.
12  A.   H-u-d-n-a-l-l.
13  Q.   Mr. Hudnall, I'm John Cottle, and I
14     represent Victor Smith in this case.
15  A.   Yes, sir.
16  Q.   I'm going to ask you some questions today
17     about our case. Your answers will be
18     under oath. And do you understand what
19     that means?
20  A.   Yes, sir.
21  Q.   Now, if I ask you a question that you
22     don't understand or if it's garbled and
23     unclear, if you'll ask me to repeat it, I

Page 6

1     will do that. Okay?
2   A.   Okay.
3   Q.   Now, what is your address?
4   A.   812 McLure Avenue, M-c-L-u-r-e, Opelika,
5     Alabama.
6   Q.   And your date of birth?
7   A.   6/29/57. I'm sorry. Do you need a zip
8     code?
9   Q.   I'm sorry. What?
10  A.   Zip code on the address?
11      MR. LIGHTFOOT: He asked if you
12         needed his zip code.
13  Q.   No.
14  A.   Okay.
15  Q.   6/29 when?
16  A.   '57.
17  Q.   And what's your Social Security number?
18  A.   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.
19  Q.   Okay. Are you married, single?
20  A.   Married.
21  Q.   Okay. Does your wife live with you at the
22     McLure Road address?
23  A.   Yes, sir.

Page 7

1   Q.   Do you have any dependents?
2   A.   One.
3   Q.   A child?
4   A.   Yes, sir.
5   Q.   That lives with you?
6   A.   Yes, sir.
7   Q.   Okay. Do you have any relatives in Lee
8     County?
9   A.   No, sir.
10  Q.   What about your wife, does she have any
11     relatives in Lee County?
12  A.   I take that back. Our mother-in-law lives
13     with us. So, yes.
14  Q.   What is her name?
15  A.   Mother-in-law?
16  Q.   Yes.
17  A.   Lorraine Nehans (phonetic).
18  Q.   What is your wife's maiden name?
19  A.   Laura Lee Nehans.
20  Q.   Do you have any relatives that you know of
21     in the surrounding counties, either you or
22     your wife?
23  A.   No, sir.

Page 8

1   Q.   Are you from Lee County?
2   A.   No, sir.
3   Q.   Where are you from?
4   A.   Originally born?
5   Q.   Yes.
6   A.   Virginia.
7   Q.   Is that where you grew up, in Virginia?
8   A.   Yes, sir.
9   Q.   Where did you go to school? Let's start
10     with high school. Did you finish high
11     school?
12  A.   Yes, sir.
13  Q.   Where did you finish?
14  A.   Brookfield High School.
15  Q.   Where is that?
16  A.   Campbell County, Virginia. I guess the
17     zip there is -- Lynchburg is the actual
18     mailing address.
19  Q.   And did you go to school after that?
20  A.   No, sir, not in Virginia.
21  Q.   Okay. Did you go anywhere?
22  A.   I attended some trade school.
23  Q.   Where were they?

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

## Page 9

1  A.  El Paso, Texas.
2  Q.  **What kind of courses did you take in trade**
3       **schools?**
4  A.  It was for electronic engineering.
5  Q.  **Did you get a degree?**
6  A.  No, sir.
7  Q.  **Do you have any other schools that you've**
8       **been to?**
9  A.  No, sir.
10 Q.  **How long have you lived at 812 McLure?**
11 A.  I have to think.  I think three years.
12 Q.  **Where did you live before that?**
13 A.  Immediately?
14 Q.  **Yes.**
15 A.  It was also in Opelika.  I don't remember
16      the street number.  It was Elizabeth
17      Street in Opelika.
18 Q.  **How long did you live there?**
19 A.  Not quite six months.
20 Q.  **Where did you live before that?**
21 A.  I rented an apartment downtown Auburn.
22      Actually, there were two apartments near
23      the downtown Auburn area.  Gay Street, and

## Page 10

1       I forget the name of the other street.
2  Q.  **Okay.  How long did you live in downtown**
3       **Auburn?**
4  A.  Probably six -- No.  More than that.
5       Probably more like nine months.
6  Q.  **Okay.  Where did you live before that?**
7  A.  Petal, Mississippi, P-e-t-a-l.
8  Q.  **Okay.  And how long did you live in Petal,**
9       **Mississippi?**
10 A.  About seven years.
11 Q.  **And at each of those addresses we have**
12      **talked about, beginning in Petal,**
13      **Mississippi forward, was your wife with**
14      **you at each of those locations?**
15 A.  Yes, except for the rental properties.  We
16      were in the process of moving.
17 Q.  **How long have you been married?**
18      **(Off-the-Record discussion)**
19 A.  Twenty-five years.
20 Q.  **Twenty-five years?**
21 A.  Yes, sir.
22 Q.  **Where is your wife from?  Is she from**
23      **Alabama or Virginia?**

## Page 11

1  A.  No, sir.  Originally born in New Mexico.
2       She -- I guess she would claim El Paso.
3       She moved there when she was young.
4  Q.  **Okay.  To the best of your knowledge, do**
5       **you have any relatives in Alabama, other**
6       **than your mother-in-law?**
7  A.  No, sir.
8  Q.  **To the best of your knowledge, does your**
9       **wife have any relatives in Alabama?**
10 A.  No, sir.
11 Q.  **You work for a company called Euro-Pro**
12      **Management Services; is that correct?**
13 A.  Yes, sir, I believe so.
14 Q.  **What do you do for them?**
15 A.  I'm in charge of the testing, making sure
16      that the products are tested in a proper
17      manner.
18 Q.  **Let's talk about what Euro-Pro does.**
19 A.  Okay.
20 Q.  **What kind of business are they in?**
21 A.  We design and sell a variety of small home
22      appliances; vacuum cleaners, steam
23      cleaners, battery-charged sweepers,

## Page 12

1       kitchen products, you know, toaster ovens,
2       those type things.
3  Q.  **Do you actually manufacture those products**
4       **or just design them and have someone else**
5       **manufacture them?**
6  A.  We design them.  Someone else manufactures
7       them.
8  Q.  **Okay.  Now, the part of the company you**
9       **work in, what do you -- are you in design,**
10      **testing?**
11 A.  Testing.
12 Q.  **Can you tell me a little bit about what**
13      **your job description is at this time?**
14 A.  To ensure all Euro-Pro product is tested
15      in accordance with whatever applicable
16      standards apply to that product.
17 Q.  **Okay.  And how long have you been in that**
18      **position?**
19 A.  This position with Euro-Pro?
20 Q.  **Yes.**
21 A.  Three and a half years.
22 Q.  **Now, how long have you worked for**
23      **Euro-Pro?**

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  A.  Three and a half years.
2  Q.  So you've been in the same position?
3  A.  Yes, sir.
4  Q.  Who is your supervisor?
5  A.  Right now?
6  Q.  Yes.
7  A.  Chad Reese.
8  Q.  Chad Reese?
9  A.  Yes, sir.
10 Q.  Has he always been your supervisor since
11     you've been employed with Euro-Pro?
12 A.  No, sir.
13 Q.  Who else has supervised you?
14 A.  Terry Robertson.
15 Q.  All right.  Are both Chad Reese and Terry
16     Robertson still with Euro-Pro?
17 A.  No, sir.
18 Q.  Who is no longer with Euro-Pro?
19 A.  Mr. Robertson.
20 Q.  How long has he been gone from Euro-Pro?
21 A.  About six months.
22 Q.  And is that when your supervisor became
23     Chad Reese?

Page 14

1  A.  I believe so.  There was some -- a little
2     bit of flux in there with the change.
3     Mr. Robertson left.  He got a replacement.
4     The replacement had to figure out who was
5     going to report to who.  I believe Chad's
6     been my boss ever since Terry left.
7  Q.  Has Terry Robertson been replaced by Chad
8     Reese or by someone else?
9  A.  Someone else.
10 Q.  Okay.  Who else?  What's the name of the
11     person who replaced Terry Robertson?
12 A.  Yigal Offir, Y-i-g-a-l O-f-f-i-r.
13 Q.  Okay.  And Mr. Offir has been there about
14     six months?
15 A.  About.
16 Q.  Is he the person in charge of the Auburn
17     -- Is it Auburn or Opelika where this
18     facility is?
19 A.  It's in Auburn.
20 Q.  Is Mr. Offir in charge of the Auburn
21     facility?
22 A.  Yes, sir.
23 Q.  How many people are in the second tier of

Page 15

1     management under Mr. Offir?
2  A.  I don't completely know.
3  Q.  Well, would -- Chad Reese, I assume, would
4     be in that second tier?
5  A.  Yes, sir.
6  Q.  And where would you fall, in like the
7     third tier?
8  A.  Yes, sir.
9  Q.  Where did you work before you came to work
10     for Euro-Pro?
11 A.  Sunbeam Household Products.
12 Q.  Was that in Petal, Mississippi?
13 A.  Hattiesburg.
14 Q.  And what kind of things did you do for
15     Sunbeam Products?
16 A.  At the end of my tenure with Sunbeam?
17 Q.  Yeah.
18 A.  Same thing.
19 Q.  How long did you work for Sunbeam?
20 A.  Seven years.
21 Q.  Have you ever given a deposition before?
22 A.  No, sir.
23 Q.  Have you ever sued anyone before?

Page 16

1  A.  No, sir.
2  Q.  Have you ever been sued?
3  A.  Yes, sir.
4  Q.  Tell me about that.
5  A.  I had just moved to the Hattiesburg area.
6     A rainy night.  I was driving down the
7     road.  A guy turned in front of me.  We
8     hit.  He sued me but -- Well, he sued me.
9  Q.  Okay.  That was about ten years ago?
10 A.  Something like that.  Yes, sir.
11 Q.  Car wreck case?
12 A.  Right.
13 Q.  That's the only time you've ever been
14     sued?
15 A.  To my knowledge, yes, sir.
16 Q.  Okay.  Have you ever been arrested or
17     charged with a criminal offense, other
18     than a traffic ticket?
19     MR. LIGHTFOOT:  You know what,
20        you don't need to answer
21        about arrested.  You can
22        answer as to convicted.
23 A.  Okay.  Yes.

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  Q.  Okay.  Tell me what that was for.
2  A.  I was involved in a DUI.
3  Q.  Anything else you've been convicted of?
4  A.  No, sir.
5  Q.  When was the DUI?
6  A.  Five years ago.
7  Q.  Was that in Mississippi or Alabama?
8  A.  Mississippi.
9         (Plaintiff's Exhibit 1 marked
10        for purposes of identification)
11 Q.  Mr. Hudnall, let me show you what I've
12     marked as Plaintiff's Exhibit 1.  This is
13     a deposition notice.  Have you seen that
14     document, sir, before today?
15 A.  I believe so.  Yes, sir.
16 Q.  It asks that you bring with you certain
17     things.  And it's possible that all that
18     I've asked for here has already been
19     produced.  But if you would look on the
20     third page of that document.  "The
21     complete personnel file of the plaintiff."
22     Do you have that with you or have I
23     already been given that?

Page 18

1  A.  I believe you've been provided that.
2  Q.  Okay.  "Documents reflecting any
3      complaints made by any supervisors or
4      co-employees of the plaintiff."  Is there
5      anything you have in response to that that
6      you have not already given me?
7  A.  No, sir.  Not that I've not already given
8      you.
9  Q.  Number 3.  "Copies of documents reflecting
10     or referencing any exit interview
11     conducted at or near the time the
12     plaintiff was terminated."  I have one
13     sheet of notes about that.
14 A.  Yes, sir.
15 Q.  Is there anything else you know of?
16 A.  Not that I know.
17 Q.  Number 4.  "All employee evaluations of
18     the plaintiff."  And I have one.  It's a
19     document several pages long.  But it
20     appears to be all the same evaluation.
21 A.  Okay.
22 Q.  Are there any others that you know of that
23     I don't have?

Page 19

1  A.  Not to my knowledge.  No, sir.
2  Q.  Number 5.  "All correspondence between the
3      plaintiff and defendant or any employee of
4      the defendant."  Do you have anything like
5      that that you've not already produced?
6  A.  No, sir.
7  Q.  "The personnel file of Ashley Sheffield."
8      That was produced with some things
9      redacted and omitted.  But you don't have
10     anything else on that today?
11 A.  No, sir.
12 Q.  The same with David Richards.  Any other
13     documents from that file did you bring
14     with you?
15 A.  No, sir.
16 Q.  I asked for the personnel file of the
17     person hired to replace the plaintiff.  Do
18     you have -- And I understand -- Actually,
19     you contend that no one was hired to
20     replace the plaintiff.
21 A.  That's correct.
22 Q.  But there was an individual hired around
23     the time the plaintiff was terminated by

Page 20

1      the name of Mr. Garrison, I think.  Did I
2      say that right?
3  A.  Garrison.  Yes, sir.
4  Q.  What is his --
5  A.  That's the correct pronunciation, I
6      believe.
7  Q.  What's his first name?
8  A.  Jeffrey.
9  Q.  Did you happen to bring his personnel file
10     with you?
11 A.  No, sir.  He was not hired to replace
12     anybody.  He was hired for a new position.
13        (Plaintiff's Exhibit 2 marked
14        for purposes of identification)
15 Q.  Let me show you what I've marked here as
16     Plaintiff's Exhibit 2.  And this is
17     Defendant's Responses to Plaintiff's First
18     Set of Interrogatories.  And I believe
19     you've signed those.  Would you just look
20     those over and tell me if you have read
21     that over and if that's your signature on
22     the last page?
23 A.  That's my signature.  Yes, sir.

5  (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 21

1  Q.  Okay.  Now, you read that over before you
2      signed it?
3  A.  Oh, yes, sir.
4  Q.  And are those answers correct and
5      truthful?
6  A.  I believe so.  Yes, sir.
7  Q.  Now, I want to ask you, Mr. Hudnall, about
8      some -- I guess these are affiliated
9      companies.  I don't know.  I'll get you to
10     tell me what you know about them.  Do you
11     know about a company by the name of
12     Euro-Pro Operating, L.L.C.?
13 A.  Yes, sir.
14 Q.  What do they do, and how are they
15     affiliated with Euro-Pro Management
16     Services?
17 A.  I honestly get confused myself.  So I
18     really couldn't -- I really can't say how
19     they are affiliated, which one owns the
20     other.  I'm confident I work for Euro-Pro
21     Management.  I don't know what the
22     affiliation is for Euro-Pro Operating.
23 Q.  Do you know what Euro-Pro Operating does

Page 22

1      different from Euro-Pro Management?
2  A.  No, sir.
3  Q.  Do you know anybody that works for
4      Euro-Pro Operating?
5  A.  I don't think so.
6  Q.  Okay.  Have you ever heard of a company
7      called Stan-Pro E.P. Corporation?
8  A.  Not in that specific name.
9  Q.  Have you heard of a company similar to
10     that?
11 A.  Stan-Ro.
12 Q.  Stan-Ro?
13 A.  Yes, sir.
14 Q.  Okay.  Tell me what you know about
15     Stan-Ro.
16 A.  Early on in our work -- in my work with
17     Mr. Robertson, we were receiving packages
18     under the name Stan-Ro.  Eventually we
19     settled on Euro-Pro.  And then there came
20     the Operating and Management, and I never
21     understood which was which.
22 Q.  Okay.  Do you know anybody that works for
23     Stan-Ro Corporation?

Page 23

1  A.  Do I know anybody?  I'd say no, sir.  I
2      could probably make guesses, but I'd
3      really rather not.
4  Q.  You don't know the relationship of any of
5      these companies and how they all fit
6      together?
7  A.  Not specifically.  Correct.
8  Q.  But is it correct to say, that as to the
9      Auburn facility where you work now and
10     where Mr. Victor Smith used to work, that
11     everyone in that facility is an employee
12     of Euro-Pro Management Services, Inc.?
13 A.  I believe so.  Yes.
14 Q.  Do you know if Euro-Pro Management
15     Services -- it's not a publicly traded
16     company, is it?
17 A.  That's correct.  It's not.
18 Q.  It's privately owned?
19 A.  Yes, sir.
20 Q.  Do you know who owns it?
21 A.  The family that owns it is Rosenzweig.  I
22     don't know now what percentage they own.
23     There are other investors.

Page 24

1  Q.  Okay.  These other companies that we've
2      talked about that I just named, do you
3      know if any of them are involved in any
4      business, other than the business that
5      Euro-Pro Management is involved in?
6  A.  No, sir, I don't.
7  Q.  Where are the headquarters of Euro-Pro?
8      And let me say this:  I'm going to use the
9      term "Euro-Pro" to mean the company that
10     you work for.
11 A.  Okay.  Very good.
12 Q.  And if I -- I want to -- I don't think I'm
13     coming back to any of these other
14     companies.  If I do, I'll specify.  So if
15     I say "Euro-Pro," we're talking about the
16     company you work for now and that
17     Mr. Smith used to work for.
18 A.  Very good.
19 Q.  Okay.  Now, where is the headquarters of
20     Euro-Pro?
21 A.  I would say Boston.
22 Q.  Do you know how many different plants or
23     facilities Euro-Pro has around the

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1     country?
2  A.  Around the U.S.?
3  Q.  Yes.
4  A.  I know of two.
5  Q.  All right. Where are they?
6  A.  Boston and Alabama.
7  Q.  Okay. And the one in Alabama is the one
8     in Auburn?
9  A.  Correct.
10 Q.  That's the only one in Alabama?
11 A.  Yes, sir, to my knowledge.
12 Q.  And then there's one in Boston?
13 A.  Yes, sir.
14 Q.  Does it do essentially the same thing that
15    the Auburn plant does?
16 A.  The marketing and sales group, as well as
17    the president, those people stay in
18    Boston.
19 Q.  Okay. Do they do design and testing of
20    products?
21 A.  No, sir.
22 Q.  That's just the management; that's the
23    corporate headquarters, I guess?

Page 26

1  A.  Correct.
2  Q.  So all of the design and testing of the
3     products is done at the Auburn facility;
4     is that correct?
5  A.  No.
6  Q.  Okay. Where else would there be design
7     and testing done?
8  A.  I believe -- Well, I know there's some
9     done in Montreal. And that's all --
10    that's all the company owns is down in
11    Montreal.
12 Q.  Okay. I think I got confused. You
13    limited your answer to the U.S., which I
14    think is what I asked you.
15 A.  Oh, yes, sir.
16 Q.  So you do have a facility in Montreal?
17 A.  Yes, sir.
18 Q.  Is there anywhere else in the world that
19    you know of that Euro-Pro has a facility
20    other than Boston, Montreal and Auburn?
21 A.  We have offices in China.
22 Q.  Okay.
23 A.  Hong Kong and China.

Page 27

1  Q.  Okay. How many people are employed in the
2     Auburn facility?
3  A.  Today?
4  Q.  Yes.
5  A.  I'm guessing twenty.
6  Q.  At the time Victor Smith was hired, which
7     was in December of '03, about how many
8     people worked there at that time?
9  A.  When he first came to us?
10 Q.  Yes.
11 A.  When he first came to us. Okay. I think
12    seven, maybe eight.
13 Q.  At the time Victor Smith was terminated,
14    which was in December of '04,
15    approximately how many people worked at
16    the Auburn plant?
17 A.  I think maybe fifteen.
18 Q.  Could you tell me how many tiers or levels
19    of authority there are at the plant? I
20    mean, you've got one person who's the
21    manager of that facility.
22 A.  Right.
23 Q.  How many different tiers or levels of

Page 28

1     authority are there below the plant
2     manager?
3  A.  Now?
4  Q.  Yes.
5  A.  At our facility itself?
6  Q.  Yes.
7  A.  I think two.
8  Q.  Is there a position called lab technician?
9  A.  Yes.
10 Q.  Where does that fall in the hierarchy?
11 A.  It would be the second level.
12 Q.  The lowest level?
13 A.  The technician level would be the lowest
14    level. But within that level are various
15    levels of technicians.
16 Q.  Okay. How many levels of lab tech are
17    there?
18 A.  We allow for three.
19 Q.  Okay. What are the various jobs -- I
20    mean, we're only talking fifteen to twenty
21    people. What are the various job
22    descriptions -- not job descriptions --
23    but job titles of the people who work in

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1  that plant?
2  A.  The specific titles?
3  Q.  Yeah.
4  A.  There are lab techs. There are -- those
5      guys are called lab techs as well and then
6      we have project managers.
7  Q.  Are the project managers over the lab
8      techs?
9  A.  Correct.
10 Q.  Do you have engineers?
11 A.  Those are project managers.
12 Q.  Okay. How many engineers do you have now?
13 A.  Right now?
14 Q.  Yes.
15 A.  Let me go around the room. Four.
16 Q.  How many lab techs do you have now?
17 A.  Three.
18 Q.  What are the other positions?
19 A.  There are non-supervisory test engineers.
20     That would be the only other positions.
21     Plus an office manager.
22 Q.  How many non-supervisory test engineers
23     are there?

Page 30

1  A.  Probably three or four. Probably three.
2  Q.  So that's four engineers, three lab techs,
3      three or four non-supervisory test
4      engineers. That's got us up to ten or
5      eleven. What do the other people do?
6  A.  I've got to go around the room again. All
7      right. I said four engineers?
8  Q.  Yeah.
9  A.  All right. Let me count them off in my
10     mind. I've got him. I'm sorry. There's
11     five actual engineers.
12 Q.  Okay.
13 A.  Five techs. Forgot a couple. I guess
14     it's less than I thought it was. A few
15     people have left in the last couple of
16     weeks. Well, I'll say the last few weeks.
17     Five engineers, five lab techs, three test
18     engineers, and the office manager. That's
19     the group.
20 Q.  Okay. The office manager is --
21 A.  Actually, we call her office manager.
22     She's in charge of making sure we have
23     pens and pencils and paper. If we need

Page 31

1  something shipped, she ships it. She
2  answers the phone and that kind of thing.
3  Q.  Keeps things on track?
4  A.  Right.
5  Q.  And then you have some supervisory
6      personnel? Mr. Offir?
7  A.  He lives in Boston.
8  Q.  Oh, okay. Where do you fall into this
9      hierarchy, Mr. Hudnall?
10 A.  I consider myself a test engineer.
11 Q.  Now, what is the difference in the
12     non-supervisory test engineers and the
13     engineers?
14 A.  The engineer is a project manager. He
15     would have the entire property. If we
16     were trying to make a court reporter
17     machine or something like that, he would
18     be responsible for everything that goes on
19     to make that machine work, from soup to
20     nuts, to say, starting with the concept,
21     finishing with the product, coming out of
22     the factory door onto a shelf so you can
23     buy it. The non-supervisory test

Page 32

1  engineers would be an engineer who is then
2  required for -- required to conduct the
3  test that we made on the machine itself.
4  Q.  Okay. But the non-supervisory test
5      engineers are licensed engineers?
6  A.  I'm not -- I don't understand the term
7      "licensed engineer." They would have gone
8      to school, have a four-year degree, some
9      sort of certification saying that.
10 Q.  All right. Other than maybe secretarial
11     positions, are there any other positions
12     at that Auburn plant?
13 A.  We do have right now two temporary people
14     working in the Cleanability Group.
15 Q.  Cleanability?
16 A.  To test the performance of vacuum
17     cleaners. We have a couple of temps in
18     that group.
19 Q.  Are they working more or less as lab
20     technicians?
21 A.  More or less.
22 Q.  When did Euro-Pro open the Auburn
23     facility?

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1　A.　I don't know specifically. It would have
2　　　been sometime in '02.
3　Q.　Were you there when it opened?
4　A.　No, sir. Let me --
5　Q.　Go ahead.
6　A.　No, sir. The organization was started in
7　　　Auburn when I came on board.
8　Q.　Okay. Were you on board with the
9　　　organization when Victor Smith was hired?
10　A.　Yes, sir.
11　Q.　Do you remember when he was hired?
12　A.　I don't remember specifically. He would
13　　　have come -- he came to us as a temp. It
14　　　would have been sometime --
15　Q.　Does December of '03 sound correct?
16　A.　That's when we hired him full-time.
17　　　That's when we hired him permanently.
18　　　Yes, sir.
19　Q.　He came there first as a temp?
20　A.　Yes, sir.
21　Q.　And that was through some employment
22　　　agency?
23　A.　That's correct.

Page 34

1　Q.　Is there one that Euro-Pro regularly uses?
2　A.　It would either have been A-1 or
3　　　Employment Resources. Those are the two
4　　　we typically use.
5　Q.　Is that typically how Euro-Pro hires
6　　　people?
7　A.　Well, for the Auburn facility, that's how
8　　　we found our local help.
9　Q.　What position was Victor Smith hired at?
10　A.　I forget the exact title. He would have
11　　　been hired as a lead tech -- some sort of
12　　　a lead tech for the Cleanability Group
13　　　when he was permanently hired.
14　Q.　Cleanability is dealing in vacuum
15　　　cleaners?
16　A.　Vacuum cleaner performance.
17　Q.　And that would have been when he came to
18　　　you as a temp?
19　A.　No, sir. As a temp he was -- I'm sorry.
20　　　As a temp he came in working the vacuum
21　　　cleaner performance as a tech -- lab tech
22　　　for vacuum cleaner performance.
23　Q.　When he was hired as a regular employee in

Page 35

1　　　December of '03, did his job duties change
2　　　any at that time?
3　A.　Yes, sir.
4　Q.　And how did they change?
5　A.　We asked him to go to second shift. We
6　　　had a lot of work to get done. We needed
7　　　to run two shifts. In order to continue
8　　　to run a second shift, we needed a
9　　　permanent person on board at the second
10　　　shift location. It was either going to be
11　　　me or somebody else. We thought of hiring
12　　　Victor, once we saw his resume', his skill
13　　　levels. We thought this would be a good
14　　　pick from the group we had to run our
15　　　second shift. So we offered him a second
16　　　shift job.
17　　　　He was responsible for scheduling the
18　　　work that had to be done for second and
19　　　first shift. He was responsible to make
20　　　sure that we had plenty of -- plenty of
21　　　things to work with, sand, dirt -- you've
22　　　got to put something down to vacuum it up
23　　　-- plenty of that stuff to work with so we

Page 36

1　　　could continue to do the testing that
2　　　needed to be done.
3　Q.　Well, do I understand that when he was
4　　　hired in December of '03, that he was
5　　　placed in charge of the second shift?
6　A.　He was responsible to make sure the second
7　　　shift was getting the work done that
8　　　needed to be done, as well as scheduling
9　　　the work for the next shift the next day.
10　Q.　So did he have any supervisory authority
11　　　in that position?
12　A.　Some.
13　Q.　Can you explain that?
14　A.　He was not authorized to give people time
15　　　off or not authorized to make any kind of
16　　　changes as far as schedule goes, things
17　　　like that. But he was looked at as the
18　　　lead for the entire group. In that lead
19　　　role you're looked at -- well, you're the
20　　　leader of the group.
21　Q.　How many people worked on that second
22　　　shift?
23　A.　On the second shift?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  Q.  Yes.
2  A.  I think it was Victor and one other guy.
3  Q.  The other guy, he was not an engineer?
4  A.  No, sir.
5  Q.  Now, when did Victor go to the second
6      shift?
7  A.  December of '03.
8  Q.  Did he work on the second shift the whole
9      time he was there?
10 A.  That he was at Euro-Pro.
11 Q.  Yes.
12 A.  No, sir.
13 Q.  When did he move to the first shift?
14 A.  It was sometime in the spring of '03, if I
15     remember right.
16 Q.  Spring of '04?
17 A.  I'm sorry. You're right. '04.
18 Q.  That's okay.
19 A.  If I remember right, one or two guys
20     either were going back to school or were
21     leaving for one reason or another. The
22     volume of work had been accomplished. We
23     didn't see a need to have a second shift

Page 38

1  anymore. So we eliminated the second
2  shift and brought everybody to first. And
3  then we offered Victor another
4  opportunity.
5  Q.  When Victor was hired, do you remember
6      what his pay was?
7  A.  Hired full-time?
8  Q.  Yeah.
9  A.  I don't recall. I think it was around
10     28,000 a year.
11 Q.  And who made the decision to hire Victor?
12 A.  Terry Robertson.
13 Q.  I don't remember if I asked you this or
14     not. But do you know where Terry
15     Robertson is now?
16 A.  I know he lives in Colorado. I don't know
17     if -- Right this minute, I don't know if
18     he's in Colorado or traveling. His job
19     normally requires traveling.
20 Q.  Do you know who he works for?
21 A.  No, sir.
22 Q.  Do you know what he does?
23 A.  No, sir.

Page 39

1  Q.  How do you know his job normally requires
2      travel?
3  A.  Fair point. The job with Euro-Pro
4      required plenty of travel. I assume that
5      he still travels.
6  Q.  Do you know why he left Euro-Pro?
7  A.  No, sir.
8  Q.  Do you know if he was terminated or if he
9      left on his own?
10 A.  I have no idea.
11 Q.  Do you know how to get in touch with him?
12 A.  Me directly?
13 Q.  Yes.
14 A.  No, sir.
15 Q.  Do you know indirectly how to get in touch
16     with him?
17 A.  I don't know. I may -- I may be able to
18     somehow get a message to him, but I don't
19     have a direct way.
20 Q.  Do you know if he has an e-mail address?
21 A.  No, sir, I don't know.
22 Q.  Do you have a phone number?
23 A.  No, sir.

Page 40

1  Q.  If you were going to try to get a message
2      to Terry Robertson, how would you do it?
3  A.  I think his sons still live in Auburn. I
4      would try to find them.
5  Q.  Do you know what their names are?
6  A.  Oh, gosh. I don't remember.
7  Q.  Do you know what part of Colorado he lives
8      in?
9  A.  No, sir.
10 Q.  Have you talked to him since he left
11     Euro-Pro?
12 A.  We did speak briefly here. He was here
13     for Victor's deposition.
14 Q.  Had he left Euro-Pro at that time?
15 A.  Yes, sir.
16 Q.  Let me ask you about how personnel records
17     are kept at the Euro-Pro facility in
18     Auburn. Does every employee have a file
19     into which goes all of the information
20     about that employee?
21 A.  I don't know.
22 Q.  Have you looked at Victor Smith's
23     personnel file before this deposition.

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1   A.   Yes, sir.
2             (Plaintiff's Exhibit 3 marked
3             for purposes of identification)
4   Q.   **Let me show you Plaintiff's Exhibit 3.**
5        **What is that, please, sir?**
6   A.   It looks like Victor's resume'.
7   Q.   **Would that be in his personnel file?**
8   A.   Yes, sir.
9             (Plaintiff's Exhibit 4 marked
10            for purposes of identification)
11  Q.   **Let me show you Plaintiff's Exhibit 4.**
12       **What is that, please, sir?**
13  A.   The Position Description for Victor.
14  Q.   **And would that be in his personnel file?**
15  A.   Yes, sir.
16  Q.   **That's a job description of lab tech?**
17  A.   When we first hired Victor.  Yes, sir.
18  Q.   **Is that the position he held when he was**
19       **terminated?**
20  A.   I don't remember.
21            (Plaintiff's Exhibit 5 marked
22            for purposes of identification)
23  Q.   **Let me show you what I've marked as**

Page 42

1        **Plaintiff's Exhibit 5.  Can you identify**
2        **that for me, please?**
3   A.   This would be an evaluation of Victor
4        given by me.
5   Q.   **If you don't mind, could you flip through**
6        **all the pages and tell me -- I just want**
7        **you to confirm that all of those pages are**
8        **part of the same evaluation.**
9   A.   I believe so.  Yes, sir.
10  Q.   **Okay.  Is that, to your knowledge, the**
11       **only evaluation that Victor ever received**
12       **while he was employed with Euro-Pro?**
13  A.   The only formal one.  Yes, sir.
14  Q.   **What is the policy about evaluating**
15       **employees?**
16  A.   I'm not sure if I understand your
17       question.
18  Q.   **How does Euro-Pro typically evaluate lab**
19       **technicians?**
20            MR. LIGHTFOOT:  I object to the
21            extent the form speaks for
22            itself.  You certainly can
23            answer otherwise.

Page 43

1   A.   Typically, on an annual basis, we give
2        them a formal evaluation.  At the same
3        time we try to talk to them all along the
4        way to make sure that they don't get too
5        far off track in what they're trying to
6        get done and making sure they keep their
7        goals in line with the company.
8   Q.   **So there is a formal evaluation done**
9        **annually?**
10  A.   Yes, sir.  At least annually.
11  Q.   **At least annually?**
12  A.   Yes, sir.
13  Q.   **And as a result of that formal evaluation,**
14       **do you generate this written report that**
15       **you have there, Plaintiff's Exhibit 5?**
16  A.   Yes, sir.
17  Q.   **So there would be one of those reports on**
18       **each employee if they had been there a**
19       **year?**
20  A.   I would think so.
21  Q.   **Should be?**
22  A.   Should be.
23  Q.   **Is there any other method of conducting a**

Page 44

1        formal evaluation of Euro-Pro employees,
2        other than what is reflected by these
3        forms?
4   A.   A formal evaluation?
5   Q.   **Yes.**
6   A.   No, sir.  Not to my knowledge.
7   Q.   **Now, I understand that if we're talking**
8        **about informal evaluations, that that**
9        **could be said to be done every day.**
10  A.   Sure.
11  Q.   **But is there any kind of routine,**
12       **periodic, informal evaluation that is done**
13       **with employees?**
14  A.   Not to my knowledge.  No, sir.
15  Q.   **Plaintiff's Exhibit 5, that would be a**
16       **part of Victor's personnel file, correct?**
17  A.   Yes, sir.
18            (Plaintiff's Exhibit 6 marked
19            for purposes of identification)
20  Q.   **Plaintiff's Exhibit 6, what is that?**
21  A.   It looks like a piece -- well, it could be
22       an entire piece of an evaluation, but it almost looks
23       like a piece of an evaluation.  We

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1   certainly talk about what is needed and
2   how he can improve. These are types of
3   things you talk about in an evaluation
4   process.
5   Q.   Is that an evaluation you did?
6   A.   Yes, sir.
7   Q.   Is that a part of the evaluation reflected
8        by Plaintiff's Exhibit 5?
9   A.   No, sir, I wouldn't think so. No, sir.
10  Q.   Okay. Those were done at different times?
11  A.   Correct.
12  Q.   All right. Which one was done first?
13  A.   This shorter one.
14  Q.   Plaintiff's Exhibit 6?
15  A.   Yes, sir.
16  Q.   And what's the date of that?
17  A.   May 5th of '04.
18  Q.   And you did that?
19  A.   Yes, sir.
20  Q.   And then the next evaluation as shown by
21       Plaintiff's Exhibit 5, what's the date of
22       that?
23  A.   August 27th of '04.

Page 46

1   Q.   And you did that one as well?
2   A.   Yes, sir.
3   Q.   All right.
4            (Plaintiff's Exhibit 7 marked
5            for purposes of identification)
6   Q.   I've marked as Plaintiff's Exhibit 7 a
7        couple of W-2 forms showing Victor's wages
8        with Euro-Pro for 2003 and 2004. Is that
9        what those documents appear to be to you?
10  A.   Yes, sir. I believe so.
11  Q.   Would they be a part of his personnel
12       file?
13  A.   I don't know.
14           (Plaintiff's Exhibit 8 marked
15           for purposes of identification)
16  Q.   Okay. Let me show you Plaintiff's Exhibit
17       8. Do you know what that is?
18  A.   Yes, sir.
19  Q.   What is that?
20  A.   I believe it's the -- it's the list of
21       things Mr. Robertson was going to discuss
22       with Victor on the day that Victor was
23       terminated.

Page 47

1   Q.   Do you know who prepared that document?
2   A.   Not specifically, no, sir.
3   Q.   Do you know if it was prepared before or
4        after Mr. Robertson had his discussion
5        with Victor in which he terminated him?
6   A.   I don't know.
7   Q.   Have you ever seen that document before?
8   A.   Yes, sir.
9   Q.   Is that document a part of Victor's
10       personnel file?
11  A.   I'm not sure. It seems like it should be,
12       but I'm not sure.
13           (Plaintiff's Exhibit 9 marked
14           for purposes of identification)
15  Q.   Plaintiff's Exhibit 9, this is some e-mail
16       messages back and forth between Victor and
17       Chad, I guess Chad Reese; is that correct?
18  A.   Yes, sir.
19  Q.   Is that something you have seen before?
20  A.   Yes, sir.
21  Q.   Is that a part of Victor's personnel file?
22  A.   I don't know.
23  Q.   Are there any other documents that should

Page 48

1        be in his personnel file that you know of?
2   A.   I don't know.
3   Q.   Do you know if there are files where
4        employee records are kept other than the
5        personnel file?
6   A.   I don't know, sir.
7   Q.   If an employee violates a company policy
8        and some kind of disciplinary action is
9        going to be taken, how is that handled?
10  A.   Each engineer -- I take that back. Each
11       project manager has their own group of
12       people. They handle their own issues
13       themselves.
14  Q.   Is there a process whereby an employee may
15       be formally reprimanded or suspended
16       without pay, suspended with pay, that sort
17       of thing?
18  A.   I don't know.
19  Q.   Have you ever known of an employee to be
20       reprimanded where a notice of that
21       reprimand was placed in the personnel
22       file?
23  A.   While at Euro-Pro?

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## Page 49

1  Q.  Yes.
2  A.  I don't recall.  No, sir.
3  Q.  At any rate, is it correct to say that
4     there are no reprimands or other
5     documented indications of misconduct by
6     Victor Smith in his personnel file?
7        MR. LIGHTFOOT:  Object to the
8           form.  Object to the
9           characterization.  You can
10          answer if you can.
11 A.  We had some issues.  I would think they
12    would be part of his file.
13 Q.  Do you have the documentation that's in
14    his file that reflects what those issues
15    are and how they were handled?
16       MR. LIGHTFOOT:  Objection, to the
17          extent it's already been
18          asked and answered.  But go
19          ahead.
20 A.  I'm sorry.  Can you ask it again?
21 Q.  Yeah.  I'm interested to see any documents
22    that reflect misconduct by Victor Smith
23    while an employee at Euro-Pro, whether it

## Page 50

1     be a written reprimand or any other
2     document.
3  A.  I would have thought we would have
4     provided them.
5  Q.  All right.  All I have is that exit
6     interview.  Is there anything else you
7     know of that exists?
8        MR. LIGHTFOOT:  Let me know if
9           you want me to help.
10       MR. COTTLE:  Sure.  Go ahead.  If
11          y'all have something else.
12       MR. LIGHTFOOT:  There's not.
13          There are performance issues
14          raised in the evaluations.
15          There's no formal reprimand.
16          There's a written reprimand,
17          if that's what you're
18          asking.  And, Ralph, you can
19          confirm that for him.  I'm
20          not aware of any.
21 A.  Then, no.
22 Q.  And I'm not trying to trick you.  I just
23    don't want something to come up later.

## Page 51

1  A.  Absolutely.
2        MR. LIGHTFOOT:  Right.
3  Q.  Now, I want to just follow up with one
4     more question along these lines.
5  A.  Sure.
6  Q.  Is it the practice and procedure of
7     Euro-Pro to place a written -- I'm going
8     to use the word "reprimand," but I don't
9     want -- I don't want that to be a limited
10    word.  By "reprimand," I'm meaning any
11    kind of written -- whether it's a
12    handwritten note, typed piece of paper,
13    any kind of notation put in the file to
14    indicate employee misconduct or violation
15    of policy.  Is that typical for Euro-Pro
16    to place something in the employee's file
17    when a violation of policy occurs?
18       MR. LIGHTFOOT:  Let me just
19          qualify that.  As of 2004,
20          right?  I mean, that's what
21          you're asking?
22 Q.  During the time period from December of
23    '03 to December of '04, was that the

## Page 52

1     policy and practice of Euro-Pro, to place
2     some sort of document in an employee's
3     file if they violated a policy?
4  A.  Not that I'm aware of.
5  Q.  Okay.  Is it now the policy of Euro-Pro to
6     do that?
7  A.  Again, I don't know.
8  Q.  Have you ever known an employee that got,
9     quote, written up for some violation of
10    policy or misconduct?
11 A.  No, sir.
12 Q.  These evaluations that you do, such is
13    shown in Plaintiff's Exhibit 5, what are
14    they used for?
15 A.  It's a tool to help management and the
16    employee understand where they are with
17    respect to how -- performing the company's
18    goals, helping getting the employee
19    aligned with the company's goals so they
20    can become a better employee.
21 Q.  Would they be used in determining who got
22    a raise, who got a bonus, et cetera?
23 A.  It could have some effect on that.  Yes,

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1   sir.
2   Q.   And how many people were you responsible
3        for evaluating?
4   A.   At this time?
5   Q.   In 2003, 2004.
6   A.   I think five.  There may have been more,
7        but I think it was five.
8   Q.   When Victor began working for Euro-Pro,
9        who was his supervisor?
10  A.   I was.
11  Q.   Did you remain his supervisor throughout
12       his tenure there?
13  A.   Yes, sir.
14  Q.   Who were the other lab techs?
15  A.   James Pierce, Ashley Sheffield, Andres
16       Simon, and later on David Richards, and of
17       course Victor.
18  Q.   David?
19  A.   Richards.
20  Q.   Richards?
21  A.   Yes, sir.
22  Q.   Are any of these people still employees of
23       Euro-Pro?

Page 54

1   A.   David Richards is.
2   Q.   Have all of the others, James Pierce,
3        Ashley Sheffield, Andres Simon, have they
4        left the employment of Euro-Pro?
5   A.   Yes, sir.
6   Q.   When did Ashley Sheffield leave the
7        employment of Euro-Pro?
8   A.   Within the last couple of weeks.
9   Q.   Was she terminated, or did she leave
10       voluntarily?
11  A.   She left voluntarily.
12  Q.   Of the project managers in 2003, 2004,
13       what was the racial make-up of the project
14       managers?
15  A.   Pardon?
16  Q.   The racial make-up.
17  A.   They were all white.
18  Q.   What about in, again, the time period
19       2003, 2004, what was the racial make-up of
20       the lab technicians?
21  A.   I did forget one.
22  Q.   Okay.
23  A.   Duvell Robinson.

Page 55

1   Q.   Duvell?
2   A.   Robinson.  Lab tech.
3   Q.   Okay.  When was Duvell Robinson an
4        employee?
5   A.   I don't remember when he was hired
6        permanently.  I don't know specifically
7        when he was hired temporarily.  I would
8        think somewhere mid-2004 -- I'm sorry,
9        mid-2003 hired temporarily and sometime
10       after that hired permanently.
11  Q.   Okay.  Is Duvell Robinson black?
12  A.   Yes, sir.
13  Q.   What about the other lab techs that you
14       named, are any of them black?
15  A.   No, sir.
16  Q.   Are they all white?
17  A.   I don't know how you would characterize
18       somebody from Hungary.  I guess white.
19       But everybody else is.
20  Q.   If you would, Mr. Hudnall, look at
21       Plaintiff's Exhibit -- I think it's
22       Plaintiff's 6.  This was done by you?
23  A.   Yes, sir.

Page 56

1   Q.   You reviewed this with Victor?
2   A.   Yes, sir.
3   Q.   And you both signed it in May of 2004?
4   A.   Correct.
5   Q.   Now, at this time Victor would have been
6        there roughly six months, right?
7   A.   More or less.  Yes, sir.
8   Q.   Did you prepare this?
9   A.   Yes, sir.
10  Q.   And this was the first formal evaluation
11       you had done of Victor Smith?
12           MR. LIGHTFOOT:  Objection.  I
13             think he testified this was
14             more informal.
15           THE WITNESS:  Right.
16           MR. LIGHTFOOT:  Go ahead.
17  Q.   Okay.  Well, written evaluation.
18  A.   Okay.  Yes.
19  Q.   And at that time it was your opinion that
20       he eagerly takes on new responsibilities?
21  A.   Yes, sir.
22  Q.   Help to develop and assemble new Life test
23       setups?

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  A.  Yes, sir.
2  Q.  **He demonstrated the ability to complete**
3      **assigned tasks?**
4  A.  Yes, sir.
5  Q.  **It says -- I'm not going to go down**
6      **through all these, but I'm just going to**
7      **pick out a few of them. And if there's**
8      **something more you want to add about this**
9      **that you remember, I'd like for you to**
10     **comment. But you indicate that he seeks**
11     **help when needed and is able to use the**
12     **information to complete testing**
13     **requirements. Are those your words?**
14 A.  Yes, sir.
15 Q.  **And he had shown the ability to take**
16     **assigned tasks to the next level of work.**
17 A.  He was starting to show that. Yes, sir.
18 Q.  **And then you've got a list of things where**
19     **he can improve?**
20 A.  Correct.
21 Q.  **And goals to meet?**
22 A.  (Witness nods head in the affirmative).
23 Q.  **And I see in here there's one -- I want to**

Page 58

1      go down to the paragraph labeled
2      "Interaction with Co-workers." **When**
3      **communicating with Cleanability crew, make**
4      **sure you address them as peers and with**
5      **respect. Take time to speak carefully and**
6      **in a level tone. Make sure to listen**
7      **fully and then answer. Put yourself in**
8      **their shoes.**
9          **Is there some -- was there some**
10     **incident or series of incidents which**
11     **caused you to include this observation**
12     **into this evaluation?**
13 A.  Yes, sir.
14 Q.  **What was that?**
15 A.  We had been getting some complaints about
16     Victor not respecting his peers,
17     respecting the people that worked for him,
18     if you could say they worked for him. It
19     was just a general tone. There was one
20     specific instance that -- the way it was
21     reported to me, a near fight broke out. I
22     wanted to make sure that we covered that;
23     that we don't allow that kind of stuff in

Page 59

1      -- You know, obviously, physical
2      confrontations cannot go on. And as well,
3      that it may help him to kind of tone
4      himself down a little bit in communicating
5      with his other workers, so that they know
6      he's not being belligerent or obnoxious or
7      anything like that. Not that he was, but
8      just so they wouldn't take that tone.
9  Q.  **Did you observe this confrontation or did**
10     **you get the report second or thirdhand?**
11 A.  Secondhand.
12 Q.  **Did you ever observe Victor being**
13     **disrespectful yourself to any co-employee**
14     **or supervisor?**
15 A.  Yes, sir.
16 Q.  **Tell me about that.**
17 A.  There was at least one instance where we
18     were discussing company policy, Victor and
19     I, whether he should be discussing
20     compensation with other employees, in
21     which case he got very upset and started
22     cursing. Voices on both sides were
23     raised, which is my fault. But voices on

Page 60

1      both sides were raised. Later, when we
2      discussed the same incident with
3      Mr. Robertson, again after that, Victor
4      took the time and told me he still didn't
5      agree with the policy. So, again, showing
6      that he was disrespectful to either the
7      rank, or myself, or Mr. Robertson, or his
8      rank or the company in general.
9  Q.  **Okay. That involved, I think, an incident**
10     **where he was discussing a bonus with other**
11     **co-employees; is that correct?**
12 A.  Something to that effect. Either bonus or
13     a compensation of some matter.
14 Q.  **And let me ask this: Was there any policy**
15     **that had been made known to the employees**
16     **that they were not supposed to discuss**
17     **these issues with each other?**
18 A.  I don't know if the policy had already
19     been made. However, it was a general
20     managerial concept within the managerial
21     group that you don't discuss these things.
22 Q.  **You don't know whether that had been**
23     **communicated formally to the employees,**

15  (Pages 57 to 60)

## FREEDOM COURT REPORTING

Page 61

1    though?
2  A.  No, sir.
3  Q.  Once that was made known to Victor, he
4    expressed that he disagreed with it?
5  A.  Extremely.
6  Q.  Did he violate the policy, though, after
7    it was made known to him?
8  A.  Not that I'm aware of.
9  Q.  The first item under "Improvements/Goals,"
10    it says, "Make sure any and all issues
11    arising from the Life testing gets
12    reported to the appropriate
13    Technician/Engineer team immediately."
14        Was there some incident which caused
15    you to include that in this evaluation?
16  A.  We wanted Victor to have more of a
17    hands-on approach to making sure that he
18    was -- he took control of the testing.
19    Part of that is not just turning the
20    equipment on, but actually making sure the
21    unit's working right.  There would be
22    instances where either I would go out or
23    somebody else would go out and then report

Page 62

1    back to me that this particular machine --
2    this particular product is not operating
3    properly.  How long has it been that way?
4    Has it been reported back to the group
5    that's responsible for it?  And the answer
6    was almost usually no, that nobody knew
7    about it.  With that statement, I was
8    trying to get Victor to understand that
9    it's more than just turning the machine
10    on.  You've got to make sure the units are
11    working right.  If they're not working
12    right, get it back to the design group so
13    they can make a correction as soon as
14    possible.
15  Q.  Now, the machine that we're talking about
16    here are machines that test the products
17    that Euro-Pro makes or designs?
18  A.  That's a good -- that's a fair way of
19    putting it.  Yes.
20  Q.  We're not talking about the machines that
21    actually are sold to the public, but the
22    machines that you use to test those
23    products?

Page 63

1  A.  Well, when I say "turn the machine on,"
2    turn the machine on that tests the
3    product.  But when we have a problem with
4    the product, that problem needs to be
5    relayed back to the appropriate team
6    immediately.
7  Q.  So you'll know what the problem is and can
8    address it?
9  A.  Correct.
10  Q.  In your opinion, was that not always being
11    done?
12  A.  Correct.
13  Q.  At least not done in a timely way?
14  A.  That's correct.
15  Q.  Okay.  So you talked with him about that
16    at this first evaluation?
17  A.  Yes, sir.
18  Q.  "Remain more focused on current assigned
19    projects.  Refrain from adding yourself to
20    conversations and projects until asked in.
21    This doesn't mean only speak when spoken
22    to; just make sure you are needed before
23    joining discussions.  The problem is, this

Page 64

1    is one way to get yourself overloaded, and
2    it can appear as if you don't have enough
3    to keep busy."
4        Is there something that happened that
5    caused you to include this remark in this
6    evaluation?
7  A.  That was a general -- Generally, I would
8    notice and other managers would notice
9    that there would be a group of people
10    talking and Victor would be in the group.
11    Now, I don't know if anybody talked to
12    anyone else.  I know the people would
13    bring the issue to me, that your guy is
14    out here talking and not doing what he's
15    supposed to be doing.  I was trying to get
16    -- This was also in the transition from
17    the Cleanability into the Life testing.
18    And I do note that later on.  It's very
19    easy for -- This is my old boss.  It's
20    easy for me to go to the old boss for an
21    issue.  But that group needed to
22    understand they come to me.  So in order
23    to clean Victor's time up and give him as

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  much time to do the job he needed to do, I
2  needed to make sure that he only enjoined
3  in the conversations that were critical to
4  his performance.
5  Q.  Okay.  So at the time this was going on,
6      Victor was in transition from one job duty
7      to another?
8  A.  In a manner of speaking.  I like to just
9      draw a line in the sand and say from now
10     on you do this.  The real world is, he has
11     knowledge of something that somebody else
12     was doing yesterday that he could probably
13     help with.
14 Q.  "Strive to become more independent and
15     self-reliant in your day-to-day work."
16     Now, was there anything in particular that
17     caused you to include this observation in
18     the evaluation?
19 A.  There were times when it seemed,
20     especially with Brian, that -- and, again,
21     I got complaints from this end -- that
22     Victor would be in the guy's -- in certain
23     people's office.  It's hard to say too

Page 66

1  much.  It's really difficult to delineate
2  how much time is too much and how much is
3  not.  But when the person comes to me and
4  complains, I can't get my work done
5  because this guy -- then you've got to
6  start getting yourself away from that
7  person and start finding other ways to do
8  things.
9  Q.  Okay.  When you went through these issues
10     with Victor, what was his response?
11 A.  He accepted all of it.  As it's indicated,
12     there's a place for him to comment.  And
13     he signed it without commenting, so he
14     accepted everything.
15 Q.  Would it be fair to say that at the time
16     that you met with Victor after this first
17     evaluation, that there were no issues that
18     were placing his job in jeopardy at that
19     time?
20 A.  Not at that time.  But there were some
21     seeds sprouting.
22         (Brief recess)
23 Q.  Mr. Hudnall, let's go to Plaintiff's

Page 67

1      Exhibit 5 if we could.  Now, as I
2      understand it, this is the formal review
3      or evaluation done on Victor Smith?
4  A.  Yes, sir.
5  Q.  And it indicates that you are the primary
6      reviewer and that Terry Robertson is the
7      secondary reviewer?
8  A.  That's correct.
9  Q.  Could we take that to mean that both you
10     and Mr. Robertson agree and are in accord
11     with what this review indicates?
12 A.  Yes, sir.
13 Q.  Now, I think, before I go through this, I
14     want to back up just a moment and ask you
15     about Victor's employment and the change
16     that he underwent sometime in the spring
17     or later of 2004.
18 A.  Okay.
19 Q.  He was moved from one job to another, so
20     to speak; is that correct?
21 A.  Yes, sir.
22 Q.  And do you know about what time that
23     happened?

Page 68

1  A.  Not specifically.  I think around April or
2      May.
3  Q.  Okay.  Well, we'll just say the spring of
4      '04.  Okay?
5  A.  I think that's fair.  Yes, sir.
6  Q.  Tell me what he was doing and then what he
7      got moved to doing.
8  A.  Okay.  As I said before, he was in charge
9      -- he was the lead tech for our
10     Cleanability Group.  He was the permanent
11     employee on site during our second shift
12     operation, making sure that the testing
13     that was required to be done at night was
14     conducted efficiently -- or the testing
15     was conducted, and making sure that the
16     status for the next morning's testing was
17     set up so that the people that came on on
18     the morning shift could go ahead and run
19     their work.
20         He was responsible to make sure we
21     had enough materials to do the testing.
22     As I said, you put down specific types of
23     sand or rice or just different dirts or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  soils, we'll say, and then you vacuum them
2  up. I'm sure there are other things to go
3  along with that. But, basically, he was
4  to make sure that the vacuum performance
5  group could operate, all the lab techs and
6  temporaries under him could perform their
7  functions.
8  Q.  Okay. All right. So that's what he was
9      doing, was Cleanability?
10 A.  Correct.
11 Q.  Now, he was taken off that and placed on
12     another project, correct?
13 A.  Right. Like I said, the reason for the
14     second shift was, we had a huge amount of
15     work to get done. It just made more sense
16     to run two shifts instead of one. It
17     worked out better for some of the
18     employees, some of the guys that were
19     working there, because they worked better
20     on the night shift than during the
21     daytime.
22         We started having trouble keeping the
23     second shift full, plus the workload

Page 70

1  required on the night shift was not
2  necessary anymore. The workload wasn't
3  there anymore. So the night shift really
4  wasn't necessary. We brought all the
5  people back to the daytime shift. And
6  then we offered Victor the position to
7  move into the Life test area, which really
8  is where I got my start.
9  Q.  What is the Life test area?
10 A.  As I said, Euro-Pro makes a variety of
11     products, from typical vacuum cleaners,
12     portable steam cleaners, clothes irons,
13     hand mixers, toaster ovens, a variety of
14     stuff. Part of that process -- Any
15     responsible manufacturer will conduct what
16     we call Life testing. We are trying to --
17     We do two things -- well, several things
18     in this business. We are trying to
19     evaluate how well the product works over
20     the course of its lifetime, making sure
21     that the consumer gets a fair value for
22     their money when they buy the product, as
23     well as -- At the end of the process, at

Page 71

1  the end of the Life test, if the unit does
2  fail, to make sure that it fails in a safe
3  manner so that it doesn't literally blow
4  up while you're trying to vacuum your
5  house and catch your house on fire, those
6  types of things, as well as evaluating the
7  product during the design process to see
8  if there are things we can make to make it
9  an even better product. Various things
10 come out of that, comes out of that Life
11 testing that most companies do to
12 determine. Are you making a safe product?
13 Is it reliable? Will the consumer get a
14 good value for it? Can we continue to
15 stay in business, basically?
16 Q.  So when you say Life testing, the term
17     "Life" refers to the life of the product?
18 A.  Correct.
19 Q.  All right. What job was Victor given when
20     he moved into Life testing?
21 A.  When he moved into it, he was responsible
22     for the entire maintenance of everything
23     on tests. I'm not sure if we even had

Page 72

1  anything on tests at that time, other than
2  a few things I had been able to cobble
3  together. So his main responsibility was
4  to start building the fixtures to allow us
5  to put units on test so that they could
6  run in an automated fashion, as opposed to
7  having -- Say, for a clothes iron, instead
8  of having to have somebody there to push
9  the iron back and forth and turn it on and
10 fill it up with water and do all the
11 things you need to do for a clothes iron,
12 it would have been Victor's
13 responsibility. And I'm using clothes
14 iron. But now that I think about it, we
15 didn't install irons until later.
16     For a deep fryer, for example,
17 something he did have involvement with, he
18 would put the oil in. He would set up a
19 system to turn that deep fryer on and off
20 per our own specifications and record the
21 number of times the unit was turned on; to
22 make sure that when it came on, it
23 actually was working and heating oil.

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  It's not necessarily to cook in it, but
2  make sure it's getting hot. Make sure
3  that the fixture itself is under no
4  duress; that we wire that up properly;
5  that we build that properly so that we
6  don't start fires while somebody is over
7  here in the corner of the room testing
8  something else and this deep fryer doesn't
9  catch on fire. It's a big job, but it was
10  a job we felt Victor was very qualified to
11  do. And actually, as I've said, it's
12  where I got my start into my field now, is
13  in the same position.
14  Q.  Do I understand you to say he was offered
15      that position, or was he told, "This is
16      your new position?"
17  A.  The actual verbiage does escape me. We
18      probably said it in the manner of "We
19      would like you to move into this
20      position," and trying to build him up to
21      say that -- to make him understand that
22      this would really be a valuable position
23      for not only Euro-Pro, but for himself and

Page 74

1  his own growth. I would never tell
2  somebody either this or the door. There's
3  always something else that a valuable
4  employee can do for a company besides that
5  specific thing you ask them to do.
6  Q.  Now, the Life testing unit, was there some
7      kind of a steam cleaner that was going to
8      have to be tested in this division?
9  A.  Yes, sir. We are the market leader in
10     portable steam cleaners. As such, it's
11     imperative that we get some sort of a
12     steam cleaner fixture built and running.
13  Q.  What do you mean a "steam cleaner
14      fixture"?
15  A.  "Fixture" being my own term, for the
16     method whereby you can then take your
17     steam cleaner, install it in this fixture,
18     and then all of the operation of the steam
19     is automatic. It fills by itself. Once
20     it's in the fixture, it fills by itself.
21     Then you cap that off. You have to then
22     close your system back so you can heat and
23     make steam. Then when it starts to make

Page 75

1  steam inside the unit, to press the
2  trigger or whatever actuation you have in
3  order to release that steam. Do that a
4  few times, and once you've exhausted all
5  the steam, then the unit has got to go
6  into an automatic shut-down phase to cool
7  down. After that, then you bring more
8  water in and repeat the process over
9  again.
10  Q.  So the fixture is sort of a machine that
11      operates the steam cleaner?
12  A.  Yes, sir.
13  Q.  And puts it through a process where it's
14      used over and over again in probably a
15      short period of time?
16  A.  Exactly.
17  Q.  In a shorter period of time than it would
18      naturally be used around the house?
19  A.  That's correct.
20  Q.  And, so, by doing that, I guess you can
21      simulate how long the product may last if
22      it were only used like it would normally
23      be used in a household?

Page 76

1  A.  Correct. And as you said, if we gave a
2  three-year warranty, we want to try to do
3  that three years in as few weeks as
4  possible.
5  Q.  Okay. So as the head of the Life testing
6      division, would they be responsible for
7      designing and building this machine, the
8      testing machine?
9  A.  I'm not sure what you mean by "head of the
10     Life testing."
11  Q.  Well, who was -- I thought you said Victor
12      was going to head up the Life testing
13      division?
14  A.  He was going to be our test technician in
15     the Life testing room. Correct.
16  Q.  Okay. The test technician. Would he be
17      responsible for designing and building the
18      device that did the testing?
19  A.  Yes, sir.
20  Q.  And did you explain that to him?
21  A.  Yes, sir.
22  Q.  And did he take the position?
23  A.  Yes, sir.

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  Q.  And this was sometime April, May of 2004?
2  A.  Yes, sir.
3  Q.  This was after he was moved to the first
4      shift -- excuse me -- after the second
5      shift shut down?
6  A.  That's correct.
7  Q.  But I guess the fact that the second shift
8      shut down is not -- is that related to why
9      you asked him to move to Life testing?
10 A.  Well, the second shift was closing up. We
11     were trying to find a position that he
12     would be happy with. And I needed help.
13     So that was my first thought. You know,
14     we looked at his resume'. We looked at
15     his experiences. It seemed like he had
16     plenty of education and plenty of
17     experience to do the job. So we
18     approached him, "Would you like to take
19     this challenge?"
20 Q.  Now, as far as designing the devices that
21     do the testing, did he have any experience
22     in doing that?
23 A.  I don't think he did.

Page 78

1  Q.  Did you discuss that with him or did he
2      discuss that with you?
3  A.  Yes, sir.
4  Q.  And what do you recall was said about
5      that?
6  A.  I've got at least fifteen years doing the
7      same thing. That I can help him in
8      whatever comes up. I've done it. Chad
9      Reese has done it. We have other guys who
10     can help. We can use those resources, and
11     that could help him over any hurdles he
12     may have. But at the same time, we were
13     not going to do the job for him. We were
14     not going to build the fixtures for him.
15     We were going to give him advice as to how
16     he could build a fixture, but the ultimate
17     construction would be his only
18     responsibility --
19 Q.  Okay.
20 A.  -- that's necessary for the performance of
21     his duties.
22 Q.  All right. So that change in his
23     employment status took place in the spring

Page 79

1      of '04?
2  A.  I think so. Yes, sir.
3  Q.  Now, this document, Plaintiff's Exhibit 5,
4      is an evaluation. This was done in -- it
5      says the review date is August 27, '04 for
6      a period ending June of '04. Can you
7      explain the difference in those two dates,
8      please?
9  A.  By the time we actually write the review
10     and Mr. Robertson gets a chance to review
11     my comments and we add our comments
12     together, it just -- his travel schedule,
13     my schedule, it just took a little time to
14     get the -- by the time I wrote it, to get
15     it approved and get it actually issued.
16     This was the date -- this should have been
17     the date we discussed it or very shortly
18     thereafter. Victor and I discussed it on
19     this date or very shortly thereafter.
20 Q.  On which date?
21 A.  I'm sorry. August 27.
22 Q.  So would it be correct to say that what's
23     contained in this report was your

Page 80

1      appraisal of Victor Smith as of August 27,
2      '04?
3  A.  Yes, sir.
4  Q.  Okay. Now, as far as in the area of
5      "Job/Knowledge/Competency," your
6      evaluation at that time was that his
7      performance met standards in all important
8      aspects; a good contributor?
9  A.  Yes, sir.
10 Q.  And this is some several months after he
11     had been moved to the Life testing unit?
12 A.  Yes, sir.
13 Q.  Or Life testing division.
14     The next area is "Quality and
15     Quantity of Work." And there you
16     indicated that his performance was well
17     above standards in many important aspects,
18     correct?
19 A.  Yes, sir.
20 Q.  The third area is "Dependability," in
21     which you indicated his performance
22     consistently and significantly was above
23     standards in virtually all areas, correct?

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1  A.  Yes, sir.
2  Q.  Now we move to "Teamwork and Cooperation,"
3      which is the next area.  And there
4      Victor's performance met the standards in
5      all important aspects; good contributor.
6      That was your opinion at that time?
7  A.  Yes, sir.
8  Q.  "Interpersonal and Communication Skills."
9      Again, you rated his performance as
10     meeting the standards in all important
11     aspects, correct?
12 A.  Yes, sir.
13 Q.  And then "Initiative/Commitment."  In that
14     area you rated his performance as meeting
15     the standards in all important aspects;
16     good contributor?
17 A.  Yes, sir.  That he met the minimum
18     standards.
19 Q.  Okay.  Then we go to, I guess, some more
20     particular observations.  And you indicate
21     that his main strength is building test
22     fixtures.  So he had been working on this
23     steam cleaning fixture; is that right?

Page 82

1  A.  He had had some work on the steam cleaning
2      fixture.  This was more to the previous
3      fixtures he had built.  He had probably
4      built five fixtures before we gave him a
5      steam cleaner, and he did a pretty good
6      job with those five, which made us think
7      he -- Those were very simple fixtures.
8      The steam cleaner was a -- was a step up
9      in challenge.  But he had done such a good
10     job on the first ones, we thought taking
11     it to the next level was an obvious
12     choice.
13 Q.  And it indicates that he's not afraid to
14     ask for assistance when needed?
15 A.  That's true.
16 Q.  He's dependable?
17 A.  Yeah.
18 Q.  Very exacting in accomplishing his
19     assigned tasks?
20 A.  Yes.  At that time he was doing fine.
21 Q.  "Areas that need improvement."  You note
22     that he needs to accept the entire role
23     for which he was hired, and that the role

Page 83

1      is constantly changing and growing.  Is
2      there anything in particular that caused
3      you to make that observation?
4  A.  Several things.  The room he was working
5      in was a large area and it's his area.  We
6      tried to make it very clear it was his
7      responsibility to make sure that the area
8      was kept neat and tidy.  It didn't
9      necessarily mean he had to go and sweep up
10     everything that was put on the floor.  It
11     was okay with me if he went and got
12     somebody else and said, "Hey, you made
13     this mess, so help me clean it up."  But
14     at the same time it's also important to
15     point out that Mr. Robertson, whose title,
16     I believe, was executive vice-president,
17     was not afraid to pick up a broom and
18     sweep himself.  So if he's setting that
19     example, then it's pretty obvious that
20     everybody in the group needs to be
21     cleaning up.  And Victor seemed to have a
22     specific problem with that specific part
23     of the duties, just keeping the area neat

Page 84

1      and clean.  The other sentence in there
2      is, "These changes are expected to be
3      accomplished without additional
4      compensation."
5          Victor had come to me a couple of
6      times talking about he wasn't making
7      enough money.  I told him at the time,
8      "You don't get paid for the job you're
9      doing now.  You work for your raise next
10     year."  That's just my philosophy.  The
11     work I do is reflected in my raise next
12     year.  If I don't do very good this year,
13     I don't deserve much next year.  But I
14     don't go and complain about what I'm doing
15     now based on my current salary.
16 Q.  Okay.  Then we go to number 2 under "Areas
17     that need improvement."  And it says there
18     is a concern with accomplishing routine
19     tasks.  "An example is cleaning his work
20     area."  So we're back to keeping the work
21     area clean here?
22 A.  That's a bit of it.  It also goes back,
23     and some of this, again, is back into the

21  (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1 first issue. When a product is on test,
2 is it actually working or is the PLC, the
3 computer that controls it, is it just
4 turning on and it looks like the product
5 is working? To actually go and touch the
6 thing, is it getting hot or getting cold?
7     We even provided him -- I gave him a
8 little, small, hand-held infrared
9 thermometer that he would just have to
10 shoot and point at the side of the device
11 to use to see if it was getting warm.
12 Just some way to record that we know the
13 thing is getting hot the way it's supposed
14 to. And these are starting to creep in
15 that he's not doing these types of things.
16 Q.    "Needs to improve Initiative. Take it
17     upon himself to correct problems seen,
18     either fixtures or products on test.
19     Don't just report that a product has quit
20     working. Look to see if he can find the
21     trouble." And that's basically what you
22     just related to me?
23 A.    More of that. Again, and the last

Page 86

1 sentence, I think, is key -- last two
2 sentences, rather. "In time, he," meaning
3 Victor, "will become the main analyst to
4 determine the Life test failures." We
5 needed a guy in that lab that if that
6 toaster oven stops working, he can then
7 take that toaster oven apart and then
8 either go to the technician or the
9 engineer and show them, well, this thing
10 failed right here. It wasn't expected for
11 him to do it necessarily at this day. But
12 if he's not even opening the units to
13 start looking at them, then he'll never
14 get to the point to where he can identify
15 problems. And at this point he wasn't
16 even wanting to open the unit. He was
17 just going to tell somebody that that
18 thing failed.
19 Q.    On the next page of this evaluation, I'm
20     just looking at under "Comments," the
21     third line down at the end of that line,
22     it says, "He is now in the midst of
23     developing an automated fixture for steam

Page 87

1 cleaners and will implement a preventive
2 maintenance system for all Life test
3 fixtures." So at this point in time, when
4 this report was done, he was working on
5 the steam cleaner testing fixture?
6 A.  Yes, sir.
7 Q.   And his overall performance, it looks like
8     a 3.5. Is that like 3.5 out of 5?
9 A.  Out of 5. Which, by the way, was the
10 lowest score I gave anybody.
11 Q.   But it is -- You do indicate he's meeting
12     standards in all important aspects and is
13     a good contributor?
14 A.  I do say that. Rightly or wrongly, the
15 way I was taught to give evaluations is,
16 you never go too high and you never go too
17 low. You never go too high because
18 nobody's perfect. You never go too low
19 because then you kill morale. I did make
20 it clear that this was -- in my opinion,
21 this was a low score; that things needed
22 to start picking up. I didn't want to --
23 again, I didn't want to grade him too low,

Page 88

1 because if you have a potential morale
2 problem and then you grade them very low,
3 then that morale problem just gets worse.
4 Q.   Let me ask you to look at Plaintiff's
5     Exhibit 2, which are the interrogatories.
6 A.  Okay.
7 Q.   And if you'd look at number 7. And what
8     this question is asking, just to review,
9     is to list the occasions in which the
10     plaintiff was reprimanded, written up or
11     counseled for anything related to his
12     employment. And there are about, I don't
13     know, seven or eight -- I guess there are
14     eleven items. The first one involves a
15     confrontation with Sam Hickman. Do you
16     know when that happened?
17 A.  Not specifically. It was while Victor --
18 I believe it was while Victor was running
19 the second shift. See, there was an
20 overlap. If I remember right, the first
21 shift would start at 6 and work till 2:30,
22 and then Victor would come on at 2 and
23 work till 10 or 10:30, something like

22  (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1    that. So there was a half-hour overlap
2    where Victor could then go over what was
3    done in the morning so he could continue
4    on for the second shift, and then he could
5    give his status for the group for the next
6    morning.
7  Q.  Okay.
8  A.  So I'm -- I know it happened during that 2
9    or 2:30 time frame. I'm just not exactly
10   sure what day it happened.
11 Q.  This happened several months before the
12   last evaluation, didn't it?
13 A.  Oh, yes, sir.
14 Q.  And once you counseled him about that, did
15   you have any more problem with him
16   confronting other workers in an aggressive
17   or disrespectful way?
18 A.  I didn't have any specific -- Nobody would
19   come up with any -- come to me with any
20   specific instances. There still seemed to
21   be a general feeling within the group that
22   he was a little bit overbearing, and
23   that's the reason for some of the comments

Page 90

1    in the earlier -- in the May discussion.
2  Q.  Number 2 just sort of reiterates the first
3    point about the confrontation with Sam
4    Hickman?
5  A.  Yes, sir.
6  Q.  What was Sam Hickman's job?
7  A.  He was one of the temporary test
8    technicians in the Cleanability Group.
9  Q.  Now, number 3 talks about the plaintiff,
10   Victor Smith, being counseled; that he
11   needed to quit wasting time on non-work
12   matters, like the telephone and the
13   Internet. Do you recall him being
14   personally singled out and counseled for
15   excessive use of the telephone and the
16   Internet?
17 A.  I know there was an instance where he was
18   counseled about use of the telephone. I
19   don't know if Mr. Robertson singled him
20   out additionally or not.
21 Q.  Weren't all the employees warned about
22   excessive use of Internet and telephone?
23 A.  That's true.

Page 91

1  Q.  That's just a general warning that was
2    issued?
3  A.  Yes, sir.
4  Q.  To everyone?
5  A.  Yes, sir.
6  Q.  Let's go to number 4. It says that you
7    and Chad Reese, after learning that the
8    plaintiff had called a female employee
9    from work during his working hours not
10   related to work, which was against company
11   policy and which made her uncomfortable,
12   and then you counseled the plaintiff about
13   that. Who was the employee that he
14   called?
15 A.  Ashley Sheffield.
16 Q.  And what policy did that violate?
17 A.  When she reported it to me, she said she
18   got the call about 9 or 9:30, which,
19   again, his working day ended at 10 or
20   10:30. Again, I forget which. It should
21   -- It would not have been -- There were no
22   scheduled breaks. But it was -- it would
23   be highly unusual and we would discourage

Page 92

1    taking a break at 9:30 if you leave at 10
2    -- take a fifteen-minute break from 9:30
3    to 9:45 and then come back to work for
4    fifteen minutes. The breaks generally
5    were supposed to be, you'd have your
6    lunchtime at the midpoint of your day, and
7    midpoint of whatever your day was, and
8    then the breaks generally are equal
9    distance apart from those two times.
10      Ashley knew the times that they were
11   working, 2 to 10, I believe it was, maybe
12   10:30. We had just been counseled. As a
13   matter of fact, Ashley had just been
14   talked with about the use of telephone and
15   Internet. And the whole group had been
16   counseled about that. So she felt it was
17   incorrect for somebody who was on the
18   night shift to be calling her while they
19   were supposed to be working.
20 Q.  Okay. Now, if I understand this, you
21   don't know what break schedule he was on?
22 A.  There was no hard-and-fast break schedule
23   due to the nature of the job. I didn't

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1    want somebody -- More detail about the
2    job. To conduct a vacuum cleaner test,
3    you test four carpets -- you test three
4    units on four carpets, three runs each.
5    If you're in the middle of a test -- and
6    we have a hard-and-fast -- 9 o'clock is
7    your break. If you're in the middle of a
8    test, we don't want you stopping at that
9    time. We want you to finish your test and
10   then go on and then take your break at the
11   end. So there was no hard-and-fast 8:45
12   is your break and that's it. But, again,
13   it was implied that you wouldn't take your
14   fifteen-minute break within an hour of
15   leaving. It just doesn't make sense.
16       So --
17   Q.   How many breaks is an employee entitled to
18       in a shift?
19   A.   Of course, we give them lunch, half-hour,
20       and they get two fifteen-minute breaks,
21       one in the morning and one in the
22       afternoon.
23   Q.   Okay. Now, what did Ashley Sheffield

Page 94

1        report to you about this incident?
2    A.   That she felt it was unfair that she had
3        just been counseled and the whole group
4        had just been counseled about improper use
5        of telephone and Internet for personal
6        business, and then that night -- that very
7        night she gets a call that's violating
8        that policy.
9    Q.   Okay. That was the -- Is it correct,
10       then, that that's why she felt aggrieved
11       by this, that someone was calling during
12       working hours when she had been just --
13       when she had apparently just gotten in
14       trouble for doing the same thing?
15   A.   Yes, sir.
16   Q.   There was nothing in the call itself that
17       she found offensive or that she reported
18       to you was offensive?
19   A.   The only thing that she reported that made
20       me think that there may have been
21       something else there was that she told me
22       she blocked the call. That another call
23       came later but she had already blocked it.

Page 95

1        She blocked the number from her phone.
2    Q.   All right. And what did that make you
3        think?
4            MR. LIGHTFOOT: Objection. Asked
5            and answered. Go ahead.
6            You can answer again.
7    A.   Well, just a general feeling of a single
8        male calling a single female and then the
9        single female feeling she has to block the
10       call. Here we are. But in this day and
11       age, anything can constitute sexual
12       harassment.
13   Q.   Okay. And is that something you talked
14       with Victor about?
15   A.   After discussing it with our general --
16       our H. R. person, she felt it was best
17       that if -- we at least cover that base to
18       make sure there was no sexual harassment.
19       We really felt like there was none. But
20       in order to cover ourselves, we thought it
21       was best to at least touch on that. The
22       gist of our conversation -- the gist of
23       mine and Chad's conversation with Victor

Page 96

1        was that he called when he shouldn't have,
2        and to not do anything to put himself in
3        the appearance of harassing somebody.
4    Q.   Ashley Sheffield is white?
5    A.   Correct.
6    Q.   Was there at this time any policy about
7        co-employees going out together?
8    A.   No.
9    Q.   And when you talked to Mr. Smith about
10       this, what was his response?
11   A.   I think he was a little surprised at the
12       sexual harassment. He may have -- Of
13       course, I'm kind of getting into his mind.
14       That's difficult to do. I think he
15       expressed a little shock at the sexual
16       harassment. Again, I tried to make it
17       clear that we were just basically covering
18       our bases to make sure there was no issue.
19       He probably took a little exception to the
20       fact that we said anything. But we also
21       wanted to reiterate that we've got to give
22       the appearance that we just had this
23       conversation about no calls and that night

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1 something comes up.
2 Q. Did he tell you that he called while he
3     was taking a break?
4 A. I think he said something to that effect.
5     And, again, that's when I said, "Why would
6     you be taking a break so late in your
7     day?" That was my question.
8 Q. After you counseled him about that, did
9     this incident of improper use of the
10    telephone ever occur again?
11 A. Not to my knowledge.
12 Q. Okay. Now, this happened before the first
13    evaluation, Plaintiff's Exhibit 6?
14 A. I'm sure it did. That was in May?
15 Q. Yes.
16 A. I'm sure it did. Yes.
17 Q. And it happened before Victor was moved to
18    the Life testing unit?
19 A. Yes.
20 Q. Number 5 is, again, back to not keeping
21    the work area clean. Number 6 involves
22    not keeping the work area clean. Number 7
23    involves the discussion of bonuses. I

Page 98

1     think we've talked about that. Number 8,
2     that such discussions with other employees
3     was inappropriate and prohibited. That
4     would be bonuses, discussion about
5     bonuses?
6 A. Any kind of compensation.
7 Q. And I think we said that once he was told
8     not to do that, although he disagreed with
9     the policy, he did not repeat that
10    mistake?
11 A. To my knowledge, he didn't.
12 Q. Number 9 deals with a charge that Victor
13    was not maintaining the supply inventory
14    for the Cleanability Group properly. What
15    specifically is that about?
16 A. There are several materials that are
17    required. I want to get the name right.
18    The American Society for Test and
19    Measurements -- it's now called ASTM
20    International -- has set about some
21    specific standards on how to test a vacuum
22    cleaner. So basically, Hoover,
23    Electrolux, Euro-Pro, anybody who makes

Page 99

1     vacuum cleaners, if you go to a store and
2     you see somebody making a claim, we're all
3     testing to the same set of standards.
4     Those specific tests call for specific
5     materials to be used for these tests;
6     sand, talcum powder, rice in certain
7     cases, various materials. Part of
8     Victor's responsibilities as a lead tech
9     for the Cleanability Group is to make sure
10    that they had plenty of stuff to do their
11    testing with. He did not necessarily have
12    to order the things himself, but he had to
13    let someone know that we need more of this
14    and more of that. And there were several
15    times when he would start to fall down on
16    not having the right sand or not having
17    the proper materials to do the test.
18 Q. Okay. So that was when he was in
19    Cleanability?
20 A. Correct.
21 Q. And that would have been, of course,
22    several months before the evaluations?
23 A. Right.

Page 100

1 Q. Number 10. "Ralph Hudnall," which is, of
2     course, you, "repeatedly counseled the
3     plaintiff that he needed to perform his
4     duties at a higher level." And then it
5     goes on and includes some specific things
6     that you told the plaintiff he needed to
7     do. Now, it says "repeatedly counseled."
8     How many times did you counsel with the
9     plaintiff that he needed to perform his
10    duties at a higher level?
11 A. Maybe a dozen. A lot of these are verbal
12    talks. You know, it's not written. We've
13    got to start picking things up. And I do
14    note various things, though. When we talk
15    about at the higher level, are we
16    including the rest of the things in that
17    or just that comment "bring it to a higher
18    level?"
19 Q. I'm sorry. I don't understand.
20 A. Your question was something to the effect
21    of, how many times did I counsel him to
22    bring his duties to a higher level? If I
23    include the other things that are

25 (Pages 97 to 100)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  mentioned in that same sentence, then
2  there's -- there's easily a dozen, if not
3  more. They may not have all said, you've
4  got to bring the job to a higher level.
5  It may have been something like, we need a
6  maintenance system for these test fixtures
7  so we know how often they need to get --
8  how often they need service or the last
9  time they had service. We've talked about
10  this before, about the maintenance of --
11  just the maintenance of the entire room,
12  whether the product is working properly or
13  not. As I said, verifying the operation
14  of all testing fixtures and buying the
15  correct and appropriate number of parts
16  for the steam cleaner he was trying to
17  build. There were several times when,
18  okay, we bought the wrong part. Not only
19  did we buy one wrong, we bought four, five
20  or six of the wrong thing and then we've
21  got to send them all back and get new
22  ones.
23      The work of the steam cleaner, as it

Page 102

1  says, it's a steam cleaner. So the water
2  is going to get to a boiling point. And
3  there were times we buy parts that weren't
4  rated for -- to handle hot water. So
5  you've got to send those back and get new
6  parts in. Adding all that together, at
7  least a dozen.
8  Q.  Okay. But none of that was in writing,
9      except to the extent it's reflected in the
10      two written evaluations that we've gone
11      over?
12  A.  Correct.
13  Q.  Okay. Number 11. You counseled the
14      plaintiff on at least one occasion, that
15      the building of a steam cleaner testing
16      station was progressing too slowly and
17      costing too much money?
18  A.  Right.
19  Q.  That was the project Victor was working on
20      at the time he was terminated, correct?
21  A.  That's correct.
22  Q.  Let me ask you about -- Go back to Ashley
23      Sheffield for a moment. She was a lab

Page 103

1      tech; is that right?
2  A.  Yes, sir.
3  Q.  Did she work in close proximity to Victor
4      at the facility or --
5  A.  Their assigned spaces were a little apart.
6      But, I mean, we all worked in close
7      proximity.
8  Q.  Did she ever complain in any way about
9      Victor, other than that one time?
10  A.  Not that I recall.
11  Q.  And she never specifically said anything
12      to indicate that what Victor said to her
13      was in the nature of sexual harassment?
14  A.  That's correct.
15  Q.  That's an assumption that was made based
16      on things other than what she directly
17      told you?
18      MR. LIGHTFOOT: Objection. Go
19      ahead. You can answer.
20  A.  That's correct. That's correct.
21  Q.  When Victor Smith was moved to Life
22      testing, his supervisor did not change?
23  A.  Correct.

Page 104

1  Q.  That was still you?
2  A.  Right.
3  Q.  The group of people that he could have
4      access to for assistance maybe in
5      designing or building the things he was
6      supposed to design and build, did they
7      change?
8  A.  Well, he had no responsibility. So, yes,
9      they did. I mean, yeah. He was no longer
10      over Vacuum performance, which I was
11      pretty much -- if there was an authority,
12      it was me. He came into another realm,
13      which I was still pretty much the
14      authority on, but we had other people who
15      had experience that could help. So in
16      that manner it did change.
17  Q.  Okay. Who did he have he could go to for
18      help?
19  A.  Of course, myself, Chad Reese.
20  Q.  Is Chad Reese an engineer?
21  A.  Yes, sir. Mechanical. We like to funnel
22      the resources through one or two other
23      individuals, Brian McGhee and Andres

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1     Simon. Andres had a Master's in
2     mechanical engineering. He could
3     certainly help with some of the mechanical
4     side of the things. Brian had a Master's
5     Degree in electrical engineering, and he
6     could help with certain things. But at
7     the same time, and as I've kind of said in
8     the past, we didn't want Victor to rely
9     solely on any one person or rely on
10     anybody to do all of the job. You go get
11     some advice, and then you go and do your
12     thing, and then you go back and get some
13     more advice.
14 **Q.**   **Now, let's talk about the steam cleaner**
15     **testing system.**
16 A.   Okay.
17 **Q.**   **Did someone design or draw out some**
18     **parameters for this system and give them**
19     **to Victor and say, "You finish designing**
20     **it and building it?" Did they give him a**
21     **blueprint and say "build it", or did they**
22     **just say, "We want you to design and build**
23     **something to do this?"**

Page 106

1 A.   It started off as basic verbal
2     discussions, verbal and visual. Okay.
3     Here's a steamer. We show him how it
4     works. This is what you have to do.
5     Conduct a little research and tell me what
6     you think, how you think we can do it, and
7     then we'll talk about where we can -- what
8     the next steps are. Sorry.
9       At one point we did sketch out an
10     idea of how he could handle some of the
11     issues he was coming up with. It was in
12     no way, shape or form a blueprint. The
13     sketch that was made would not even --
14     wouldn't leave our building as anything
15     other than a simple sketch. The reason
16     for that is, because everybody who was
17     concerned with it was right there in our
18     building. If there was an issue, like "I
19     can't figure this out," we could very
20     easily walk to the steam cleaner station
21     -- or where the steam cleaners were going
22     and see what the issue was, or we could
23     gather in our conference room all around a

Page 107

1     table and then hammer out the details.
2       (Plaintiff's Exhibit 10 marked
3       for purposes of identification)
4 **Q.**   **The drawing you mentioned -- I'll show you**
5     **Plaintiff's Exhibit 10. Is that the**
6     **drawing?**
7 A.   That would be it.
8 **Q.**   **Who made that drawing?**
9 A.   I think Chad drew it.
10 **Q.**   **Okay. Was that the first written**
11     **description of what Victor was supposed to**
12     **construct?**
13 A.   Yes.
14 **Q.**   **Is that the only written description of**
15     **what he was supposed to construct?**
16 A.   There would be -- In conjunction with this
17     would be the product specification for the
18     steamers themselves. But this would
19     detail -- this actually details our
20     expected time line for getting things
21     finished. And it gives him a general idea
22     of how he could then use an air cylinder
23     to actuate the steam trigger. We seemed

Page 108

1     to have a problem, "Okay, somebody's got
2     to squeeze the trigger. How do I do that?
3     Well, you can do that with air. Well, how
4     do I do it with air? Oh, okay." You just
5     make a cylinder and even -- we'd show them
6     cylinders. We'd get a cylinder, attach it
7     somehow to the nozzle. I can't tell him
8     how because he's the one that's -- he's
9     the one that's going to have to change the
10     nozzle out at some point. I could tell
11     him specifically do this and this and
12     this, but it might make his life a lot
13     tougher when he has to change that product
14     out. We wanted him to think about how you
15     could look at this and then make those
16     changes yourself with this as a concept.
17 **Q.**   **So it was up, then, to Victor to design**
18     **this machine -- this testing machine based**
19     **on that drawing and the other things that**
20     **he was told about what you wanted to**
21     **accomplish?**
22 A.   Yes, sir.
23 **Q.**   **Okay. He wasn't given any blueprint or**

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1    diagram other than that to show what he
2    was to build?
3    A.   That's correct.
4    Q.   Was he given a timetable to complete this
5    project?
6    A.   7/28.
7    Q.   Is that on that page there?
8    A.   Yes, sir.
9    Q.   Do you know when the project was assigned
10   to him?
11   A.   It was probably mid-May or so.
12   Q.   Okay.
13   A.   It may be later.  It may be later on in
14   May.  I'm thinking sometime in May he was
15   assigned the project.
16   Q.   Okay.  And that writing there, is that
17   Chad -- Help me.
18   A.   Reese.
19   Q.   -- Reese's?
20   A.   Yes, sir.
21   Q.   Was there a budget for this project?
22   A.   Not a hard-and-fast budget.
23   Q.   Well, was there any budget?

Page 110

1    A.   Generally, no.  But we don't want to just
2    spend -- As an organization, we needed to
3    watch what we spend and make sure we,
4    again, buy the correct parts.
5    Q.   Sure.  Was Victor given any information
6    about what kind of money you expected to
7    spend on this project?
8    A.   I doubt it.
9    Q.   Now, was Victor given engineering support
10   if he needed it?
11   A.   Yes.  Absolutely.
12   Q.   And who was he told to go to?
13   A.   Well, his first contact was me.  I'm not
14   the degreed engineer.  But I've been doing
15   this almost twenty years now.  Chad Reese
16   was on the project.  Chad's at least a
17   mechanical engineer.  Andres Simon was
18   assigned -- Andres Simon was available for
19   help.  Brian McGhee was available for
20   help.  They weren't necessarily available
21   on an on-call basis, as they had their own
22   projects to run.  They had to get their
23   own work done.  But they also knew that

Page 111

1    they were there and that we needed them to
2    help Victor in certain cases.
3    Q.   Well, did Victor ever come to you for help
4    with his steam cleaner machine?
5    A.   Sure.
6    Q.   Testing machine?
7    A.   A few times.
8    Q.   And what kind of help was he asking for?
9    A.   It depended.  When he would come to me, it
10   would depend.  It may be he didn't know
11   where to find this valve or he doesn't
12   know where to -- Finding parts, for the
13   most part.  Some theory about how do we do
14   certain things.  General guidance, for the
15   most part.
16   Q.   Do you know if he went to any of the
17   engineers for assistance?
18   A.   Yes.  I know he would talk to Chad on
19   occasion.  I know he would talk to Brian
20   on occasion.  Actually, one of the details
21   was -- and this was -- the comment from
22   Brian to me was that Victor would come to
23   him; Brian would give him advice.  Victor

Page 112

1    would go out to do something, and then
2    Brian would go check it later and he
3    wouldn't do what Brian had advised him.
4    He had actually done something different
5    on a couple of occasions.  And it was
6    getting to the point where Brian felt that
7    Victor was using him as a how-do-you-do-it
8    kind of guy as opposed to give me some
9    advice and I'll go and see what I can do;
10   that he was leaning more towards -- almost
11   towards trying to get Brian to do the -- I
12   won't -- almost leaning to get Brian to do
13   the work for him.
14   Q.   Brian's last name is what?
15   A.   McGhee.
16   Q.   He's an engineer?
17   A.   Yes, sir.
18   Q.   And is he still an employee of Euro-Pro?
19   A.   Yes, sir.
20   Q.   Could you kind of go down through the
21   project with me, Mr. Hudnall, the steam
22   cleaner tester, and tell me every way you
23   say that Victor failed in designing and

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1    constructing this machine?
2  A.    A lot of it's detailed. The first thing
3    he missed was the expected completion
4    date. Several instances of buying the
5    wrong parts. As I stated earlier, some
6    things we -- some assumptions we made --
7    The product is generating steam. So any
8    component that's going to -- that that
9    steam is going to touch needs to be rated
10    for a high-temperature component, as well
11    as a fairly high-pressure device.
12        There were times when he would buy
13    components that were neither high-pressure
14    nor high-temperature. So there's an
15    expenditure there that didn't need to be
16    done. We get the parts in. They don't
17    work. So we have to install them. They
18    don't work. We've got to take those off.
19    We've got to identify new components,
20    order those and install those. That
21    happened several different times in the
22    process.
23        I'm sure there's others that will

Page 114

1    come to me. The main thing to me was that
2    it wasn't complete on time. We were
3    almost wasting money because we were
4    buying the wrong parts that obviously
5    wouldn't go into this fixture. And then
6    after we started to bring it to his
7    attention that it was taking too much time
8    and costing too much money, it seemed like
9    the project just drug on longer and
10    longer. As I said, I'm sure there's other
11    things that I can add to it. Those are
12    the main points in my mind right now as to
13    what was wrong with the steam fixture.
14        (Lunch recess)
15  Q.    Mr. Hudnall, I want to ask you now -- I
16    want to move to the date that Victor Smith
17    was terminated --
18  A.    Yes, sir.
19  Q.    -- as an employee of Euro-Pro. When did
20    that happen?
21  A.    I believe it was something like December
22    3rd. I think that's when it was.
23    Something in that neighborhood.

Page 115

1  Q.    Of '04?
2  A.    Of '04. Yes, sir.
3  Q.    And who made the decision to terminate his
4    employment?
5  A.    Terry Robertson.
6  Q.    Were there discussions that you had with
7    Terry Robertson before that decision was
8    made?
9  A.    Yes, sir.
10  Q.    And when did you first start talking with
11    Terry Robertson about anything to do with
12    the possibility of terminating Victor
13    Smith?
14  A.    Well, I never approached Terry with the
15    idea of a termination. I approached Terry
16    which some specific instances of some
17    concern that I knew he would be -- would
18    want to know about. That was probably --
19    I don't know the dates. Late in November,
20    in and around the Thanksgiving time frame.
21  Q.    Okay. And when you first approached him,
22    what was the issue you discussed with him?
23  A.    Victor had taken vacation. And I felt I

Page 116

1    had made it very evident that I would need
2    to be able to operate the steam cleaner
3    fixtures properly while Victor was on
4    vacation. I actually wanted to take that
5    opportunity to go through and kind of
6    critique his work. I don't like to do
7    that in front of the employee because it
8    can sometimes become belittling, and that
9    was not my intention to belittle anybody.
10    I just wanted to take a chance and look
11    through the whole thing myself, knowing
12    it's a fairly complex fixture, to see how
13    well it was operating and see if there was
14    any things I could help Victor -- either
15    help the machine get better or help Victor
16    to get it better the next time we have
17    another similar project to work on.
18  Q.    Let me just interrupt here a second. At
19    this time, in November, had he completed
20    building the testing machine?
21  A.    I would say it was not fully operational.
22    It seemed like that every -- it would fail
23    often enough that -- or have to be stopped

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1    -- We found a problem often enough that I
2    couldn't say it was completely
3    operational, but it would run probably
4    eighty percent of the time it needed to
5    run. So it was in an operational
6    condition, but there's still probably some
7    bugs to be figured out about it.
8  Q.   But that's typical any time you build a
9       machine of this complexity, isn't it, that
10      there are bugs you have to get out of it?
11          MR. LIGHTFOOT: Objection.
12          THE WITNESS: I still answer,
13          right?
14          MR. LIGHTFOOT: You do.
15 A.   Yes. That's not uncommon. It's not
16   uncommon.
17 Q.   Okay. All right. So he was going --
18      Victor was going on vacation or I guess
19      had gone on vacation, and then continue
20      on.
21 A.   He was on vacation. Monday morning I go
22   to work. And as is my normal routine, I
23   start turning the equipment on, knowing

Page 118

1    that, you know, it's my job to do this. I
2    get to the steam cleaner and I can't -- I
3    see that there are wires disconnected from
4    the fixture itself. And I'm afraid to
5    turn it on because I don't know what the
6    wires are there for, why they're there --
7    rather, why they're not connected, and
8    what that's going to do if I do turn the
9    machine on. Because, again, portable
10   steam cleaners -- any steam-generating
11   vessel, if you don't vent the steam but
12   you allow the unit to continue to heat
13   becomes a bomb, literally becomes a bomb.
14   It will explode. If you're making steam
15   and you don't release that pressure --
16   It's just like the old-style pressure
17   cookers that blow up and blow the meat
18   sauce all over the roof. This is what
19   you've got. Steam cleaners, by their
20   operation, make more pressure than a
21   pressure cooker. So that makes the
22   explosion that much worse.
23        I was not going to turn this thing on

Page 119

1    not knowing if it's safe to operate and
2    knowing that people are going to be
3    passing by. Either the building gets
4    blown up or the thing blows up and hurts
5    somebody, or anything could happen if the
6    -- if we're not properly discharging the
7    steam. So I look at the fixture. I see
8    some -- I see loose wires on every
9    station. I'm concerned about how to --
10   should I even turn it on now. I go back
11   to my desk. I call Victor. Got him on
12   the phone. He reminded me that he had had
13   some issues with the steam cleaner, and
14   that he had disconnected these wires. I'm
15   not sure if he told me at that time or if
16   we -- I think he did say at that time that
17   he had spoken to Chad about it and that
18   everything was okay. Chad was in the
19   hospital with -- at least with chest
20   pains. I don't know exactly what the
21   condition was. But I believe he was in
22   the hospital room -- this comes out after
23   the fact -- when Victor and Chad had their

Page 120

1    discussion.
2        Anyway, I asked Victor, "Where do the
3    wires go?" He said he would take care of
4    it when he got back. I indicated that
5    that wasn't acceptable because we had to
6    run it this week while he's gone -- or the
7    time he's gone. I think I said something
8    to the effect of, "I'll see if I can't
9    figure it out. But if I can't figure it
10   out, I've got to be able to talk to you so
11   I can put this thing back into running
12   order."
13        I went back to the steam cleaner to
14   -- We hung up. I went back to the steam
15   cleaner to see if I could figure out where
16   the wires went. I couldn't. I tried to
17   call Victor again and I couldn't get him
18   back on the phone. At that point I went
19   to Mr. Robertson and explained that the
20   steam cleaner is not working. These wires
21   are disconnected. I can't get in touch
22   with Victor. My only option at this point
23   is to take everything out and see what all

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1  goes back in and to rebuild it. I'd
2  rather not do that because that's going to
3  take another couple of months to get it
4  figured out. "What do you want to do?"
5  Basically asking Terry, "How do you want
6  to handle this?" My instruction was to
7  then attempt to make it work. If I can't
8  make it work, we'll deal with it when
9  Victor comes back.
10 Q.  Did you then try to make it work?
11 A.  Yes, sir.
12 Q.  Were you able to make it work?
13 A.  No, not at all.
14 Q.  Did Victor have any discussion with you
15     before he left to go on vacation about the
16     problems -- about the issues with the
17     steam cleaner? You said he reminded you
18     that there were issues with it.
19 A.  He said something about -- We use a
20     transducer to determine -- A transducer is
21     a device that takes an analog signal --
22     "analog" being a natural signal -- and
23     transposes it into an electrical impulse

Page 122

1  that a machine can then read. So we use
2  this transducer -- we wanted to use the
3  transducer to monitor the steam output so
4  we'd know when to refill it. He said he
5  was having some trouble making the
6  transducer operate. My comment back to
7  that was, "Can you make this fixture
8  operational?" He said, "Yes." I said,
9  "Well, make it operational, and we'll
10 worry about the transducers at a later
11 point." The final direction was, "Make it
12 operational or make sure I understand why
13 it is not operational."
14 Q.  And when was the last moment he was on the
15     job before he left to go on vacation,
16     before his vacation began?
17 A.  I'm not sure if I understand.
18 Q.  Well, was it -- I mean, what day did his
19     vacation begin? Was it like a week
20     vacation, beginning on a Monday?
21 A.  Oh, yes, yes. I'm sorry. His vacation
22     started on a Monday and it was supposed to
23     run through the week.

Page 123

1  Q.  Did he work on Saturday and Sunday?
2  A.  No, sir. It would have been Friday.
3  Q.  Okay. So did he work a full day that
4      Friday?
5  A.  He asked me about taking off early. And I
6      said that if he would make the thing
7      operational and get me up to speed on how
8      to make it work, leaving a little early
9      probably wouldn't be a problem. But
10     you've got to meet these conditions first.
11 Q.  Did he talk with you before he left?
12 A.  No, sir.
13 Q.  He was out a week?
14 A.  Yes, sir.
15 Q.  All right.
16 A.  I would need to review it, but I believe
17     it was a one-week vacation. I don't think
18     it was two. I think it was one.
19 Q.  Okay. Now, when he got back, was that on
20     a Monday?
21 A.  Yes, sir.
22 Q.  Is that the day he was terminated?
23 A.  Yes, sir.

Page 124

1  Q.  How many conversations did you have during
2      the week of his vacation with Terry
3      Robertson about Victor Smith?
4  A.  I don't know. I honestly don't know.
5  Q.  At what point did you become aware that
6      Terry Robertson was going to terminate
7      Victor Smith's employment?
8  A.  After it happened.
9  Q.  You didn't know what was going to happen
10     before it happened?
11 A.  That's correct.
12 Q.  Who all -- Well, when did Terry Robertson
13     meet with Victor Smith to tell him he was
14     fired?
15 A.  It's my understanding it was the morning
16     of his return from vacation.
17 Q.  Were you present in the office when that
18     meeting occurred? I say "in the office."
19     I assume it was done in Mr. Robertson's
20     office?
21 A.  I think it was done in his office. Was I
22     present in Mr. Robertson's office?
23 Q.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 125

1   A.   No, sir.
2   Q.   You weren't present when Victor was told
3        he was being fired?
4   A.   That's correct.
5   Q.   Do you know who all was present?
6   A.   I believe it was Terry Robertson and Chad
7        Reese.
8   Q.   Did you have more than one discussion with
9        Terry Robertson during the week of Victor
10       Smith's vacation about Victor Smith?
11  A.   Yes.
12  Q.   Was it more than one?
13  A.   More than one.
14  Q.   What else did you talk about, other than
15       what you've already told me?
16  A.   I don't recall. I would say that it all
17       centered around the steam cleaner at that
18       point.
19  Q.   Now, there is -- has been marked as an
20       exhibit, and I don't recall the number,
21       some notes of an exit interview. Do you
22       see that?
23  A.   This one (indicating)?

Page 126

1   Q.   Yes.
2   A.   8.
3   Q.   Do you know whose notes those are?
4   A.   I believe they're Mr. Robertson's. Yes.
5   Q.   Have you ever seen these before today?
6   A.   Yes, sir.
7   Q.   When's the first time you saw them?
8   A.   I don't recall. It was some months after
9        Victor was dismissed.
10  Q.   Did you see them before this case was
11       brought?
12  A.   I don't think so.
13  Q.   Under what circumstances did you review
14       this document, Plaintiff's Exhibit 8?
15       What were the circumstances that brought
16       this document to your attention?
17  A.   I believe it was the fact that we now have
18       this court case that it was brought to my
19       attention.
20  Q.   Paragraph number 1 says, "Don't appear to
21       want to be here." Do you know what that
22       refers to?
23  A.   Do I know?

Page 127

1   Q.   Yes.
2   A.   No, sir.
3   Q.   All right. Did you ever express to Terry
4        Robertson that Victor appeared not to want
5        to work for Euro-Pro?
6   A.   I don't recall saying that. No, sir.
7   Q.   That's not your conclusion, number 1?
8   A.   No, sir.
9   Q.   Number 3 talks about lab view software
10       controls.
11  A.   Yes, sir.
12  Q.   Do you know what that's referring to?
13  A.   Lab view is what is known in the industry
14       as a graphic user interface. Basically
15       what that allows -- what that does, it's a
16       computer program that you put on your
17       computer. It allows a very -- it allows
18       very easy access into -- This is not a
19       very good summary. Our use would be to
20       allow it to -- allow a user and in anybody
21       to go to the computer and very easily pull
22       up information on the various tests that
23       are being conducted in the Life test room.

Page 128

1        You could relatively easily then change
2        the parameters of the tests so that you
3        could -- it makes it a little bit easier
4        to write new programs, to put the units
5        on, to take the units off, to help conduct
6        analyses of the units as they're on the
7        test. There's a million things you can do
8        with lab view.
9   Q.   What was Victor Smith supposed to be doing
10       with lab view? How does that relate to
11       his job?
12  A.   Part of what we wanted -- The current --
13       I'm sorry. At that time the current state
14       of affairs was, we had probably as many as
15       fifteen different tests operating at one
16       time. Lab view, if properly used and
17       properly installed, we were hoping to be
18       able to use this to install it on one
19       computer -- I need to back up. With the
20       fifteen different units, fifteen different
21       fixtures going, if I wanted to know
22       information about that specific fixture, I
23       would have to take a computer or a

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1   hand-held device, some device and actually
2   connect it to that station. There is a
3   Programmable Logic Controller, or PLC, in
4   the station, which is a mini-computer that
5   tells the station what to do. I would
6   interface with that station, with that
7   PLC. And then I could tell at what status
8   the station was in, whether it was
9   running, whether it was -- how many cycles
10  the unit had conducted, where it was in
11  the program, if it's operating or if it's
12  not operating. Basically it allows me to
13  see into the program and get an idea of
14  how the programs work.
15      Lab view would then be installed on
16  one main computer, and then all the other
17  little PLC's would be networked into that
18  computer. And instead of having to go to
19  each individual station, I can go to one
20  spot and look at all of them.
21  Q.   Okay.
22  A.   Victor was supposed to take lab view and
23      install it on the computer and help us

Page 130

1   make it work to interface all the other
2   pieces.
3   Q.   Okay. And that didn't get done? Is that
4       what you're saying?
5   A.   That's correct.
6   Q.   Is that something you discussed with Terry
7       Robertson?
8   A.   Yes. I made a comment that it had not
9       been up and --
10  Q.   Did Victor know how to program a computer
11      in that fashion?
12  A.   I don't know.
13  Q.   When was he asked to do that?
14  A.   This was kind of part of the -- Let me
15      look. I don't want to guess. I'm not
16      sure if I talked to him in August or if I
17      talked to him in May. It may have come
18      out in August. Because as I said -- I
19      believe it did come out in August.
20      Because he had -- we already had a few
21      stations running. The addition of the
22      steamer and the other stations that were
23      in the process to be connected, it would

Page 131

1   have made sense at that point after he was
2   done -- after he was done with the steamer
3   to start looking into the lab view.
4   Q.   Okay. Item number 4 talks about a pant
5       press that had -- has been in the
6       Reliability stations for many months.
7       What does that mean, "been in the
8       Reliability stations?"
9   A.   Terry preferred the term "Reliability
10      testing" to "Life testing." I guess the
11      -- I'm guessing the connotation of "Life
12      test" is not as positive, possibly in the
13      consumer's mind, as the term "Reliability
14      testing." But in my mind, "Reliability
15      stations" and "Life stations" are the same
16      thing.
17  Q.   Okay. So this is a station to test a pant
18      press?
19  A.   Correct.
20  Q.   And how did that relate to Victor's job?
21  A.   It was another device that we were
22      evaluating for sale for possible inclusion
23      into the Euro-Pro line. In order to get

Page 132

1   an idea as to whether the thing works very
2   well or works for any length of time, we
3   wanted Victor to operate the unit several
4   times a day.
5   Q.   When was he assigned that job?
6   A.   I don't remember when we got the unit.
7   Q.   Was it before or after the evaluations?
8   A.   It may be between the informal but before
9       the -- Honestly -- I take that back. I
10      don't remember. We get a lot of one-of
11      products. And sometimes a test is simply
12      "Will this test last for any length of
13      time?"
14  Q.   What does number 5 refer to, "Failure and
15      analysis of failed items in Reliability?"
16  A.   If we go -- If a unit is on test and
17      either it completes the requirements or it
18      fails before it completes the
19      requirements, I wanted Victor to be the
20      first one to take that unit apart, to
21      start to analyze what was wrong with it,
22      why it failed, at least at this point to
23      start to pinpoint what were the failure

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1  modes, and then take that back to the
2  engineering team again to learn a little
3  bit more about the products so he would
4  eventually grow into the role of becoming
5  the go-to guy for telling us why the
6  products failed and possibly offering
7  engineering solutions. This was all part
8  of his growth as a Reliability guy, Life
9  test guy, whatever you want to call him.
10 Q.  Number 6 deals with the clean-up of the
11     area. I think we've talked about that. I
12     won't get into that.
13         Number 7, "Totally changed
14     personality after being made permanent."
15     Do you know what this means, "after being
16     made permanent?" Would that be when he
17     was moved from temp to permanent?
18 A.  Correct.
19 Q.  That would have been in December of 2003?
20 A.  Right.
21 Q.  Is this conclusion about "totally changed
22     personality," is this something you
23     expressed to Terry Robertson?

Page 134

1  A.  Not the "changed personality." I don't
2      know that I used those words. I did
3      express a seeming resistance now to accept
4      new responsibilities. Other people --
5      It's my understanding that other people
6      have made similar type comments or other
7      comments that Terry then used to come up
8      with the term "changed personality."
9  Q.  How closely did Terry Robertson work with
10     Victor Smith?
11 A.  That's a hard one to answer. As I've said
12     before, we were a small organization.
13     Terry really wanted to create this family
14     environment. I mean, he took an active
15     interest in everybody's personal life,
16     basically to make sure you're a happy
17     person and you were happy to come to work.
18     That's really the only way I could answer
19     it. How closely, I mean --
20 Q.  Was Terry there on a daily basis?
21 A.  Again, that's tough. But he traveled a
22     lot. But when he was there, he was very
23     hands-on with all of us. I mean, he would

Page 135

1  -- he's the kind of guy that he brought
2  out Brewster's ice cream one day, bought
3  it out of his pocket. Just had the guys
4  bring their truck down and bought
5  everybody ice cream one afternoon.
6  Q.  The thing, I guess, that's confusing about
7      this to me, when I look down here and see
8      "totally changed personality," as of
9      December of '03, and then we get these
10     evaluations indicating that he's meeting
11     or exceeding expectations, it doesn't seem
12     to fit to me. And I'm just wondering if
13     that -- the "totally changed personality,"
14     do you agree with that assessment?
15         MR. LIGHTFOOT: Objection, to the
16             extent it's been asked and
17             answered by Mr. Hudnall
18             already. If you want to try
19             to expand, you can.
20 A.  I have to agree that it seemed he was not
21     the same -- I really don't like this word
22     -- but effervescent person when he started
23     that he was later with Euro-Pro. It

Page 136

1  seemed like when you would want to assign
2  something new to him, there would be --
3  there would always be some reason why not.
4  "Do I get more money for this?" Or, "It's
5  another responsibility. Do I get
6  something extra?" Those kind of things.
7  And that's when I'd have to say again, you
8  know, we don't work for the pay we're
9  making now. We work for next year's
10 raise. The more of these things you
11 accept willingly with no pain and
12 suffering on our part, the better your
13 raise is going to look like next year when
14 we get ready to do something. In that
15 respect, I don't know if "changed
16 personality" is the right word, but there
17 was a definite change in temperament.
18 I'll put it that way.
19 Q.  Let's move to number 8, because that talks
20     about something that I don't think we've
21     touched on yet. It has two parts really.
22     The first is about discussion of bonuses
23     with other employees, which we have talked

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

Page 137

1    about. And then number 2 is, "Accused
2    while here of a problem with two other
3    female employees of harassment, both from
4    the office and outside the office." Now,
5    who were those two female employees that
6    we're talking about there?
7        MR. LIGHTFOOT: Objection, to the
8            extent he says this isn't
9            his document. Now, you can
10           answer his question if you
11           want. But you said "that
12           we're talking about here."
13 Q.   Well, that are referred to in this
14       document. I understand it's not your
15       document. But, on the other hand, you
16       know, our subpoena does say that we want
17       to question on the reasons for
18       termination. And this is -- you know,
19       this outlines the reasons for termination.
20       So I'm assuming you know something about
21       these two female employees, who they are
22       and what these allegations are that
23       they've made; is that correct?

Page 138

1        MR. LIGHTFOOT: Same objection.
2  A.   The two females would have been Ashley
3        Sheffield and Allison Rhodes.
4  Q.   Okay. Back to Ashley Sheffield for a
5        moment. As I understand it, she never
6        made any allegation about sexual
7        harassment toward Victor, did she?
8  A.   Correct.
9        MR. LIGHTFOOT: Objection.
10 Q.   Now, let's go to -- The other one was
11       named --
12 A.   Allison Rhodes.
13 Q.   Allison Rhodes?
14 A.   Right.
15 Q.   Is Allison Rhodes still an employee?
16 A.   No, sir.
17 Q.   Is Rhodes still her last name?
18 A.   I believe she got married, but I don't
19       know what it is.
20 Q.   When did her employment with Euro-Pro end?
21 A.   I don't recall.
22 Q.   Do you know if it was before or after
23       Victor Smith's employment ended?

Page 139

1  A.   After.
2  Q.   Was she terminated, fired, or did she
3        quit?
4  A.   She quit.
5  Q.   Do you know why she quit?
6  A.   No, sir.
7  Q.   Do you know where she lives now?
8  A.   No, sir.
9  Q.   Do you know where she works now?
10 A.   No, sir.
11 Q.   What did she say about Victor Smith?
12 A.   I really don't know, because I don't --
13       I'm not -- I'm not real sure what he's
14       talking about here.
15 Q.   Okay. Did Allison Rhodes ever make any
16       complaint to you about Victor Smith?
17 A.   No.
18 Q.   Do you know if Allison Rhodes made a
19       complaint to Terry Robertson about Victor
20       Smith?
21 A.   No, sir, I don't know.
22 Q.   Do you know if Allison Rhodes made a
23       complaint to anyone with Euro-Pro about

Page 140

1        Victor Smith?
2  A.   I'm unaware of anything.
3  Q.   Have you been told by someone at Euro-Pro
4        or anywhere else, other than your lawyer,
5        what kind of complaint that Allison Rhodes
6        made against Victor Smith?
7  A.   I'm unaware of any complaints.
8  Q.   Are you aware of any documentation of a
9        complaint or allegation made by Allison
10       Rhodes against Victor Smith?
11 A.   No, sir.
12 Q.   Well, my question then, Mr. Hudnall, is
13       this: This document, Plaintiff's Exhibit
14       8, refers to a problem with two female
15       employees. And I asked you who they were
16       and you told me Allison Rhodes. How did
17       you get that name?
18 A.   Because, while no complaint was made, at
19       some point during the discussions with
20       Ashley about the telephone call, the
21       comment was made to me that Victor had
22       asked Allison and Ashley if either one
23       would ever date a black guy. Now that I

35 (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 141

1  think about it, that probably was part of
2  our discussion on the sexual harassment
3  side. I had honestly forgotten about it
4  till we got to this. But again, in my
5  opinion, in my estimation, it was asked
6  and answered, "You can't harass anybody.
7  Well, I know, I know. Well, we just want
8  to make sure that we all understand, we're
9  all on the same page and it's forgotten
10  about."
11      In fact, to that end, shortly after
12  that discussion the owner of the company
13  and our H. R. representative came down for
14  a visit. We all went to dinner together.
15  And the H. R. person talked to me the next
16  day. We both noted that Ashley and
17  Allison and Victor all voluntarily left
18  the dinner together and all walked out
19  together going out to some -- to wherever
20  they went. And H. R. commented how happy both
21  commented how happy we were that they
22  seemed to not have a problem and that it
23  was truly -- well and truly said and done.

Page 142

1  Q.  When was that dinner?
2  A.  I would have to look at when we -- I'd
3  have to base this on when we talked to
4  Victor about the phone call.
5  Q.  Well, I know you can't remember the exact
6  date.
7  A.  Within a week of -- after talking to him
8  about the phone call. Because, again,
9  H. R. and I made the comment to each other
10  that it was -- it was really good that we
11  -- management said what they had to say.
12  The parties involved seemed to have taken
13  our -- understood where we were coming
14  from but could still remain friends.
15  Q.  So that dinner would have been in the
16  spring of '04?
17  A.  I believe so. Yes.
18  Q.  Do you know of any other complaint that
19  Allison ever had against Victor?
20  A.  No, sir.
21  Q.  I want to go back to what you said when --
22  I guess you -- The reason you gave me
23  Allison's name is, you got that from

Page 143

1  Ashley when she came to you; is that
2  right?
3  A.  Correct.
4  Q.  And tell me again what she told you about
5  Victor -- I don't know. Was it Victor had
6  asked about dating a black man? Is
7  that --
8      MR. LIGHTFOOT: You want him to
9      restate it?
10  Q.  Yeah. Just tell me again.
11      MR. LIGHTFOOT: You already
12      answered. But --
13  Q.  I'm jumbling the question.
14  A.  I believe the comment was something to the
15  effect that Victor had asked Ashley -- I'm
16  sorry. Ashley is white. Allison is
17  white. That Victor had asked if either
18  one of them would date a black man.
19  Q.  Okay. You heard that from Ashley?
20  A.  Correct.
21  Q.  Now, in what context did Ashley tell you
22  that?
23      MR. LIGHTFOOT: Objection. He's

Page 144

1      answered that to the best of
2      his knowledge. If you want
3      him to answer it again, he
4      can.
5      MR. COTTLE: I do.
6  A.  To the best of my knowledge, it was during
7  the discussion about the phone call. I
8  was trying to get to the bottom of it.
9  "Do you feel like he sexually harassed
10  you?" I think that's how it went.
11  Q.  Was she offended by that question, or did
12  she indicate to you that she was offended
13  by being asked that question?
14  A.  I don't think so.
15      MR. LIGHTFOOT: Are you talking
16      about Ashley?
17      MR. COTTLE: Ashley.
18  Q.  Well, you didn't talk to Allison about it,
19  did you?
20  A.  I did.
21  Q.  Oh, you did?
22  A.  And she corroborated. Is that the right
23  word?

36  (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 145

1  Q.  Yeah.
2  A.  She said Victor asked her the question.
3      "Did that bother you?  Well, No, not
4      really."  Allison never complained.  I
5      heard it.  I went to Allison to confront
6      her.  Yes, he asked it.  This all goes
7      back into -- besides the phone call, we
8      touched on sexual harassment, making sure
9      we're not doing anything wrong.
10 Q.  So you actually went to Allison and asked
11     her about a conversation Victor had with
12     her about dating a black man?
13 A.  Right.
14 Q.  And there's no prohibition against
15     co-employees dating?
16 A.  Oh, no, no.  Not at all.  My reason for
17     seeing Allison was, "Were you offended by
18     being asked that question by a black man?"
19 Q.  And she replied no?
20 A.  No.
21 Q.  Well, where do we get, if you know, the
22     allegation in paragraph 8 of this exhibit
23     about two people -- two female employees

Page 146

1      talking about harassment?
2          MR. LIGHTFOOT:  Objection.  Asked
3          and answered for the last
4          fifteen minutes.
5  A.  I don't know.
6  Q.  At this point in time, if a female
7      employee came to management of Euro-Pro
8      and made a complaint about sexual
9      harassment, would there be some kind of
10     documentation made about that complaint?
11 A.  Absolutely.
12         MR. LIGHTFOOT:  Objection.  Calls
13         for speculation.
14 Q.  During the period of time Victor Smith
15     worked there in 2004, if a female employee
16     had come to management of Euro-Pro and
17     complained about sexual harassment, would
18     it have been the practice and procedure of
19     Euro-Pro to document that complaint in
20     writing?
21         MR. LIGHTFOOT:  Objection.  Calls
22         for speculation.
23 A.  I believe so.

Page 147

1  Q.  Okay.
2  A.  It's a serious charge.
3  Q.  And to your knowledge, there is no
4      documented file or documented instance of
5      Victor Smith sexually harassing anyone?
6  A.  That's correct.
7          (Plaintiff's Exhibit 11 marked
8          for purposes of identification)
9  Q.  I've marked this as Plaintiff's Exhibit
10     11.  It's been produced in discovery in
11     this case.  Do you know what that is?  Can
12     you tell me what that is supposed to show?
13         MR. LIGHTFOOT:  I don't know that
14         he's ever seen it.
15 A.  I don't know.  No.  I don't know what this
16     is.
17 Q.  Okay.  Do you know whose handwriting that
18     is?
19 A.  No, sir.
20 Q.  It appears to be just an itemization of
21     deductions from Victor Smith's payroll
22     check, I guess.
23 A.  Okay.

Page 148

1          (Off-the-Record discussion)
2  Q.  Let's look at Plaintiff's 9.  Do you know
3      what this is?  This is an e-mail from Chad
4      Reese -- an e-mail correspondence between
5      Chad Reese and Victor Smith?
6  A.  Yes, sir.
7  Q.  Have you read over this?
8  A.  Yes, sir.
9  Q.  What does this refer to?
10 A.  It refers to Victor trying to get some
11     information on how to build a steamer
12     fixture.
13 Q.  He was asking this information of Chad
14     Reese?
15 A.  Yes, sir.
16 Q.  Where did this document come from?
17 A.  It's a chain of e-mails between the --
18     between Victor and Chad.
19 Q.  Off someone's computer?
20 A.  Yes.
21 Q.  Is it something that -- if you know the
22     answer to this, was this in a file
23     somewhere, or was it retrieved

37  (Pages 145 to 148)

# FREEDOM COURT REPORTING

## Page 149

1  specifically in response to a discovery
2  request?
3  A.  I don't know.  I don't know.
4  Q.  **Do you know what it purports to show?**
5  A.  Well, it shows Victor asking -- You have
6  to read these things backwards.  So you'd
7  start towards the bottom of the first page
8  where it says "Original Message.  Victor
9  Smith.  Sent, Friday June 25th."  Next
10  page.  "To Chad Reese."  That's actually
11  the first e-mail.
12  Q.  **Yeah.**
13  A.  Victor is asking -- he says, "Chad, I need
14  a copy of the Life test spec for steamer
15  so I can start writing the PLC program.
16  Please reply through e-mail."
17      MR. LIGHTFOOT:  Why don't you
18          just answer his questions?
19          If he wants to ask you
20          questions about it --
21      THE WITNESS:  I'm sorry.
22      MR. LIGHTFOOT:  You don't need to
23          read it to him.

## Page 150

1  Q.  **Okay.  So we start with a request from**
2      **Victor for some specifications.  Now, I**
3      **guess what I'm trying to get to is, is**
4      **there anything in here of any significance**
5      **as to why Victor Smith was terminated?**
6  A.  It leads to it.
7  Q.  **And in what way?**
8  A.  We stated previously that Victor seemed to
9  have a problem taking the whole grasp of
10  his job.  And in this set of e-mails you
11  can see Victor asking a question for the
12  spec for steamers.  The reply is the spec.
13  The next is asking for more information.
14  The last reply is that these are the
15  things that Victor has to figure out in
16  order to start the unit, in order to build
17  a fixture.  Basically, each different
18  model steamer is different.  He's asking
19  for how long it takes for the unit to
20  reach steady state.  In other words, how
21  long does it take -- Once you put water
22  in, put the cap back on, start heating,
23  how long does it take for that steamer to

## Page 151

1  be able to produce steam?  Well, the only
2  way to do that is to fill a steamer up,
3  run it for awhile, see how long it takes
4  for the light to come on or whatever
5  indicator for the consumer comes on to let
6  the consumer know it's ready to make
7  steam, time it and steam it.  If Chad
8  answers every question Victor asks in the
9  June 28th section of the e-mail, Chad is
10  doing Victor's job for him.
11  Q.  **Well, the questions deal with a product**
12      **that Euro-Pro manufactures, correct?**
13      **These are not questions about the machine**
14      **that Victor was building?**
15          MR. LIGHTFOOT:  Objection.
16  A.  Right.  These are questions about the --
17  But the machine Victor is building is
18  built to test these products.
19  Q.  **Correct.**
20  A.  And that may change from product to
21  product.
22  Q.  **But are you saying that the product, in**
23      **this case the steamers that Euro-Pro**

## Page 152

1  builds, will all take different amounts of
2  time to get to a steady state?
3  A.  Different models will take different
4  times.  They have different capacities.
5  It's going to take longer to heat a gallon
6  of water than a pint of water.
7  Q.  **But every model should achieve a steady**
8      **state in approximately the same amount of**
9      **time, should it not?**
10  A.  Correct.
11  Q.  **And would it be helpful for Victor to**
12      **know, that as he's building this device,**
13      **to test these machines?**
14  A.  Absolutely.
15  Q.  **And somebody would have that information,**
16      **would they not, of how long it takes this**
17      **certain model to get to a steady state?**
18  A.  We would have a written specification that
19  we put out to the factory that they need a
20  window to meet.  But when you get down to
21  the actual model, you have to actually
22  test it yourself.
23  Q.  **What I'm asking is, that information of**

# FREEDOM COURT REPORTING

Page 153

1  how long it would take model A, B 120 or
2  whatever to reach a steady state, that
3  information is available somewhere within
4  the company, isn't it?
5  A.  Not necessarily.
6  Q.  Okay.  Would you agree that if the
7  information is available, it's a waste of
8  time for somebody to have to go test it to
9  come up with the same information again?
10 A.  That depends on what tests you're trying
11 to conduct and how you're trying to
12 approach your testing.
13 Q.  How long does it take for a lab technician
14 to determine the length of time it takes
15 one of these steamers to get to a steady
16 state?
17 A.  It depends on the steamer.  Some fifteen
18 minutes.
19 Q.  Some longer?
20 A.  Maybe.  At the same time the technician
21 could be timing one and over here doing
22 something else.
23 Q.  Okay.  But it takes some amount of time to

Page 154

1  do that work?
2  A.  Yes.
3  Q.  If that information is available somewhere
4  else in the company and in somebody's
5  files or somebody's head, wouldn't it make
6  sense to ask about it and get it -- and
7  get it from wherever it already was rather
8  than to spend the time testing it when the
9  company already had the information?
10 A.  If the information is in a file somewhere,
11 then somebody has got to go find that
12 file.  It may take that engineer longer to
13 find that information -- all that
14 information that's asked that it would for
15 the technician to find it himself.
16 Q.  If it would, the engineer could say that,
17 as Mr. Chad Reese has done?
18 A.  Right.
19 Q.  "Find it yourself."  But certainly it
20 doesn't hurt to ask him if he knows and
21 has the information at the tip of his
22 fingers, does it?
23 A.  That's true.

Page 155

1  Q.  In fact, it makes some sense to ask
2  because it might save time, mightn't it?
3  A.  I would say it makes some sense to ask.
4  It may not save time.
5  Q.  It may or it may not; we don't know, but
6  it could, correct?
7  A.  It could.
8  Q.  And, therefore, it makes sense to ask?
9  MR. LIGHTFOOT:  Objection.
10 A.  Right.
11 Q.  Now, let me show you what I'm going to
12 mark as Plaintiff's Exhibit 12.
13 (Plaintiff's Exhibit 12 marked
14 for purposes of identification)
15 Q.  This appears to be a Euro-Pro policy for
16 vacation time, time away from work, et
17 cetera.  Is that what that is?
18 A.  It's the beginnings of the development of
19 an employee's handbook.
20 Q.  Okay.  Now, is there anything with regard
21 to that policy that you would say Victor
22 Smith ever violated?
23 A.  Yes.

Page 156

1  Q.  What?
2  A.  Well, at the beginning -- at first he
3  violated the protocol for time spent out
4  of the office.
5  Q.  In what way?
6  A.  When he was about to go on vacation, he
7  left early without letting me know what he
8  needed to let me know before he left
9  early.
10 Q.  Okay.  What else?
11 A.  I would probably have to review more of
12 the actions.  I don't see anything
13 obvious.
14 Q.  When was that policy made available to the
15 employees of Euro-Pro?
16 A.  I don't recall.  I know it was published
17 December 3rd.  I also know Terry went back
18 to Francine about some possible
19 modifications.  But I think we put it out
20 on the 3rd of 2003 as our first start.
21 (Plaintiff's Exhibit 13 marked
22 for purposes of identification)
23 Q.  Okay.  Let me show you Plaintiff's Exhibit

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1      13. That's another part of the policy
2      manual.
3 A.  Okay.
4 Q.  Have you reviewed that before?
5 A.  Probably.
6 Q.  And that deals with what?
7 A.  Performance reviews.
8 Q.  And were the performance reviews of Victor
9      Smith that we've gone over and talked
10     about here today conducted in accordance
11     with that policy?
12 A.  Let me read it. I would have to say no to
13     that.
14 Q.  In what way were they not?
15 A.  Well, the third sentence indicates that
16     performance reviews should take place
17     during the month of April. And at the
18     earliest I reviewed with Victor was in
19     May.
20 Q.  Well, is that the only thing?
21 A.  As far as the review goes, I believe so.
22 Q.  Okay. Let me ask you, backing up to the
23     August evaluation of Victor Smith.

Page 158

1 A.  Okay.
2 Q.  I believe that's Plaintiff's Exhibit 6 or
3     it may be 5.
4 A.  Okay.
5 Q.  If you go to the last page where the
6     overall evaluations -- may be the
7     next-to-the-last page. There is the
8     number 3.5 down there on the bottom left.
9     I want to ask you again about what scale
10     that's on.
11 A.  Scale of 5.
12 Q.  Is it possibly a 1-to-4 scale?
13 A.  No, sir.
14 Q.  You're certain about that?
15 A.  Absolutely.
16 Q.  I may or may not mark this. I want to ask
17     you about it first. It may be irrelevant.
18     This document here is several pages long
19     that's been produced. It says "PLC
20     Instruction."
21 A.  Yes, sir.
22 Q.  Can you tell me what this is?
23 A.  Yes, sir.

Page 159

1 Q.  What is it?
2 A.  This is a handout -- Let me back up a
3     little bit. Brian McGhee, that we've
4     mentioned before, was hired into Euro-Pro
5     from Auburn University. He was a very
6     recent graduate of their Master's in
7     Electrical Engineering Program. His -- I
8     don't know for how long. But for some
9     time during his last -- during his
10     Master's work he instructed the electrical
11     engineering students at Auburn University
12     under Programmable Logic Controller
13     instruction. Programmable Logic
14     Controllers are commonly referred to as
15     PLC's within the industry. He gave a
16     general class to the students at Auburn
17     University on how to program -- generally
18     how to program PLC's. I asked him to then
19     give a class to our employees on the
20     specific direct Soft 32 program that we
21     use. So this is a handout from that class
22     that specifically details how to program
23     the exact PLC units that we use at

Page 160

1     Euro-Pro. The nomenclature may be
2     different. Some terms may be different.
3     This is detailed to the ones that we
4     purchased.
5 Q.  Victor Smith, did he sit in on this class?
6 A.  I believe so. Yes, sir.
7 Q.  Was any part of his job to program the
8     computers with this program?
9 A.  Yes, sir.
10 Q.  And was he able to do that? Did you ever
11     have a problem with him not properly doing
12     that part of his job?
13 A.  No, sir.
14 Q.  Okay. Who is Jeff Garrison?
15 A.  Jeff works for us.
16 Q.  When was he hired?
17 A.  December of '04.
18 Q.  After Victor left?
19 A.  I believe so.
20 Q.  Now, Jeff Garrison is an engineer?
21 A.  That's correct.
22 Q.  When was the decision made to hire an
23     engineer?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1  A.  Honestly, I don't know.
2  Q.  **Who made the decision?**
3  A.  I don't know that either.
4  Q.  **Do you know if the decision to hire an**
5     **engineer was made before or after Victor**
6     **Smith was terminated?**
7  A.  I don't know. I'd have to guess.
8  Q.  **But at any rate, we do know that Jeff**
9     **Garrison was hired after Victor was**
10    **terminated?**
11 A.  That's correct.
12 Q.  **And do you know the exact date he came in?**
13     MR. LIGHTFOOT: He's already said
14     he didn't.
15 A.  I don't.
16 Q.  **Okay.**
17 A.  I will say this: Jeff was part of -- I
18     want to get this right. The word escapes
19     me. We approached Auburn University,
20     their electrical group -- actually, their
21     electrical group and their mechanical
22     group, for senior design projects. They
23     routinely -- It's routine in the

Page 162

1     engineering field for the senior students
2     to design a product, and that tells their
3     professors how well they can design a
4     project and if they deserve to graduate or
5     not. We approached Auburn University for
6     two electrical projects and one or two
7     mechanical projects.
8         Brian McGhee, as the lead of the
9     Electrical Engineering Group, had gotten
10    to the point where he needed help in his
11    work, the electrical -- design of
12    electronic circuits. Jeff and one other
13    guy were noted during that time -- and
14    this is -- You approach these guys at the
15    beginning of their semester. So it would
16    have been in September, I think, of '03,
17    whenever school starts -- to here's a
18    couple of projects we'd like to see if
19    your design students could help us with.
20    Jeff and Larry Frost were identified
21    fairly early on as possible candidates.
22    Once they graduated school, they were
23    hired.

Page 163

1  Q.  **Was someone else hired at the same time**
2     **Jeff was?**
3  A.  Yes, sir.
4  Q.  **Who?**
5  A.  Larry Frost.
6  Q.  **Okay. Were they hired both in December of**
7     **'04?**
8  A.  I would say so. All coming out of this
9     Electrical Engineering Senior Project
10    Design Group.
11 Q.  **At the time Victor left, as I understand**
12    **it, the steam testing device was**
13    **operational but not fully operational?**
14     MR. LIGHTFOOT: Objection. Asked
15     and answered. Go ahead.
16 A.  It seemed to be operational before he
17    left. When we found the exposed wires, we
18    were -- it then became non-operational
19    because we weren't sure if it was safe to
20    operate.
21 Q.  **Well, let me -- Right. I understand,**
22    **because of the exposed wires, it was not**
23    **operational. But I understood you to say**

Page 164

1     **earlier, exposed wires aside, it was maybe**
2     **only eighty percent operational?**
3         MR. LIGHTFOOT: Objection. Go
4     ahead.
5  Q.  **Is that what you said?**
6  A.  Yes. That's what I said.
7         MR. LIGHTFOOT: Objection.
8  Q.  **Whose job did it become after Victor's**
9     **termination to bring that machine into**
10    **full operation?**
11 A.  Mine.
12 Q.  **What part, if any, did Mr. Garrison play**
13    **in working on the steam cleaner testing**
14    **device?**
15 A.  Jeff assisted. Once I got into it and
16    realized how much work it would take, we
17    were faced with the choice of me doing
18    nothing but steamers and steam cleaners or
19    getting a little bit -- a little bit of
20    help, and I could continue to run the
21    other projects as well as my own workload.
22    And, so, in that role Jeff helped.
23 Q.  **All right. Are you saying that it would**

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1    have been pretty much a full-time job for
2    you to work on the steam cleaner tester?
3  A.   Yes, sir.  Basically, I would have had to
4    fill Victor's shoes completely.  And with
5    my current workload I just didn't have
6    time.
7  Q.   So Victor's job was then divided between
8    you and Jeff Garrison; is that correct?
9         MR. LIGHTFOOT:  Objection.
10  A.   I would characterize it as saying I took
11    on the job and Jeff gave me a little help.
12  Q.   So how much of your time, after Victor
13    Smith left, was spent working on the
14    things Victor had been working on?
15  A.   Eventually that became my full-time job.
16    It eventually became my full-time job.
17    It's a full-time -- that's a full-time
18    position.  In order to keep the things
19    running, you've got to have somebody back
20    there making sure they are running.
21  Q.   Is that your full-time position now?
22  A.   Pretty much.
23  Q.   And you say that no one has been hired to

Page 166

1    replace Victor?
2  A.   That's correct.
3  Q.   Is anyone going to be hired?
4  A.   We've had some subsequent changes.  And I
5    may be changing roles, and we'll deal --
6    bring somebody in to fill mine or Victor's
7    position at this point.
8  Q.   Is Mr. Garrison still with the company?
9  A.   Yes, sir.
10  Q.   Is he white?
11  A.   Yes, sir.
12  Q.   What age person is he?
13  A.   I don't know.
14  Q.   He just recently graduated from Auburn
15    University?
16  A.   That's correct.
17  Q.   He's an engineer?
18  A.   Yes, sir.
19  Q.   When he came to work for Euro-Pro,
20    Mr. Garrison, how much of his -- what
21    percentage of his time would you estimate
22    was devoted to completing the steam
23    cleaner tester?

Page 167

1         MR. LIGHTFOOT:  For what period
2    of time?
3  Q.   Well, over the first -- say the first
4    three months.
5  A.   On the steam cleaner?
6  Q.   Yeah.
7  A.   I would estimate he put what I call
8    one-man month into it.  Four weeks, forty
9    hours a day, over a three-month period or
10    so.
11  Q.   So over a three-month period it was -- he
12    devoted about a third of his time to it?
13  A.   That's a fair estimate, I think.
14  Q.   Let me ask you this:  If it was eighty
15    percent operational when Victor Smith
16    left, how long did it take to get it up to
17    a hundred percent?
18         MR. LIGHTFOOT:  Objection.  I
19    believe he testified he had
20    to start over.  But anyway,
21    go ahead.
22  A.   We did.  We had to start over from
23    scratch.  Not knowing -- Again, not

Page 168

1    knowing about the wires, we had to start
2    over from scratch.
3  Q.   How long did it take to start over from
4    scratch and get it fully operational?
5  A.   I think at least two months.  Maybe a
6    little longer.
7  Q.   And during that time Mr. Garrison spent
8    approximately a third of his time on that
9    project?
10  A.   I think that's fair.  I mean, again, we
11    hired him because we had other things for
12    him to do.
13  Q.   Of the employees that are currently
14    employed in the Lee County facility of
15    Euro-Pro, how many of them are black?
16  A.   One.
17  Q.   And what's that employee's name?
18  A.   Duvell Robinson.
19  Q.   And he's a lab tech?
20  A.   Yes, sir.
21  Q.   Have there been any other black employees
22    hired since Victor Smith was terminated?
23  A.   No, sir, not permanent.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  Q.  Have there been some hired temporarily?
2  A.  Yes, sir.
3  Q.  Through a temp agency?
4  A.  Through a temp agency.  Yes, sir.
5  Q.  And they were not kept full-time, or they
6      were not --
7  A.  I'm sorry.  One more.  I completely forgot
8      about Patricia.
9  Q.  Patricia?
10 A.  I honestly -- I don't remember her last
11     name.
12 Q.  What department does she work in?
13 A.  She's a lab tech now.
14         MR. LIGHTFOOT:  Temp or regular?
15         THE WITNESS:  She's full-time.  I
16            think around June of last
17            year she was made full-time.
18            Sorry.  Might have been June
19            of this year she was made
20            full-time.  Sorry.
21 Q.  Now, Mr. Hudnall, I want to cover one
22     other area.  There's been testimony in
23     Mr. Victor Smith's deposition of the use

Page 170

1  of some offensive words.  I want to ask
2  you this:  Personally, does the use of the
3  word "nigger" offend you?
4  A.  Absolutely.
5  Q.  Is that a word that is frequently used
6      around the Euro-Pro factory?
7  A.  No, sir.
8  Q.  Do you consider it to be inappropriate to
9      use that word?
10 A.  Yes, sir.
11 Q.  Are there any written policies that are
12     directed toward the use of that kind of
13     offensive language?
14 A.  I don't know what the 401 posters say
15     about language.
16 Q.  The 401 posters being
17     anti-discrimination --
18 A.  Those.  Right.
19 Q.  -- information?
20     Have you ever used the word "nigger"
21     during work hours in front of Victor
22     Smith?
23 A.  No, sir.  I don't believe so.

Page 171

1  Q.  You don't believe so?
2  A.  No, sir.
3  Q.  Have you ever repeated any routines by
4      some comedian wherein that comedian used
5      that word?
6  A.  I believe so.  Yes, sir.
7  Q.  All right.  And was Victor Smith present
8      when you repeated that?
9  A.  Yes, sir.
10 Q.  And as you were repeating this, did you
11     use the word "nigger"?
12 A.  No, sir.
13 Q.  Did you use any other word that you would
14     consider offensive had it just been
15     mentioned in ordinary conversation?
16 A.  It's hard to know what offends someone
17     without them telling you.  But I don't
18     believe so.
19 Q.  Okay.  Did you ever hear any other
20     employee use that word or any other word
21     that you would consider to be racially
22     offensive?
23 A.  No, sir.

Page 172

1  Q.  Who was the comedian that you were talking
2      about when we just went over that?  David
3      Chappelle?
4  A.  That would have been one.  Yes, sir.
5  Q.  Do you recall any conversation you ever
6      had in Victor Smith's presence where you
7      were talking about David Chappelle and
8      anything he said during a comedy routine?
9  A.  We would discuss him, that he had -- About
10     the time Victor came to work for us, he
11     started a show on comedy central.  I
12     thought it was a point -- a point of
13     common interest.  And, so, it seemed like
14     water-cooler talk, for lack of a better
15     term.  You come in the next morning.  "Did
16     you see the show?  Yeah, we saw the show."
17     A lot of his comedy is racially motivated.
18     But you try to say to yourself -- You're
19     trying to get the funniness across and not
20     the mean-spirited part.
21 Q.  I understand.  Okay.  I think that's all.
22     Let me take about five minutes and then
23     we'll come back.

43  (Pages 169 to 172)

# FREEDOM COURT REPORTING

Page 173

1      (Brief recess)
2   Q.  **Mr. Hudnall, I want to ask you about the**
3       **Friday that Victor left to go on his**
4       **vacation. This is in November of '04.**
5   A.  Okay.
6   Q.  **Or thereabouts. Did you and he have a**
7       **conversation at the Euro-Pro facility**
8       **before he left?**
9   A.  Immediately before he left?
10  Q.  **Well, let's say the afternoon before he**
11      **left.**
12  A.  No, sir. First, I don't know when he
13      left. Secondly, we didn't talk in the
14      afternoon because I was moving that
15      afternoon.
16  Q.  **Okay. Did you talk in the morning?**
17  A.  Yes, sir.
18  Q.  **Okay. Where did you talk?**
19  A.  Where?
20  Q.  **Yes.**
21  A.  I know he came to my office asking if he
22      could have the afternoon off. And I think
23      we walked back out towards the Life test

Page 174

1       room so I could try to get some sense of
2       where we were with the projects that had
3       to be finished, especially the steamer.
4       And it was either in the -- From my
5       office, down the hallway, into the Life
6       test room, and in the Life test room was
7       where the conversation took place.
8   Q.  **Was anybody else around that was listening**
9       **to the conversation and participating in**
10      **it or was it just you and Victor?**
11  A.  Just Victor and myself.
12  Q.  **Now, you were taking off early that day**
13      **yourself, were you not?**
14  A.  Yes, sir.
15  Q.  **Because you were moving?**
16  A.  Moving.
17  Q.  **And you told Victor that he could take off**
18      **early, too, provided everything was in**
19      **order?**
20      MR. LIGHTFOOT: Objection, to the
21          extent it's been asked and
22          answered. You can comment
23          again.

Page 175

1   A.  I don't remember my exact words. But I
2       know that I put across the point that I
3       had to understand and be able to operate
4       the steam cleaner fixture before we could
5       even consider him leaving early, and that
6       he had to finish up whatever other little,
7       small projects he had going before he
8       could take off.
9   Q.  **You didn't tell him he could not leave**
10      **early, period?**
11  A.  No, sir. I didn't say that.
12  Q.  **Do you remember Victor talking with you**
13      **about the steam cleaner tester needing a**
14      **current sensor device?**
15  A.  That was one of the discussions at some
16      point.
17  Q.  **Do you recall Victor telling you that, in**
18      **his opinion, the testing machine was not**
19      **safe to operate without a current sensor**
20      **device put on it?**
21  A.  No, sir.
22  Q.  **Do you agree that that was a good idea, to**
23      **put a current sensor device on that**

Page 176

1       machine?
2   A.  No, sir.
3   Q.  **You disagree?**
4   A.  I disagree. It's running now without one,
5       without any kind of current sensor.
6   Q.  **Did you tell Victor that you would order a**
7       **current sensor device to put on the**
8       **machine?**
9   A.  No, sir, I don't believe I did.
10  Q.  **Do you remember Victor saying that if you**
11      **would order a current sensor device and**
12      **call him when it came in, that he would**
13      **come in off his vacation and put it on the**
14      **machine?**
15  A.  No, sir. I never agreed to put a current
16      sensor on the fixture.
17  Q.  **Would you have objected to it being put on**
18      **there?**
19  A.  Asked like that, yes, sir. I would need
20      to review it. I would need to have the
21      device, play with it, in my terminology,
22      see is it going to do the job, and then we
23      may consider buying a few more. But I

44 (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1    never felt a current sensor was going to
2    do the job.
3    Q.   Do you remember that Victor did believe
4         that that was something necessary?
5    A.   I remember talking about it.
6    Q.   Okay.
7    A.   I remember we did talk about it.
8    Q.   You don't remember any resolution that the
9         two of you came to about whether it was
10        necessary or not?
11   A.   I seem -- I know I expressed my hesitation
12        for such a device. I didn't understand
13        how the current sensor was going to do
14        anything over and above what we already
15        had.
16   Q.   Do you recall Victor saying that he would
17        be available during the vacation to come
18        back up there and put the current sensor
19        device or do any other repairs or
20        maintenance to this steam cleaner tester?
21   A.   I believe he said something to that
22        effect. When I called him Monday, I
23        reminded him I may need his help. And

Page 178

1    then when I called him back Monday, he
2    didn't answer the phone. When I called
3    him back Tuesday, he didn't answer the
4    phone. I made several calls back that
5    week he was on vacation to get this
6    fixture running. We talked Monday
7    morning. I told him, "I'm going to see
8    what I can do to get it going. If I
9    can't, I'm going to call you back." When
10   I called back, I didn't get an answer.
11   Q.   Did you get an answering machine?
12   A.   Nothing. Just the phone would ring.
13   Q.   How many times did you call?
14        MR. LIGHTFOOT: The whole time?
15        MR. COTTLE: Yeah.
16   Q.   During that week.
17   A.   I think twice on Monday. Of course, we
18        talked once. I think I called back twice
19        on Monday and I tried another time
20        Tuesday. By that time I got frustrated
21        and gave up.
22   Q.   Does Euro-Pro run regular hours on
23        Saturday and Sunday?

Page 179

1    A.   No, sir.
2    Q.   Can the employees come in and work on
3         those days if they are behind or need to
4         or want to?
5    A.   They can. If it's going to be testing
6         work, we do require that someone else be
7         in the building for safety reasons. But
8         if a person had something that was
9         non-threatening to do, we have -- The
10        doors are magnetically locked. We all
11        have a magnetic little fob that allows you
12        access to go in and out. And most
13        everybody has that fob also has a key
14        to the front door.
15   Q.   Isn't it true that Victor Smith frequently
16        worked on weekends?
17   A.   I don't know how frequently. I would see
18        him there occasionally on the weekends.
19   Q.   Saturdays and Sundays?
20   A.   I can't speak to Sundays. I don't work on
21        Sundays. I would come up on Saturdays and
22        he'd there be. Attendance was never a
23        problem, never a problem.

Page 180

1    Q.   That's all. Thank you.
2         MR. LIGHTFOOT: I've got none.
3
4         * * * * * * * * * * * *
5    FURTHER DEPONENT SAITH NOT
6         * * * * * * * * * * * *
7
8         REPORTER'S CERTIFICATE
9    STATE OF ALABAMA,
10   MONTGOMERY COUNTY,
11       I, Jackie Parham, Certified Shorthand
12   Reporter and Commissioner for the State of
13   Alabama at Large, do hereby certify that I
14   reported the deposition of:
15       RALPH HUDNALL,
16   who was first duly sworn by me to speak the
17   truth, the whole truth, and nothing but the
18   truth, in the matter of:
19
20       IN THE UNITED STATES DISTRICT COURT
21       FOR THE MIDDLE DISTRICT OF ALABAMA
22            EASTERN DIVISION
23

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

```
 1    VICTOR SMITH,
 2         Plaintiff,
 3    versus              3:05-CV-1186-MEF
 4    EURO-PRO MANAGEMENT
 5    SERVICES, INC.,
 6         Defendant.
 7
 8    on Wednesday, the 4th day of October, 2006.
 9        The foregoing 180 computer-printed pages
10    contain a true and correct transcript of the
11    examination of said witness by counsel for the
12    parties set out herein.  The reading and signing
13    of same is hereby not waived.
14        I further certify that I am neither of kin
15    nor of counsel to the parties to said cause, nor
16    in any manner interested in the results thereof.
17
18        _____
19        JACKIE PARHAM, Certified
20        Shorthand Reporter and
21        Commissioner for the State
22        of Alabama at Large
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 182

---

**A**

ability 57:2,15
able 39:17 57:11
  72:2 116:2
  120:10 121:12
  128:18 151:1
  160:10 175:3
Absolutely 51:1
  110:11 146:11
  152:14 158:15
  170:4
accept 82:22
  134:3 136:11
acceptable
  120:5
accepted 66:11
  66:14
access 104:4
  127:18 179:12
accomplish
  108:21
accomplished
  37:22 84:3
accomplishing
  82:18 84:18
accord 67:10
Accused 137:1
achieve 152:7
action 48:8
actions 156:12
active 134:14
actual 8:17
  30:11 73:17
  152:21
actuate 107:23
actuation 75:2
add 57:8 79:11
  114:11
adding 63:19
  102:6
addition 130:21
additional 84:3
additionally
  90:20

address 6:3,10
  6:22 8:18
  39:20 58:4
  63:8
addresses 10:11
advice 78:15
  105:11,13
  111:23 112:9
advised 112:3
affairs 128:14
affiliated 21:8
  21:15,19
affiliation 21:22
affirmative
  57:22
afraid 82:13
  83:17 118:4
afternoon 93:22
  135:5 173:10
  173:14,15,22
age 95:11
  166:12
agency 33:22
  169:3,4
aggressive 89:16
aggrieved 94:10
ago 16:9 17:6
agree 60:5 67:10
  135:14,20
  153:6 175:22
agreed 3:2,19
  176:15
agreement 1:17
ahead 33:5
  49:19 50:10
  56:16 68:18
  95:5 103:19
  163:15 164:4
  167:21
air 107:22 108:3
  108:4
Alabama 1:2,20
  1:22 2:7,17 3:8
  6:5 10:23 11:5

  11:9 17:7 25:6
  25:7,10 180:9
  180:13,21
  181:22
Alexander 5:10
aligned 57:21
allegation 138:6
  140:9 145:22
allegations
  137:22
Allison 138:3,12
  138:13,15
  139:15,18,22
  140:5,9,16,22
  141:17 142:19
  143:16 144:18
  145:4,5,10,17
Allison's 142:23
allow 28:18
  58:23 72:4
  118:12 127:20
  127:20
allows 127:15,17
  127:17 129:12
  179:11
American 98:18
amount 69:14
  152:8 153:23
amounts 152:1
AmSouth/Har...
  2:16
analog 121:21
  121:22
analyses 128:6
analysis 132:15
analyst 86:3
analyze 132:21
Andres 53:15
  54:3 104:23
  105:1 110:17
  110:18
annual 43:1
annually 43:9
  43:10,11

answer 16:20,22
  26:13 42:23
  49:10 58:7
  62:5 95:6
  103:19 117:12
  134:11,18
  137:10 144:3
  148:22 149:18
  178:2,3,10
answered 49:18
  95:5 135:17
  141:6 143:12
  144:1 146:3
  163:15 174:22
answering
  178:11
answers 5:17
  21:4 31:2
  151:8
anti-discrimin...
  170:17
anybody 20:12
  22:3,22 23:1
  64:11 87:10
  98:23 105:10
  116:9 127:20
  141:6 174:8
anymore 38:1
  70:2,3
anyway 120:2
  167:20
apart 86:7 92:9
  103:5 132:20
apartment 9:21
apartments 9:22
apparently
  94:13
appear 46:9
  64:2 126:20
appearance 96:3
  96:22
APPEARAN...
  2:1
appeared 127:4

APPEARING
  2:3,12
appears 18:20
  147:20 155:15
appliances
  11:22
applicable 12:15
apply 12:16
appraisal 80:1
approach 61:17
  153:12 162:14
approached
  77:18 115:14
  115:15,21
  161:19 162:5
appropriate
  61:12 63:5
  101:15
approved 79:15
approximately
  1:23 27:15
  152:8 168:8
April 68:1 77:1
  157:17
area 9:23 16:5
  70:7,9 80:4,14
  80:20 81:3,14
  83:5,5,7,23
  84:20,21 97:21
  97:22 133:11
  169:22
areas 80:23
  82:21 84:16
arising 61:11
arrested 16:16
  16:21
Ashley 19:7
  53:15 54:3,6
  91:15 92:10,13
  93:23 96:4
  102:22 138:2,4
  140:20,22
  141:16 143:1
  143:15,16,19

---

# FREEDOM COURT REPORTING

143:21 144:16
144:17
**aside** 164:1
**asked** 6:11
17:18 19:16
26:14 35:5
38:13 49:18
63:20 77:9
95:4 120:2
123:5 130:13
135:16 140:15
140:22 141:5
143:6,15,17
144:13 145:2,6
145:10,18
146:2 154:14
159:18 163:14
174:21 176:19
**asking** 50:18
51:21 88:8
111:8 121:5
148:13 149:5
149:13 150:11
150:13,18
152:23 173:21
**asks** 17:16 151:8
**aspects** 80:8,17
81:5,11,15
87:12
**assemble** 56:22
**assessment**
135:14
**assign** 136:1
**assigned** 57:3,16
63:18 82:19
103:5 109:9,15
110:18 132:5
**assistance** 82:14
104:4 111:17
**assisted** 164:15
**assume** 15:3
39:4 124:19
**assuming**
137:20

**assumption**
103:15
**assumptions**
113:6
**ASTM** 98:19
**attach** 108:6
**attempt** 121:7
**Attendance**
179:22
**attended** 8:22
**attention** 114:7
126:16,19
**Auburn** 9:21,23
10:3 14:16,17
14:19,20 23:9
25:8,15 26:3
26:20 27:2,16
32:12,22 33:7
34:7 40:3,18
159:5,11,16
161:19 162:5
166:14
**August** 45:23
79:5,21 80:1
130:16,18,19
157:23
**authority** 27:19
28:1 36:10
104:11,14
**authorized**
36:14,15
**automated** 72:6
86:23
**automatic** 74:19
75:6
**available** 110:18
110:19,20
153:3,7 154:3
156:14 177:17
**Avenue** 2:15 6:4
**aware** 50:20
52:4 61:8
124:5 140:8
**awhile** 151:3

**A-1** 34:2
**a.m** 1:23

---
### B
---
**B** 2:13 153:1
**back** 7:12 24:13
37:20 47:16
48:10 62:1,4
62:12 63:5
67:14 70:5
72:9 74:22
84:20,22,23
92:3 97:20
101:21 102:5
102:22 105:12
119:10 120:4
120:11,13,14
120:18 121:1,9
122:6 123:19
128:19 132:9
133:1 138:4
142:21 145:7
150:22 156:17
159:2 165:19
172:23 173:23
177:18 178:1,3
178:4,9,10,18
**backing** 157:22
**backwards**
149:6
**base** 95:17 142:3
**based** 84:15
103:15 108:18
**bases** 96:18
**basic** 106:1
**basically** 69:3
71:15 85:21
96:17 98:22
121:5 127:14
129:12 134:16
150:17 165:3
**basis** 43:1
110:21 134:20
**battery-charged**

11:23
**becoming** 133:4
**began** 53:8
122:16
**beginning** 10:12
122:20 156:2
162:15
**beginnings**
155:18
**BEHALF** 2:3,12
**believe** 11:13
14:1,5 17:15
18:1 20:6,18
21:6 23:13
26:8 42:9
46:10,20 83:16
88:18 92:11
114:21 119:21
123:16 125:6
126:4,17
130:19 138:18
142:17 143:14
146:23 157:21
158:2 160:6,19
167:19 170:23
171:1,6,18
176:9 177:3,21
**belittle** 116:9
**belittling** 116:8
**belligerent** 59:6
**best** 11:4,8
95:16,21 144:1
144:6
**better** 52:20
69:17,19 71:9
116:15,16
136:12 172:14
**big** 73:9
**Birmingham**
2:17
**birth** 6:6
**bit** 12:12 14:2
59:4 84:22
89:22 128:3

133:3 159:3
164:19,19
**black** 55:11,14
140:23 143:6
143:18 145:12
145:18 168:15
168:21
**block** 95:9
**blocked** 94:22
94:23 95:1
**blow** 71:3
118:17,17
**blown** 119:4
**blows** 119:4
**blueprint**
105:21 106:12
108:23
**board** 33:7,8
35:9
**boiling** 102:2
**bomb** 118:13,13
**bonus** 52:22
60:10,12
**bonuses** 97:23
98:4,5 136:22
**born** 8:4 11:1
**boss** 14:6 64:19
64:20
**Boston** 24:21
25:6,12,18
26:20 31:7
**bother** 145:3
**bottom** 144:8
149:7 158:8
**bought** 101:18
101:19 135:2,4
**Bowles** 1:20 2:5
**break** 92:1,2,21
92:22 93:7,10
93:12,14 97:3
97:6
**breaks** 91:22
92:4,8 93:17
93:20

# FREEDOM COURT REPORTING

**Brewster's**
135:2
**Brian** 65:20
104:23 105:4
110:19 111:19
111:22,23
112:2,3,6,11
112:12 159:3
162:8
**Brian's** 112:14
**Brief** 66:22
173:1
**briefly** 40:12
**bring** 17:16
19:13 20:9
64:13 75:7
100:17,22
101:4 114:6
135:4 164:9
166:6
**broke** 58:21
**Brookfield** 8:14
**broom** 83:17
**brought** 38:2
70:4 126:11,15
126:18 135:1
**budget** 109:21
109:22,23
**bugs** 117:7,10
**build** 73:5,20
78:14,16
101:17 104:6
105:21,22
109:2 117:8
148:11 150:16
**building** 72:4
76:7,17 81:21
102:15 104:5
105:20 106:14
106:18 116:20
119:3 151:14
151:17 152:12
179:7
**builds** 152:1

**built** 74:12 82:3
82:4 151:18
**business** 11:20
24:4,4 70:18
71:15 94:6
**busy** 64:3
**buy** 31:23 70:22
101:19 102:3
110:4 113:12
**buying** 101:14
113:4 114:4
176:23

― C ―

**call** 30:21 70:16
91:18 94:7,16
94:22,22 95:10
99:4 119:11
120:17 133:9
140:20 142:4,8
144:7 145:7
167:7 176:12
178:9,13
**called** 11:11
22:7 28:8 29:5
91:8,14 96:1
97:2 98:19
177:22 178:1,2
178:10,18
**calling** 92:18
94:11 95:8
**calls** 96:23
146:12,21
178:4
**Campbell** 8:16
**candidates**
162:21
**cap** 74:21
150:22
**capacities** 152:4
**Car** 16:11
**care** 120:3
**carefully** 58:5
**carpets** 93:3,4

**case** 5:14,17
16:11 59:21
126:10,18
147:11 151:23
**cases** 99:7 111:2
**catch** 71:5 73:9
**cause** 181:15
**caused** 58:11
61:14 64:5
65:17 83:2
**centered** 125:17
**central** 172:11
**certain** 17:16
65:22 99:6
105:6 111:2,14
152:17 158:14
**certainly** 42:22
45:1 105:3
154:19
**CERTIFICA...**
180:8
**certification**
32:9
**Certified** 1:18
3:6 180:11
181:19
**certify** 180:13
181:14
**cetera** 52:22
155:17
**Chad** 13:7,8,15
13:23 14:7
15:3 47:17,17
78:8 91:7
104:19,20
107:9 109:17
110:15 111:18
119:17,18,23
125:6 148:3,5
148:13,18
149:10,13
151:7,9 154:17
**Chad's** 14:5
95:23 110:16

**chain** 148:17
**challenge** 77:19
82:9
**chance** 79:10
116:10
**change** 14:2
35:1,4 67:15
78:22 103:22
104:7,16 108:9
108:13 128:1
136:17 151:20
**changed** 133:13
133:21 134:1,8
135:8,13
136:15
**changes** 36:16
84:2 108:16
166:4
**changing** 83:1
166:5
**Chappelle** 172:3
172:7
**characterizati...**
49:9
**characterize**
55:17 165:10
**charge** 11:15
14:16,20 30:22
36:5 68:8
98:12 147:2
**charged** 16:17
**check** 112:2
147:22
**chest** 119:19
**child** 7:3
**China** 26:21,23
**choice** 82:12
164:17
**circuits** 162:12
**circumstances**
126:13,15
**Civil** 3:17
**claim** 11:2 99:2
**class** 159:16,19

159:21 160:5
**clean** 64:23
83:13 84:1,21
97:21,22
**Cleanability**
32:14,15 34:12
34:14 58:3
64:17 68:10
69:9 90:8
98:14 99:9,19
**cleaner** 34:16,21
34:22 74:7,12
74:13,17 75:11
82:5,8 87:5
93:2 98:22
101:16,23
102:1,15
105:14 106:20
111:4 112:22
116:2 118:2
119:13 120:13
120:15,20
121:17 125:17
164:13 165:2
166:23 167:5
175:4,13
177:20
**cleaners** 11:22
11:23 32:17
34:15 70:11,12
74:10 87:1
99:1 106:21
118:10,19
164:18
**cleaning** 81:23
82:1 83:21
84:19
**clean-up** 133:10
**clear** 83:6 87:20
96:17
**close** 74:22
103:3,6
**closely** 134:9,19
**closing** 77:10

# FREEDOM COURT REPORTING

clothes 70:12
72:7,11,13
cobble 72:2
code 6:8,10,12
cold 85:6
Colorado 38:16
38:18 40:7
come 33:13
50:23 64:22
71:10 84:5
88:22 89:19,19
92:3 111:3,9
111:22 114:1
130:17,19
134:7,17
146:16 148:16
151:4 153:9
172:15,23
176:13 177:17
179:2,21
comedian 171:4
171:4 172:1
comedy 172:8
172:11,17
comes 66:3
71:10 78:8
97:1 119:22
121:9 151:5
coming 24:13
31:21 106:11
142:13 163:8
commencing
1:23
comment 57:10
66:12 100:17
111:21 122:6
130:8 140:21
142:9 143:14
174:22
commented
141:21
commenting
66:13
comments 79:11

79:11 86:20
89:23 134:6,7
commission 3:9
Commissioner
1:19 3:7
180:12 181:21
common 172:13
commonly
159:14
communicated
60:23
communicating
58:3 59:4
Communication
81:8
companies 21:9
23:5 24:1,14
71:11
company 11:11
12:8 21:11
22:6,9 23:16
24:9,16 26:10
43:7 48:7
59:18 60:8
74:4 91:10
141:12 153:4
154:4,9 166:8
company's
52:17,19
compensation
59:20 60:13
84:4 98:6
complain 84:14
103:8
complained
145:4 146:17
complains 66:4
complaint
139:16,19,23
140:5,9,18
142:18 146:8
146:10,19
complaints 18:3
58:15 65:21

140:7
complete 17:21
57:2,12 109:4
114:2
completed
116:19
completely 15:2
117:2 165:4
169:7
completes
132:17,18
completing
166:22
completion
113:3
complex 116:12
complexity
117:9
component
113:8,10
components
113:13,19
computer 85:3
127:16,17,21
128:19,23
129:16,18,23
130:10 148:19
computers
160:8
computer-pri...
181:9
concept 31:20
60:20 108:16
concern 84:18
115:17
concerned
106:17 119:9
conclusion
127:7 133:21
condition 117:6
119:21
conditions
123:10
conduct 32:2

70:15 93:2
106:5 128:5
153:11
conducted 18:11
68:14,15
127:23 129:10
157:10
conducting
43:23
conference
106:23
confident 21:20
confirm 42:7
50:19
confront 145:5
confrontation
59:9 88:15
90:3
confrontations
59:2
confronting
89:16
confused 21:17
26:12
confusing 135:6
conjunction
107:16
connect 129:2
connected 118:7
130:23
connotation
131:11
consider 31:10
170:8 171:14
171:21 175:5
176:23
consistently
80:22
constantly 83:1
constitute 95:11
construct
107:12,15
constructing
113:1

construction
78:17
consumer 70:21
71:13 151:5,6
consumer's
131:13
contact 110:13
contain 181:10
contained 79:23
contend 19:19
context 143:21
continue 35:7
36:1 71:14
89:3 117:19
118:12 164:20
contributor 80:8
81:5,16 87:13
control 61:18
Controller
129:3 159:12
Controllers
159:14
controls 85:3
127:10
conversation
95:22,23 96:23
145:11 171:15
172:5 173:7
174:7,9
conversations
63:20 65:3
124:1
convicted 16:22
17:3
cook 73:1
cooker 118:21
cookers 118:17
cool 75:6
Cooper 2:14
Cooperation
81:2
Copies 18:9
copy 149:14
corner 73:7

# FREEDOM COURT REPORTING

corporate 25:23
Corporation
  22:7,23
correct 11:12
  19:21 20:5
  21:4 23:7,8,17
  25:9 26:1,4
  29:9 33:15,23
  44:16 45:11
  47:17 49:3
  56:4 57:20
  60:11 63:9,12
  63:14 67:8,20
  69:10,12 71:13
  75:19 76:1,15
  77:6 79:22
  80:18,23 81:11
  85:17 94:9
  96:5 99:20
  101:15 102:12
  102:20,21
  103:14,20,20
  103:23 109:3
  110:4 124:11
  125:4 130:5
  131:19 133:18
  137:23 138:8
  143:3,20 147:6
  151:12,19
  152:10 155:6
  160:21 161:11
  165:8 166:2,16
  181:10
correction 62:13
correspondence
  19:2 148:4
corroborated
  144:22
costing 102:17
  114:8
Cottle 1:21 2:4,5
  5:6,13 50:10
  144:5,17
  178:15

counsel 3:3
  100:8,21
  181:11,15
counseled 88:11
  89:14 90:10,14
  90:18 91:12
  92:12,16 94:3
  94:4 97:8
  100:2,7 102:13
count 30:9
counties 7:21
country 25:1
County 7:8,11
  8:1,16 168:14
  180:10
couple 30:13,15
  32:17 46:7
  54:8 84:5
  112:5 121:3
  162:18
course 53:17
  70:20 93:19
  96:13 99:21
  100:2 104:19
  178:17
courses 9:2
court 1:1 31:16
  126:18 180:20
cover 95:17,20
  169:21
covered 58:22
covering 96:17
co-employee
  59:13
co-employees
  18:4 60:11
  96:7 145:15
Co-workers
  58:2
cream 135:2,5
create 134:13
creep 85:14
crew 58:3
criminal 16:17

critical 65:3
critique 116:6
current 63:18
  84:15 128:12
  128:13 165:5
  175:14,19,23
  176:5,7,11,15
  177:1,13,18
currently
  168:13
cursing 59:22
cycles 129:9
cylinder 107:22
  108:5,6
cylinders 108:6

———— D ————

daily 134:20
date 6:6 45:16
  45:21 79:5,16
  79:17,19,20
  113:4 114:16
  140:23 142:6
  143:18 161:12
dates 79:7
  115:19
dating 143:6
  145:12,15
David 19:12
  53:16,18 54:1
  172:2,7
day 1:22 36:9
  44:9 46:22
  86:11 89:10
  91:19 92:6,7
  95:10 97:7
  122:18 123:3
  123:22 132:4
  135:2 141:16
  167:9 174:12
  181:8
days 179:3
daytime 69:21
  70:5

day-to-day
  65:15
deal 121:8
  151:11 166:5
dealing 34:14
deals 98:12
  133:10 157:6
December 27:7
  27:14 33:15
  35:1 36:4 37:7
  51:22,23
  114:21 133:19
  135:9 156:17
  160:17 163:6
decision 38:11
  115:3,7 160:22
  161:2,4
deductions 4:15
  147:21
deep 72:16,19
  73:8
defendant 1:10
  2:12 19:3,4
  181:6
Defendant's
  20:17
definite 136:17
degree 9:5 32:8
  105:5
degreed 110:14
delineate 66:1
demonstrated
  57:2
department
  169:12
depend 111:10
Dependability
  80:20
dependable
  82:16
depended 111:9
dependents 7:1
depends 153:10
  153:17

Depo 4:3
DEPONENT
  180:5
deposition 1:16
  3:4,15,22
  15:21 17:13
  40:13,23
  169:23 180:14
description 4:7
  12:13 41:13,16
  107:11,14
descriptions
  28:22,22
deserve 84:13
  162:4
design 11:21
  12:4,6,9 25:19
  26:2,6 62:12
  71:7 104:6
  105:17,22
  108:17 161:22
  162:2,3,11,19
  163:10
designing 76:7
  76:17 77:20
  104:5 105:19
  112:23
designs 62:17
desk 119:11
detail 93:1
  107:19
detailed 113:2
  160:3
details 107:1,19
  111:20 159:22
determine 71:12
  86:4 121:20
  153:14
determining
  52:21
develop 56:22
developing
  86:23
development

# FREEDOM COURT REPORTING

155:18
device 76:18
   85:10 113:11
   121:21 129:1,1
   131:21 152:12
   163:12 164:14
   175:14,20,23
   176:7,11,21
   177:12,19
devices 77:20
devoted 166:22
   167:12
diagram 109:1
difference 31:11
   79:7
different 22:1
   24:22 27:23
   45:10 68:23
   112:4 113:21
   128:15,20,20
   150:17,18
   152:1,3,3,4
   160:2,2
difficult 66:1
   96:14
dinner 141:14
   141:18 142:1
   142:15
direct 39:19
   159:20
directed 170:12
direction 122:11
directly 39:12
   103:16
dirt 35:21
dirts 68:23
disagree 176:3,4
disagreed 61:4
   98:8
discharging
   119:6
disciplinary
   48:8
disconnected

118:3 119:14
   120:21
discourage
   91:23
discovery
   147:10 149:1
discuss 46:21
   60:16,21 78:1
   78:2 172:9
discussed 60:2
   79:17,18
   115:22 130:6
discussing 59:18
   59:19 60:10
   95:15
discussion 10:18
   47:4 90:1
   97:23 98:4
   120:1 121:14
   125:8 136:22
   141:2,12 144:7
   148:1
discussions
   63:23 98:2
   106:2 115:6
   140:19 175:15
dismissed 126:9
disrespectful
   59:13 60:6
   89:17
distance 92:9
DISTRICT 1:1
   1:2 180:20,21
divided 165:7
division 1:3 74:8
   76:6,13 80:13
   180:22
document 17:14
   17:20 18:19
   47:1,7,9 50:2
   52:2 79:3
   126:14,16
   137:9,14,15
   140:13 146:19

148:16 158:18
documentation
   49:13 140:8
   146:10
documented
   49:5 147:4,4
documents 18:2
   18:9 19:13
   46:9 47:23
   49:21
doing 64:14,15
   65:12 68:6,7
   69:9 75:20
   77:22 78:6
   82:20 84:9,14
   85:15 94:14
   110:14 128:9
   145:9 151:10
   153:21 160:11
   164:17
door 31:22 74:2
   179:14
doors 179:10
doubt 110:8
downtown 9:21
   9:23 10:2
dozen 100:11
   101:2 102:7
draw 65:9
   105:17
drawing 4:14
   107:4,6,8
   108:19
drew 107:9
driving 16:6
drug 114:9
Dubois 1:21 2:6
due 92:23
DUI 17:2,5
duly 5:3 180:16
duress 73:4
duties 35:1
   78:21 83:23
   100:4,10,22

duty 65:6
Duvell 54:23
   55:1,3,11
   168:18

_____
**E**
eagerly 56:20
earlier 90:1
   113:5 164:1
earliest 157:18
early 22:16
   123:5,8 156:7
   156:9 162:21
   174:12,18
   175:5,10
easier 128:3
easily 101:2
   106:20 127:21
   128:1
EASTERN 1:3
   180:22
easy 64:19,20
   127:18
education 77:16
effect 52:23
   60:12 97:4
   100:20 120:8
   143:15 177:22
effervescent
   135:22
efficiently 68:14
eight 27:12
   88:13
eighty 117:4
   164:2 167:14
either 3:16 7:21
   34:2 35:10
   37:20 60:6,12
   61:22 74:2
   85:18 86:8
   116:14 119:3
   132:17 140:22
   143:17 161:3
   174:4

E1 9:1 11:2
electrical 105:5
   121:23 159:7
   159:10 161:20
   161:21 162:6,9
   162:11 163:9
Electrolux 98:23
electronic 9:4
   162:12
eleven 30:5
   88:14
eliminated 38:1
Elizabeth 9:16
employed 13:11
   27:1 42:12
   168:14
employee 4:8
   18:17 19:3
   23:11 34:23
   40:18,20 43:18
   48:4,7,14,19
   49:23 51:14
   52:8,16,18,20
   55:4 68:11
   74:4 91:8,13
   93:17 112:18
   114:19 116:7
   138:15 146:7
   146:15 171:20
employees 42:15
   44:1,13 53:22
   59:20 60:15,23
   69:18 90:21
   98:2 136:23
   137:3,5,21
   140:15 145:23
   156:15 159:19
   168:13,21
   179:2
employee's
   51:16 52:2
   155:19 168:17
employment
   33:21 34:3

# FREEDOM COURT REPORTING

54:4,7 67:15
78:23 88:12
115:4 124:7
138:20,23
**ended** 91:19
138:23
**engineer** 31:10
31:14 32:1,7
37:3 48:10
86:9 104:20
110:14,17
112:16 154:12
154:16 160:20
160:23 161:5
166:17
**engineering** 9:4
105:2,5 110:9
133:2,7 159:7
159:11 162:1,9
163:9
**engineers** 29:10
29:12,19,22
30:2,4,7,11,17
30:18 31:12,13
32:1,5,5
111:17
**enjoined** 65:2
**ensure** 12:14
**entire** 31:15
36:18 44:22
71:22 82:22
101:11
**entitled** 93:17
**environment**
134:14
**equal** 92:8
**equipment**
61:20 117:23
**escape** 73:17
**escapes** 161:18
**especially** 65:20
174:3
**ESQUIRE** 2:4
2:13

**essentially** 25:14
**estimate** 166:21
167:7,13
**estimation** 141:5
**et** 52:22 155:16
**Euro-Pro** 1:8
11:11,18 12:14
12:19,23 13:11
13:16,18,20
15:10 21:12,15
21:20,22,23
22:1,4,19
23:12,14 24:5
24:7,9,15,20
24:23 26:19
32:22 34:1,5
37:10 39:3,6
40:11,14,17
42:12,18 44:1
46:8 48:23
49:23 51:7,15
52:1,5 53:8,23
54:4,7 62:17
70:10 73:23
98:23 112:18
114:19 127:5
131:23 135:23
138:20 139:23
140:3 146:7,16
146:19 151:12
151:23 155:15
156:15 159:4
160:1 166:19
168:15 170:6
173:7 178:22
181:4
**evaluate** 42:18
70:19
**evaluating** 42:14
53:3 71:6
131:22
**evaluation** 4:8,9
18:20 42:3,8
42:11 43:2,8

43:13 44:1,4
44:12,22,23
45:3,5,7,20
56:10,17 58:12
61:15 63:16
64:6 65:18
66:17 67:3
79:4 80:6
86:19 89:12
97:13 157:23
**evaluations**
18:17 44:8
50:14 52:12
87:15 99:22
102:10 132:7
135:10 158:6
**eventually** 22:18
133:4 165:15
165:16
**everybody** 38:2
55:19 83:20
106:16 135:5
179:13
**everybody's**
134:15
**evidence** 3:15
**evident** 116:1
**exact** 34:10
142:5 159:23
161:12 175:1
**exacting** 82:18
**exactly** 75:16
89:9 119:20
**examination** 5:5
181:11
**example** 72:16
83:19 84:19
**exceeding**
135:11
**exception** 96:19
**excessive** 90:15
90:22
**excuse** 77:4
**executive** 83:16

**exhausted** 75:4
**exhibit** 17:9,12
20:13,16 41:2
41:4,9,11,21
42:1 43:15
44:15,18,20
45:8,14,21
46:4,6,14,16
47:13,15 52:13
55:21 67:1
79:3 88:5
97:13 107:2,5
125:20 126:14
140:13 145:22
147:7,9 155:12
155:13 156:21
156:23 158:2
**exists** 50:7
**exit** 18:10 50:5
125:21
**expand** 135:19
**expectations**
135:11
**expected** 84:2
86:10 107:20
110:6 113:3
**expenditure**
113:15
**experience**
77:17,21
104:15
**experiences**
77:15
**explain** 36:13
76:20 79:7
**explained**
120:19
**explode** 118:14
**explosion**
118:22
**exposed** 163:17
163:22 164:1
**express** 127:3
134:3

**expressed** 61:4
96:15 133:23
177:11
**extent** 42:21
49:17 102:9
135:16 137:8
174:21
**extra** 136:6
**Extremely** 61:5
**e-mail** 4:13
39:20 47:15
148:3,4 149:11
149:16 151:9
**e-mails** 148:17
150:10
**E.P** 22:7

---

**F**

**faced** 164:17
**facilities** 24:23
**facility** 14:18,21
23:9,11 26:3
26:16,19 27:2
27:21 28:5
32:23 34:7
40:17 103:4
168:14 173:7
**fact** 77:7 92:13
96:20 119:23
126:17 141:11
155:1
**factory** 31:22
152:19 170:6
**fail** 71:2 116:22
**failed** 86:10,18
112:23 132:15
132:22 133:6
**fails** 71:2 132:18
**failure** 132:14
132:23
**failures** 86:4
**fair** 39:3 62:18
66:15 68:5
70:21 167:13

# FREEDOM COURT REPORTING

168:10
**fairly** 113:11
  116:12 162:21
**fall** 15:6 28:10
  31:8 99:15
**family** 23:21
  134:13
**far** 36:16 43:5
  77:20 80:4
  157:21
**fashion** 72:6
  130:11
**fault** 59:23
**Federal** 3:17
**feel** 144:9
**feeling** 89:21
  95:7,9
**felt** 73:10 92:16
  94:2,10 95:16
  95:19 112:6
  115:23 177:1
**female** 91:8 95:8
  95:9 137:3,5
  137:21 140:14
  145:23 146:6
  146:15
**females** 138:2
**field** 73:12 162:1
**fifteen** 27:17
  28:20 78:6
  92:4 128:15,20
  128:20 146:4
  153:17
**fifteen-minute**
  92:2 93:14,20
**fight** 58:21
**figure** 14:4
  106:19 120:9,9
  120:15 150:15
**figured** 117:7
  121:4
**file** 17:21 19:7
  19:13,16 20:9
  40:18,23 41:7

41:14 44:16
46:12 47:10,21
48:1,5,22 49:6
49:12,14 51:13
51:16 52:3
147:4 148:22
154:10,12
**files** 48:3 154:5
**fill** 72:10 151:2
  165:4 166:6
**fills** 74:19,20
**final** 122:11
**find** 40:4 77:11
  85:20 111:11
  154:11,13,15
  154:19
**finding** 66:7
  111:12
**fine** 82:20
**fingers** 154:22
**finish** 8:10,13
  93:9 105:19
  175:6
**finished** 107:21
  174:3
**finishing** 31:21
**fire** 71:5 73:9
**fired** 124:14
  125:3 139:2
**fires** 73:6
**first** 5:2 20:7,17
  27:9,11 33:19
  35:19 37:13
  38:2 41:17
  45:12 56:10
  61:9 63:16
  66:16 77:3,13
  82:10 85:1
  88:14,20 90:2
  97:12 107:10
  110:13 113:2
  115:10,21
  123:10 126:7
  132:20 136:22

149:7,11 156:2
156:20 158:17
167:3,3 173:12
180:16
**fit** 23:5 135:12
**five** 17:6 30:11
  30:13,17,17
  53:6,7 82:4,6
  101:19 172:22
**fixture** 73:3
  74:12,14,15,17
  74:20 75:10
  78:16 81:23
  82:2 86:23
  87:5 114:5,13
  116:12 118:4
  119:7 122:7
  128:22 148:12
  150:17 175:4
  176:16 178:6
**fixtures** 72:4
  78:14 81:22
  82:3,4,7 85:18
  87:3 101:6,14
  116:3 128:21
**flip** 42:5
**floor** 83:10
**flux** 14:2
**fob** 179:11,13
**focused** 63:18
**follow** 51:3
**follows** 5:4
**foregoing** 181:9
**forget** 10:1
  34:10 54:21
  91:20
**forgot** 30:13
  169:7
**forgotten** 141:3
  141:9
**form** 3:12 42:21
  49:8 106:12
**formal** 42:13
  43:2,8,13 44:1

44:4 50:15
56:10 67:2
**formality** 3:9,9
**formally** 48:15
  60:23
**forms** 4:10 44:3
  46:7
**forth** 47:16 72:9
**forty** 167:8
**forward** 10:13
**found** 34:8
  94:17 117:1
  163:17
**four** 29:15 30:1
  30:2,3,7 93:3,4
  101:19 167:8
**four-year** 32:8
**frame** 89:9
  115:20
**Francine** 156:18
**frequently** 170:5
  179:15,17
**Friday** 123:2,4
  149:9 173:3
**friends** 142:14
**front** 16:7 116:7
  170:21 179:14
**Frost** 162:20
  163:5
**frustrated**
  178:20
**fryer** 72:16,19
  73:8
**full** 5:8 69:23
  123:3 164:10
**fully** 58:7
  116:21 163:13
  168:4
**full-time** 33:16
  38:7 165:1,15
  165:16,17,17
  165:21 169:5
  169:15,17,20
**functions** 69:7

**funnel** 104:21
**funniness**
  172:19
**further** 3:19
  180:5 181:14

---

## G

**Gale** 2:14
**gallon** 152:5
**garbled** 5:22
**Garrison** 20:1,3
  160:14,20
  161:9 164:12
  165:8 166:8,20
  168:7
**gather** 106:23
**Gay** 9:23
**general** 58:19
  60:8,19 64:7
  89:21 91:1
  95:7,15 107:21
  111:14 159:16
**generally** 64:7
  92:4,8 110:1
  159:17
**generate** 43:14
**generating**
  113:7
**getting** 36:7
  52:18 58:15
  66:6 73:2 85:6
  85:6,11,13
  96:13 107:20
  112:6 164:19
**gist** 95:22,22
**give** 36:14 43:1
  64:23 78:15
  87:15 89:5
  93:19 96:21
  105:18,20
  111:23 112:8
  159:19
**given** 15:21
  17:23 18:6,7

42:4 71:19
108:23 109:4
110:5,9
**gives** 107:21
**go** 8:9,19,21
29:15 30:6
33:5 35:5 37:5
49:18 50:10
56:16 57:5
58:1 59:2
61:22,23 64:20
66:23 67:13
68:18 69:2
75:5 81:19
83:9 84:14,16
85:5 86:8
87:16,16,17,18
89:2 91:6
93:10 95:5
99:1 102:22
103:18 104:17
105:10,11,12
110:12 112:1,2
112:9,20 114:5
116:5 117:21
119:10 120:3
121:15 122:15
127:21 129:18
129:19 132:16
138:10 142:21
153:8 154:11
156:6 158:5
163:15 164:3
167:21 173:3
179:12
**goals** 43:7 52:18
52:19 57:21
**goes** 31:18 36:16
40:19 84:22
100:5 121:1
145:6 157:21
**going** 5:16 14:5
24:8 35:10
37:20 40:1

46:21 48:9
51:7 57:5,6
65:5 74:7
76:12,14 78:13
78:14,15 86:17
96:7 102:2
106:21 108:9
113:8,9 117:17
117:18 118:8
118:23 119:2
121:2 124:6,9
128:21 136:13
141:19 152:5
155:11 166:3
175:7 176:22
177:1,13 178:7
178:8,9 179:5
**good** 24:11,18
35:13 62:18
71:14 80:8
81:5,16 82:5,9
84:12 87:13
127:19 142:10
175:22
**gosh** 40:6
**gotten** 94:13
162:9
**go-to** 133:5
**grade** 87:23
88:2
**graduate** 159:6
162:4
**graduated**
162:22 166:14
**graphic** 127:14
**grasp** 150:9
**grew** 8:7
**group** 25:16
30:19 32:14,18
34:12 35:14
36:18,20 48:11
60:21 62:4,12
64:9,10,21
68:10 69:5

83:20 89:5,21
90:8 92:15
94:3 98:14
99:9 104:3
161:20,21,22
162:9 163:10
**grow** 133:4
**growing** 83:1
**growth** 74:1
133:8
**guess** 8:16 11:2
21:8 25:23
30:13 47:17
55:18 75:20
77:7 81:19
88:13 117:18
130:15 131:10
135:6 142:22
147:22 150:3
161:7
**guesses** 23:2
**guessing** 27:5
131:11
**guidance** 111:14
**guy** 16:7 37:2,3
64:13 66:5
86:5 112:8
133:5,8,9
135:1 140:23
162:13
**guys** 29:5 37:19
69:18 78:9
135:3 162:14
**guy's** 65:22

___

**H**

**H** 95:16 141:13
141:15,20
142:9
**half** 12:21 13:1
**half-hour** 89:1
93:19
**hallway** 174:5
**hammer** 107:1

**hand** 70:13
137:15
**handbook**
155:19
**handle** 48:12
102:4 106:10
121:6
**handled** 48:9
49:15
**handout** 159:2
159:21
**hands-on** 61:17
134:23
**handwriting**
147:17
**handwritten**
51:12
**hand-held** 85:8
129:1
**happen** 20:9
114:20 119:5
124:9
**happened** 64:4
67:23 88:16
89:8,10,11
97:12,17
113:21 124:8
124:10
**happy** 77:12
134:16,17
141:21
**harass** 141:6
**harassed** 144:9
**harassing** 96:3
147:5
**harassment**
95:12,18 96:12
96:16 103:13
137:3 138:7
141:2 145:8
146:1,9,17
**hard** 65:23
134:11 171:16
**hard-and-fast**

92:22 93:6,11
109:22
**Hattiesburg**
15:13 16:5
**head** 57:22 76:5
76:9,12 154:5
**headquarters**
24:7,19 25:23
**hear** 171:19
**heard** 22:6,9
143:19 145:5
**heat** 74:22
118:12 152:5
**heating** 72:23
150:22
**held** 41:18
**help** 34:8 50:9
52:15 56:22
57:11 59:3
65:13 77:12
78:7,10,11
83:13 104:15
104:18 105:3,6
109:17 110:19
110:20 111:2,3
111:8 116:14
116:15,15
128:5 129:23
162:10,19
164:20 165:11
177:23
**helped** 164:22
**helpful** 152:11
**helping** 52:18
**hereto** 3:20
**hesitation**
177:11
**Hey** 83:12
**he'll** 86:13
**Hickman** 88:15
90:4
**Hickman's** 90:6
**hierarchy** 28:10
31:9

**high** 8:10,10,14
  87:16,17
**higher** 100:4,10
  100:15,17,22
  101:4
**highly** 91:23
**high-pressure**
  113:11,13
**high-temperat...**
  113:10,14
**hire** 38:11
  160:22 161:4
**hired** 19:17,19
  19:22 20:11,12
  27:6 33:9,11
  33:16,17 34:9
  34:11,13,23
  36:4 38:5,7
  41:17 55:5,7,9
  55:10 82:23
  159:4 160:16
  161:9 162:23
  163:1,6 165:23
  166:3 168:11
  168:22 169:1
**hires** 34:5
**hiring** 35:11
**hit** 16:8
**home** 11:21
**honestly** 21:17
  124:4 132:9
  141:3 161:1
  169:10
**Hong** 26:23
**Hoover** 98:22
**hoping** 128:17
**hospital** 119:19
  119:22
**hot** 73:2 85:6,13
  102:4
**hour** 93:14
**hours** 91:9
  94:12 167:9
  170:21 178:22

**house** 71:5,5
  75:18
**household** 15:11
  75:23
**how-do-you-d...**
  112:7
**Hudnall** 1:16
  3:5 5:1,10,13
  17:11 21:7
  31:9 55:20
  66:23 100:1
  112:21 114:15
  135:17 140:12
  169:21 173:2
  180:15
**huge** 69:14
**hundred** 167:17
**hung** 120:14
**Hungary** 55:18
**hurdles** 78:11
**hurt** 154:20
**hurts** 119:4
**H-u-d-n-a-l-l**
  5:12

**I**
**ice** 135:2,5
**idea** 39:10
  106:10 107:21
  115:15 129:13
  132:1 175:22
**identification**
  17:10 20:14
  41:3,10,22
  44:19 46:5,15
  47:14 107:3
  147:8 155:14
  156:22
**identified**
  162:20
**identify** 42:1
  86:14 113:19
**III** 2:4
**immediately**

9:13 61:13
  63:6 173:9
**imperative**
  74:11
**implement** 87:1
**implied** 93:13
**important** 80:7
  80:17 81:5,10
  81:15 83:14
  87:12
**improper** 94:4
  97:9
**improve** 45:2
  57:19 85:16
**improvement**
  82:21 84:17
**Improvement...**
  61:9
**impulse** 121:23
**inappropriate**
  98:3 170:8
**incident** 58:10
  60:2,9 61:14
  94:1 97:9
**incidents** 58:10
**include** 58:11
  61:15 64:5
  65:17 100:23
**includes** 100:5
**including**
  100:16
**inclusion** 131:22
**incorrect** 92:17
**independent**
  65:14
**INDEX** 4:1
**indicate** 51:14
  57:10 81:20
  87:11 103:12
  144:12
**indicated** 66:11
  80:16,21 120:4
**indicates** 67:5
  67:11 82:13

157:15
**indicating**
  125:23 135:10
**indications** 49:5
**indicator** 151:5
**indirectly** 39:15
**individual** 19:22
  129:19
**individuals**
  104:23
**industry** 127:13
  159:15
**informal** 44:8
  44:12 56:14
  132:8
**information**
  40:19 57:12
  110:5 127:22
  128:22 148:11
  148:13 150:13
  152:15,23
  153:3,7,9
  154:3,9,10,13
  154:14,21
  170:19
**infrared** 85:8
**Initiative** 85:16
**Initiative/Co...**
  81:13
**inside** 75:1
**install** 72:15
  74:17 113:17
  113:20 128:18
  129:23
**installed** 128:17
  129:15
**instance** 58:20
  59:17 90:17
  147:4
**instances** 61:22
  89:20 113:4
  115:16
**instructed**
  159:10

**instruction**
  121:6 158:20
  159:13
**intention** 116:9
**Interaction** 58:2
**interest** 134:15
  172:13
**interested** 49:21
  181:16
**interface** 127:14
  129:6 130:1
**Interim** 4:16
**International**
  98:20
**Internet** 90:13
  90:16,22 92:15
  94:5
**Interpersonal**
  81:8
**interrogatories**
  20:18 88:5
**interrupt** 116:18
**interview** 18:10
  50:6 125:21
**inventory** 98:13
**investors** 23:23
**involved** 17:2
  24:3,5 60:9
  142:12
**involvement**
  72:17
**involves** 88:14
  97:21,23
**iron** 72:7,9,11
  72:14
**irons** 70:12
  72:15
**irrelevant**
  158:17
**issue** 64:13,21
  85:1 96:18
  106:18,22
  115:22
**issued** 79:15

# FREEDOM COURT REPORTING

91:2
**issues** 48:12
49:11,14 50:13
60:17 61:10
66:9,17 106:11
119:13 121:16
121:18
**item** 61:9 131:4
**itemization**
147:20
**items** 88:14
132:15

___

**J**
**Jackie** 1:18 3:6
180:11 181:19
**James** 53:15
54:2
**Jeff** 160:14,15
160:20 161:8
161:17 162:12
162:20 163:2
164:15,22
165:8,11
**Jeffrey** 20:8
**jeopardy** 66:18
**job** 12:13 28:21
28:22,23 35:1
35:16 38:18
39:1,3 41:16
65:1,6 66:18
67:19 71:19
73:9,10 77:17
78:13 82:6,10
84:8 90:6
92:23 93:2
101:4 105:10
118:1 122:15
128:11 131:20
132:5 150:10
151:10 160:7
160:12 164:8
165:1,7,11,15
165:16 176:22

177:2
**jobs** 28:19
**Job/Knowled...**
80:5
**John** 2:4 5:13
**joining** 63:23
**jumbling** 143:13
**June** 79:6 149:9
151:9 169:16
169:18

___

**K**
**keep** 43:6 64:3
165:18
**keeping** 69:22
83:23 84:20
97:20,22
**Keeps** 31:3
**kept** 40:17 48:4
83:8 169:5
**key** 86:1 179:13
**kill** 87:19
**kin** 181:14
**kind** 9:2 11:20
15:14 31:2
36:15 44:11
48:8 51:11,13
58:23 59:3
74:7 96:13
98:6 105:7
110:6 111:8
112:8,20 116:5
130:14 135:1
136:6 140:5
146:9 170:12
176:5
**kitchen** 12:1
**knew** 62:6 92:10
110:23 115:17
**know** 7:20 12:1
15:2 16:19
18:15,16,22
21:9,10,11,21
21:23 22:3,14

22:22 23:1,4
23:14,20,22
24:3,22 25:4
26:8,19 33:1
38:14,16,16,17
38:20,22 39:1
39:6,8,11,15
39:17,20,21
40:5,7,21
46:13,17 47:1
47:3,6,22 48:1
48:2,3,6,18
50:7,8 52:7
55:6,17 59:1,5
60:18,22 63:7
64:11,12 67:22
77:13 85:12
88:13,16 89:8
90:17,19 92:21
99:13 100:12
101:7 109:9
111:10,12,16
111:18,19
115:18,19
118:1,5 119:20
122:4 124:4,4
124:9 125:5
126:3,21,23
127:12 128:21
130:10,12
133:15 134:2
136:8,15
137:16,18,20
138:19,22
139:5,7,9,12
139:18,21,22
141:7,7 142:5
142:18 143:5
145:21 146:5
147:11,13,15
147:15,17
148:2,21 149:3
149:3,4 151:6
152:12 155:5

156:7,8,16,17
159:8 161:1,3
161:4,7,8,12
166:13 170:14
171:16 173:12
173:21 175:2
177:11 179:17
**knowing** 116:11
117:23 119:1,2
167:23 168:1
**knowledge** 11:4
11:8 16:15
19:1 25:11
42:10 44:6,14
65:11 97:11
98:11 144:2,6
147:3
**known** 48:19
52:8 60:15
61:3,7 127:13
**knows** 154:20
**Kong** 26:23

___

**L**
**lab** 28:8,16 29:4
29:5,7,16 30:2
30:17 32:19
34:21 41:16
42:18 53:14
54:20 55:2,13
69:5 86:5
102:23 127:9
127:13 128:8
128:10,16
129:15,22
131:3 153:13
168:19 169:13
**labeled** 58:1
**lack** 172:14
**language** 170:13
170:15
**large** 1:20 3:8
83:5 180:13
181:22

**Larry** 162:20
163:5
**late** 97:6 115:19
**Laura** 7:19
**law** 1:20
**lawyer** 140:4
**lead** 34:11,12
36:18,18 68:9
99:8 162:8
**leader** 36:20
74:9
**leads** 150:6
**leaning** 112:10
112:12
**learn** 133:2
**learning** 91:7
**leave** 54:6,9 92:1
106:14 175:9
**leaving** 37:21
93:15 123:8
175:5
**Lee** 7:7,11,19
8:1 168:14
**left** 14:3,6 30:15
39:6,9 40:10
40:14 54:4,11
121:15 122:15
123:11 141:17
156:7,8 158:8
160:18 163:11
163:17 165:13
167:16 173:3,8
173:9,11,13
**length** 132:2,12
153:14
**letting** 156:7
**let's** 8:9 11:18
66:23 91:6
105:14 136:19
138:10 148:2
173:10
**level** 28:11,12,13
28:14,14 57:16
58:6 82:11

___

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

100:4,10,15,18
100:22 101:4
**levels** 27:18,23
28:15,16 35:13
**licensed** 32:5,7
**life** 56:22 61:11
64:17 70:7,9
70:16 71:1,10
71:16,17,17,20
74:6 76:5,10
76:12,15 77:9
80:11,13 86:4
87:2 97:18
103:21 108:12
127:23 131:10
131:11,15
133:8 134:15
149:14 173:23
174:5,6
**lifetime** 70:20
**light** 151:4
**LIGHTFOOT**
2:13 6:11
16:19 42:20
49:7,16 50:8
50:12 51:2,18
56:12,16 95:4
103:18 117:11
117:14 135:15
137:7 138:1,9
143:8,11,23
144:15 146:2
146:12,21
147:13 149:17
149:22 151:15
155:9 161:13
163:14 164:3,7
165:9 167:1,18
169:14 174:20
178:14 180:2
**limited** 26:13
51:9
**line** 43:7 65:9
86:21,21

107:20 131:23
**lines** 51:4
**list** 4:11 46:20
57:18 88:9
**listen** 58:6
**listening** 174:8
**literally** 71:3
118:13
**little** 12:12 14:1
59:4 79:13
85:8 89:22
96:11,15,19
103:5 106:5
123:8 128:3
129:17 133:2
159:3 164:19
164:19 165:11
168:6 175:6
179:11
**live** 6:21 9:12,18
9:20 10:2,6,8
40:3
**lived** 9:10
**lives** 7:5,12 31:7
38:16 40:7
139:7
**local** 34:8
**location** 35:10
**locations** 10:14
**locked** 179:10
**Logic** 129:3
159:12,13
**long** 9:10,18
10:2,8,17
12:17,22 13:20
15:19 18:19
62:3 75:21
150:19,21,23
151:3 152:16
153:1,13
158:18 159:8
167:16 168:3
**longer** 13:18
104:9 114:9,10

152:5 153:19
154:12 168:6
**look** 17:19 20:19
55:20 85:20
88:4,7 108:15
116:10 119:7
129:20 130:15
135:7 136:13
142:2 148:2
**looked** 36:17,19
40:22 77:14,14
**looking** 86:13,20
131:3
**looks** 41:6 44:21
44:22 85:4
87:7
**loose** 119:8
**Lorraine** 7:17
**lot** 35:6 100:11
108:12 113:2
132:10 134:22
172:17
**low** 87:17,18,21
87:23 88:2
**lowest** 28:12,13
87:10
**lunch** 93:19
114:14
**lunchtime** 92:6
**Lynchburg** 8:17
**L.L.C** 21:12

_____

## M

**machine** 31:17
31:19 32:3
62:1,9,15 63:1
63:2 75:10
76:7,8 108:18
108:18 111:4,6
113:1 116:15
116:20 117:9
118:9 122:1
151:13,17
164:9 175:18

176:1,8,14
178:11
**machines** 62:16
62:20,22
152:13
**magnetic** 179:11
**magnetically**
179:10
**maiden** 7:18
**mailing** 8:18
**main** 72:3 81:21
86:3 114:1,12
129:16
**maintaining**
98:13
**maintenance**
71:22 87:2
101:6,10,11
177:20
**make-up** 54:13
54:16,19
**making** 11:15
30:22 43:6
61:17,20 68:12
68:15 70:20
71:12 84:6
99:2 118:14
122:5 136:9
145:8 165:20
**male** 95:8
**man** 143:6,18
145:12,18
**management**
1:8 11:12 15:1
21:15,21 22:1
22:20 23:12,14
24:5 25:22
52:15 142:11
146:7,16 181:4
**manager** 27:21
28:2 29:21
30:18,20,21
31:14 48:11
**managerial**

60:20,20
**managers** 29:6,7
29:11 54:12,14
64:8
**manner** 11:17
65:8 71:3
73:18 104:16
181:16
**manual** 157:2
**manufacture**
12:3,5
**manufacturer**
70:15
**manufactures**
12:6 151:12
**mark** 155:12
158:16
**marked** 17:9,12
20:13,15 41:2
41:9,21,23
44:18 46:4,6
46:14 47:13
107:2 125:19
147:7,9 155:13
156:21
**market** 74:9
**marketing** 25:16
**married** 6:19,20
10:17 138:18
**Master's** 105:1
105:4 159:6,10
**materials** 68:21
98:16 99:5,7
99:17
**matter** 60:13
92:13 180:18
**matters** 90:12
**Maynard** 2:14
**McGhee** 104:23
110:19 112:15
159:3 162:8
**McLure** 6:4,22
9:10
**mean** 24:9 27:20

28:20 51:20
63:21 67:9
74:13 76:9
83:9 103:6
104:9 122:18
131:7 134:14
134:19,23
168:10
meaning 51:10
86:2
means 5:19
133:15
mean-spirited
172:20
Measurements
98:19
meat 118:17
mechanical
104:21 105:2,3
110:17 161:21
162:7
meet 57:21
123:10 124:13
152:20
meeting 81:10
81:14 87:11
124:18 135:10
Memo 4:16,18
mentioned
101:1 107:4
159:4 171:15
mess 83:13
message 39:18
40:1 149:8
messages 4:13
47:16
met 66:16 80:7
81:4,17
method 43:23
74:16
Mexico 11:1
middle 1:2 93:5
93:7 180:21
midpoint 92:6,7

midst 86:22
mid-May 109:11
mid-2003 55:9
mid-2004 55:8
mightn't 155:2
million 128:7
mind 30:10 42:5
96:13 114:12
131:13,14
mine 95:23
164:11 166:6
minimum 81:17
mini-computer
129:4
minute 38:17
minutes 92:4
146:4 153:18
172:22
misconduct 49:5
49:22 51:14
52:10
missed 113:3
Mississippi 10:7
10:9,13 15:12
17:7,8
mistake 98:10
mixers 70:13
model 150:18
152:7,17,21
153:1
models 152:3
modes 133:1
modifications
156:19
moment 67:14
102:23 122:14
138:5
Monday 117:21
122:20,22
123:20 177:22
178:1,6,17,19
money 70:22
84:7 102:17
110:6 114:3,8

136:4
monitor 122:3
MONTGOM...
180:10
month 157:17
167:8
months 9:19
10:5 13:21
14:14 56:6
80:10 89:11
99:22 121:3
126:8 131:6
167:4 168:5
Montreal 26:9
26:11,16,20
morale 87:19
88:1,3
morning 68:18
89:3,6 93:21
117:21 124:15
172:15 173:16
178:7
morning's 68:16
mother-in-law
7:12,15 11:6
motivated
172:17
move 37:13 70:7
73:19 77:9
81:2 114:16
136:19
moved 11:3 16:5
67:19 68:7
71:20,21 77:3
80:11 97:17
103:21 133:17
moving 10:16
173:14 174:15
174:16
M-c-L-u-r-e 6:4
────────
N
name 5:7,8,11
7:14,18 10:1

14:10 20:1,7
21:11 22:8,18
98:17 112:14
138:17 140:17
142:23 168:17
169:11
named 24:2
55:14 138:11
names 40:5
natural 121:22
naturally 75:18
nature 92:23
103:13
near 9:22 18:11
58:21
neat 83:8,23
necessarily 73:1
83:9 86:11
99:11 110:20
153:5
necessary 70:2,4
78:20 177:4,10
need 3:13 6:7
16:20 30:23
37:23 72:11
82:21 84:17
99:13 101:5,7
101:8 113:15
116:1 123:16
128:19 149:13
149:22 152:19
176:19,20
177:23 179:3
needed 6:12
35:6,8 36:2,8
45:1 57:11
63:22 64:21
65:1,2 77:12
82:14 86:5
87:21 90:11
100:3,6,9
110:2,10 111:1
117:4 156:8
162:10

needing 175:13
needs 63:4 82:22
83:20 85:16
113:9
Nehans 7:17,19
neighborhood
114:23
neither 113:13
181:14
networked
129:17
never 22:20 74:1
86:13 87:16,16
87:17,18
103:11 115:14
138:5 145:4
176:15 177:1
179:22,23
new 11:1 20:12
56:20,22 73:16
101:21 102:5
113:19 128:4
134:4 136:2
next-to-the-last
158:7
nigger 170:3,20
171:11
night 16:6 68:13
69:20 70:1,3
92:18 94:6,7
96:23
nine 10:5
nobody's 87:18
nods 57:22
nomenclature
160:1
non-operational
163:18
non-superviso...
29:19,22 30:3
31:12,23 32:4
non-threatening
179:9
non-work 90:11

# FREEDOM COURT REPORTING

normal 117:22
normally 38:19
  39:1 75:22
North 2:15
notation 51:13
note 51:12 64:18
  82:21 100:14
noted 141:16
  162:13
notes 18:13
  125:21 126:3
notice 4:3 17:13
  48:20 64:8,8
November
  115:19 116:19
  173:4
nozzle 108:7,10
number 6:17
  9:16 18:9,17
  19:2 39:22
  72:21 84:16
  88:7 90:2,9
  91:6 95:1
  97:20,21,22
  98:1,12 100:1
  101:15 102:13
  125:20 126:20
  127:7,9 131:4
  132:14 133:10
  133:13 136:19
  137:1 158:8
nuts 31:20

_____

## O

oath 5:18
object 42:20
  49:7,8
objected 176:17
objection 49:16
  56:12 95:4
  103:18 117:11
  135:15 137:7
  138:1,9 143:23
  146:2,12,21

151:15 155:9
163:14 164:3,7
165:9 167:18
174:20
objections 3:11
  3:12
obnoxious 59:6
observation
  58:11 65:17
  83:3
observations
  81:20
observe 59:9,12
obvious 82:11
  83:19 156:13
obviously 59:1
  114:4
occasion 102:14
  111:19,20
occasionally
  179:18
occasions 88:9
  112:5
occur 97:10
occurred 124:18
occurs 51:17
October 1:22
  181:8
offend 170:3
offended 144:11
  144:12 145:17
offends 171:16
offense 16:17
offensive 94:17
  94:18 170:1,13
  171:14,22
offered 3:15
  35:15 38:3
  70:6 73:14
offering 133:6
office 29:21
  30:18,20,21
  65:23 124:17
  124:18,20,21

124:22 137:4,4
156:4 173:21
174:5
offices 1:20
  26:21
Offir 14:12,13
  14:20 15:1
  31:6
Off-the-Record
  10:18 148:1
Oh 21:3 26:15
  31:8 40:6
  89:13 108:4
  122:21 144:21
  145:16
oil 72:18,23
okay 6:1,2,14,19
  6:21 7:7 8:21
  10:2,6,8 11:4
  11:19 12:8,17
  14:10,13 16:9
  16:16,23 17:1
  18:2,21 21:1
  22:6,14,22
  24:1,11,19
  25:7,19 26:6
  26:12,22 27:1
  27:11 28:16,19
  29:12 30:12,20
  31:8 32:4 33:8
  37:18 42:10
  45:10 46:16
  52:5 54:22
  55:3,11 56:17
  56:18 60:9
  63:15 65:5
  66:9 67:18
  68:3,4,8 69:8
  76:5,16 78:19
  80:4 81:19
  83:11 84:16
  88:6 89:7
  92:20 93:23
  94:9 95:13

97:12 99:18
101:18 102:8
102:13 104:17
105:16 106:2
107:10 108:1,4
108:23 109:12
109:16 115:21
117:17 119:18
123:3,19
129:21 130:3
131:4,17 138:4
139:15 143:19
147:1,17,23
150:1 153:6,23
155:20 156:10
156:23 157:3
157:22 158:1,4
160:14 161:16
163:6 171:19
172:21 173:5
173:16,18
177:6
old 64:19,20
old-style 118:16
omitted 19:9
once 35:12 61:3
  74:19 75:4
  89:14 98:7
  150:21 162:22
  164:15 178:18
ones 82:10
  101:22 160:3
one-man 167:8
one-of 132:10
one-week
  123:17
on-call 110:21
Opelika 6:4 9:15
  9:17 14:17
open 32:22
  86:16
opened 33:3
opening 86:12
operate 69:5

116:2 119:1
122:6 132:3
163:20 175:3
175:19
operates 75:11
operating 21:12
  21:22,23 22:4
  22:20 62:2
  116:13 128:15
  129:11,12
operation 68:12
  74:18 101:13
  118:20 164:10
operational
  116:21 117:3,5
  122:8,9,12,13
  123:7 163:13
  163:13,16,23
  164:2 167:15
  168:4
opinion 56:19
  63:10 81:6
  87:20 141:5
  175:18
opportunity
  38:4 116:5
opposed 72:6
  112:8
option 120:22
order 35:7 64:22
  75:3 95:20
  99:12 113:20
  120:12 131:23
  150:16,16
  165:18 174:19
  176:6,11
ordinary 171:15
organization
  33:6,9 110:2
  134:12
Original 149:8
Originally 8:4
  11:1
outlines 137:19

output 122:3
outside 137:4
oven 86:6,7
ovens 12:1 70:13
overall 87:7
158:6
overbearing
89:22
overlap 88:20
89:1
overloaded 64:1
owned 23:18
owner 141:12
owns 21:19
23:20,21 26:10
o'clock 93:6
O-f-f-i-r 14:12

P
packages 22:17
page 17:20
20:22 86:19
109:7 141:9
149:7,10 158:5
158:7
pages 18:19 42:6
42:7 158:18
181:9
paid 84:8
pain 136:11
pains 119:20
pant 131:4,17
paper 30:23
51:12
paragraph 58:1
126:20 145:22
parameters
105:18 128:2
Pardon 54:15
Parham 1:18 3:6
180:11 181:19
part 12:8 40:7
42:8 44:16
45:7 46:11

47:9,21 49:12
61:19 70:14
83:22 99:7
101:18 111:13
111:15 128:12
130:14 133:7
136:12 141:1
157:1 160:7,12
161:17 164:12
172:20
participating
174:9
particular 62:1
62:2 65:16
81:20 83:2
parties 3:3,20
142:12 181:12
181:15
parts 101:15
102:3,6 110:4
111:12 113:5
113:16 114:4
136:21
party 3:16
Paso 9:1 11:2
passing 119:3
Patricia 169:8,9
pay 4:15 38:6
48:16,16 136:8
payroll 147:21
peers 58:4,16
pencils 30:23
pens 30:23
people 14:23
25:17 27:1,8
27:15 28:21,23
30:5,15 32:13
34:6 36:14,21
48:12 53:2,22
58:17 64:9,12
68:17 70:5
104:3,14 119:2
134:4,5 145:23
people's 65:23

percent 117:4
164:2 167:15
167:17
percentage
23:22 166:21
perfect 87:18
perform 69:6
100:3,9
performance
4:18 32:16
34:16,21,22
50:13 65:4
69:4 78:20
80:7,16,21
81:4,9,14 87:7
104:10 157:7,8
157:16
performing
52:17
period 4:15
51:22 54:18
75:15,17 79:6
146:14 167:1,9
167:11 175:10
periodic 44:12
permanent 35:9
68:10 133:14
133:16,17
168:23
permanently
33:17 34:13
55:6,10
person 14:11,16
19:17 27:20
35:9 66:3,7
95:16 105:9
134:17 135:22
141:15 166:12
179:8
personal 94:5
134:15
personality
133:14,22
134:1,8 135:8

135:13 136:16
personally 90:14
170:2
personnel 4:17
17:21 19:7,16
20:9 31:6
40:16,23 41:7
41:14 44:16
46:11 47:10,21
48:1,5,21 49:6
Petal 10:7,8,12
15:12
phase 75:6
philosophy
84:10
phone 31:2
39:22 95:1
119:12 120:18
142:4,8 144:7
145:7 178:2,4
178:12
phonetic 7:17
physical 59:1
pick 35:14 57:7
83:17
picking 87:22
100:13
piece 44:21,23
51:12
pieces 130:2
Pierce 53:15
54:2
pinpoint 132:23
pint 152:6
place 51:7,16
52:1 66:12
78:23 157:16
174:7
placed 36:5
48:21 69:11
placing 66:18
plaintiff 1:6 2:3
17:21 18:4,12
18:18 19:3,17

19:20,23 88:10
90:9 91:8,12
100:3,6,9
102:14 181:2
Plaintiff's 17:9
17:12 20:13,16
20:17 41:2,4,9
41:11,21 42:1
43:15 44:15,18
44:20 45:8,14
45:21 46:4,6
46:14,16 47:13
47:15 52:13
55:21,22 66:23
79:3 88:4
97:13 107:2,5
126:14 140:13
147:7,9 148:2
155:12,13
156:21,23
158:2
plant 25:15
27:16,19 28:1
29:1 32:12
plants 24:22
play 164:12
176:21
Plaza 2:16
PLC 85:2 129:3
129:7 149:15
158:19 159:23
PLC's 129:17
159:15,18
please 5:7,11
41:5,12 42:2
79:8 149:16
plenty 35:20,20
35:23 39:4
77:16,16 99:10
plus 29:21 69:23
pocket 135:3
point 39:3 83:15
85:10 86:14,15
87:3 90:3

# FREEDOM COURT REPORTING

102:2 106:9
108:10 112:6
120:18,22
122:11 124:5
125:18 131:1
132:22 140:19
146:6 162:10
166:7 172:12
172:12 175:2
175:16
**points** 114:12
**policies** 4:17
170:11
**policy** 4:19
42:14 48:7
51:15,17 52:1
52:3,5,10
59:18 60:5,14
60:18 61:6
91:11,16 94:8
96:6 98:9
155:15,21
156:14 157:1
157:11
**portable** 70:12
74:10 118:9
**position** 4:7
12:18,19 13:2
20:12 28:8
34:9 36:11
41:13,18 70:6
73:13,15,16,20
73:22 76:22
77:11 165:18
165:21 166:7
**positions** 29:18
29:20 32:11,11
**positive** 131:12
**possibility**
115:12
**possible** 17:17
62:14 76:4
131:22 156:18
162:21

**possibly** 131:12
133:6 158:12
**posters** 170:14
170:16
**potential** 88:1
**powder** 99:6
**practice** 51:6
52:1 146:18
**preferred** 131:9
**prepare** 56:8
**prepared** 47:1,3
**presence** 172:6
**present** 2:9
124:17,22
125:2,5 171:7
**president** 25:17
**press** 75:1 131:5
131:18
**pressure** 118:15
118:16,20,21
**pretty** 82:5
83:19 104:11
104:13 165:1
165:22
**preventive** 87:1
**previous** 82:2
**previously** 150:8
**primary** 67:5
**privately** 23:18
**probably** 10:4,5
23:2 30:1,1
65:12 73:18
75:14 82:3
96:19 109:11
115:18 117:3,6
123:9 128:14
141:1 156:11
157:5
**problem** 63:3,4
63:7,23 83:22
88:2,3 89:15
108:1 117:1
123:9 137:2
140:14 141:22

150:9 160:11
179:23,23
**problems** 85:17
86:15 121:16
**procedural** 3:10
**procedure** 3:18
51:6 146:18
**process** 10:16
45:4 48:14
70:14,23 71:7
75:8,13 113:22
130:23
**produce** 151:1
**produced** 17:19
19:5,8 147:10
158:19
**product** 12:14
12:16 31:21
62:2 63:3,4
70:19,22 71:7
71:9,12,17
75:21 85:1,4
85:19 101:12
107:17 108:13
113:7 151:11
151:20,21,22
162:2
**Production** 4:5
**products** 11:16
12:1,3 15:11
15:15 25:20
26:3 62:16,23
70:11 85:18
132:11 133:3,6
151:18
**professors** 162:3
**program** 127:16
129:11,13
130:10 149:15
159:7,17,18,20
159:22 160:7,8
**Programmable**
129:3 159:12
159:13

**programs** 128:4
129:14
**progressing**
102:16
**prohibited** 98:3
**prohibition**
145:14
**project** 29:6,7
29:11 31:14
48:11 54:12,13
69:12 102:19
109:5,9,15,21
110:7,16
112:21 114:9
116:17 162:4
163:9 168:9
**projects** 63:19
63:20 110:22
161:22 162:6,7
162:18 164:21
174:2 175:7
**pronunciation**
20:5
**proper** 11:16
99:17
**properly** 62:3
73:4,5 98:14
101:12 116:3
119:6 128:16
128:17 160:11
**properties** 10:15
**property** 31:15
**protocol** 156:3
**provided** 3:17
18:1 50:4 85:7
174:18
**proximity** 103:3
103:7
**public** 62:21
**publicly** 23:15
**published**
156:16
**pull** 127:21
**purchased** 160:4

**purports** 149:4
**purpose** 3:16
**purposes** 17:10
20:14 41:3,10
41:22 44:19
46:5,15 47:14
107:3 147:8
155:14 156:22
**pursuant** 1:17
**push** 72:8
**put** 35:22 51:13
58:7 68:22
72:5,18 83:10
96:2 120:11
127:16 128:4
136:18 150:21
150:22 152:19
156:19 167:7
175:2,20,23
176:7,13,15,17
177:18
**puts** 75:13
**putting** 62:19
**PX-1** 4:3
**PX-10** 4:14
**PX-11** 4:15
**PX-12** 4:16
**PX-13** 4:18
**PX-2** 4:4
**PX-3** 4:6
**PX-4** 4:7
**PX-5** 4:8
**PX-6** 4:9
**PX-7** 4:10
**PX-8** 4:11
**PX-9** 4:13
**P-e-t-a-l** 10:7

---
**Q**
---
**qualified** 73:10
**qualify** 51:19
**Quality** 80:14
**Quantity** 80:15
**question** 3:12

# FREEDOM COURT REPORTING

Page 198

5:21 42:17
51:4 88:8 97:7
100:20 137:10
137:17 140:12
143:13 144:11
144:13 145:2
145:18 150:11
151:8
questions 3:11
5:16 149:18,20
151:11,13,16
quit 85:19 90:11
139:3,4,5
quite 9:19
quote 52:9

**R**
R 95:16 141:13
141:15,20
142:9
racial 54:13,16
54:19
racially 171:21
172:17
rainy 16:6
raise 52:22 84:9
84:11 136:10
136:13
raised 50:14
59:23 60:1
Ralph 1:16 3:5
5:1,10 50:18
100:1 180:15
rank 60:7,8
rate 49:3 161:8
rated 81:9,14
102:4 113:9
reach 150:20
153:2
read 20:20 21:1
122:1 148:7
149:6,23
157:12
reading 181:12

ready 136:14
151:6
real 65:10
139:13
realized 164:16
really 21:18,18
23:3 66:1 70:3
70:7 73:22
95:19 134:13
134:18 135:21
136:21 139:12
142:10 145:4
realm 104:12
reason 37:21
69:13 89:23
106:15 136:3
142:22 145:16
reasons 137:17
137:19 179:7
rebuild 121:1
recall 38:9 49:2
78:4 90:13
103:10 125:16
125:20 126:8
127:6 138:21
156:16 172:5
175:17 177:16
received 42:11
receiving 22:17
recess 66:22
114:14 173:1
record 72:20
85:12
records 40:16
48:4
redacted 19:9
Reese 13:7,8,15
13:23 14:8
15:3 47:17
78:9 91:7
104:19,20
109:18 110:15
125:7 148:4,5
148:14 149:10

154:17
Reese's 109:19
refer 132:14
148:9
referencing
18:10
referred 137:13
159:14
referring 127:12
refers 71:17
126:22 140:14
148:10
refill 122:4
reflect 49:22
reflected 44:2
45:7 84:11
102:9
reflecting 18:2,9
reflects 49:14
Refrain 63:19
regard 155:20
Regarding 4:16
4:18
regular 34:23
169:14 178:22
regularly 34:1
reiterate 96:21
reiterates 90:2
relate 128:10
131:20
related 77:8
85:22 88:11
91:10
relationship
23:4
relatively 128:1
relatives 7:7,11
7:20 11:5,9
relayed 63:5
release 75:3
118:15
Reliability 131:6
131:8,9,13,14
132:15 133:8

reliable 71:13
rely 105:8,9
remain 53:11
63:18 142:14
remark 64:5
remember 9:15
33:11,12 37:15
37:19 38:5,13
40:6 41:20
55:5 57:9
88:20 132:6,10
142:5 169:10
175:1,12
176:10 177:3,5
177:7,8
reminded
119:12 121:17
177:23
rental 10:15
rented 9:21
repairs 177:19
repeat 5:23 75:8
98:9
repeated 171:3
171:8
repeatedly
100:2,7
repeating
171:10
replace 19:17,20
20:11 166:1
replaced 14:7,11
replacement
14:3,4
replied 145:19
reply 149:16
150:12,14
report 14:5
43:14 59:10
61:23 79:23
85:19 87:4
94:1
reported 58:21
61:12 62:4

91:17 94:17,19
180:14
reporter 1:19
3:7 31:16
180:12 181:20
REPORTER'S
180:8
reports 43:17
represent 5:14
representative
141:13
representing 3:3
reprimand
48:21 50:1,15
50:16 51:8,10
reprimanded
48:15,20 88:10
reprimands
49:4
request 149:2
150:1
Requests 4:4
require 179:6
required 32:2,2
39:4 68:13
70:1 98:17
requirements
3:10 57:13
132:17,19
requires 38:19
39:1
research 106:5
reserved 3:14
resistance 134:3
resolution 177:8
resources 34:3
78:10 104:22
respect 3:10
52:17 58:5
136:15
respecting 58:16
58:17
response 18:5
66:10 96:10

# FREEDOM COURT REPORTING

149:1
**Responses** 4:4
20:17
**responsibilities**
56:20 99:8
134:4
**responsibility**
72:3,13 78:18
83:7 104:8
136:5
**responsible**
31:18 35:17,19
36:6 53:2 62:5
68:20 70:15
71:21 76:6,17
**rest** 100:16
**restate** 143:9
**result** 43:13
**results** 181:16
**resume** 4:6
35:12 41:6
77:14
**retrieved** 148:23
**return** 124:16
**review** 4:19 67:2
67:11 79:5,9
79:10 88:8
123:16 126:13
156:11 157:21
176:20
**reviewed** 56:1
157:4,18
**reviewer** 67:6,7
**reviews** 157:7,8
157:16
**Rhodes** 138:3,12
138:13,15,17
139:15,18,22
140:5,10,16
**rice** 68:23 99:6
**Richards** 19:12
53:16,19,20
54:1
**right** 13:5,15

16:12 20:2
25:5 27:22
29:13 30:7,9
31:4 32:10,13
37:15,17,19
38:17 45:12
46:3 50:5 51:2
51:20 56:6,15
61:21 62:11,12
69:8,13 71:19
78:22 81:23
86:10 88:20
95:2 98:17
99:16,23
102:18 103:1
104:2 106:17
114:12 117:13
117:17 123:15
127:3 133:20
136:16 138:14
143:2 144:22
145:13 151:16
154:18 155:10
161:18 163:21
164:23 170:18
171:7
**Rightly** 87:14
**ring** 178:12
**road** 6:22 16:7
**Robertson** 13:14
13:16,19 14:3
14:7,11 22:17
38:12,15 40:2
46:21 47:4
60:3,7 67:6,10
79:10 83:15
90:19 115:5,7
115:11 120:19
124:3,6,12
125:6,9 127:4
130:7 133:23
134:9 139:19
**Robertson's**
124:19,22

126:4
**Robinson** 54:23
55:2,3,11
168:18
**role** 36:19 82:22
82:23 133:4
164:22
**roles** 166:5
**roof** 118:18
**room** 29:15 30:6
73:7 76:15
83:4 101:11
106:23 119:22
127:23 174:1,6
174:6
**Rosenzweig**
23:21
**roughly** 56:6
**routine** 44:11
84:18 117:22
161:23 172:8
**routinely** 161:23
**routines** 171:3
**Rules** 3:17
**ruling** 3:14
**run** 35:7,8,14
68:18 69:16
72:6 110:22
117:3,5 120:6
122:23 151:3
164:20 178:22
**running** 74:12
88:18 120:11
129:9 130:21
165:19,20
176:4 178:6
**runs** 93:4

_____
**S**
**safe** 71:2,12
119:1 163:19
175:19
**safety** 179:7
**SAITH** 180:5

**salary** 84:15
**sale** 131:22
**sales** 25:16
**Sam** 88:15 90:3
90:6
**sand** 35:21 65:9
68:23 99:6,16
**Saturday** 123:1
178:23
**Saturdays**
179:19,21
**sauce** 118:18
**save** 155:2,4
**saw** 35:12 126:7
172:16
**saying** 32:9
127:6 130:4
151:22 164:23
165:10 176:10
177:16
**says** 57:5 61:10
79:5 84:17
86:22 91:6
100:7 102:1
126:20 137:8
149:8,13
158:19
**scale** 158:9,11
158:12
**schedule** 36:16
79:12,13 92:21
92:22
**scheduled** 91:22
**scheduling**
35:17 36:8
**school** 8:9,10,11
8:14,19,22
32:8 37:20
162:17,22
**schools** 9:3,7
**score** 87:10,21
**scratch** 167:23
168:2,4
**second** 14:23

15:4 28:11
35:5,8,9,15,15
35:18 36:5,6
36:21,23 37:5
37:8,23 38:1
59:10 68:11
69:14,23 77:4
77:7,10 88:19
89:4 116:18
**secondary** 67:7
**Secondhand**
59:11
**Secondly** 173:13
**secretarial**
32:10
**section** 151:9
**Security** 6:17
**see** 37:23 49:21
57:23 71:7
85:11,20 88:19
99:2 106:22
112:9 116:12
116:13 118:3
119:7,8 120:8
120:15,23
125:22 126:10
129:13 135:7
150:11 151:3
156:12 162:18
172:16 176:22
178:7 179:17
**seeds** 66:21
**seeing** 145:17
**seeks** 57:10
**seen** 17:13 47:7
47:19 85:17
126:5 147:14
**self-reliant**
65:15
**sell** 11:21
**semester** 162:15
**send** 101:21
102:5
**senior** 161:22

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

162:1 163:9
**sense** 69:15
93:15 131:1
154:6 155:1,3
155:8 174:1
**sensor** 175:14
175:19,23
176:5,7,11,16
177:1,13,18
**Sent** 149:9
**sentence** 84:1
86:1 101:1
157:15
**sentences** 86:2
**September**
162:16
**series** 58:10
**serious** 147:2
**service** 101:8,9
**Services** 1:9
11:12 21:16
23:12,15 181:5
**set** 20:18 68:17
72:18 98:20
99:3 150:10
181:12
**setting** 83:18
**settled** 22:19
**setups** 56:23
**seven** 10:10
15:20 27:12
88:13
**sexual** 95:11,18
96:12,15
103:13 138:6
141:2 145:8
146:8,17
**sexually** 144:9
147:5
**shape** 106:12
**sheet** 18:13
**Sheffield** 19:7
53:15 54:3,6
91:15 93:23

96:4 102:23
138:3,4
**shelf** 31:22
**shift** 35:5,8,10
35:15,16,19
36:5,7,9,22,23
37:6,8,13,23
38:2 68:11,18
69:14,20,23
70:1,3,5 77:4,5
77:7,10 88:19
88:21 89:4
92:18 93:18
**shifts** 35:7 69:16
**shipped** 31:1
**ships** 31:1
**shock** 96:15
**shoes** 58:8 165:4
**shoot** 85:10
**short** 75:15
**shorter** 45:13
75:17
**Shorthand** 1:18
3:7 180:11
181:20
**shortly** 79:17,19
141:11
**show** 17:11
20:15 41:4,11
41:23 46:16
57:17 86:9
106:3 107:4
108:5 109:1
147:12 149:4
155:11 156:23
172:11,16,16
**showing** 46:7
60:5
**shown** 45:20
52:13 57:15
**shows** 149:5
**shut** 77:5,8
**shut-down** 75:6
**side** 85:10 105:4

141:3
**sides** 59:22 60:1
**signal** 121:21,22
**signature** 3:21
20:21,23
**signed** 20:19
21:2 56:3
66:13
**significance**
150:4
**significantly**
80:22
**signing** 181:12
**similar** 22:9
116:17 134:6
**Simon** 53:16
54:3 105:1
110:17,18
**simple** 82:7
106:15
**simply** 132:11
**simulate** 75:21
**single** 6:19 95:7
95:8,9
**singled** 90:14,19
**sir** 5:15,20 6:23
7:4,6,9,23 8:2
8:8,12,20 9:6,9
10:21 11:1,7
11:10,13 13:3
13:9,12,17
14:22 15:5,8
15:22 16:1,3
16:10,15 17:4
17:14,15 18:7
18:14 19:1,6
19:11,15 20:3
20:11,23 21:3
21:6,13 22:2
22:13 23:1,19
24:6 25:11,13
25:21 26:15,17
33:4,6,10,18
33:20 34:19

35:3 37:4,12
38:21,23 39:7
39:14,21,23
40:9,15 41:1,5
41:8,12,15,17
42:9,13 43:10
43:12,16 44:6
44:14,17 45:6
45:9,9,15,19
46:2,10,18
47:2,8,18,20
48:6 49:2
52:11 53:1,13
53:21 54:5
55:12,15,23
56:2,7,9,21
57:1,4,14,17
58:13 59:15
61:2 63:17
67:4,12,21
68:5 74:9
75:12 76:19,21
76:23 77:2
78:3 79:2 80:3
80:9,12,19
81:1,7,12,17
87:6 89:13
90:5 91:3,5
94:15 103:2
104:21 108:22
109:8,20
112:17,19
114:18 115:2,9
121:11 123:2
123:12,14,21
123:23 125:1
126:6 127:2,6
127:8,11
138:16 139:6,8
139:10,21
140:11 142:20
147:19 148:6,8
148:15 158:13
158:21,23

160:6,9,13
163:3 165:3
166:9,11,18
168:20,23
169:2,4 170:7
170:10,23
171:2,6,9,12
171:23 172:4
173:12,17
174:14 175:11
175:21 176:2,9
176:15,19
179:1
**sit** 160:5
**site** 68:11
**six** 9:19 10:4
13:21 14:14
56:6 101:20
**Sixth** 2:15
**sketch** 106:9,13
106:15
**skill** 35:12
**Skills** 81:8
**slowly** 102:16
**small** 11:21 85:8
134:12 175:7
**Smith** 1:5 2:9
4:9 5:14 23:10
24:17 27:6,13
33:9 34:9 49:6
49:22 56:11
67:3 80:1
90:10 96:9
103:21 114:16
115:13 124:3
124:13 125:10
128:9 134:10
139:11,16,20
140:1,6,10
146:14 147:5
148:5 149:9
150:5 155:22
157:9,23 160:5
161:6 165:13

# FREEDOM COURT REPORTING

167:15 168:22
170:22 171:7
179:15 181:1
**Smith's** 4:6
40:22 124:7
125:10 138:23
147:21 169:23
172:6
**Social** 6:17
**Society** 98:18
**Soft** 159:20
**software** 127:9
**soils** 69:1
**sold** 62:21
**solely** 105:9
**solutions** 133:7
**somebody** 35:11
55:18 61:23
65:11 72:8
73:6 74:2
83:12 86:17
92:17 93:1
96:3 99:2
119:5 152:15
153:8 154:11
165:19 166:6
**somebody's**
108:1 154:4,5
**someone's**
148:19
**sons** 40:3
**soon** 62:13
**sorry** 6:7,9
30:10 34:19
37:17 49:20
55:8 79:21
100:19 106:8
122:21 128:13
143:16 149:21
169:7,18,20
**sort** 32:9 34:11
48:16 52:2
74:11 75:10
90:2

**sound** 33:15
**soup** 31:19
**South** 1:21 2:6
**spaces** 103:5
**speak** 5:3 40:12
58:5 63:21
67:20 179:20
180:16
**speaking** 65:8
**speaks** 42:21
**spec** 149:14
150:12,12
**specific** 22:8
29:2 58:20
68:22 74:5
83:22,22 89:18
89:20 98:21
99:4,4 100:5
115:16 128:22
159:20
**specifically** 23:7
33:1,12 47:2
55:6 68:1
88:17 98:15
103:11 108:11
149:1 159:22
**specification**
107:17 152:18
**specifications**
72:20 150:2
**specify** 24:14
**speculation**
146:13,22
**speed** 123:7
**Spell** 5:11
**spend** 110:2,3,7
154:8
**spent** 156:3
165:13 168:7
**spoken** 63:21
119:17
**spot** 129:20
**spring** 37:14,16
67:16 68:3

78:23 142:16
**sprouting** 66:21
**squeeze** 108:2
**standards** 12:16
80:7,17,23
81:4,10,15,18
87:12 98:21
99:3
**Stan-Pro** 22:7
**Stan-Ro** 22:11
22:12,15,18,23
**start** 8:9 66:6,7
70:8 72:4 73:6
73:12 86:13
87:22 88:21
99:15 100:13
115:10 117:23
131:3 132:21
132:23 149:7
149:15 150:1
150:16,22
156:20 167:20
167:22 168:1,3
**started** 33:6
59:21 69:22
106:1 114:6
122:22 135:22
172:11
**starting** 31:20
57:17 85:14
**starts** 74:23
162:17
**state** 1:19 3:8
5:7 128:13
150:20 152:2,8
152:17 153:2
153:16 180:9
180:12 181:21
**stated** 113:5
150:8
**statement** 62:7
**STATES** 1:1
180:20
**station** 102:16

106:20 119:9
129:2,4,5,6,8
129:19 131:17
**stations** 130:21
130:22 131:6,8
131:15,15
**status** 68:16
78:23 89:5
129:7
**stay** 25:17 71:15
**steady** 150:20
152:2,7,17
153:2,15
**steam** 11:22
70:12 74:7,10
74:12,13,17,18
74:23 75:1,3,5
75:11 81:23
82:1,5,8 86:23
87:5 101:16,23
102:1,15
105:14 106:20
106:21 107:23
111:4 112:21
113:7,9 114:13
116:2 118:2,10
118:11,14,19
119:7,13
120:13,14,20
121:17 122:3
125:17 151:1,7
151:7 163:12
164:13,18
165:2 166:22
167:5 175:4,13
177:20
**steamer** 106:3
130:22 131:2
148:11 149:14
150:18,23
151:2 153:17
174:3
**steamers** 107:18
150:12 151:23

153:15 164:18
**steam-generat...**
118:10
**step** 82:8
**steps** 106:8
**stipulated** 3:2
3:19
**stipulation** 1:17
3:1
**stopped** 116:23
**stopping** 93:8
**stops** 86:6
**store** 99:1
**street** 1:21 2:6
9:16,17,23
10:1
**strength** 81:21
**Strive** 65:14
**students** 159:11
159:16 162:1
162:19
**stuff** 35:23
58:23 70:14
99:10
**subpoena**
137:16
**subsequent**
166:4
**sued** 15:23 16:2
16:8,8,14
**suffering** 136:12
**summary**
127:19
**Sunbeam** 15:11
15:15,16,19
**Sunday** 123:1
178:23
**Sundays** 179:19
179:20,21
**supervised**
13:13
**supervisor** 13:4
13:10,22 53:9
53:11 59:14

# FREEDOM COURT REPORTING

103:22
**supervisors** 18:3
**supervisory**
  31:5 36:10
**supply** 98:13
**support** 110:9
**supposed** 60:16
  64:15 85:13
  92:5,19 104:6
  107:11,15
  122:22 128:9
  129:22 147:12
**sure** 11:15 30:22
  35:20 36:6
  42:16 43:4,6
  44:10 47:11,12
  50:10 51:5
  58:4,6,22
  61:10,17,20
  62:10 63:22
  65:2 68:12,15
  68:20 69:2,4
  70:20 71:2,23
  72:22 73:2,2
  76:9 83:7
  89:10 95:18
  96:18 97:14,16
  99:9 110:3,5
  111:5 113:23
  114:10 119:15
  122:12,17
  130:16 134:16
  139:13 141:8
  145:8 163:19
  165:20
**surprised** 96:11
**surrounding**
  7:21
**suspended**
  48:15,16
**sweep** 83:9,18
**sweepers** 11:23
**sworn** 5:3
  180:16

**system** 72:19
  74:22 87:2
  101:6 105:15
  105:18

---

**T**

**table** 107:1
**take** 7:12 9:2
  48:10 57:15
  58:5 59:8 67:9
  74:16 76:22
  77:18 85:16
  86:7 92:2
  93:10,13
  113:18 116:4
  116:10 120:3
  120:23 121:3
  128:5,23
  129:22 132:9
  132:20 133:1
  150:21,23
  152:1,3,5
  153:1,13
  154:12 157:16
  164:16 167:16
  168:3 172:22
  174:17 175:8
**taken** 1:17 3:6
  48:9 69:11
  115:23 142:12
**takes** 56:20
  121:21 150:19
  151:3 152:16
  153:14,23
**talcum** 99:6
**talk** 11:18 43:3
  45:1,3 100:14
  105:14 106:7
  111:18,19
  120:10 123:11
  125:14 144:18
  172:14 173:13
  173:16,18
  177:7

**talked** 10:12
  24:2 40:10
  63:15 64:11
  92:14 95:13
  96:9 98:1
  101:9 130:16
  130:17 133:11
  136:23 141:15
  142:3 157:9
  178:6,18
**talking** 24:15
  28:20 44:7
  62:15,20 64:10
  64:14 84:6
  115:10 137:6
  137:12 139:14
  142:7 144:15
  146:1 172:1,7
  175:12 177:5
**talks** 90:9
  100:12 127:9
  131:4 136:19
**Tallassee** 1:21
  2:7
**tasks** 57:3,16
  82:19 84:19
**taught** 87:15
**team** 61:13 63:5
  133:2
**Teamwork** 81:2
**tech** 28:16 34:11
  34:12,21,21
  41:16 55:2
  68:9 99:8
  103:1 168:19
  169:13
**technician** 28:8
  28:13 76:14,16
  86:8 153:13,20
  154:15
**technicians**
  28:15 32:20
  42:19 54:20
  90:8

**Technician/E...**
  61:13
**techs** 29:4,5,8,16
  30:2,13,17
  53:14 55:13
  69:5
**telephone** 90:12
  90:15,18,22
  92:14 94:5
  97:10 140:20
**tell** 12:12 16:4
  17:1 20:20
  21:10 22:14
  27:18 42:6
  59:16 68:6
  74:1 86:17
  97:2 106:5
  108:7,10
  112:22 124:13
  129:7 143:4,10
  143:21 147:12
  158:22 175:9
  176:6
**telling** 133:5
  171:17 175:17
**tells** 129:5 162:2
**temp** 33:13,19
  34:18,19,20
  133:17 169:3,4
  169:14
**temperament**
  136:17
**temporaries**
  69:6
**temporarily**
  55:7,9 169:1
**temporary**
  32:13 90:7
**temps** 32:17
**ten** 16:9 30:4
**tenure** 15:16
  53:12
**term** 24:9 32:6
  71:16 74:15

131:9,13 134:8
  172:15
**terminate** 115:3
  124:6
**terminated**
  18:12 19:23
  27:13 39:8
  41:19 46:23
  47:5 54:9
  102:20 114:17
  123:22 139:2
  150:5 161:6,10
  168:22
**terminating**
  115:12
**termination**
  4:12 115:15
  137:18,19
  164:9
**terminology**
  176:21
**terms** 160:2
**Terry** 13:14,15
  14:6,7,11
  38:12,14 40:2
  67:6 115:5,7
  115:11,14,15
  121:5 124:2,6
  124:12 125:6,9
  127:3 130:6
  131:9 133:23
  134:7,9,13,20
  139:19 156:17
**test** 29:19,22
  30:3,17 31:10
  31:12,23 32:3
  32:4,16 56:22
  62:16,22 70:7
  70:9 71:1 72:5
  76:14,16 81:21
  85:1,18 86:4
  87:2 90:7 93:2
  93:3,3,5,8,9
  98:18,21 99:17

# FREEDOM COURT REPORTING

101:6 127:23
128:7 131:12
131:17 132:11
132:12,16
133:9 149:14
151:18 152:13
152:22 153:8
173:23 174:6,6
**tested** 11:16
12:14 74:8
**tester** 112:22
165:2 166:23
175:13 177:20
**testified** 5:4
56:13 167:19
**testimony**
169:22
**testing** 11:15
12:10,11 25:19
26:2,7 36:1
57:12 61:11,18
64:17 68:12,14
68:16,21 70:16
71:11,16,20
73:7 74:6 76:5
76:8,10,12,15
76:18 77:9,21
80:11,13 87:5
97:18 99:3,11
101:14 102:15
103:22 105:15
108:18 111:6
116:20 131:10
131:10,14
153:12 154:8
163:12 164:13
175:18 179:5
**tests** 63:2 71:23
72:1 99:4,5
127:22 128:2
128:15 153:10
**Texas** 9:1
**Thank** 180:1
**Thanksgiving**

115:20
**theory** 111:13
**thereabouts**
173:6
**thereof** 181:16
**thermometer**
85:9
**thing** 15:18
25:14 31:2
48:17 74:5
78:7 85:6,13
86:9,18 94:14
94:19 101:20
105:12 113:2
114:1 116:11
118:23 119:4
120:11 123:6
131:16 132:1
135:6 157:20
**things** 12:2
15:14 17:17
19:8 31:3
35:21 36:16
45:3 46:21
57:18 60:21
66:8 69:2
70:17,17 71:6
71:8,9 72:2,11
83:4 85:15
87:21 99:12
100:5,13,14,16
100:23 103:16
104:5 105:4,6
107:20 108:19
111:14 113:6
114:11 116:14
128:7 136:6,10
149:6 150:15
165:14,18
168:11
**think** 9:11,11
20:1 22:5
24:12 26:12,14
27:11,17 28:7

37:2 38:9 40:3
43:20 45:9
49:11 53:6,7
55:8,21 56:13
60:9 67:13
68:1,5 72:14
77:23 79:2
82:6 86:1
94:20 95:3
96:11,14 97:4
98:1,7 106:6,6
107:9 108:14
114:22 119:16
120:7 123:17
123:18 124:21
126:12 133:11
136:20 141:1
144:10,14
156:19 162:16
167:13 168:5
168:10 169:16
172:21 173:22
178:17,18
**thinking** 109:14
**third** 15:7 17:20
80:20 86:21
157:15 167:12
168:8
**thirdhand** 59:10
**thought** 30:14
35:11,13 50:3
76:11 77:13
82:10 95:20
172:12
**three** 9:11 12:21
13:1 28:18
29:17 30:1,1,2
30:3,17 76:3
93:3,4 167:4
**three-month**
167:9,11
**three-year** 76:2
**ticket** 16:18
**tidy** 83:8

**tier** 14:23 15:4,7
**tiers** 27:18,23
**till** 88:21,23
141:4
**time** 3:13,14
12:13 16:13
18:11 19:23
27:6,8,13 35:2
36:14 37:9
40:14 43:3
51:22 53:4
54:18 56:5,19
58:5 60:4
64:23 65:1,5
66:2,15,19,20
67:22 72:1
75:15,17 78:12
79:9,13,14
80:6 81:6
82:20 83:14
84:7 86:2 87:3
89:9 90:11
93:9 96:6
101:9 102:20
103:9 105:7
107:20 114:2,7
115:20 116:16
116:19 117:4,8
119:15,16
120:7 126:7
128:13,16
132:2,13 146:6
146:14 151:7
152:2,9 153:8
153:14,20,23
154:8 155:2,4
155:16,16
156:3 159:7
162:13 163:1
163:11 165:6
165:12 166:21
167:2,12 168:7
168:8 172:10
178:14,19,20

**timely** 63:13
**times** 45:10
65:19 72:21
75:4 84:6 92:9
92:10 99:15
100:8,21
101:17 102:3
111:7 113:12
113:21 132:4
152:4 178:13
**timetable** 109:4
**timing** 153:21
**tip** 154:21
**title** 34:10 83:15
**titles** 28:23 29:2
**toaster** 12:1
70:13 86:6,7
**today** 5:16 17:14
19:10 27:3
126:5 157:10
**told** 60:4 73:15
84:7 94:21
98:7 100:6
103:17 108:20
110:12 119:15
125:2,15 140:3
140:16 143:4
174:17 178:7
**tone** 58:6,19
59:3,8
**tool** 52:15
**Topics** 4:11
**totally** 133:13
133:21 135:8
135:13
**touch** 39:11,15
85:5 95:21
113:9 120:21
**touched** 136:21
145:8
**tough** 134:21
**tougher** 108:13
**track** 31:3 43:5
**trade** 8:22 9:2

traded 23:15
traffic 16:18
transcript
181:10
transducer
121:20,20
122:2,3,6
transducers
122:10
transition 64:16
65:6
transposes
121:23
travel 39:2,4
79:12
traveled 134:21
traveling 38:18
38:19
travels 39:5
trick 50:22
tried 83:6 96:16
120:16 178:19
trigger 75:2
107:23 108:2
trouble 69:22
85:21 94:14
122:5
truck 135:4
true 82:15 90:23
154:23 179:15
181:10
truly 141:23,23
truth 5:3,3,4
180:17,17,18
truthful 21:5
try 40:1,4 43:3
76:2 121:10
135:18 172:18
174:1
trying 31:16
43:5 50:22
62:8 64:15
70:16,18 71:4
73:20 77:11

101:16 112:11
144:8 148:10
150:3 153:10
153:11 172:19
Tuesday 178:3
178:20
turn 63:1,2 72:9
72:19 118:5,8
118:23 119:10
turned 16:7
72:21
turning 61:19
62:9 85:4
117:23
twenty 27:5
28:20 110:15
Twenty-five
10:19,20
twice 178:17,18
two 9:22 25:4
28:7 32:13
34:3 35:7
37:19 69:16
70:17 79:7
86:1 92:9
93:20 102:10
104:22 123:18
136:21 137:2,5
137:21 138:2
140:14 145:23
145:23 162:6,6
168:5 177:9
type 12:2 134:6
typed 51:12
types 45:2 68:22
71:6 85:15
typical 51:15
70:11 117:8
typically 34:4,5
42:18 43:1

_____ U _____

ultimate 78:16
unaware 140:2

140:7
unclear 5:23
uncomfortable
91:11
uncommon
117:15,16
understand 5:18
5:22 19:18
32:6 36:3
42:16 44:7
52:16 62:8
64:22 67:2
73:14,21 92:20
100:19 122:12
122:17 137:14
138:5 141:8
163:11,21
172:21 175:3
177:12
understanding
124:15 134:5
understood
22:21 142:13
163:23
underwent
67:16
unfair 94:2
unit 71:1 72:21
74:6 75:1,5
80:11 86:16
97:18 118:12
129:10 132:3,6
132:16,20
150:16,19
UNITED 1:1
180:20
units 62:10 72:5
86:12 93:4
128:4,5,6,20
159:23
unit's 61:21
University 159:5
159:11,17
161:19 162:5

166:15
unusual 91:23
upset 59:21
use 24:8 34:4
51:8 57:11
62:22 78:10
85:11 90:15,18
90:22 92:14
94:4 97:9
107:22 121:19
122:1,2 127:19
128:18 159:21
159:23 169:23
170:2,9,12
171:11,13,20
user 127:14,20
uses 34:1
usually 62:6
U.S 25:2 26:13

_____ V _____

vacation 115:23
116:4 117:18
117:19,21
121:15 122:15
122:16,19,20
122:21 123:17
124:2,16
125:10 155:16
156:6 173:4
176:13 177:17
178:5
vacuum 11:22
32:16 34:14,16
34:20,22 35:22
69:1,4 70:11
71:4 93:2
98:21 99:1
104:10
valuable 73:22
74:3
value 70:21
71:14
valve 111:11

variety 11:21
70:10,13
various 28:14,19
28:21 71:9
99:7 100:14
127:22
vent 118:11
verbal 100:11
106:1,2
verbiage 73:17
verifying 101:13
versus 1:7 181:3
vessel 118:11
vice-president
83:16
Victor 1:5 2:9
4:6,9 5:14
23:10 27:6,13
33:9 34:9
35:12 37:2,5
38:3,5,11
40:22 41:13,17
42:3,11 46:22
46:22 47:5,16
49:6,22 53:8
53:17 56:1,5
56:11 58:16
59:12,18 60:3
61:3,16 62:8
64:10 65:6,22
66:10,16 67:3
70:6 71:19
73:10 76:11
79:18 80:1
83:21 84:5
86:3 88:17,18
88:22 89:2
90:10 95:14,23
97:17 98:12
102:19 103:3,9
103:12,21
105:8,19
107:11 108:17
110:5,9 111:2

# FREEDOM COURT REPORTING

111:3,22,23
112:7,23
114:16 115:12
115:23 116:3
116:14,15
117:18 119:11
119:23 120:2
120:17,22
121:9,14 124:3
124:7,13 125:2
125:9,10 126:9
127:4 128:9
129:22 130:10
132:3,19
134:10 138:7
138:23 139:11
139:16,19
140:1,6,10,21
141:17 142:4
142:19 143:5,5
143:15,17
145:2,11
146:14 147:5
147:21 148:5
148:10,18
149:5,8,13
150:2,5,8,11
150:15 151:8
151:14,17
152:11 155:21
157:8,18,23
160:5,18 161:5
161:9 163:11
165:12,14
166:1 167:15
168:22 169:23
170:21 171:7
172:6,10 173:3
174:10,11,17
175:12,17
176:6,10 177:3
177:16 179:15
181:1
**Victor's** 40:13

41:6 44:16
46:7 47:9,21
64:23 67:15
72:12 81:4
99:8 131:20
151:10 164:8
165:4,7 166:6
**view** 127:9,13
128:8,10,16
129:15,22
131:3
**violate** 61:6
91:16
**violated** 52:3
155:22 156:3
**violates** 48:7
**violating** 94:7
**violation** 51:14
51:17 52:9
**Virginia** 8:6,7
8:16,20 10:23
**virtually** 80:23
**visit** 141:14
**visual** 106:2
**voices** 59:22,23
**volume** 37:22
**voluntarily**
54:10,11
141:17

---
**W**
---
**wages** 46:7
**waived** 3:11,22
181:13
**walk** 106:20
**walked** 141:18
173:23
**want** 21:7 24:12
42:6 50:9,23
51:3,9,9 57:8
57:23 67:14
76:2 87:22,23
93:1,8,9 98:17
105:8,22 110:1

114:15,16
115:18 121:4,5
126:21 127:4
130:15 133:9
135:18 136:1
137:11,16
141:7 142:21
143:8 144:2
158:9,16
161:18 169:21
170:1 173:2
179:4
**wanted** 58:22
61:16 96:21
108:14,20
116:4,10 122:2
128:12,21
132:3,19
134:13
**wanting** 86:16
**wants** 149:19
**warm** 85:11
**warned** 90:21
**warning** 91:1
**warranty** 76:2
**WARREN** 2:13
**wasn't** 70:2,4
84:6 86:10,15
108:23 114:2
120:5
**waste** 153:7
**wasting** 90:11
114:3
**watch** 110:3
**water** 72:10
75:8 102:1,4
150:21 152:6,6
**water-cooler**
172:14
**way** 39:19 43:4
58:20 62:3,18
63:13 64:1
85:12,13 87:9
87:15 89:17

103:8 106:12
112:22 134:18
136:18 150:7
151:2 156:5
157:14
**ways** 66:7
**Wednesday** 1:22
181:8
**week** 120:6
122:19,23
123:13 124:2
125:9 142:7
178:5,16
**weekends**
179:16,18
**weeks** 30:16,16
54:8 76:3
167:8
**went** 66:9 83:11
111:16 120:13
120:14,16,18
141:14,20
144:10 145:5
145:10 156:17
172:2
**weren't** 90:21
102:3 110:20
125:2 163:19
**we'll** 68:3 69:1
106:7 121:8
122:9 166:5
172:23
**we're** 24:15
28:20 44:7
62:15,20 84:20
99:2 119:6
136:8 137:6,12
141:8 145:9
**we've** 24:1 96:21
98:1 100:12
101:9,20
102:10 113:18
113:19 133:11
136:20 157:9

159:3 166:4
**When's** 126:7
**white** 54:17
55:16,18 96:4
143:16,17
166:10
**wife** 6:21 7:10
7:22 10:13,22
11:9
**wife's** 7:18
**willingly** 136:11
**window** 152:20
**wire** 73:4
**wires** 118:3,6
119:8,14 120:3
120:16,20
163:17,22
164:1 168:1
**witness** 3:20,21
5:2 56:15
57:22 117:12
149:21 169:15
181:11
**wondering**
135:12
**word** 51:8,10
135:21 136:16
144:23 161:18
170:3,5,9,20
171:5,11,13,20
171:20
**words** 57:13
134:2 150:20
170:1 175:1
**work** 11:11 12:9
15:9,9,19
21:20 22:16,16
23:9,10 24:10
24:16,17 28:23
31:19 35:6,18
35:21,23 36:7
36:9 37:8,22
57:16 65:15
66:4 68:19

# FREEDOM COURT REPORTING

Page 206

69:15 80:15
82:1 84:9,11
84:19,20 88:21
88:23 91:9,10
92:3 97:21,22
101:23 103:3
110:23 112:13
113:17,18
116:6,17
117:22 121:7,8
121:10,12
123:1,3,8
127:5 129:14
130:1 134:9,17
136:8,9 154:1
155:16 159:10
162:11 164:16
165:2 166:19
169:12 170:21
172:10 179:2,6
179:20
**worked** 12:22
27:8,15 36:21
58:17,18 69:17
69:19 103:6
146:15 179:16
**workers** 59:5
89:16
**working** 32:14
32:19 34:20
53:8 61:21
62:11,11 69:19
72:23 81:22
83:4 85:2,5,20
86:6 87:4 91:9
91:19 92:11,19
94:12 101:12
102:19 120:20
164:13 165:13
165:14
**workload** 69:23
70:2 164:21
165:5
**works** 22:3,22

38:20 70:19
106:4 132:1,2
139:9 160:15
**world** 26:18
65:10
**worry** 122:10
**worse** 88:3
118:22
**wouldn't** 45:9
59:8 93:13
106:14 112:3
114:5 123:9
154:5
**wreck** 16:11
**write** 79:9 128:4
**writing** 102:8
109:16 146:20
149:15
**written** 43:14
50:1,16 51:7
51:11 52:9
56:17 88:10
100:12 102:10
107:10,14
152:18 170:11
**wrong** 101:18
101:19,20
113:5 114:4,13
132:21 145:9
**wrongly** 87:14
**wrote** 79:14
**W-2** 4:10 46:7

**Y**
**yeah** 15:17 29:3
30:8 38:8
49:21 82:17
104:9 143:10
145:1 149:12
167:6 172:16
178:15
**year** 38:10 43:19
84:10,12,12,13
136:13 169:17

169:19
**years** 9:11 10:10
10:19,20 12:21
13:1 15:20
16:9 17:6 76:3
78:6 110:15
**year's** 136:9
**yesterday** 65:12
**Yigal** 14:12
**young** 11:3
**y'all** 50:11
**Y-i-g-a-l** 14:12

**Z**
**zip** 6:7,10,12
8:17

**0**
**02** 33:2
**03** 27:7 33:15
35:1 36:4 37:7
37:14 51:23
135:9 162:16
**04** 27:14 37:16
37:17 45:17,23
51:23 68:4
79:1,5,6 80:2
115:1,2 142:16
160:17 163:7
173:4

**1**
**1** 17:9,12 126:20
127:7
**1-to-4** 158:12
**10** 88:23 91:19
92:1,11 100:1
107:2,5
**10:15** 1:23
**10:30** 88:23
91:20 92:12
**107** 4:14
**11** 102:13 147:7
147:10
**12** 155:12,13

**120** 153:1
**13** 156:21 157:1
**147** 4:15
**155** 4:16
**156** 4:18
**17** 4:3
**180** 181:9
**1901** 2:15

**2**
**2** 1:21 2:6 20:13
20:16 84:16
88:5,22 89:8
90:2 92:11
137:1
**2:30** 88:21 89:9
**20** 4:4
**2003** 46:8 53:5
54:12,19
133:19 156:20
**2004** 46:8 51:19
53:5 54:12,19
56:3 67:17
77:1 146:15
**2006** 1:23 181:8
**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**
6:18
**2400** 2:16
**25th** 149:9
**27** 79:5,21 80:1
**27th** 45:23
**28th** 151:9
**28,000** 38:10

**3**
**3** 18:9 41:2,4
90:9 127:9
**3rd** 114:22
156:17,20
**3.5** 87:8,8 158:8
**3:05-CV-1186...**
1:7 181:3
**32** 159:20
**35203** 2:17
**36078** 2:7

**4**
**4** 18:17 41:9,11
91:6 131:4
**4th** 1:22 181:8
**401** 170:14,16
**41** 4:6,7,8
**44** 4:9
**46** 4:10,11
**47** 4:13

**5**
**5** 19:2 41:21
42:1 43:15
44:15 45:8,21
52:13 67:1
79:3 87:8,9
97:20 132:14
158:3,11
**5th** 45:17
**57** 6:16

**6**
**6** 44:18,20 45:14
55:22 88:21
97:13,21
133:10 158:2
**6/29** 6:15
**6/29/57** 6:7

**7**
**7** 46:4,6 88:7
97:22 133:13
**7/28** 109:6

**8**
**8** 46:14,17 98:1
126:2,14
136:19 140:14
145:22
**8:45** 93:11
**812** 6:4 9:10

**9**
**9** 47:13,15 91:18
93:6 98:12

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 148:2 **9:30** 91:18 92:1 92:2 **9:45** 92:3 | | | | |

# EURO-PRO X

## EMPLOYEE EVALUATION

| Employee Name: | Victor Smith |
|---|---|
| Primary Reviewer: | Ralph Hudnall |
| Secondary Reviewer: | Terry Robertson |
| Office: | Auburn |
| Department | Life Test |
| Title: | Lab Technician |
| Job Summary: | This position is responsible for implementing, conducting, monitoring and reporting the results of all Life Tests conducted on Euro-Pro products in the Auburn facility. |
| Review Date: | August 27, 2004 |
| For Period ending: | June , 2004 |

1

PLAINTIFF'S
EXHIBIT

Employee Evaluation



EURO-PRO X.

| Area | Performance Appraisal |
|---|---|
| **Job/Knowledge/Competency:** Demonstrates the knowledge and skills necessary to perform the job effectively. Performs responsibilities in accordance with job procedures and policies. Acts as a resource person upon whom others rely for assistance. | __ Performance consistently and significantly above standard in virtually all areas<br>__ Performance well above standard in many important aspects<br>__ Performance meets standard in all important aspects; good contributor.<br>__ Performance slightly below standard in some important aspects, but meets standards in others. |
| **Quality/Quantity of Work:** Completes assignments in a thorough, accurate, and timely manner that achieves expected outcomes. Exhibits concern for the goals and needs of the department and others that depend on services or work products. Effectively handles multiple tasks. Uses work time productively. | __ Performance consistently and significantly above standards in virtually all areas<br>__ 4 Performance well above standard in many important aspects<br>__ Performance meets standards in all important aspects; good contributor.<br>__ Performance slightly below standard in some important aspects, but meets standards in others. |
| **Dependability:** Meets company attendance standards. | __ 5 Performance consistently and significantly above standards in virtually all areas<br>__ Performance well above standards in many important aspects<br>__ Performance meets standards in all important aspects; good contributor.<br>__ Performance slightly below standards in some important aspects, but meets standards in others. |
| **Teamwork & Cooperation:** Maintains harmonious and effective work relationships with fellow employees, supervisors and others. Adapts to changing priorities and demands. Shares information and resources with others to promote positive and collaborative work relationships. | __ Performance consistently and significantly above standards in virtually all areas<br>__ Performance well above standard in many important aspects<br>__ 3 Performance meets standards in all important aspects; good contributor.<br>__ Performance slightly below standard in some important aspects, but meets standards in others. |
| **Interpersonal and Communication Skills:** Exercises courtesy, tact and respect when interacting with all members of the Company and external persons. Listens carefully to requests and seeks clarification to ensure understanding. | __ Performance consistently and significantly above standards in virtually all areas<br>__ Performance well above standard in many important aspects<br>__ 3 Performance meets standards in all important aspects; good contributor.<br>__ Performance slightly below standards in some important aspects, but meets standards in others. |
| **Initiative/Commitment:** Demonstrates personal responsibility when performing duties. Offers assistance to support the goals and objects of the department and division. Performs with minimal supervision. Seeks guidance when goals or priorities are unclear. | __ Performance consistently and significantly above standards in virtually all areas<br>__ Performance well above standards in many important aspects<br>__ 3 Performance meets standards in all important aspects; good contributor.<br>__ Performance slightly below standards in some important aspects, but meets standards in others. |

Employee Evaluation

EURO-PRO X 

## Areas of strength:

| 1 | Victor's main strength is building test fixtures. He is not afraid to ask for assistance when needed, but he also has his own ideas about the construction of the fixture. |
| 2 | Victor is very dependable. He is constantly in the office before 8AM, and never leaves before 5PM. |
| 3 | Victor is very exacting in accomplishing his assigned tasks. He is detailed oriented and sees his assignments through to completion. |

## Areas that need improvement:

| 1 | Victor needs to accept the entire role for which he was hired. He must accept that the role is constantly changing and growing. These changes are expected to be accomplished without additional compensation. |
| 2 | There is a concern with accomplishing the routine tasks of the job. An example is cleaning his work area before leaving for the day. Personal areas especially should be cleaned before leaving for the day. |
| 3 | Victor needs to improve his initiative. He needs to take it upon himself to correct problems seen, either fixtures, or products on test. Don't just report that a product has quit working, look to see if he can find the trouble. In time, he will become the main analyst to determine life test failures. This cannot happen if he does not start looking into the problems as they occur. |

## Objectives to accomplish in the Next 12 Months:

| 1 | Implement a daily check list of all products on Life Test. For example, a clipboard at the Deep Fryers, where external temperatures can be recorded twice daily. Incorporate similar reports for all tests being conducted. |
| 2 | Begin to be more involved with Life test analysis. Further grow your analytical skills to the point that you are conducting all post test analysis by yourself. |
| 3 | Formalize reporting structure of failed and end of life test products. We need you to be the go to guy for all things concerning Life Test. |



3

Employee Evaluation

# EURO-PRO X.

## Comments

Victor came to us with Technician experience, but not with consumer products, and no experience with Life Testing or fixture set ups. He started in the Cleanability area, becoming the night shift leader. We eventually recognized the need for someone to assist in Life Testing, and Victor accepted this role. He has been instrumental in developing and implementing various life test set ups. He is now in the midst of developing an automated fixture for Steam Cleaners, and will implement a Preventive Maintenance system for all Life Test fixtures and equipment within the next two weeks. We also need to begin recording specific daily parameters to ensure all products under test are functioning correctly and within Euro-Pro specifications.

Victor has to realize that the job is continually growing and changing. This means new tasks and assignments will continue to be added to his work load. Prioritizing these assignments, and meeting the established completion dates will be the main challenge. Further, the formalization of reporting the status of the testing is equally important. He will need to expand his review of failed and completed tests, to eventually become the first line of analysis of all products coming off test. He will be issuing reports in a similar manner as the Lab Techs and Test Engineers.

## Overall Performance

___ Performance consistently and significantly above standards in virtually all areas; far exceeds normal expectations.

___ Performance well above standards in many important aspects; usually exceeds normal expectations

_3.5_ Performance meets standards in all important aspects; good contributor.

___ Performance slightly below standards in some important aspects, but meets standards in others; performance generally acceptable, but improvement needed to fully achieve functional performance level.

___ Performance below standards in a number of critical aspects; substantial improvement needed.

# EURO-PRO X.

4

Employee Evaluation

**EURO-PRO** ✕

**Acknowledgement:**

Employee Signature _____  Date 8/31/04

Reviewer Signature _____  Date 8/31/04

Employee Evaluation

5

# Victor Smith

## Current Performance/Accomplishments:

- Eagerly takes on new responsibilities and tasks.
- Has continued to improve the understanding of specified test standards.
- Demonstrates the ability to complete assigned tasks.
- Helped to develop and assemble new life test setups.
- Shows good organization skills. He is utilizing and maintaining a filing system that allows him to accurately track the progress of product life testing.
- Victor also provides accurate updates on product life testing in our morning meetings.
- He seeks help when needed and is able to use the information to complete testing requirements.
- Victor has shown the ability to take assigned tasks to the next level of work.
- He has assisted in improving the cleanability testing and scheduling.
- He has taken responsibility for monitoring and setting up life tests for all Euro-Pro products being tested in Alabama.

## Improvements/Goals:

- Make sure any and all issues arising from the Life testing gets reported to the appropriate Technician/Engineer team immediately.
- Remain more focused on current assigned projects. Refrain from "adding yourself" to conversations and projects until asked in. This doesn't mean only speak when spoken to; just make sure you are needed before joining discussions. The problem is this is one way to get yourself overloaded, AND it can appear as if you don't have enough to keep busy.
- Take life testing to the next level. We will want all test setups to be transitioned from the existing wood frames into professional setups, using enclosures for the control system.
- Start developing life test specifications and methods for additional products.
- Needs to continue to learn and understand the life test standards.
- Strive to become more independent and self-reliant in your day to day work. Work more with the PLC's, so you become the internal expert, and we can get away from asking Brian for help with Life Test setups.
- Interaction with co-workers: When communicating with the cleanability crew make sure you address them as peers and with respect. Take time to speak carefully and in a level tone. Make sure to listen fully and then answer. Basically, put yourself in their shoes, and speak to them as you would want to be spoken to.
- Don't be afraid to tell the Cleanability group to come see Ralph with their problems. I know that was your area of expertise, but not any longer. It's natural for them to see you first. Again, in order to keep from being overloaded, make them see Ralph with issues.
- Make sure to deliver requested data/information as requested on time and regularly.

Reviewed's Comments:

_____

_____

_____

_____

Supervisor Signature and Date:                     Reviewed's Signature and Date

5/5/04

PLAINTIFF'S
EXHIBIT

### *Victor Smith (General)*

1. *Don't appear to want to be here?*

2. *Steam station life testing station  - Already total investment, 25K could have built outside not any testing for six months. We have been waiting for this item to run for six months, as of today it is still not running, we have spent so much money trying to get this item up and running, this is just not acceptable.  –*

3. *We acquired lab view software controls from Auburn University, this was brought here, there have been no attempts to get this free software up and running to tie into all of the stations, this is ill use of the equipment and free information that we have been given, but nothing has been utilized.*

4. *Pant press has been in the reliability stations for many months, I have come upon this unit not working, while inquiring with Victor he indicated that he was not running this item, did not have time, which is totally unacceptable.*

5. *Failure and analysis of failed items in reliability are defined in his job description, I have had problem with Victor getting these done, he always relies on someone else to do these, this has been overall problem with him taking responsibility of reviewing and analyzing things first hand and giving reports, he always seem to want someone else to perform and do this, instead of himself.*

6. *Clean up of area – always seemed painful that he did not want to pick up or clean up as the other employees, this is his area. He even went to order signs and said that everyone else was responsible for making a mess and not him. Point for the company is that we are all responsible, I sweep at least twice a week and pick up trash daily, so I believe everyone should be responsible. He would not take responsibility for his area, this was a major problem, same trash would sit there for weeks.*

7. *Totally changed personality after being made permanent, he was made permanent before many other temp employess, based on his resume and skills of what he was capable of doing electrically and electronically. In his exit review it was interesting that he said he was given a task he could not complete, was not given help (we had degreed engineers offering to help, but their help was refused) and this is where the problems started and ended.*

8. *There were previous issues that were discussed, 1. Did not like the fact that he could not discuss bonuses with other employees, said this did not make sense, when actually he was being given a bonus based on my recommendation only, he was not eligible for bonus anyway. 2. Was accused while here of a problem with two other female employees of harassment both from the office and outside the office, this created a problem area very early on, but we discussed and allowed this to pass as warning.*

PLAINTIFF'S
EXHIBIT

8

12/13

Other Hardware Received — 6/26

Fitting — 6/22 Due

Electrovalves — In House

Pressure Transducer — 6/26

PLC Programming — 7/14

Wate Fixture Build — 7/1

Trigger Fixture Design — 7/2

Trigger Fixture Build — 7/8

Testing / Debugging — 7/21

Project Complete — 7/28



Steam Cleaner
Life Test Fixture

PLAINTIFF'S EXHIBIT