IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR SMITH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:05-cv-1186-MEF |
| | ) | (WO) |
| EURO-PRO OPERATING, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Victor Smith ("Smith") brings this action against his former employer, Euro-Pro Management Services, Inc. ("Euro-Pro"),[1] for alleged race discrimination against him arising from his termination of employment. Pursuant to 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981, Smith seeks redress. This cause is before the Court on Defendant Euro-Pro's Motion for Summary Judgment (Doc. # 16) filed on November 16, 2006. The Court has carefully considered all submissions in support of and in opposition to this motion and finds that the Motion for Summary Judgment (Doc. # 16) is due to be GRANTED.

### II. JURISDICTION

---

[1] Defendants Euro-Pro Operating, LLC and STANRO-EP Corp. were terminated from this action following the filing of Smith's Amended Complaint. *See* Doc. 14. In his Amended Complaint, Smith substituted "Euro-Pro Management Services, Inc." for "Euro-Pro Management Company Corp."

The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331. The parties do not contest personal jurisdiction or venue, and the court finds sufficient

factual basis for each.

### III.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole

could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material'

if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc.*

*v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence

showing there is no dispute of material fact, or by showing the non-moving party has failed

to present evidence in support of some element of its case on which it bears the ultimate

burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### IV. FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts:

*A.    Smith Begins Working at Euro-Pro*

Smith is  an African-American resident of Montgomery, Alabama. He holds an associates degree in electronic engineering technology. Euro-Pro is a designer and seller of

home appliance products.[2]    In December, 2003, Smith began working for Euro-Pro as a

temporary employee at Euro-Pro's Auburn, Alabama facility.  Soon thereafter, Euro-Pro took

Smith on as a permanent employee and even made Smith the lead employee on one of the

shifts in its "Cleanability" division.[3]

B.      *Investigations into Workplace Improprieties*

Shortly after joining Euro-Pro, Smith was involved in two situations with white

female co-workers.  The first occurred when Smith, at work but on a break, made a personal

call to Ashleigh Sheffield.  Sheffield was at her home when Smith called.  Sheffield reported

what happened to Ralph Hudnall ("Hudnall"), Smith's supervisor.  According to Hudnall,

Sheffield"felt it was unfair that she had just been counseled and the whole group had just

been counseled about improper use of telephone and Internet for personal business, and then

... that very night she gets a call that's violating that policy."  Doc. 21-3 at 24 (Hudnall

deposition).  No accusations of offensive or harassing conduct were lodged against Smith.

Nonetheless, Hudnall investigated the matter with Smith "to make sure there was no sexual

harassment."  *Id.*

In a separate incident that came to Euro-Pro's attention during the investigation into

---

[2] These products include vacuum cleaners, steam cleaners, battery-charged sweepers, and kitchen products.

[3] The Cleanability division focused on vacuum cleaner performance.  As his supervisor described Smith's work in this division: "He was responsible to make sure that we had plenty of ... things to work with, sand, dirt – you've got to put something down to vacuum it up – ... so we could continue to do the testing that needs to be done."  Doc. 18 at 38 (deposition of Hudnall).

Smith's call to Sheffield, Smith asked another white female co-worker, Allison Rhodes ("Rhodes"), whether she dated black men. Sheffield heard about the comment and relayed it to Hudnall. Rhodes, however, in her words, "did not consider the question to be offensive or to be harassing." Doc. 21-4 at 1 (deposition of Rhodes). Indeed, Rhodes asserts that Smith "never did anything to me that I consider harassment and I never reported any harassment on his part to any supervisor with Euro-Pro." *Id.* at 2.

  *C. The Steam Cleaner Tester*

 After a few months in the Cleanability division and subsequent to the incidents with Sheffield and Rhodes, Smith transferred to the "Lifecycles" testing division to work as a lab technician. The Lifecycles division evaluated how well Euro-Pro's products performed over the course of their useful life and whether when the products ultimately failed, they did so in a safe manner. To accomplish this task, the testing division created "fixtures," which were systems that tested the products in an automated fashion.[4] As a lab technician, Smith was responsible for building new fixtures, monitoring the fixtures, and troubleshooting problems with fixtures.

 Smith was informed in his initial meeting with his supervisors that Euro-Pro wanted Smith to take the Lifecycles testing to the "next level." Smith was told that he should rely

---

  [4] "For a deep fryer, for example, something [Smith] did have involvement with, he would put the oil in. He would set up a system to turn that deep fryer on and off per our own specifications and record the number of times the unit was turned on; to make sure that when it came on, it actually was working and heating the oil." Doc. 18 at 40 (deposition of Ralph Hudnall).

primarily on Hudnall but several engineers would also be available to assist Smith.[5]  Smith

first major task in the Lifecycles division was designing a fixture for testing one of Euro-

Pro's portable steam cleaners.[6]  Smith was given the project in mid-May of 2004 and a

"project complete" date of July 28, 2004.  One of the supervising engineers, Chad Reese

("Reese"), drew Smith a crudely drawn schematic for the steam cleaner fixture.  *See* Doc 21-

3 at 80.  Smith informed Hudnall that, absent help, he could not finish the project by the

projected completion date.  Hudnall reminded Smith that engineering assistance was

available and that Smith should do the best he could.

Problems quickly arose in the project.  For example, Smith ordered parts that

ultimately could not handle the hot temperatures required for testing.  Smith alleges that he

consulted with Reese before ordering the parts.  Additionally, the handles on the fixture were

not as flexible as they needed to be.  Smith blames this problem on a fault in Reese's design.

Smith did not complete the project by the "project complete" date of July 28th.  In late

August, 2004, with the fixture still unfinished, Hudnall submitted a written evaluation of

Smith that included a list of "areas that need improvement."  Those areas  included routine

issues such as "cleaning his work area before leaving for the day" and more substantive

issues such as improving his initiative in regards to correcting problems in fixtures and

---

[5] There is some dispute as to the extent of which some of the engineers were actually made available to him.  At any rate, Smith admits that Hudnall was always available.

[6] Prior to getting this assignment, "[Smith] had probably built five fixtures ... and he did a pretty good job with those five." Doc. 18 at 41 (Hudnall deposition).   The steam cleaner fixture was, however, considered a "step-up."

"accept[ing] the entire role for which he was hired."  The evaluation also stated that Smith

must prioritize assignments and meet  established completion dates.[7]

In late November, 2004, Smith took a two week vacation.  When Hudnall tried to start

the fixture in Smith's absence, Hudnall noticed that wires were disconnected.  Fearing what

would happen if he started the fixture with the wires improperly connected, Hudnall decided

to contact Smith.  Hudnall alleges that he called Smith at home to discuss the disconnected

wires and inform Smith that the fixture needed to run during Smith's vacation.  Smith

disputes that this phone conversation occurred.

Terry Robinson ("Robinson"), an executive at Euro-Pro's Auburn facility, instructed

Hudnall to try to rebuild the machine himself during Smith's absence.  Hudnall was not

successful in doing so.

Robinson subsequently terminated Smith in December 2004.  According to

Robinson's affidavit dated November 15, 2006, Robinson fired Smith due primarily to

Smith's poor performance, in particular Smith's failure to complete the steam cleaner fixture

on schedule.  Smith's "actions surrounding his leaving for vacation and dealings with

Hudnall" were what Robinson characterized as the "final straw."  Doc. 18 at 54-55 (affidavit

---

[7]    While it is tempting to view this evaluation as thoroughly negative, the
document reveals that Smith received satisfactory ratings in all categories.  Indeed, the lowest
rating Smith received was a "3" or "Performance meets standards in all important aspects;
good contributor."  Doc. 21-3 at 74.  Indeed, under "areas of strength," Smith is described
as "very exacting in accomplishing his assigned tasks [and] is detailed oriented and sees his
assisgnments through to completion."  *Id.*  at 75.

of Terry Robinson).  In the termination memo Robinson prepared in December, 2004, Robinson wrote more specifically about the problems related to Smith's failure to finish the steam cleaner fixture:

> Steam station life testing station - Already total investment, 25K could have built outside not any testing for six months.  We have been waiting for this item to run for six months, as of today it is still not running, we have spent so much money trying to get this item up and running, this is just not acceptable.

Doc. 18 at 56.  The memo listed several other problem areas to justify the termination.[8]

Euro-Pro did not hire a lab technician to take Smith's place although it did hire an electrical engineer, Jeff Garrison ("Garrison"), who was a recent graduate of Auburn University.  Garrison is white.  Following Smith's departure from Euro-Pro and Garrison's hiring,  Hudnall "took on the job" of finishing the steam cleaner.  According to Hudnall, Garrison "gave [Hudnall] a little help."  Doc. 18 at 50 (Hudnall deposition).  While the parties dispute whether Garrison was hired to replace Smith, what is clear is that during Garrison's first three months on the job with Euro-Pro, he spent approximately one-third of this time assisting Hudnall complete the task of finishing the steam cleaner fixture.  The task

---

[8] These include complaints that: Smith doesn't appear to want be at Euro-Pro; Smith failed to utilize a free software program that would have assisted with the fixture stations; Smith wasn't running the pant press station; not analyzing "failed items" despite this being part of his job description; failure to clean up his work area; a "totally changed personality after been made permanent"; discussing compensation and bonuses with other employees; and the "problem with two other female employees of harassment ... [that] created a problem area very early on."  Doc. 18 at 56.

was time intensive because they had to rebuild the machine from scratch.

D.    *"The Dave Chappelle Show" Remark*

While Smith does not allege that any Euro-Pro employees made any direct racist comments in his presence, Smith alleges Hudnall once employed the epithet "nigger" in the context of recounting a skit from "The Dave Chappelle Show," a program on Comedy Central.   In the skit, comedian Dave Chappelle portrays a racist, blind African-American who is under the impression that he is white.  Chappelle's character divorces his white wife and when asked why he did so, he replies, "because she was a nigger lover."  Doc. 21-2 at 13 (Deposition of Smith).  While Hudnall admits that, at various times, he repeated routines from the show in Smith's presence, he denies ever uttering the word "nigger" in Smith's presence.[9]  Smith neither complained directly to Hudnall nor did he complain to Hudnall's superiors.  Nonetheless, Smith "didn't think that [Hudnall] should be making comments like that." *Id.*

## V.  DISCUSSION

Smith brings claims against Euro-Pro under both Title VII and 42 U.S.C. § 1981. The claims brought under these two statutes have the same requirements of proof and use the same analytical framework.  *Keith v. MGA, Inc.*, 2006 WL 3228073 at *2 (11th Cir. 2006).

---

[9] Even though there is a dispute on this fact, Smith complains that even on the occasions where explicit racial epithets were not used, it was inappropriate for Hudnall to recount Chappelle's material in from of Smith.  Much of Chappelle's humor consisted of racial jokes and Smith felt that Hudnall was not in a position to make those jokes.

Therefore, from this point forward, the Court "will explicitly address the Title VII claim with the understanding that the analysis applies to the 1981 claim as well." *Id.* (quoting *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

Smith stipulates that his allegations of racial discrimination rest solely on circumstantial evidence. Circumstantial evidence is analyzed under the burden-shifting analysis articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny. First, Smith must establish a *prima facie* case of racial discrimination. This is done by showing (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class.[10] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas,* 411 U.S. at 802).

As both sides stipulate, only the fourth prong of the test for prima facie case of racial discrimination is in dispute. Whether or not Smith was in fact replaced by a person outside his protected class hinges on whether Garrison, the white engineer hired after Smith, could be considered Smith's replacement. Smith argues that the answer is a resounding "yes" because out of Garrison's first three months at Euro-Pro, Garrison spent approximately one-third of his time working on the steam cleaner fixture. Euro-Pro contends that it never

---

[10] Smith can also satisfy the fourth prong if he shows that Euro-Pro treated similarly situated employees outside his classification more favorably. Although Euro-Pro extensively briefed this issue, Smith does not attempt to meet his burden of proof on this issue and relies instead on the alleged fact that he was replaced by a person outside his protected class. Doc. 20-1 at 9 n.3.

actually hired anyone to replace Smith. According to Euro-Pro, Hudnall was the one who took over Smith's outstanding responsibilities and Garrison merely assisted Hudnall in completing the steam cleaner fixture.

Euro-Pro cites extensively to *Hawkins v. Ceco Corp.*, 883 F.2d 977 (11th Cir. 1989), for the proposition that "[w]here the employee's position is clearly delineated and responsibilities are well defined, the court should focus on the person that physically replaced the employee or consider whether that job title was actually filled." *Id.* at 982. Therefore, Euro-Pro argues, because Garrison was an engineer and Smith, by contrast, was a lab technician with specifically delineated responsibilities,[11] Garrison did not replace Smith even if Garrison did expend time helping Hudnall finish the steam cleaner fixture. What Euro-Pro misses in this argument is that while Garrison certainly did not completely fill Smith's shoes, Garrison put his foot far enough in to replace Smith for a short period of time.

*Hawkins* is distinguishable from the facts of this case because the *Hawkins* court dealt with a position that required general labor and little skills of training. *Hawkins*, 883 F.2d at 983. Instead, *Rollins v. Techsouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987) controls. Rollins was an accounting clerk and her replacement, Richardson, a non-minority, assumed some of Rollins' duties after Rollins was terminated. Even though Rollins' position was officially

---

[11] Smith's August 2004 employment evaluation listed the duties of a lab technician: "This position is responsible for implementing, conducting, monitoring and reporting the results of all Life Tests conduct on Euro-Pro products in the Auburn facility." Doc. 21-3 at 73 (employee evaluation).

eliminated in Rollins and Richardson only took over some of Rollins' duties, the Eleventh

Circuit held that "Rollins has articulated specific facts from which one could infer that

Richardson actually replaced her ... [and] we find that appellant has met her burden of

presenting a prima facie case." *Rollins*, 833 F.2d at 1529. As the court noted, "although

[Rollins' duties] purportedly takes up very little of Richardson's time, it still comprises part

of his work." *Id.* Likewise, in the instant case, because Smith's responsibility of building

the clean steamer fixture comprised part of Garrison's work, Smith has established a prima

facie case of termination based on racial discrimination and will withstand a motion for

summary judgment on this portion of the Title VII burden shifting analysis.

Thus, the burden shifts to Euro-Pro to rebut the inference of race discrimination by

presenting legitimate, non-discriminatory reasons for Smith's termination. *Holifield*, 115

F.3d at 1564. This burden is "exceedingly light." *Id.* The burden is one of production, not

persuasion, and consequently, the employer need only produce evidence that could allow a

rational fact-finder to conclude that the challenged employment action was not made for a

discriminatory or retaliatory reason. *See, e.g., Davis v. Qualico Miscellaneous, Inc.,* 161 F.

Supp. 2d, 1314, 1321 (M.D. Ala. 2001) (Thompson, J.). Here, Euro-Pro has produced

evidence that, among other things, Smith did not finish the steam cleaner fixture by the set

completion date and then left for a two-week vacation without making sure that the fixture

was operational.[12]   This is alone sufficient to meet Euro-Pro's burden of providing a

legitimate, non-discriminatory reason for the termination.

Once the employer offers a legitimate, non-discriminatory reason, the burden returns

to the employee to supply "evidence . . . sufficient to permit a reasonable fact-finder to

conclude that the reasons given by the employer were not the real reasons for the adverse

employment decision." *Davis,* 161 F. Supp. 2d at 1322 (*citing Chapman v. AI Transp.,* 229

F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).  This burden of proof may be met by either of

two methods.  Smith "could abduce evidence that might directly establish discrimination"

or, alternatively, he could point to enough evidence to permit the jury to reasonably

disbelieve Euro-Pro's proffered reason for terminating him. *Ross v. Rhodes Furniture, Inc.*,

146 F.3d 1286, 1290 (11th Cir. 1998).  Smith claims that he met his burden by both methods.

The Court disagrees.

As to the reasons relied upon by Euro-Pro in support of termination, Smith attacks

each reason proffered in the Robinson termination memo.  The Court will focus instead on

the steam cleaner fixture issue, because while the Robinson termination memo does set out

many reasons for Smith's termination, most of those reasons are merely supplemental.  In

---

[12] Robinson's termination memo also sets forth numerous less substantial reasons for
Smith's termination. *See supra* note 8 (listing other problem areas justifying termination).
Indeed, in Smith's Response to Euro-Pro's Motion for Summary Judgment, Smith
"concede[s] that the reasons set forth in the Robertson memo, taken in the aggregate, would
be a sufficient justification for terminating the Plaintiff under the prevailing case law." Doc.
20-1 at 13.

other words, most of the reasons for Smith's termination that were listed in Robinson's termination memo merely provided context for the problem Euro-Pro had with Smith's performance on the steam cleaner fixture project.

Smith contends that he was not provided a budget for the steam cleaner fixture project. Euro-Pro does not dispute this. However, Smith was given a firm time table in which to complete the project and, four months after the supposed completion date, when Smith left for a two-week vacation, the fixture was still not running. While the schematic Euro-Pro provided for Smith is admittedly lacking in specificity and clarity – in fact, it looks more like a hastily-drawn doodle on a napkin – Smith was allowed consultations with engineers and had previous success constructing less complicated fixtures. It would be a stretch to argue, as Smith does, that "Plaintiff was set up to fail." Doc. 20-1 at 15. If anything, Euro-Pro demonstrated patience and understanding with Smith by waiting until December 2004 to terminate him. The Court acknowledges that Smith received some mixed messages along the way,[13] but Smith has not met its burden of showing that a reasonable trier of fact would disbelieve Euro-Pro's justification for terminating him.

Moreover, Smith has not met his burden of producing evidence from a which a reasonable jury could conclude that Euro-Pro's legitimate reasons for terminating him were pretextual. Smith summarizes into three areas the evidence from which he alleges

_____

[13] For example, Smith's evaluation in August 2004 indicated, on the one hand, that Smith was performing at an adequate level, and, on the other hand, that Smith's performance was lacking.

discrimination may be inferred.  First, Smith points to the context in which the sexual allegations were leveled against him.  In particular, Smith finds it worrisome that Robertson would consider the incidents with Sheffield and Rhodes to be "sexual harassment." Furthermore, Smith questions why Hudnall would, absent a complaint directly from Rhodes, confront her about the statement Smith made to her about dating black men.

While Robertson misstates what actually happened when he writes in the termination memo that Smith "was accused while here of a problem with two other female employees of harassment," that alone does not constitute a pretext for discrimination.  Euro-Pro, if anything, acted responsibly by following up on these two workplace incidents.  As Euro-Pro notes in its reply brief, it is inaccurate to say that Smith was investigated for his remark to Rhodes on Euro-Pro's initiative.  Hudnall was legitimately investigating Smith's call to Sheffield at home during Smith's working hours when *Sheffield* told Hudnall of the Smith's query of Rhodes about her dating proclivities.

Smith argues that Euro-Pro's handling of the incidents creates a "strong inference ... that someone in Euro-Pro management objected to the notion of a black male employee dating a white female employee, and thereafter set out to get rid of the offender."  Doc. 20-1 at 20. Given the problems of workplace sexual harassment, Hudnall did the responsible thing by following up with Rhodes.  If anything, the fact that Euro-Pro dropped the investigation once they learned that Rhodes had not felt the comment to be inappropriate demonstrates professional behavior.

Smith next argues that the "shifting reasons advanced for Plaintiff's termination" somehow raise an inference that the reasons now relied upon by Euro-Pro are pretextual. Smith cites here the fact that when Robertson fired him, Robertson told Smith that Euro-Pro "needed to eliminate the technician in that area and hire an engineer." That does not, however, tell the whole story. Robertson was not inconsistent. According to Smith's own deposition, Robertson and Smith discussed in detail Smith's performance problems during the meeting at which Smith was fired.

Lastly, and perhaps Smith's best argument, is that "Hudnall's use of the word 'nigger' in the presence of Plaintiff, while repeating a joke he had heard on television, can be considered ... as bearing on the issue of discriminatory intent." Doc. 20-1 at 21. While Hudnall disputes ever using the word "nigger," even if he did, this remark alone, absent other circumstantial evidence of pretext, does not constitute circumstantial evidence of discrimination. Plaintiff cites *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998), for the proposition that this isolated use of a racial epithet could support an inference of discrimination. Euro-Pro correctly distinguishes *Ross* from the facts of this case. In *Ross*, the Eleventh Circuit considered the isolated remark "in conjunction with the entire record" as circumstantial evidence of discrimination. *Id.*

In *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223 (11th Cir. 2002), the Eleventh Circuit found that where the plaintiff's supervisor said of the plaintiff, "We'll burn his black ass," this alone, with no additional evidence of pretext, "is even marginally

persuasive on the issue of pretext." *Id*. at 1229.  As discussed above, Smith has not presented

any other evidence of pretext that a reasonable jury would find constitutes circumstantial

evidence of discrimination.[14]  In light of the absence of any genuine issue as to the material

facts, and this Court's finding regarding the applicable law, Euro-Pro's Motion for Summary

Judgment is due to be GRANTED.

## VI.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) The Motion for Summary Judgment (Doc. # 16) is GRANTED.

(2) The trial scheduled in this matter is CANCELLED.

A separate final judgment will be entered in accordance with this Memorandum

Opinion and Order.

DONE this the 7th day of March, 2007.


        /s/ Mark E. Fuller
        CHIEF UNITED STATES DISTRICT JUDGE

---

[14] This Court does not question, however, that Smith found Hudnall's recounting of Dave Chappelle's material offensive.  Whether or not Hudnall actually said "nigger" in doing so, it was inappropriate for Hudnall to parrot a comedy skit with racial overtones.  While it is irrelevant to speculate at this point whether Hudnall's actions reflected an underlying racial animus, Hudnall displayed poor judgment.